Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Tel:  (973) 639-9100
cseeger@seegerweiss.com

James E. Cecchi
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel:  (973) 994-1700

*Counsel for Plaintiffs and the Proposed Classes*

### UNITED STATES DISTRICT COURT FOR THE

### DISTRICT OF NEW JERSEY

| | |
|---|---|
| LORETTA FLYNN-MURPHY, LYNN COHN, and KELLY McNEW, <br><br> individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JAGUAR LAND ROVER NORTH AMERICA, LLC, a Delaware Limited Liability Company <br><br> Defendant. | Civil Action No.  _____ <br><br><br> **CLASS ACTION COMPLAINT and <u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

I.        INTRODUCTION.................................................................................................1

II.       JURISDICTION AND VENUE ........................................................................3

III.      PARTIES..............................................................................................................3

    Plaintiff Flynn-Murphy................................................................................................ 3

    Plaintiff Cohn ............................................................................................................... 4

    Plaintiff McNew ........................................................................................................... 5

    Defendant...................................................................................................................... 7

IV.       FACTUAL ALLEGATIONS.............................................................................8

    A.      Turbocharger Operation ..................................................................... 8

    B.      Class Vehicle Engines & Defendant's Turbocharger ...................... 12

    C.      The Turbocharger Defect .................................................................. 13

    D.      Defendant Marketed the Class Vehicles as Clean and Safe While Knowing
About the Turbocharger Defect ................................................................................. 15

    E.      Relevant Warranties .......................................................................... 25

V.        TOLLING OF THE STATUTE OF LIMITATIONS ...................................26

VI.       CHOICE OF LAW ALLEGATIONS .............................................................27

VII.      CLASS ACTION ALLEGATIONS.................................................................28

VIII.     CLAIMS FOR RELIEF ...................................................................................31

    A. Claims Brought on Behalf of the Nationwide Class .................................... 31

    COUNT I (Fraud) ...................................................................................................... 31

    COUNT II (Breach of Contract)................................................................................ 33

    COUNT III (Negligent Misrepresentation) .............................................................. 35

    COUNT IV (Breach of Express Warranty) ............................................................... 36

    COUNT V (Breach of Implied Warranty)................................................................. 39

COUNT VI (Violation of the Magnuson-Moss Warranty Act ("MMWA") 15 U.S.C. § 2301, et seq On behalf of the Nationwide Class) ........................................................................ 42

COUNT VII (Unjust Enrichment) ........................................................................................ 45

COUNT VIII (Violation of the New Jersey Consumer Fraud Act ("NJCFA") on behalf of the National and the Alternate New Jersey Sub-Class) ............................................................... 46

B.      Allegations on behalf of the alternative subclasses (in addition to Counts I-VII which are asserted for the Michigan and Oklahoma subclasses) ...................................... 49

COUNT IX Violation of the Michigan Consumer Protection Act, ("MCPA"), Mich. Comp. Laws § 445.901, et seq. (on behalf of Plaintiff Cohn and the Michigan Sub-Class) .............. 49

COUNT X Violation of Oklahoma Consumer Protection Act, Okla. Stat. Tit. 15 § 751, et seq (on behalf of Plaintiff McNew and the Oklahoma Sub-Class) ...................................... 54

IX.      **PRAYER FOR RELIEF** .................................................................................... 56

X.      **DEMAND FOR JURY TRIAL** .......................................................................... 58

## I.       INTRODUCTION

1.       Plaintiffs Loretta Flynn-Murphy, Lynn Cohn, and Kelly McNew, bring this class action against Jaguar Land Rover North America, LLC ("JLRNA" or "Defendant"), individually and on behalf of all persons in the United States who purchased, own, owned, lease, or leased a 2012 through 2017 model year 2.0 Liter Land Rover Range Rover Evoque; 2015 through 2017 model year 2.0 Liter Land Rover Discovery Sport; or a 2013 through 2015 model year 2.0 Liter Land Rover LR2 (the "Class Vehicles"), for Defendant's violations of the New Jersey Consumer Fraud Act (and other consumer protection statutes), breaches of express and implied warranty, fraudulent omission, and unjust enrichment resulting from Defendant's concealment of a known defect in the Class Vehicles.

2.       Defendant wrongfully and intentionally concealed a defect ("Turbocharger Defect") in the turbocharger assembly ("Turbocharger") in the Class Vehicles.  The Turbocharger design is insufficient to survive for its useful life in the operational environment of the engine. As a result of the Turbocharger Defect, regular operational vibrations, temperature fluctuations, and other forces cause the Turbocharger's internal assembly to crack and catastrophically fail at or near the mechanical structure that supports the Turbocharger operation, leading to pieces of the component becoming loose and/or ricocheting around inside the housing, damaging the turbine blades and leading swiftly to the failure of the Turbocharger.

3.       The Turbocharger Defect exposes owners to unsafe conditions and decreased engine performance.  In particular, the Turbocharger Defect causes the sudden failure of the Turbocharger, derating the engine (going into sudden "limp" mode), reducing engine efficiency and "clean" operation.  When the Turbocharger fails as a result of the Turbocharger Defect during

operation, an owner will be left unable to accelerate safely into or with traffic, or become stranded along the roadside needing complex mechanical assistance.

4.     As a result of the Turbocharger Defect, the Turbochargers fail long before the end of the useful life of the vehicle, exposing owners not only to sudden and severe risks of an underperforming engine, but also leaving owners with thousands of dollars in repair bills and a choice between fixing the Turbocharger at great expense or junking their vehicles when they are only worth nominally more than the costs of replacing the Turbocharger.

5.     Despite Defendant's knowledge of the Turbocharger Defect, Defendant never disclosed to Plaintiffs and members of the Classes that the defect existed or that drivers and occupants of the Class Vehicles are at risk. Notwithstanding the expected life of such an integrated part, and the hazards posed by the defect, Defendant has not issued a recall for the defective Turbocharger, and has refused to repair or replace the Turbocharger outside of the time periods covered by its limited express warranties. Accordingly, Defendant has wrongfully and intentionally transferred the cost of repair or replacement of the Turbocharger to Plaintiffs and members of the Classes by fraudulently concealing the existence of the defect, which Defendant knows will typically occur after the expiration of the relevant warranties.

6.     Based on the status of Plaintiffs' current investigation, the same defective Turbocharger is integrated into the engines of the Class Vehicles.   However, Plaintiffs' investigation is continuing.

7.     As a direct result of Defendant's wrongful conduct, Plaintiffs and members of the Classes have suffered damages and bring this class action complaint to recover, including, inter alia: (1) out-of-pocket expenses for repair or replacement of the Turbocharger, other engine parts,

or the entire engine; (2) costs for future repairs or replacements; (3) sale of their vehicle at a loss; and/or (4) diminished value of their vehicles.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendant, and greater than two-thirds of the members of the Classes reside in states other than the states in which Defendant is a citizen. This Court has jurisdiction over supplemental state law claims pursuant to 20 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

9.      Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendant JLRNA is headquartered in Mahwah, New Jersey, and Defendant have marketed, advertised, sold, and/or leased the Class Vehicles within this District through numerous dealers doing business in the District, including in Englewood (Bergen County), Eatontown (Monmouth County), and Cherry Hill (Camden County).

## III.     PARTIES

### Plaintiffs

### Plaintiff Flynn-Murphy

10.     Plaintiff Loretta Flynn-Murphy is a citizen of the State of New York and resides in the town of Monroe. On or around May 1, 2017, Plaintiff purchased a 2015 Land Rover LR2 from a JLRNA authorized dealer, Land Rover Paramus, in Paramus, NJ for personal use.

11.    Unbeknownst to Plaintiff Flynn-Murphy at the time of purchase in 2017, Plaintiff's vehicle contained the Turbocharger Defect. On or around April 2020, Plaintiff Flynn-Murphy's 2015 Land Rover LR2 experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine. The vehicle was brought to the dealer multiple times for service, and Plaintiff informed the dealer of performance issues as well as an odor coming through the vents. The dealer noted: "crack in manifold/turbo."

12.    As a result of the Turbocharger failure, Plaintiff Flynn-Murphy was forced to replace the Turbocharger. None of the marketing materials, advertisements or other disclosures or representations made by Defendant and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendant disclosed that the defects in the Turbocharger would require Plaintiff to spend thousands of dollars to repair or replace the Turbocharger, other engine parts, and/or the engine, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

**Plaintiff Cohn**

13.    Plaintiff Lynn Cohn is a citizen of the State of Michigan and resides in West Bloomfield Township. On or around January 1, 2016, Plaintiff purchased a 2015 Land Rover Evoque from a JLRNA authorized dealer, Land Rover Farmington Hills, in Farmington Hills, MI personal use.

14.    Unbeknownst to Plaintiff Cohn at the time of purchase in 2016, Plaintiff's vehicle contained the Turbocharger Defect. On or around September 2019, Plaintiff's 2015 Land Rover Evoque experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine. The vehicle was brought to the dealer for service, and Plaintiff Cohn informed the dealer

that the vehicle lost power and was unable to accelerate over 30mph. The dealer noted: "the turbo, radiator and cooling system needed to be replaced."

15.     As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger, radiator and cooling system. None of the marketing materials, advertisements or other disclosures or representations made by Defendant and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendant disclosed that the defects in the Turbocharger would require Plaintiff to spend thousands of dollars to repair or replace the Turbocharger, other engine parts, and/or the engine, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

**Plaintiff McNew**

16.     Plaintiff Kelly McNew is a citizen of the State of Oklahoma and resides in Noble Township. On or around January 1, 2017, Plaintiff purchased a 2015 Land Rover Evoque from a JLRNA authorized dealer, Land Rover Oklahoma City, in Oklahoma City, OK for personal use.

17.     Unbeknownst to Plaintiff at the time of purchase in 2017, Plaintiff's vehicle contained the Turbocharger Defect. Between February 2020 and August 2020, Plaintiff's 2015 Land Rover Evoque experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine. The vehicle was brought to the dealer for service in February 2020, and Plaintiff informed the dealer that the vehicle is having performance issues. The dealer neglected the problem with the Turbocharger, but replaced the power transfer unit instead. In August 2020, Plaintiff's vehicle was serviced again due to continuing performance issues. The dealer noted: "vehicle is unsafe to drive as turbo and wheel bearings needed to be replaced."

18.     As a result of the Turbocharger failure, Plaintiff was forced to replace the

Turbocharger and power transfer unit. None of the marketing materials, advertisements or other disclosures or representations made by Defendant and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendant disclosed that the defects in the Turbocharger would require Plaintiff to spend thousands of dollars to repair or replace the Turbocharger, other engine parts, and/or the engine, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

19.    When Plaintiffs and members of the Classes purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Turbocharger would last the useful life of the engine without the need for repair or replacement and/or would not pose and sudden and unexpected safety risk. Had Defendant disclosed that the Turbocharger was prone to premature failure and/or a sudden and unexpected safety risk, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles. Further, had Defendant disclosed that the Turbocharger in the Class Vehicles would not last for the expected useful life, Plaintiffs and members of the Classes would have demanded repair or replacement during the relevant warranty periods at no cost to Plaintiffs and members of the Classes – as provided for in Defendant's warranties.

20.    The Class Vehicles were operated in a reasonably foreseeable manner and as the vehicles were intended to be used. Plaintiffs and members of the Classes have suffered an ascertainable loss as a result of Defendant's deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Turbocharger defect, including but not limited to, out-of-pocket losses and/or the costs of future repairs  or replacements, and diminished performance and value of their respective vehicles.

21.     Neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiffs and members of the Classes of the premature failure of the Turbocharger and/or the defective nature of the Turbocharger prior to the purchase or lease of the Class Vehicles.

**Defendant**

22.     Defendant Jaguar Land Rover North America, LLC ("JLRNA") is an automobile design, marketing, sale, leasing, distribution, and warranting Delaware limited liability company with its corporate headquarters and principle place of business in Mahwah, New Jersey. This entity was created in connection with Ford Motor Company's sale of its Land Rover branded business entities to Defendant Tata Motors Limited. Land Rover is a subsidiary of Jaguar Cars Limited, a United Kingdom business entity that is a subsidiary of Jaguar Land Rover Limited, another United Kingdom business entity which, in turn, is a subsidiary of Tata Motors, a business entity of the Republic of India. Land Rover was formerly known as Land Rover North America, Inc., and is the successor in interest to Land Rover North America, Inc. Land Rover designs, distributes, markets, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide.

23.     At all relevant times, JLRNA acted as authorized agent, representatives, servants, employees and/or alter egos of its parent companies while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of Land Rover vehicles in the United States, including substantial activities that occurred within this jurisdiction.

24.     At all times relevant to this action, Defendant manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Land Rover brand name throughout the United States. Defendant and/or its agents designed, manufactured, and/or installed the defective exhaust

manifold/Turbocharger component in the Class Vehicles. Defendant and/or its agents also developed and disseminated the owner's manuals and warranty booklets, USA Warranty and Maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

## IV.     FACTUAL ALLEGATIONS

### A. Turbocharger Operation

25.    Turbochargers have been used in engine applications for many years. The first applications were on diesel engines which required a higher air to fuel ratio, and were the mechanism to force additional air to the engine. Similarly, turbochargers have been used in gasoline powered aircraft engines in order to compensate for the reduction in air density at flying altitude. In automotive applications turbochargers (and a similar technology, the supercharger, in high performance race cars) for many years.  Since the 1970's turbochargers have been used occasionally in standard automotive applications as a way to improve fuel economy and reduce emissions by reducing weight. More recently as fuel economy and emission standards have tightened further, and turbocharger design and technology have advanced, turbochargers have become ubiquitous in diesel engines, and much more common in gasoline engines.

26.    The demands of the modern turbocharger have resulted in numerous improvements over the years. First, to maximize performance, thermal losses between the engine cylinders and the inlet to the turbo are minimized. To prevent heat loss, the stainless-steel exhaust manifold is typically enclosed with a metal shroud (jacket or housing) with an insulating air gap. Second, the turbo charger is located as close as possible to the engine block to reduce heat loss or heat storage in the exhaust manifold.  That is, the turbocharger is put into direct contact with the engine block.

27.    A turbocharger works by using pressurized, high temperature engine exhaust to spin a turbine impeller, which is connected to the compressor by a common shaft and turned by the turbine. The compressor then pressurizes the air going into the cylinders via the intake manifold.[1] This is known as "boosting."



28.    Turbochargers are a forced induction system that compresses air flowing into a vehicle's engine, allowing the engine to burn more fuel by forcing more air into the vehicle's cylinders. This translates to greater power and power density (which is the power divided by the displacement of the engine). That is, it allows a smaller engine to perform like a bigger engine.

---

[1] https://auto.howstuffworks.com/turbo.htm (last visited 10/12/2020)



29.   A turbocharger is attached to the exhaust manifold of the engine, where it harnesses the energy of the hot exhaust leaving the engine to drive a compressor which forces more air into the engine. Exhaust is channeled from each cylinder of the engine through the volute in the turbocharger which directs and focuses the force of the exhaust over the turbine.  Since the amount of fuel consumed is limited by the amount of air available for the combustion process, the additional air flow provided by the turbocharger, allows for more fuel to be used thus increasing the power output. In addition, the thermodynamic efficiency of the engine is improved by taking advantage of otherwise wasted exhaust energy.

30.   A turbocharger is subject to a wide range of exhaust flows and temperatures (among the other conditions) that change often and quickly as the engine's speed and load change dynamically during the many accelerations and decelerations encountered in typical driving. For example, when a vehicle is first started, the exhaust side of the turbo charger will be close to ambient temperature, while at full load operation the exhaust temperature can reach 2000 degrees Fahrenheit.  The hot pressurized exhaust stream is not uniformly smooth, but rather rapidly

10

pulsing in nature owing to the fact that the cylinder exhaust values open and close multiple times during each revolution of engine.  These non-steady events create stresses on the structure of the turbocharger.  Further, at some engine speeds a resonant frequency may be achieved whereby the forces imparted on internal components are significantly amplified.

31.    In such an extreme environment, the turbocharger must operate with precision. The shaft connecting the turbine to the compressor will spin at a rate of tens of thousands of revolutions per minute and upwards of 200,000 rotations of the turbocharger axle each minute when operating at maximum speed.  To ensure long and efficient operation of a turbocharger, the design must accommodate such extreme operational environments and maintain critical clearances and tolerances

32.    As Defendant describes it in its "Turbocharger Manual"[2] the Turbocharger needs to accommodate and be protected from the extreme conditions in which it operates:

> The Turbocharger is an exhaust-driven centrifugal air compressor which increases power output by supplying compressed air to the engine. The turbine wheel of the Turbocharger uses the engine's exhaust gasses to drive the compressor wheel at speeds of up to 195,000 RPM. The compressor wheel draws in fresh air which is compressed and delivered through a charge air cooler to the engine cylinders.
>
> By turbocharging the engine, the pressure and density of the air entering the cylinders is increased, and therefore so is the amount of oxygen. This enables a greater quantity of fuel to be injected, thus increasing the engine's power output, improving fuel consumption and the ability to maintain power at higher altitudes.
>
> The internal components are oil and coolant cooled. Engine oil and coolant are circulated through the center housing which acts as a heat barrier between the "hot" turbine and the "cold" compressor. The bearing is a sleeve type and is lubricated by engine oil. Oil is circulated to the Turbocharger center housing and returned to the sump through an oil drain to the cylinder block.

---

[2]    *See* Evoque Manual: Fuel Charging and Controls – Turbocharger – GTDi 2.0L Petrol – Turbocharger – System Operation and Component Description (published 09-Jun-2011), Exhibit 1 hereto (Pg. 15 of PDF) (Retrieved from https://cardiagn.com/evoque-2011-13-fuel-charging-and-controls-gtdi-2-0l-petrol/) (last visited 10/12/2020).

**B.  Class Vehicle Engines & Defendant's Turbocharger**

33.    The Class Vehicles are equipped with a 2.0 liter in-line 4-cylinder gasoline engine that were first introduced by Defendant in the 2011, for the 2012 model year. To obtain the kind of power that these kinds of utility vehicles are associated with, Defendant incorporated a Turbocharger to increase the power of these smaller engines, while maintaining the benefits of greater fuel efficiency and lower tailpipe emissions.

34.    Defendant incorporated the Turbocharger further into the engine and power train than a typical turbocharger.  The Turbocharger housing and the exhaust manifold are designed as a single component eliminating the need to bolt the two pieces together, thus reducing weight and heat transfer area:



E133482

35.    As an integrated component to the engine and power train, the Turbocharger is

expected to last as long as the useful life of the vehicle without the need for repair or replacement. For example, owners and lessors of Class Vehicles were provided with Federal Warranty and Maintenance schedules that do not show any Turbocharger inspection or maintenance within the first 100,000 miles. Recognizing this fact, Defendant placed the Turbocharger in such a location in the engine that replacement requires over a day of highly skilled shop labor, adding to the significant cost of the replacement Turbocharger.

### C.  The Turbocharger Defect

36.   The Turbocharger in Defendant's vehicles were not adequately designed for the task Defendant gave them and are defective.

37.   Incorporation of the turbocharger with the exhaust manifold in Defendant's Turbocharger increases the operational extremes that the Turbocharger is exposed to.

38.   In the expected, albeit extreme, operational environment of the engine, the internally mounted volute (the part that channels the force of the exhaust to the turbine) and its supporting structure in the exhaust manifold portion of the Turbocharger assembly experience accelerated metal fatigue and premature failure. As a result, the volute becomes loose and although remaining contained, may rattle around in the exhaust manifold. Eventually, the loose volute can no longer maintain critical clearances with the turbine and contacts the turbine (which is spinning at a high rate of speed), causing breaking, chipping, and erosion of the metal turbine blades. The Turbocharger may fail immediately, or it may continue to run while the damage worsens and performance is increasingly degraded as the turbine blades are eroded.  In the end, the turbine become ineffective in extracting power from the exhaust and the compressor fails to make the desired level of boost and, ultimately provides no boost at all.

39.   The effect of the Turbocharger Defect are disastrous. The turbine will cease to

13

operate properly, if at all, leading to sluggish performance, high emissions, and derating the engine to prevent further damage. When this occurs during operation, an owner may be left unable to accelerate safely into or with traffic, or become stranded along the roadside needing complex mechanical assistance.

40.     When the Turbocharger fails as a result of the Turbocharger Defect, the owner will find the vehicle loses power and acceleration. Typically the "check engine" light will go on, and be left requiring immediate service assistance.

41.     More importantly, the failure of the Turbocharger creates a hazard.  When the Turbocharger fails completely, the engine becomes nonresponsive and the vehicle will not accelerate and loses power.   This condition makes the vehicle unsafe to drive in many cases such as accelerating to enter a freeway on-ramp, or accelerate to avoid another vehicle, especially when such performance, as in the case of Defendant's vehicles, is an expected feature of the vehicle's operation.  In addition the maximum speed of the vehicle will be compromised such that it may not be possible to keep up with traffic in highway or freeway conditions, particularly if the road grades are significant.

42.     As a result of the Turbocharger Defect, the Turbochargers fail long before the end of the useful life of the vehicle and the engine. However, it is typical to see the Turbocharger fail due to the Turbocharger Defect just after the relevant warranty period has lapsed, leaving the owner to face not only the unsafe and highly polluting conditions created by the failure of the Turbocharger, but also the substantial costs of replacement for a known defective component. The Turbocharger is sufficiently integrated into the engine such that removal and replacement can require 15-20 hours of labor. In addition to the thousands of dollars for the replacement part, the total cost of labor and additional parts lead to a total repair cost upwards of $6,000, or more. Given

the value of the vehicles at such a time, this leaves owners with the unenviable choice of paying a substantial fraction of the value of the vehicle to repair this defect or selling the vehicle at a substantial loss.

43.    Defendant's failure to issue a recall and replace the defective Turbocharger was unreasonable and caused economic damages and environmental and safety hazards for the Class Members.

**D.  Defendant Marketed the Class Vehicles as Clean and Safe While Knowing About the Turbocharger Defect**

44.    Knowledge and information regarding the Turbocharger Defect were in the exclusive and superior possession of Defendant and its dealers, and that information was not provided to Plaintiffs and members of the Classes.

45.    Notwithstanding Defendant's exclusive and superior knowledge of the Turbocharger Defect, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the defect through the at least the 2017 model year. Defendant have intentionally concealed that the Turbocharger is defective, prone to premature failure and presents a safety risk and a risk to the environment rather than disclosing these risks to consumers, including Plaintiffs and members of the Sub-Classes, and the public.

46.    In addition to concealing the defective Turbocharger, Defendant marketed the benefits of the Class Vehicles' turbocharged engines, which "offer[ed] improved fuel efficiency" while minimizing "the impact on the planet."[3] Additionally, Defendant touted the Class Vehicles' "advanced turbocharging and twin independent variable valve timing" which allegedly

---

[3] 2014 Evoque Catalog Brochure, Exhibit 2 hereto, at 23.

"lower[ed] fuel consumption and CO2 emissions…"[4] Defendant even highlighted "a unique exhaust manifold for quicker warm-up and lower emissions" as a selling point of the Class Vehicles' 2.0 liter engine,[5] while pushing "SAFETY AND SUSTAINABILITY" of the 2013 Evoque.[6]

# SAFETY AND SUSTAINABILITY

Starting at just 3,902lbs and using a range of advanced materials, Range Rover Evoque is the lightest and most efficient Range Rover ever. Key components throughout the vehicle, including an aluminum hood and roof and a magnesium cross car beam, enhance the vehicle's sustainability credentials and help improve fuel economy as well as providing strength.

Range Rover Evoque was awarded a maximum five-star rating in the prestigious Euro NCAP safety tests. The front fenders and tailgate assembly are constructed from composite materials – materials made from two, or more, distinct substances whose differing properties (lightness and strength, for example) complement one another. Even the thickness of the acoustically laminated windscreen is reduced to save weight and improve fuel efficiency, performance and handling without compromising strength and safety.

47.    Defendant concealed the Turbocharger defect and nonetheless marketed the Class Vehicles with additional knowledge of the defect via consumer complaints such as those made to the NHTSA. Defendant have a duty to monitor NHTSA and similar consumer complaints as part of its continuous obligation to identify potential defects in its vehicles.

48.    Below is a small sample of consumer complaints made to NHTSA regarding failures of Defendant's Turbocharger:

> **a.   NHTSA ID Number: 11162020**
> **Incident Date November 7, 2018**
> **Consumer Location ALSIP, IL**

---

[4] 2013 Evoque Catalog Brochure, Exhibit 3 hereto, at 15.
[5] 2012 Evoque Catalog Brochure, Exhibit 4 hereto, at 23.
[6] 2013 Evoque Catalog Brochure, Exhibit 3 hereto, at 28.

Vehicle Identification Number SALVT2BG3CH****

TL* THE CONTACT OWNS A 2012 LAND ROVER RANGE ROVER EVOQUE. WHILE DRIVING FOR AN EXTENDED PERIOD OF TIME, THE CONTACT FELT SICK, SLEEPY, AND SUFFERED HEADACHES AND VOMITING. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE CONTACT'S SON NOTICED AN ABNORMAL ODOR IN THE VEHICLE. THE CONTACT TOOK THE VEHICLE TO THE DEALER (LAND ROVER HINSDALE, 300 E OGDEN AVE, HINSDALE, IL, 301-521-3426) WHERE IT WAS DIAGNOSED THAT THERE WAS A CRACK IN THE TURBO MANIFOLD THAT NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE CONTACT WENT TO THE HOSPITAL AND FOUND CARBON MONOXIDE IN HER BLOODSTREAM. THE MANUFACTURER WAS MADE WARE OF THE FAILURE AND INFORMED THE CONTACT THAT HER WARRANTIES HAD EXPIRED. NO FURTHER ASSISTANCE WAS PROVIDED. THE FAILURE MILEAGE WAS 49,000.

b. **NHTSA ID Number: 10704618**
   **Incident Date December 11, 2014**
   **Consumer Location COLORADO SPRINGS, CO**
   **Vehicle Identification Number SALVP2BG5CH****

I TOOK MY CAR IN TO THE LAND ROVER SERVICE DEPT WHERE I PURCHASED MY VEHICLE BECAUSE I SMELLED EXHAUST THROUGH THE VENTS AND I WAS GETTING HEADACHES EVERY TIME I DROVE. ON MY FIRST VISIT THEY TOLD ME THEY COULD NOT FIND ANYTHING WRONG. AFTER A MONTH OF CONTINUED EXHAUST ISSUES I TOOK IT TO A DIFFERENT LAND ROVER SERVICE DEPT AND THEY EVENTUALLY FOUND A HAIRLINE FRACTURE IN THE TURBO. THEY QUOTED ME $6,500 FOR THE REPAIR AND ADVISED ME THAT IT WAS NOT COVERED BY WARRANTY. THEY TOLD ME TO SIMPLY RUN MY AIR/HEATER ON MANUAL VERSUS AUTOMATIC AND DRIVE WITH A WINDOW CRACKED. I AM CURRENTLY TRYING TO FIND SOMEONE THAT WILL WORK ON MY EVOQUE THAT COULD POSSIBLY WELD THE FRACTURE RATHER THAN REPLACING THE ENTIRE SYSTEM BUT HAVING DIFFICULTY. *TR

c. **NHTSA ID Number: 11291924**
   **Incident Date December 26, 2019**
   **Consumer Location EL PASO, TX**
   **Vehicle Identification Number SALVN2BG8DH****

WHILE DRIVING MY CAR ON A ROAD AND ATTEMPTING TO MERGE ONTO A HIGHWAY (I10) IT LOST THE ABILITY TO ACCELERATE. THE VEHICLE WOULD THEN NOT SHIFT ABOVE 3RD GEAR (AUTOMATIC). WHEN I PLACED IT MANUALLY INTO HIGHER GEARS IT TRIED TO

AUTOMATICALLY DOWNSHIFT. I WAS UNABLE TO ACCELERATE TO MERGE ONTO THE HIGHWAY. I HAD TO PLACE ON MY FOUR WAYS AND MAKE AN EMERGENCY STOP TO AVOID AN ACCIDENT CAUSING A VERY UNSAFE DRIVING SITUATION. THE DEALERSHIP SAID THAT THE TURBO COMPONENT HAD FAILED AND NEEDED TO BE REPLACED. AFTER IT WAS REPLACED I ASKED WHAT HAD CAUSED THE FAILURE AND THEY SAID THAT NOTHING I DID CAUSED IT. IT IS APPARENTLY A COMMON ISSUE FOR THE TURBO COMPONENT TO FAIL IN THE 2012-2014 MODELS. I WAS NOT WARNED ABOUT THIS SAFETY ISSUE AND THEY SAID IT IS CAUSED BY A KNOWN MECHANICAL ISSUE. THEY ALSO SAID THE REPLACED THE TURBO COMPONENT WITH AN ALTERNATE PART NUMBER BECAUSE THE ONE ORIGINALLY IN MY VEHICLE FAILS SO OFTEN THEY NO LONGER USE IT. THIS OCCURS OFTEN ENOUGH THEY ALREADY HAD THE PART IN STOCK. I THINK THEY SHOULD BE FORCED TO RECALL THESE FAULTY TURBO PARTS. I HAVE THE SERVICE RECORD IF NEEDED.

**d. NHTSA ID Number: 1124427**
   **Incident Date August 14, 2019**
   **Consumer Location NEWARK, OH**
   **Vehicle Identification Number SALVP2BG9DH\*\*\*\***

76K MILES AND TURBO CHARGER NEEDS REPLACED. $3,454.00. RIDICULOUS. NO TEPAIR SHOULD BE THIS MUCH. MANY ONLINE COMPLAINTS AT SIMILAR MILES. FOR A 4 CYLINDER ENGINE THIS IS HORRIBLE! NOTICED SLOW ACCELERATION WHEN ATTEMPTING TO GO UP HILLS.

**e. NHTSA ID Number: 11192765**
   **Incident Date November 13, 2018**
   **Consumer Location HAYWARD, CA**
   **Vehicle Identification Number SALVR2BG7DH\*\*\*\***

I HAVE 50234 MILEAGE IN MY VEHICLE AND MY TURBO WENT OUT I TOOK IT THE DELLER SHOP AND THEY DON'T COVER OR GIVE ME ANY KIND OFF DISCOUNT IF I NEW FROM THE BEGINNING I WELL NOT GONNA BY THIS CAR. I THOUGHT THIS CAR IS SUPPORT TO BE RELIABLE CAR I WANT SOME ONE TO ANSWER THIS FOR ME OR I WELL TAKE FATHER ACTION ASAP.

**f. NHTSA ID Number: 11192373**
   **Incident Date March 12, 2019**
   **Consumer Location DENVER, CO**
   **Vehicle Identification Number SALVR2BG2DH\*\*\*\***

UPON STARTING THE ENGINE IN THE GARAGE WITH THE HEAT

SYSTEM ON THE EXHAUST FROM THE ENGINE ENTERS THE CABIN OF THE CAR WITH CARBON MONOXIDE FUMES. SMELL IS SICKENING, POISONOUS, AND DANGEROUS. THE CAUSE AS PER MY REPAIRMAN: THE EXHAUST MANIFOLD HAS A FAULTY DESIGN. THE PIECES ARE WELDED, THE WELDING FAILS, A CRACK ALLOWS CARBON MONOXIDE TO LEAK INTO THE CABIN OF THE VEHICLE. THE EXHAUST MANIFOLD AND TURBO CHARGER ARE ONE PIECE. REPAIR COSTS OVER $3000. THE CAR HAS 44,000 MILES ON IT. THE NEWLY INSTALLED EXHAUST MANIFOLD/TURBO CHARGER IS THE SAME DESIGN THAT FAILED, LAND ROVER HASN'T MADE ANY CHANGES. IT'S LIKELY THIS NEW PART WILL FAIL AS WELL.

**g.  NHTSA ID Number: 11102828**
**Incident Date June 3, 2018**
**Consumer Location HIGHLANDS, NC**
**Vehicle Identification Number N/A**

VEHICLE HAS JUST OVER 50,000 MILES , WARRANTY EXPIRES AT 50,000. LOOKING ON THE INTERNET I FOUND THAT THE 2013-2015 MODELS OF THIS CAR HAS HAD HUNDREDS OF PROBLEMS WITH THE TURBO WHICH GOES OUT BEFORE AND AFTER 50,000 MILE ,MOST OF THE TIME LAND ROVER WILL NOT COVER ALWAYS BLAMING THE CONSUMER , I FOUND WELL OVER A MILLION HITS ON THE INTERNET CONCERNING THIS PROBLEM , BUT LAND ROVER REFUSES TO DO A RECALL, CAR ACTUALLY LOSES ALL POWER AND STOPS DEAD ANYWHERE WHEN IT BLOWS , IF YOU GO ON THE INTERNET YOU'LL SEE A CLUB THAT FORMED IN ENGLAND CONCERNING THIS , THERE ARE LITERALLY THOUSANDS OF COMPLAINTS ON THE FAULTY TURBO'S ON THE ENGINE ON THE 2013-2015 RANGE ROVER EVOQUES,. LAND ROVER N.A. CUSTOMER SERVICE ACTUALLY BLAMED ME FOR NOT DOING OIL CHANGES , WHICH I HAVE ALL RECEIPTS , SOCIAL MEDIA HAS HUNDREDS OF PAGES RELATING TO THE EVOQUES TURBO FAILURES, ALSO CONSUMER AFFAIRS HAS SEVERAL PAGES ON THE RANGE ROVER EVOQUES ENGINE AND TURBO PROBLEMS AND FAILURES , WHY HASNT THE U SGOVERMNENT FORCED A RECALL ON THIS SERIOUS SAFETY ISSUE, LIKE I PREVIOUSLY STATED , THIS HAPPENS WHEN I VEHICLE WAS ON THE INTERSTATE , I READ WHERE ONE GIRL IN OHIO WAS IN THE MIDDLE LANE OF AN INTERSATE AND HER CAR STOPPED DEAD ,ALMOST GETTING REAR ENDED , PLEASE ADDRESS THIS ISSUE

**h.  NHTSA ID Number: 10870035**
**Incident Date May 10, 2016**
**Consumer Location PONCE, PR**
**Vehicle Identification Number SALVN2BG1DH****

MY EVOQUE ONLY 3 YEARS 63,000 MILES AND THE TURBO IS BROCKEN THE DEALER LAND ROVER SAN JUAN PUERTO RICO SORRY NO WARRANTY FOR WHAT MY EVOQUE ONLY 3 YEARS

i.   **NHTSA ID Number: 11348546**
     **Incident Date March 1, 2019**
     **Consumer Location MCLOUD, OK**
     **Vehicle Identification Number SALVR2BG8EH****

TURBO STOPPED WORKING FOR SECOND TIME AT 51,000 MILES, JUST OUT OF WARRANTY. THIS IS A KNOWN FAILURE AND SHOULD BE RECALLED.

j.   **NHTSA ID Number: 11061155**
     **Incident Date October 5, 2017**
     **Consumer Location Unknown**
     **Vehicle Identification Number EH883207****

WHILE DRIVING THE VEHICLE I EXPERIENCED A LOSS IN ENGINE POWER AND IT SEEMED TO BE AT A VERY HIGH RPM FOR A LOW SPEED. THE VEHICLE WOULD NOT GO OVER 30MPH AND HAD TO BE DRIVEN TO THE SHOP. IT WAS DIAGNOSED AS A BLOWN TURBO AND THE TURBO HAD TO BE REPLACE. ABOUT A MONTH LATER THE ENGINE NEEDS TO BE REPLACED. I BELIEVE A DIRECT CORRULATION BETWEEN THE TURBO AND ENGINE.

k.   **NHTSA ID Number: 11042631**
     **Incident Date March 28, 2017**
     **Consumer Location BEVERLY HILLS, FL**
     **Vehicle Identification Number N/A**

WHILE DRIVING THE VEHICLE I EXPERIENCED A LOSS IN ENGINE POWER AND IT SEEMED TO BE AT A VERY HIGH RPM FOR A LOW SPEED. THE VEHICLE WOULD NOT GO OVER 30MPH AND HAD TO BE DRIVEN TO THE SHOP. IT WAS DIAGNOSED AS A BLOWN TURBO AND THE TURBO HAD TO BE REPLACE.

l.   **NHTSA ID Number: 11319199**
     **Incident Date March 22, 2020**
     **Consumer Location BLOOMFIELD HILLS, MI**
     **Vehicle Identification Number SALVT1BG6FH****

I WAS DRIVING ON THE HIGHWAY GOING APPROXIMATELY THE SPEED LIMIT OF 75 MPH WHEN ALL THE SUDDEN THE CAR BEGAN MAKING A KNOCKING NOISE & STARTED LOSING POWER AND RAPIDLY DECELERATING OUT OF MY CONTROL. MY RPMS BEGAN RUNNING 7K+ AND I NEEDED TO JAM DOWN ON THE GAS PEDAL IN

ORDER TO TRY AND MAINTAIN SPEED AND AVOID AN ACCIDENT, WHICH WORKED FOR A SECOND AND ACTUALLY ALLOWED ME TO GAIN BACK SPEED. HOWEVER, WITH THE GAS ALL THE WAY DOWN IT ONLY KEPT SPEED FOR A SHORT PERIOD UNTIL THE CHECK ENGINE LIGHT POPPED ON AND I BEGAN DROPPING DOWN SPEED AGAIN. I COULD NOT MAINTAIN SPEED. I IMMEDIATELY CHANGED TO THE RIGHT LANE AND WAS ABLE TO PULL OVER AT A REST STOP. I READ THE MANUAL, AND ACCORDING TO THE WARNING TRANSMISSION SIGNAL WHICH DISPLAYED, MY CAR MAY BE DRIVEN BUT PERFORMANCE MAY BE REDUCED AND I SHOULD IMMEDIATELY TAKE IT INTO A DEALER, WHICH I DID. I WAS LATER TOLD BY AN AUTHORIZED DEALER THAT "MY TURBO HAD BLOWN" WITH CRACKS ALONG WITH A DESTROYED SOLENOID AND OTHER PARTS RELATING TO THE SPEED OF MY CAR. IT CURRENTLY HAS UNDER 80K MILES AND IS IN THE REPAIR SHOP AS WE SPEAK. IT HAS HAD ROUTINE MAINTENANCE AND JUST UNDERWENT SERVICE CARE (REPLACED OIL/ OIL FILTER, TRANSMISSION FLUID , ETC) LESS THAN 2 MONTHS AGO. THE TOTAL ESTIMATED REPAIR COST RELATING TO THIS SAFETY CONCERN IS ROUGHLY $5,200 USD FROM AN AUTHORIZED DEALER (A NEW TURBO, SOLENOID, LABOR, ETC).

m. **NHTSA ID Number: 11278366**
   **Incident Date September 27, 2019**
   **Consumer Location GASSVILLE, AR**
   **Vehicle Identification Number SALVP2BG3FH****

   LOSS OF POWER. HIGH RPM, ECO MODE NOT WORKING. CHECK ENGINE LIGHT ON WITH CODE FOR TURBO LOSS OF POWER. ONLY 47K MILES. WILL NOT SHIFT PROPERLY. MAJOR POWER LOSS

n. **NHTSA ID Number: 11277829**
   **Incident Date September 22, 2019**
   **Consumer Location LOUISVILLE, KY**
   **Vehicle Identification Number SALVR2BG7FH****

   TURBO BLOWS UP/GOES OUT WHILE DRIVING. MAKING INCLINED SPEEDS HARD TO REACH TO MOVE OUT OF WAY OF VEHICLES. HAS NO PEP BEHIND IT.

o. **NHTSA ID Number: 11192381**
   **Incident Date March 2, 2019**
   **Consumer Location DIX HILLS, NY**
   **Vehicle Identification Number SALVP2BG8FH****

   JUST PURCHASED MY CAR IN JULY 2018. WAS A PREVIOUS LEASED CAR WITH REGUIAR MAINTENANCE. I WAS DRIVING ON THE HIGHWAY AND MY CAR SUDDENLY WOULD NOT SHIFT GEARS NO

PICKUP IN THE CAR. LUCKILY I WAS ABLE TO PULL TO SIDE OF THE ROAD TO PREVENT AN ACCIDENT AND TURN CAR OFF AND BACK ON AGAIN. CHECK ENGINE LIGHT CAME ON. WAS ABLE TO DRIVE TO AN AUTHORIZED LAND ROVER DEALER TO WHICH THEY STATE TURBOCHARGER HAS AN INTERNAL DEFECT AND A COMMON PROBLEM WITH MY MAKE AND MODEL CAR.

p. **NHTSA ID Number: 11186830**
**Incident Date February 20, 2019**
**Consumer Location DAYTON, WA**
**Vehicle Identification Number SALVP2BG8FH****

THE TURBO FAILED AT 42000 MILES, WAS REPLACED UNDER WARRANTY BY RANGE ROVER OF PORTLAND. THE TURBO HAS FAILED AGAIN AT 84000 MILES. BOTH FAILURES OCCURRED WHILE DRIVING ON A HIGHWAY PASSING ANOTHER VEHICLE AT APPROXIMATELY 65 MPH. I HAVE BEEN ADVISED BY AN AUTHORIZED RANGE ROVER REPAIRMAN. MESSER AUTOWERKS OF KENNEWICK, WA. THAT THE TURBOS FOR THE EVOQUE AND LR2 HAVE A DESIGN FLAW, THERE IS AN INTERNAL COMPONENT THAT BREAKS OFF AND CAUSES THE TURBO TO FAIL. I RESEARCHED WITH YOUR WEBSITE AND RANGE ROVER THERE IS NO RECALL IN PLACE FOR MY MODEL AN YEAR

q. **NHTSA ID Number: 11328560**
**Incident Date June 1, 2020**
**Consumer Location KING, NC**
**Vehicle Identification Number SALVR2BG3FH****

THE TURBOCHARGER HAS GONE OUT AND THE VEHICLE HAS LESS THAN 60K MILES ON IT. HOW CAN THIS BE POSSIBLE? AREN'T LAND ROVERS A HIGH END VEHICLE??? THERE IS NO REASON THAT MY AMERICAN MADE CAR IS OLDER THAN THIS VEHICLE AND I HAVE HAD NO COSTLY REPAIRS ON IT. SOMEONE NEEDS TO REVIEW THESE TURBOCHARGERS AND ENSURE A BETTER QUALITY BECAUSE THESE CARS ARE TOO EXPENSIVE AS IT IS AND NOW TO FIX THIS I NEED TO PAY OVER $3000!!! IT'S NOT RIGHT! THE VEHICLE WILL ACCELERATE SLOWLY AND DRIVE ROUGH WHEN GEARS ARE CHANGING. THE CODES WE GET ARE FOR THE TURBO CHARGER

r. **NHTSA ID Number: 11331837**
**Incident Date June 27, 2020**
**Consumer Location MELISSA, TX**
**Vehicle Identification Number SALVP2BG6EH****

IT IS KNOWN THE 2014 RANGE ROVER/ENVOQUE HAS A TERRIBLE AND REPEATED PROBLEM WITH THE TURBO /SUPER CHARGER OVER

22

BOOST CONDITION. IT COSTS THOUSANDS OF DOLLARS TO REPAIR. THIS IS DUE TO A FAILED DESIGN WITH THE EXHAUST SYSTEM AS RANGE ROVER CAME UP WITH A NEW DESIGN AFTER 2014

**s.   NHTSA ID Number: 10478209**
Consumer Location: Fair Oaks Ranch, TX
Vehicle Make/Model/Year: 2012 Evoque
Manufacturer: Land Rover
Vehicle Identification No. (VIN): SALVV2BG2CH****
**SUMMARY:** WHILE DRIVING IN RAINY WEATHER FOR APPROXIMATELY ONE HOUR, I WENT TO ACCELERATE TO PASS A CAR AND THERE WAS A LOSS OF POWER, AMBER WANING LIGHT CAME ON, ENGINE LIGHT CAME ON AND I COULD NOT GO FASTER THAN 35 MPH. THIS COULD HAVE CAUSED A SERIOUS ACCIDENT BUT I WAS ABLE TO SLOW DOWN ENOUGH TO GET BACK IN THE SLOW LANE. CAR HAD TO BE TOWED TO DEALER THE NEXT DAY. THE LONER EVOQUE THEY GAVE ME DID THE SAME THING IN RAINY WEATHER ON SEPTEMBER 16, 2012.

**t.   NHTSA ID Number: 10508351**
Consumer Location: Houston, TX
Vehicle Make/Model/Year: 2012 Evoque
Manufacturer: Land Rover
Vehicle Identification No. (VIN): SALVT2BG7CH****
**SUMMARY:** I WAS DRIVING VEHICLE AT ABOUT 65-70 MPH ON FREEWAY FOR ABOUT ONE HOUR. EXITED FREEWAY, STOPPED AT TRAFFIC LIGHT. WHEN LEAVING LIGHT, ACCELERATED NORMAL & INSTANTLY NOTICED THERE WAS VERY POOR ACCELERATION. THE ENGINE SERVICE LIGHT DISPLAYED & VEHICLE WOULD NOT GO OVER 35MPH. I THEN PULLED INTO PARKING LOT, TURNED CAR OFF FOR 2 MINUTES, RESTARTED & NO CHANGE IN PROBLEM. TOOK CAR TO DEALERSHIP WHERE I PURCHASED & VEHICLE WAS FIXED AT NO CHARGE.

**u.   NHTSA ID Number: 10474124**
Consumer Location: Annapolis, MD
Vehicle Make/Model/Year: 2012 Evoque
Manufacturer: Land Rover
Vehicle Identification No. (VIN): SALVV2BG2CH****
**SUMMARY:** ON JULY 28, 2012 MY MOTHER AND I WERE DRIVING TO NEW ENGLAND FROM MARYLAND THROUGH INTERMITTENT THUNDERSTORMS AT SPEEDS ABOVE 65 MILES PER HOUR. I ATTEMPTED TO ACCELERATE TO PASS A VEHICLE WHEN THE ENGINE BEGAN TO LOSE POWER AND TOOK OVER 30 SECONDS TO

REACH 40 MILES PER HOUR. I OBSERVED THE SPEED WARNING LIGHT AND THE AMBER ?CHECK ENGINE? LIGHT COME ON. I TRIED TO ACCELERATE TO PULL OFF OF THE ROAD BUT COULD ONLY DRIVE APPROXIMATELY 35-40 MILES PER HOUR UNTIL THE NEXT EXIT WHICH WAS OVER 2 MILES AHEAD (AS CARS UNSAFELY HAD TO SUDDENLY STOP BEHIND ME ON I-95 AS I MANEUVERED BACK INTO THE RIGHT TRAVEL LANE) SINCE THE VEHICLE WOULD NOT GO ANY FASTER. ONCE OFF OF THE ROAD (THE RAIN HAD CEASED) I TURNED OFF THE VEHICLE AND REMOVED THE 74 MILE AN HOUR SPEED WARNING AND THE AMBER ?CHECK ENGINE? LAMP WENT OFF AFTER TEN MINUTES OF DRIVING. I RESUMED MY TRIP THROUGH THE ON-AND-OFF-AGAIN RAIN FOR ANOTHER THREE HOURS AND DID NOT ATTEMPT TO ACCELERATE AGAIN. I LATER TOLD MY HUSBAND THAT I THOUGHT THAT THE SUDDEN SLOW ENGINE ACCELERATION AND SPEED IMPEDIMENT WAS A FUNCTION OF THE SPEED WARNING AND ASSUMED THAT TO BE THE CAUSE OF THE LACK OF SPEED AND ABILITY TO ACCELERATE. NEEDLESS TO SAY THIS WAS A FRIGHTENING EXPERIENCE FOR ME AND MY MOTHER.

ON AUGUST 25TH MY HUSBAND AND I WERE DRIVING FOR OVER AN HOUR IN HEAVY RAIN AND IT HAPPENED AGAIN. UNLIKE MY EXPERIENCE, A WARNING MESSAGE THAT SAID ?RESTRICTED PERFORMANCE? CAME UP ON THE DASHBOARD AND THE AMBER CHECK ENGINE LIGHT WAS ON (THERE WAS ALSO AN AMBER HAZARD SIGNAL ON THE DASHBOARD). WHEN WE PULLED OVER, WE LOOKED IN THE OWNER?S MANUAL UNDER THE FOLLOWING WORDS: ?PERFORMANCE, ENGINE, AND WARNINGS, TO FIND THE RESTRICTED PERFORMANCE WARNING AND WHAT IT MEANT TO NO AVAIL. THE RAIN CONTINUED ON THIS EVENING AND WE DROVE (SLOWLY) HOME FOR THE REMAINING 20 MINUTES WHILE THE CHECK ENGINE LIGHT REMAINED RED.

**v. NHTSA ID Number:** 10897792
Consumer Location: North Tustin, CA
Vehicle Make/Model/Year: 2013 Evoque
Manufacturer: Land Rover
Vehicle Identification No. (VIN): SALVR2BG2DH****
**SUMMARY:** ENGINE MISFIRES CAUSING CAR TO LOSE POWER AND GO INTO 'RESTRICTED MODE'. THIS IS VERY DANGEROUS. IT HAPPENED AT HIGH SPEED, MAKING IT VERY UNSAFE TO PULL OVER TO THE SIDE OF THE HIGHWAY - ALMOST CAUSING A MULTIPLE VEHICLE ACCIDENT. TAKEN TO DEALER 3 TIMES AND THEY HAVE NOT RESOLVED THE ISSUE. INFORMED LANDROVER USA ABOUT MY CONCERNS AND THEY HAVE NOT BEEN HELPFUL - SAYING TAKE THE VEHICLE BACK TO THE DEALER AND PAY AN ADDITIONAL $380

FOR DIAGNOSTICS AFTER ALREADY PAYING THEM $200 AS THE CAR IS NO LONGER UNDER WARRANTY. VEHICLE HAS $59,250 MILES. OTHER EVOQUE OWNERS ALSO EXPERIENCE SIMILAR PROBLEMS.

    **w.**  **NHTSA ID Number: 11152296**
Consumer Location: Garland, TX
Vehicle Make/Model/Year: 2017 Evoque
Manufacturer: Land Rover
Vehicle Identification No. (VIN): SALVP2BG2HH****
**SUMMARY:** THE VEHICLE COMPLETELY SHUT DOWN WHILE I WAS DRIVING ON A MAJOR HIGHWAY CAUSING A LIFE-THREATENING SITUATION. THIS IS THE SECOND TIME THE ISSUE HAS OCCURRED. THE FIRST TIME I WAS EXITING A HIGHWAY AND MANAGED TO GET TO THE ACCESS ROAD BEFORE THE ENGINE SHUT DOWN AGAIN. IT WILL RESTART AND IMMEDIATELY SHUT DOWN. IT SEEMS TO OCCUR WHEN SLOWING DOWN FOLLOWING HIGHWAY DRIVING AT 55+MPH. BOTH INCIDENTS REQUIRED POLICE ASSISTANCE TO REDIRECT HEAVY TRAFFIC.

### E.  Relevant Warranties

49.   Defendant's basic New Vehicle Limited Warranty provides bumper-to-bumper coverage for four years or 40,000 miles during which time Defendant will repair or replace components defective in materials or workmanship.

50.   Because the performance of the turbocharger is critical to maintain the emissions performance of the engine, it is covered under two governmentally mandated warranties: the Federal Emissions Control System Warranties and the California Emissions Control System Warranties.

51.   The Federal Warranty provides a baseline of two years or 24,000 miles warranty that the vehicle will pass emissions inspections (which is increased as part of most manufacturers express limited warranties), and 8 year, 80,000 mile coverage for select parts (not including the turbocharger assembly).

52.   The California Emissions Control System Warranties established by the California Air Resources Board, establishes a baseline period of three years or 30,000 miles where defective

emissions components are to be replaced without charge, and 7 years, or 70,000 miles for select emissions-related components, including the turbocharger assembly.  Although promulgated in California, several other states have adopted California's Emissions Warranty, sometimes called the Section 177 states, after the California regulatory provision.  The Section 177 states include Connecticut, Delaware, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, and Vermont.

53.    Notwithstanding Defendant's obligation to repair or replace defective components, and its knowledge of the Turbocharger Defect, Defendant took no action to repair or replace the Turbochargers in Plaintiffs Vehicles or the vehicles of the Class members.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

54.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Turbocharger Defect and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Turbocharger Defect and could not reasonably discover the latent nature of the defect.

55.    Knowledge and information regarding the Turbocharger Defect was in the exclusive and superior possession of Defendant and its dealers, and was not provided to Plaintiffs and members of the Classes, who could not reasonably discover the defect through due diligence. Based on pre-production testing, design failure mode analysis, and consumer complaints to dealers, *inter alia*, Defendant was aware of the premature failure of the turbocharger in the Class Vehicles and fraudulently concealed the defect from Plaintiffs and members of the Classes.

56.    Within the time period of  any applicable statutes of limitations, Plaintiffs and

members of the Classes could not have  discovered through the exercise of reasonable diligence that Defendant was concealing the Turbocharger Defect.

57.   Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a latent defect and/or that the Class Vehicles contained an exhaust manifold/Turbocharger component prone to premature  failure or safety risk. As alleged herein, the existence of the Turbocharger Defect and  safety risk were material to Plaintiffs and members of the Classes at all relevant times.

58.   At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality and grade of the Class Vehicles and to disclose the Turbocharger Defect and potential safety risk associated with the premature failure of the system.

59.   Defendant knowingly, actively, and affirmatively concealed the facts alleged herein including the Turbocharger Defect. Plaintiffs and members of the Classes reasonably relied on Defendant's knowing, active and affirmative concealment. Knowledge

60.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

**VI.    CHOICE OF LAW ALLEGATIONS**

61.   Because this action is brought in New Jersey, New Jersey's choice of law  regime governs the state law allegations in this Complaint.

62.   Because JLRNA is headquartered in New Jersey, and made all decisions related to these claims in this State, New Jersey has a substantial connection to, and materially greater

interest in, the rights, interests, and policies involved in this action compared to any other state. Application of New Jersey law to JLRNA and the claims of all Class members would accordingly not be arbitrary or unfair. Accordingly, under New Jersey's choice of law analysis, New Jersey law should apply to the claims of all Class members regardless of the place of purchase or residence

## VII.   CLASS ACTION ALLEGATIONS

63.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class and alternative Sub-Classes:

All persons or entities in the United States that purchased, leased, or own a Class Vehicle (the "**Nationwide Class**" or "**Class**");

All persons or entities in New Jersey that purchased, leased or own a Class Vehicle (the "**New Jersey Sub-Class**");

All persons or entities in Michigan that purchased, leased, or own a Class Vehicle (the "**Michigan Sub-Class**");

All persons or entities in Oklahoma that purchased, leased, or own a Class Vehicle (the "**Oklahoma Sub-Class**") (together with the New Jersey Sub-Class and the Oklahoma Sub-Class (the "Sub-Classes").

64.   Excluded from the Class and Sub-Class is Defendant and its parents, subsidiaries and corporate affiliates. Plaintiffs reserve the right to revise the definition of the  Class and Sub-Class based upon subsequently discovered information and reserves the right to  establish additional subclasses where appropriate. The Class and Sub-Class are collectively  referred to herein as the "Classes."

65.   The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of proposed members of the Classes throughout the United States.

66.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

a.  Whether the exhaust Turbocharger in the Class Vehicles is defective and prone to premature failure;

b.  Whether the Turbocharger in the Class Vehicles presents a safety risk;

c.  Whether Defendant knew or should have known that the Turbocharge Defect;

d.  Whether Defendant breached its duty to disclose the existence of the Tubrocharger Defect;

e.  Whether Defendant intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts about the Turbocharger Defect;

f.  Whether Defendant negligently falsely misrepresented or omitted material facts including the existence of the Tubrochrger Defect;

g.  Whether Defendant breached its express and/or implied contractual duties to s and members of the Classes;

h.  Whether Defendant breached its express and/or implied warranties;

i.  Whether Defendant violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. and/or any other statutory duties under state laws;

j.  Whether Defendant was unjustly enriched by the conducted alleged herein;

k.  Whether Defendant actively concealed material facts from Plaintiffs and members of the Classes in order to, *inter alia*, sell more Class Vehicles and/or transfer the costs associated with repair or replacement of the Turbocharger to Plaintiffs and the Classes; and

l.  Whether damages, restitution, equitable, injunctive, compulsory, or other relief is

29

warranted.

67.    Plaintiffs' claims are typical of the claims of the Classes Plaintiffs seek to represent. As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same illegal actions and conduct by Defendant.

68.    Plaintiffs are willing and prepared to serve the Class and Sub-Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiffs will fairly and adequately protect the interests of the Class and Sub-Class and has no interests adverse to or in conflict with the interests of the other members in the Classes.

69.    Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes.  Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

70.    Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

71.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

72.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

73.    The Classes may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Classes would create a risk of

inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

74.     The Classes may also be certified under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

75.     The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

## VIII.   CLAIMS FOR RELIEF

### A.  Claims Brought on Behalf of the Nationwide Class

### COUNT I
**(Fraud)**

76.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

77.     Plaintiffs bring this count on behalf of themselves and the members of the Classes.

78.     Defendant intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Turbocharger in the Class Vehicles is defective and  prone to premature failure, exposing drivers, occupants and members of the public to worsened performance and safety risks with the intent that Plaintiffs and members of the Nationwide Class

rely on Defendant's misrepresentations and omissions. As a direct result of Defendant's fraudulent conduct, members of the Nationwide Class have suffered actual damages.

79.    As a result of Defendant's failure to disclose to members of the Nationwide Class the material fact that the turbocharger component installed in the Class Vehicles is defective and prone to premature failure, owners and lessors of the Class Vehicles are required to spend thousands of dollars to repair or replace the Turbocharger. The fact that the Turbocharger is defective and prone to premature failure is material because no reasonable consumer expects that he or she will have to spend thousands of dollars for diagnosis, repair or replacement of the Turbocharger before the end of the useful life of the engine, and because Plaintiffs and members of the Classes had a reasonable expectation that the vehicles would not suffer from a premature failure of the Turbocharger that would present a safety risk.

80.    The fact that the Turbocharger is defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. When the Turbocharger fails, drivers may be unable to accelerate or maintain speed or may experience catastrophic engine failure. Drivers and occupants of the Class Vehicles are at risk for rear-end collisions or other accidents caused by the inability to maintain an appropriate speed, and the general public is also at risk for being involved in an accident with a Class Vehicle that suddenly stops or is unable to maintain an appropriate speed. Plaintiffs and members of the Classes would not have purchased the Class Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Turbocharger Defect, or would have paid less for the Class Vehicles.

81.    Defendant knew its false misrepresentation, concealment and suppression of

32

material facts was false and misleading and knew the effect of concealing those material facts. Defendant knew its concealment and suppression of the Turbocharger Defect would sell  more Class Vehicles and would discourage Plaintiffs and Class members from seeking  replacement or  repair  of  the  exhaust  manifold/Turbocharger  component  within  the  warranty  periods. Further,  Defendant intended to induce Plaintiffs and members of the Nationwide Class into purchasing or  leasing the Class Vehicles and discourage them from seeking replacement or repair  of  the   turbocharger component within  the  warranty  periods,  thereby  unlawfully transferring the cost of repair  or replacement from Defendant to Plaintiffs and Class members, in order to decrease costs and  increase profits.

82.   Defendant acted with malice, oppression and fraud.

83.   Plaintiffs  and  members  of  the  Classes  reasonably  relied  upon  Defendant's knowing, affirmative and active false representations, concealment and omissions.  As  a  direct and  proximate result of Defendant's false representations, omissions and active  concealment of material facts regarding the Turbocharger Defect, Plaintiffs and members of  the Nationwide Class have suffered actual damages in an amount to be determined at trial.

## COUNT II
### (Breach of Contract)

84.   Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

85.   Plaintiffs bring this count on behalf of themselves and the members of the Classes.

86.   Every purchase or lease of a Class Vehicle from an authorized dealer of the Class Vehicles constitutes a contract between the Defendant and the purchaser or lessee. Defendant materially breached these contracts by selling or leasing defective Class Vehicles to Plaintiffs and Class members and by misrepresenting the standard, quality or grade of the Class Vehicles

and/or failing to disclose the existence of the Turbocharger Defect. The existence of the Turbocharger Defect at the time of lease or sale rendered the Class Vehicles substantially less valuable than the vehicles Defendant advertised and promised to deliver to Plaintiffs and Class members.

87.    Defendant's misrepresentations and omissions and failure to disclose the existence of the Turbocharger Defect caused Plaintiffs and Class members to enter into agreements to purchase or lease their Class Vehicles. Plaintiffs and Class members would not have purchased or leased their Class Vehicles, or would have paid less for their Class Vehicles, but for Defendant's misrepresentations and omissions. Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

88.    Defendant also breached the implied covenant of good faith and fair dealing implied in its contracts with Plaintiffs and members of the Classes by providing Class Vehicles that contain an undisclosed Turbocharger Defect that is prone to premature failure and presents a safety risk to drivers and occupants of the Class Vehicles. Defendant further breached the implied covenant of good faith and fair dealing by providing limited warranties on Class Vehicles that contain a known latent defect in the Turbocharger that Defendant knew or should have known would fail beyond the warranty periods. Defendant acted in bad faith in order to sell additional Class Vehicles and/or transfer the cost of repair or replacement of the defective exhaust manifold/Turbocharger to Plaintiffs and Class Members.

89.    As a direct and proximate result of Defendant's breach of its express and implied duties, Plaintiffs and Class members have been damaged in an amount to be proven at trial, including, but not limited to, compensatory damages, incidental and consequential damages, and other damages allowed by law.

34

<u>**COUNT III**</u>
**(Negligent Misrepresentation)**

90.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

91.    Plaintiffs bring this count on behalf of themselves and the members of the Classes.

92.    Defendant owed a duty to disclose the defective turbocharger and its corresponding safety risk to Plaintiffs and members of the Classes because Defendant possessed superior and exclusive knowledge regarding the defect and the risks associated with the Turbocharger's failure.

93.    Defendant negligently misrepresented and omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Turbocharger installed  in the Class Vehicles is defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks. As a direct result of Defendant's negligent conduct, members of the Classes have suffered actual damages.

94.    As a result of Defendant's failure to disclose, in owners' manuals, maintenance schedules or elsewhere, to members of the Classes the material fact that the Turbocharger installed in the Class Vehicles is defective and prone to premature failure, owners and lessors of the Class Vehicles are required to spend thousands of dollars to repair or replace the Turbocharger or sell their vehicles  at a substantial loss.  The fact that the Turbocharger installed in the Class Vehicles is prone  to premature failure is material because no reasonable consumer expects that he or she will have  to spend thousands of dollars for diagnosis, repair or replacement  of the Turbocharger before the end of the useful life of the engine, and because Plaintiffs and members of the Class  had a reasonable expectation that the vehicles would not

35

suffer from a premature failure of the Turbocharger that would present a safety risk.

95.     The fact that the Turbocharger installed in the Class Vehicles is prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. When the Turbocharger fails, drivers may be unable to accelerate or maintain speed or may experience catastrophic engine failure. Drivers   and occupants of the Class Vehicles are at risk for rear-end collisions or other accidents caused  by the inability to maintain an appropriate speed, and the general public is also at risk for being involved in an accident with a Class Vehicle that suddenly stops or is unable to maintain an appropriate speed.  Plaintiffs and members of the Classes would not have purchased the  Class Vehicles but for Defendant's negligent false representations and omissions of material  facts regarding the nature and quality of the Class Vehicles and existence of the Turbocharger defect, or would have paid less for the Class Vehicles.

96.     Plaintiffs and members of the Classes justifiably relied upon Defendant's  negligent false representations and omissions of material facts. As a direct and proximate result   of Defendant's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Turbocharger defect, Plaintiffs and members of the Nationwide Class have suffered an ascertainable loss and actual damages in  an amount to be determined at trial.

<u>**COUNT IV**</u>
<u>**(Breach of Express Warranty)**</u>

97.     Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

98.     Plaintiffs bring this count on behalf of themselves and the Classes.

36

99.   Defendant marketed the Class Vehicles as innovative, high-performance, dynamic, and environmentally friendly  vehicles.  Such representations formed the basis of the bargain in Plaintiffs' and Class Members'  decisions to purchase or lease the Class Vehicles.

100.  Defendant is and was at all relevant times a  merchant and seller of motor vehicles as defined under the Uniform Commercial Code.

101.  With respect to leases, Defendant is and was at all relevant times a  lessor of motor vehicles as defined under the Uniform Commercial Code.

102.  The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

103.  In connection with the purchase or lease of each of the Class Vehicles, Defendant provided warranty coverage for the Class Vehicles under one or more manufacturer's warranties.  Under the warranties provided to members of the Classes, Defendant promised  to repair or replace covered defective engine components arising out of defects in materials and/or workmanship, including the Turbocharger, at no cost to owners and lessors of the Class Vehicles.

104.  However, given the latent nature of the defective Turbocharger, Defendant knew or should have known that the majority of failures would occur outside the warranty periods, leaving Class Members with substantial repair bills.

105.  Defendant's warranties formed a basis of the bargain that was reached when Plaintiffs and members of the Classes purchased or leased their Class Vehicles.

106.  Plaintiffs and the members of the Classes experienced the existence of  the Turbocharger Defect but had no knowledge of the existence of the defect, which was known and concealed by Defendant. Despite the existence of the warranties, Defendant failed to inform

Plaintiffs and members of the Classes that the Class Vehicles contained the Turbocharger Defect during the warranty periods, and thus, wrongfully transferred the costs of repair or replacement of the Turbocharger to Plaintiffs and members of the Classes.

107.  Defendant breached the express warranties by promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied, but failing to do so during the terms of the warranties.

108. On information and belief, Defendant has not repaired or replaced the Turbocharger free of charge for Plaintiffs and members of the Classes despite the Turbocharger Defect in the Class Vehicles at the time of sale or lease.

109. Defendant was provided notice of the Turbocharger Defect by numerous consumer complaints made to authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here because Defendant has known of and concealed the Turbocharger Defect and, on information and belief, has refused to repair or replace the Turbocharger Defect free of charge outside of the warranty periods despite the defect's  existence at the time of sale or lease of the Class Vehicles.

110. Defendant's attempt to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Defendant's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiffs and the Class members. Among other things, Plaintiffs and the Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in

bargaining power existed between Defendant and Class members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Turbocharger would fail well before their useful lives.

111.  Further, the warranties promising to repair and/or correct a manufacturing defect fails in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other members of the Classes whole because, on information and belief, Defendant have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

112.  Defendant knew that the Class Vehicles were inherently defective and did not conform to its warranties and Plaintiffs and the members of the Classes were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

113.  As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and the members of the Classes have been damaged in an amount to be determined at trial.

114.  Finally, because of Defendant's breach of express warranty as set forth herein, Plaintiffs and the members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT V
### (Breach of Implied Warranty)

115.  Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

39

116. Plaintiffs bring this count on behalf of themselves and members of the Nationwide Class.

117. Plaintiffs and Class Members purchased or leased the Class Vehicles from Defendant by and through Defendant's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Defendant was the manufacturer, distributor, warrantor, and/or seller of Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

118. Defendant is and was at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.

119. With respect to leases, Defendant is and was at all relevant times lessors of motor vehicles as defined under the Uniform Commercial Code.

120. The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

121. Defendant impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

122. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherently defective Turbocharger (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Defendant breached its implied warranty of merchantability.

123. Under normal circumstances, a properly designed and manufactured Turbocharger should last for the life of the engine without the need for repair or replacement. Defendant cannot disclaim this implied warranty as it knowingly sold or leased a defective product.

124. Defendant was provided notice of the Turbocharger Defect by numerous consumer complaints made to its authorized dealers nationwide, complaints to NHTSA, and through its own testing. Affording Defendant a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendant has known of and concealed the Turbocharger defect and, on information and belief, has refused to repair or replace the Turbocharger free of charge outside of the warranty periods despite the defect's existence at the time of sale or lease of the Class Vehicles.

125. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

126. Defendant's attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendant's warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiffs and the Class members. Among other things, Plaintiffs and the Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and Class members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Turbocharger would fail well before their useful lives.

127. Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein. Further, given the latent nature of the Turbocharger defect, Defendant knew  or should have known that the majority of Turbocharger failures likely would occur outside  of the warranty periods and have wrongfully transferred the costs of repair or replacement to Plaintiffs and members of the Classes through Defendant's fraudulent concealment of the defect.  These costs are significant and range in the thousands of dollars, and no reasonable consumer  expects to incur such costs during the useful life of the engine.

128. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule, fraudulent concealment and the terms of the express warranty.

## COUNT VI
### (Violation of the Magnuson-Moss Warranty Act ("MMWA")
### 15 U.S.C. § 2301, *et seq*.
### On behalf of the Nationwide Class)

129. Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

130. Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class.

131. Plaintiffs satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

132. Plaintiffs and members of the Classes are "consumers" within the  meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

133. Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

134. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

135. The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.  2310(d)(1).

136. Defendant provided Plaintiffs and members of the Classes with one or more express warranties, which are covered under 15 U.S.C. § 2301(6).  For illustrative purposes, Defendant currently provides a "Limited Warranty" for new vehicles, which covers the vehicle for four years or 50,000 miles, whichever comes first, as well as a six-year/unlimited-mileage corrosion perforation warranty, plus various emissions warranties.[7] Under warranties provided to  members of the Classes, Defendant promised to repair or replace covered defective engine  components arising out of defects in materials and/or workmanship, including the Turbocharger, at no cost to owners and lessors of the Class Vehicles.  However, given the latent nature of the defective Turbocharger, Defendant knew or should have known that the majority of Turbocharger failures typically occur outside of the warranty terms.

137. Any attempt by Defendant to disclaim or limit its express or implied  warranties is unconscionable and unenforceable here.  Specifically, Defendant's warranty  limitations are unenforceable because they knowingly sold or leased a defective product without  informing consumers about the  defect. The  time limits contained in Defendant's warranty  periods were also unconscionable and inadequate to protect Plaintiffs and the Class members.  Among other things, Plaintiffs and the Class members had no meaningful choice in determining  these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in  bargaining power existed between Defendant and Class members, and Defendant knew or  should have

---

[7] https://www.landroverusa.com/ownership/vehicle-warranty.html (last visited 10/12/2020)

known that the Class Vehicles were defective at the time of sale or lease and that the Turbocharger would fail well before their useful lives.

138. Defendant breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Turbocharger defect. Without limitation, the Class Vehicles share a common Turbocharger defect in design, material, manufacturing and/or workmanship that is prone to premature failure and fails to operate as represented by Defendant. Defendant has acknowledged that the Class Vehicles are not of the standard, quality or grade that Defendant represented at the time of purchase or lease and contain the Turbocharger Defect.

139. Plaintiffs and members of the Nationwide Class have had sufficient direct dealings with Defendant or its agents (dealerships) to establish privity of contract between Defendant, on the one hand, and Plaintiffs and members of the Nationwide Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of its implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit purchasers and lessors of the Class Vehicles only.

140. Affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendant knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Turbocharger Defect, but failed to repair or replace the Turbocharger and/or disclose the

44

Turbocharger Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

141. Plaintiffs and the members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Defendant. Thus, Plaintiffs and members of the Classes have not re-accepted their Class Vehicles by retaining them.

142. The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

143. Plaintiffs, individually and on behalf of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT VII
## (Unjust Enrichment)

144. Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

145. Plaintiffs bring this count on behalf of themselves and the members of the Nationwide Class.

146. Plaintiffs and members of the Classes conferred a benefit on Defendant by leasing or purchasing the Class Vehicles. Defendant was and should have been reasonably expected to provide Class Vehicles free from the Turbocharger defect.

147. Defendant unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of its false representations, omissions and concealment of the Turbocharger defect in the Class Vehicles.

148. As a proximate result of Defendant's false representations, omissions and concealment of the Turbocharger Defect in the Class Vehicles, and as a result of Defendant's ill-gotten gains, benefits and profits, Defendant has been unjustly enriched at the expense of Plaintiffs and members of the Classes. It would be inequitable for Defendant to retain its ill-gotten profits without paying the value thereof to Plaintiffs and members of the Nationwide Class.

149. Plaintiffs and members of the Classes are entitled to restitution of the amount of Defendant's ill-gotten gains, benefits and profits, including interest, resulting from its unlawful, unjust and inequitable conduct.

150. Plaintiffs and members of the Classes seek an order requiring Defendant to disgorge its gains and profits to Plaintiffs and members of the Classes, together with interest, in a manner to be determined by the Court.

## COUNT VIII
### (Violation of the New Jersey Consumer Fraud Act ("NJCFA") on behalf of the National and the Alternate New Jersey Sub-Class)

151. Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

152. Plaintiffs bring this claim on behalf of themselves and the members of the Nationwide Class (and alternately, by Plaintiff Flynn-Murphy on behalf of the New Jersey Sub-Class).

46

153. The NJCFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . ." N.J.S.A. § 56:8-2.

154. Plaintiffs and members of the Class are consumers who purchased or leased Class Vehicles for personal, family, or household use.

155. In violation of the NJCFA, Defendant employed unconscionable commercial practices, deception, fraud, false pretense and/or false promise by providing Class Vehicles that contain the Turbocharger defect and present an undisclosed safety risk to drivers and occupants of the Class Vehicles. Further, Defendant misrepresented the standard, quality or grade of the Class Vehicles which were sold or leased with the latent defect and failed to disclose the Turbocharger defect and corresponding safety risk in violation of the NJCFA.

156. Defendant's misrepresentations and fraudulent omissions were material to Plaintiff Flynn-Murphy and members of the Class. When Plaintiffs and members of the Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Turbochargers would last beyond the warranty periods without need for repair or replacement and/or would not pose an unavoidable safety risk. Had Defendant disclosed that the Turbocharger was prone to premature failure and/or an unavoidable safety risk, Plaintiffs and members of the Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles. Further, had Defendant disclosed that the Turbochargers

in the Class Vehicles would not last beyond the warranty periods without need for repair or replacement, Plaintiffs and members of the Class would have demanded repair or replacement during the warranty periods at no cost to Plaintiffs and members of the Class—as provided for in Defendant's warranties.

157. Defendant knowingly concealed, suppressed and/or omitted the existence of the Turbocharger defect and safety risk in the Class Vehicles at the time of sale or lease and at all relevant times thereafter.

158. Further, Defendant knew that the Turbocharger defect would cause the Turbocharger to fail before the useful life of the engine, thereby unlawfully transferring the costs of repair of the Turbocharger to Plaintiffs and members of the Class. Further, Defendant unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

159. Defendant owed a duty to disclose the Turbocharger defect and its corresponding safety risk to Plaintiffs and Class members because Defendant possessed superior and exclusive knowledge regarding the defect and the risks associated with the Turbocharger's failure. Rather than disclose the defect, Defendant intentionally concealed the defect with the intent to mislead Plaintiffs and the Class members in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the manifold/Turbocharger system's failure or failed engine to Plaintiffs and the Class members.

160. Defendant knew, or should have known, that the Turbocharger defect in the Class Vehicles could cause loss of engine power while the vehicle was operating. Further, Defendant knew, or should have known, such loss of power could cause the Class Vehicles to become

48

involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

161. Had Plaintiffs and the Class members known about the Turbocharger defect at the time of purchase, including the safety hazard posed by the defect and the monetary cost of repair, they would not have bought the Class Vehicles or would have paid much less for them.

162. As a direct and proximate result of Defendant's wrongful conduct in violation of the NJCFA, Plaintiffs and Class members have suffered and continue to suffer harm by the threat of sudden and unexpected failure of the Turbocharger and/or actual damages in the amount of the cost to replace the Turbocharger, essential engine parts or the entire engine, and damages to be determined at trial. Plaintiffs and Class members have also suffered the ascertainable loss of the diminished value of their vehicles.

163. As a result of Defendant's fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, Plaintiffs and the Class members are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. *See* N.J.S.A. § 56:8-19.

164. Plaintiffs the Class members also seek an order enjoining Defendant's unlawful, fraudulent and/or deceptive practices, and any other just and proper declaratory or equitable relief available under the NJCFA. *See* N.J.S.A. § 56:8-19.

**B. Allegations on behalf of the alternative subclasses (in addition to Counts I-VII which are asserted for the Michigan and Oklahoma subclasses)**

### COUNT IX
### Violation of the Michigan Consumer Protection Act, ("MCPA"), Mich. Comp. Laws § 445.901, *et seq.* (on behalf of Plaintiff Cohn and the Michigan Sub-Class)

165. Plaintiff Cohn incorporates and realleges each preceding paragraph as though fully set forth herein.

49

166. Plaintiff Cohn brings this count on behalf of herself and members of the Michigan Sub-Class.

167. Plaintiff Cohn and members of the Michigan Sub-Class are "persons" within the meaning of the MCPA. *See* Mich. Comp. Laws § 445.902(1)(d).

168. Plaintiff Cohn and members of the Michigan Sub-Class are permitted to bring this action for injunctive relief and actual damages under the MCPA. *See* Mich. Comp. Laws § 445.911.

169. Defendant is a "person" engaged in "trade or commerce" within the meaning of the MCPA. *See* Mich. Comp. Laws § 445.902(1)(d) and (g).

170. The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . " Mich. Comp. Laws § 445.903(1). Defendant engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the MCPA, including, inter alia: "[r]epresenting that goods or services have . . . characteristics. . . that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

171. Defendant violated the MCPA by employing unfair, unconscionable, or deceptive acts or practices, and/or by engaging in fraud, misrepresentations, concealment,

50

suppression and/or omissions of material facts with the intent that others rely upon such concealment, suppression and/or omissions, in connection with the sale and/or lease of Class Vehicles.

172. Defendant knowingly concealed, suppressed and/or omitted material facts regarding the defective Turbocharger and its corresponding safety risk and performance issues, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Cohn and members of the Michigan Sub-Class. Plaintiff Cohn and members of the Michigan Sub-Class could not reasonably have known about the Turbocharger Defect and its corresponding safety risk as the information was in the superior and exclusive control of Defendant.

173. Defendant intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff Cohn and members of the Michigan Sub-Class. Defendant knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendant also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendant knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

174. Defendant owed a duty to disclose the Turbocharger Defect and its corresponding safety risk to Plaintiff Cohn and members of the Michigan Sub-Class because they possessed superior and exclusive knowledge regarding the defect and the risks associated

with the Turbocharger. Rather than disclose the defect, Defendant engaged in unfair, unconscionable and deceptive trade practices in order to sell additional Class Vehicles and  wrongfully transfer the cost of repair or replacement of the Turbocharger to Plaintiff Cohn and members of the Michigan Sub-Class.

175. Defendant's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger defect were intended to mislead consumers and misled Plaintiff Cohn and members of the Michigan Sub-Class.

176. At all relevant times, Defendant's unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or omissions regarding the Turbocharger Defect and  its corresponding safety risk were material to Plaintiff Cohn and members of the Michigan  Sub-Class. When Plaintiff Cohn and members of the Michigan Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Turbochargers were free from latent defects and would last beyond the periods  of the manufacturer's warranties. Had Defendant disclosed that the Turbocharger was  prone to premature failure and/or an unavoidable safety risk, Plaintiff Cohn and members of  the Michigan Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

177. Defendant had a continuous duty to Plaintiff Cohn and members of the Michigan Sub-Class to refrain from unfair and deceptive practices under the MCPA and to  disclose the Turbocharger defect. Defendant's unfair, unconscionable and deceptive  acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger Defect and corresponding safety risk are substantially injurious to consumers.  As a result  of

Defendant's knowing, intentional concealment, suppression and/or omission of the Turbocharger defect in violation of the MCPA, Plaintiff Cohn and members of the Michigan Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and  unexpected failure of the Turbocharger and/or actual damages in the amount of the cost to replace the Turbocharger, essential engine parts or the entire engine, and damages to  be determined at trial.   Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's unfair, unconscionable and deceptive acts and practices in the course of their business.

178. Defendant's unfair, unconscionable and deceptive acts and practices occurred in  the conduct of trade or commerce.

179. Defendant has knowingly and willfully engaged in the unfair, unconscionable and deceptive acts and practices alleged herein.  Further, Defendant unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

180. Defendant's unfair, unconscionable and deceptive acts and practices affect the  public interest and present a continuing safety risk to Plaintiff Cohn and members of the  Michigan Sub-Class as well as the public.

181. As a direct and proximate result of Defendant's violations of the MCPA, Plaintiff Cohn and members of the Michigan Sub-Class have suffered actual damages and/or injury in fact.

182. As a result of Defendant's unlawful conduct, Plaintiff Cohn and members of the Michigan Sub-Class are entitled to actual damages, costs of litigation, attorneys' fees, injunctive and other equitable relief.  *See* Mich. Comp. Laws § 445.911.

## COUNT X
**Violation of Oklahoma Consumer Protection Act, Okla. Stat. Tit. 15 § 751, *et seq.***
**(on behalf of Plaintiff McNew and the Oklahoma Sub-Class)**

183. Plaintiff McNew incorporates by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

184. Plaintiff McNew asserts this count on behalf of herself and members of the Oklahoma Sub-Class.

185. Plaintiff McNew and members of the Oklahoma Sub-Class are persons within the context of the Oklahoma Consumer Protection Act, Okla. Stat. Tit. 15 § 752 (hereinafter "OCPA") who purchased or leased class vehicles in a "consumer transaction" for "personal, household, or business," specifically, Okla. Stat. Tit. 15 § 752(2).

186. Defendant is a person within the context of OCPA § 752(2), and Defendant's actions set forth herein occurred in the conduct of trade or commerce.

187. The OCPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics… uses, [or] benefits of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* Okla. Stat. Tit. 15, § 753.

188. In the course of their business, Defendant violated the OCPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff McNew and the

Oklahoma Sub Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons. Specifically, in marketing the Class Vehicles, Defendant engaged in one or more of the following unfair or deceptive acts or practices that are proscribed ty the OCPA:

     a.  Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

     b.  Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

     c.  Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

     d.  Selling Class Vehicles knowing that a service, replacement or repair was needed.

189. Defendant's scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff McNew and the Oklahoma Sub-Class, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff McNew and members of the Oklahoma Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff McNew and the Oklahoma Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

190. Defendant violated the OCPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that class engines contained defects and would require regular replacement of expensive internal engine components such as the Turbocharger.

191. Defendant had an ongoing duty to Plaintiff McNew and the Oklahoma Sub-

Class to refrain from unfair and deceptive practices under the OCPA in the course of their business. Specifically, Defendant owed the Sub-Class members a duty to disclose all the material facts concerning the Class Vehicles and, specifically, the Turbocharger Defect because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff McNew and the Oklahoma Sub-Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

192. Plaintiff McNew and the Oklahoma Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

193. Plaintiff McNew and members of the Oklahoma Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and  maintenance costs and incurred other substantial monetary damages and inconvenience

194. Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiff McNew and the Oklahoma Sub-Class demand judgment against the Defendant for restitution, disgorgement, statutory and actual monetary damages including multiple damages, interest, costs, attorneys' fees and injunctive relief including a  declaratory judgment and an appropriate court order prohibiting Defendant from further  deceptive acts and practices described in this complaint.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendant and in favor of Plaintiffs and the Class and Sub-Classes, and award the following relief:

1.  An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and  Sub-Class,

and Plaintiff's counsel as counsel for the Class and Sub-Class;

2.      An order awarding declaratory relief and enjoining Defendant from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged herein;

3.      Injunctive and equitable relief in the form of a comprehensive program to repair or replace the Turbocharger in all Class Vehicles, and/or buyback all Class Vehicles, and to fully reimburse and make whole all Class and Sub-Class members for all costs and economic losses;

4.      A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

5.      An order awarding costs, restitution, disgorgement, punitive damages, treble damages and exemplary damages under applicable law, and compensatory damages for economic loss and out-of-pocket costs in an amount to be determined at trial;

6.      An order awarding any applicable statutory and civil penalties;

7.      A declaration that Defendant is required to engage in corrective advertising;

8.      An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

9.      An award of costs, expenses and attorneys' fees as permitted by law; and

10.     Such other or further relief as the Court may deem appropriate, just, and equitable.

## X.     DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


DATED: October 14, 2020                    Respectfully submitted,

                                           **SEEGER WEISS LLP**

                                           By  /s/ *Christopher A. Seeger*
                                           Christopher A. Seeger
                                           55 Challenger Road, 6th Fl.
                                           Ridgefield Park, NJ 07660
                                           (973) 639-9100
                                           cseeger@seegerweiss.com

                                           James E. Cecchi
                                           **CARELLA, BYRNE, CECCHI,**
                                           **OLSTEIN, BRODY & AGNELLO, P.C.**
                                           5 Becker Farm Road
                                           Roseland, New Jersey 07068
                                           Tel:  (973) 994-1700

                                           *Counsel for Plaintiffs and the Proposed Classes*