Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: (973) 639-9100
Facsimile: (973) 584-9393
Email: cseeger@seegerweiss.com

James E. Cecchi
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne,com

*Counsel for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER BULLARD, NATALIE BUSH, LEO CANIZARES, LYNN COHN, RAYMOND DARBENZIO, JAMES DAVIES, LILIANA DE LA TORRE, LORETTA FLYNN-MURPHY, WILLIAM GILCHRIST, JAIME GONZALEZ, EMILY HARRELL, TOM HERBENER, JEFFREY HERZOG, RODNEY HOWARD, MANAGAYA KABBA, BILL LIQUORI, KELLY MCNEW, ANGELA PICK, SYDNEY POSTLE, LOLITHA SHEPHERD, and JEFFREY WILBUR, Individually And On Behalf Of All Others Similarly Situated, | Civil Action No.  2:20-cv-14464-JMV-JBC |
| Plaintiffs, | |
| v. | |
| JAGUAR LAND ROVER AUTOMOTIVE PLC, JAGUAR LAND ROVER LIMITED, and JAGUAR LAND ROVER NORTH AMERICA, LLC, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT JAGUAR LAND ROVER NORTH AMERICA, LLC'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

LEGAL STANDARD ............................................................................................. 5

ARGUMENT .......................................................................................................... 7

   I.    PLAINTIFFS HAVE STATED THEIR CLAIM FOR BREACH OF EXPRESS WARRANTY ...................................................................................................7

   II.   PLAINTIFFS HAVE STATED THEIR CLAIM FOR BREACH OF IMPLIED WARRANTY ..................................................................................................16

   III.  PLAINTIFFS MAY SEEK RELIEF UNDER THE MAGNUSON-MOSS WARRANTY ACT..................................................................................................................17

   IV.  PLAINTIFFS MAY PURSUE THEIR CLAIM FOR UNJUST ENRICHMENT .............18

   V.   PLAINTIFFS HAVE STATED THEIR FRAUD-BASED AND NEGLIGENT MISREPRESENTATION CLAIMS ........................................................................22

      A.   Plaintiffs Have Pled Their Claims with the Requisite Particularity .............................. 22

      B.   Defendant Had a Duty to Disclose .................................................................. 28

      C.   Plaintiffs Allege Facts Establishing Defendant's Knowledge of The Defect ................ 30

      1.   Plaintiffs Allege an Actionable Post-Warranty Omission of a Defect Manifesting Prior to the Lapse of Defendant's Express Warranty ...................................................... 32

      2.   Defendant Knew of the Turbocharger Defect at All Pertinent Times............................ 32

   VI.  PLAINTIFFS MAY SEEK EQUITABLE RELIEF................................................38

CONCLUSION ...................................................................................................... 40

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Albers v. Mercedes-Benz USA, LLC*,
    2020 WL 1466359 (D.N.J. Mar. 25, 2020) ................................................................. 6

*Alin v. Am. Honda Motor Company*,
    2010 WL 1372308 (D.N.J. Mar. 31, 2010) ......................................................... 15, 22

*Alpha Pro Tech, Inc. v. VWR International LLC*,
    984 F. Supp. 2d 425 (E.D. Pa. 2013) ...................................................................... 19

*Amato v. Subaru of America, Inc.*,
    2019 WL 6607148 (D.N.J. Dec. 5, 2019) ................................................. 14, 29, 37

*Argabright v. Rheem Manufacturing Company*,
    201 F. Supp. 3d 578 (D.N.J. 2016) ........................................................................ 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2nd Cir. 2009) .............................................................................. 5, 6

*Bang v. BMW of North America, LLC*,
    2016 WL 7042071 (D.N.J. Dec. 1, 2016) ............................................................... 16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 5, 6, 7

*Bellak v. Wells Fargo & Company*,
    2017 WL 3425177 (D.N.J. Aug. 9, 2017) ................................................................ 7

*Benkle v. Ford Motor Company*,
    2017 WL 9486154 (C.D. Cal. Dec. 22, 2017) ......................................................... 9

*Burton v. Chrysler Group LLC*,
    2012 WL 831843 (D.S.C. Mar. 12, 2012) ......................................................... 16, 17

*Carlson v. GM Corp.*,
    883 F.2d 287 (4th Cir. 1989) ................................................................................ 11

*Carter v. L'Oreal USA, Inc.*,
    2017 WL 3891666 (S.D. Ala. Sept. 6, 2017) ......................................................... 20

*CashCall, Inc. v. BancFirst*,
    2016 WL 9559037,& n.11 (W.D. Okla. Dec. 15, 2016) ......................................... 29

*Cholakyan v. Mercedes-Benz USA, LLC*,
 796 F. Supp. 2d 1220 (C.D. Cal. 2011) ................................................................ 16

*Cirulli v. Hyundai Motor Company*,
 2009 WL 5788762 (C.D. Cal., Jun. 12, 2009) ................................................... 33, 34

*Clark v. Prudential Insurance Company of America*,
 736 F. Supp. 2d 902 (D.N.J. 2010) ...................................................................... 25

*Click v. General Motors LLC*,
 2020 WL 3118577 (S.D. Tex. Mar. 27, 2020) .................................................. 9, 26

*Coba v. Ford Motor Company*,
 932 F.3d 114 (3d Cir. 2019) ............................................................................ 13, 14

*Connelly v. Lane Construction Corp.*,
 809 F.3d 780 (3d Cir. 2016) ............................................................................... 6, 34

*Corson v. Toyota Motor Sales, U.S.A., Inc.*,
 2013 WL 10068136 (C.D. Cal. July 18, 2013) ..................................................... 26

*Cox v. Chrysler Group, LLC*,
 2015 WL 5771400 (D.N.J. Sept. 30, 2015) .......................................................... 16

*Defrank v. Samsung Electronics America, Inc.*,
 2020 WL 6269277 (D.N.J. Oct. 26. 2020) ...................................................... 12, 20

*Doe v. Bank of America, National Association*,
 2018 WL 295565 (D.N.J. Jan. 2, 2019) ............................................................... 12

*Doll v. Ford Motor Company*,
 814 F. Supp. 2d 526 (D. Md. 2011) ..................................................................... 16

*Dopico v. IMS Trading Corp.*,
 2018 WL 4489677 (D.N.J. Sept. 18, 2018) .......................................................... 26

*DuMont v. Litton Loan Servicing, LP*,
 2015 WL 1061138 (S.D.N.Y. Mar. 11, 2015) ...................................................... 25

*Duquesne Light Company v. Westinghouse Electric Corp.*
 66 F.3d 604 (3d Cir. 1995) ................................................................................... 12

*Durham v. City & County of Erie*,
 171 F. App'x 412 (3d Cir. 2006) .......................................................................... 40

*E. Concrete Materials, Inc. v. Jamer Materials Limited*,
 2019 WL 6734511 (D.N.J. Oct. 25, 2019) ............................................................ 7

*Eady v. Fort Metal Plastic Company*,
    2020 WL 5371461 (M.D. Ala. Sept. 8, 2020) ............................................................ 9

*Estate of Roman v. City of Newark*,
    914 F.3d 789 (3d Cir. 2019) ............................................................... 32, 33

*Ewalt v. Gatehouse Media Ohio Holdings II, Inc.*,
    2021 WL 825978 (S.D. Ohio Mar. 4, 2021) ............................................ 25

*Falk v. General Motors Corp.*,
    496 F. Supp. 2d 1088 (N.D. Cal. 2007) ................................................. 29

*Flynn-Murphy v. Jaguar Land Rover North America, LLC*,
    2021 WL 5448716 (D.N.J. Nov. 19, 2021) ................................. 1, 2, 10, 11, 18, 19, 22, 28, 39

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) .................................................................. 6

*Francis v. General Motors, LLC*,
    2020 WL 7042935 (E.D. Mich. Nov. 30, 2020) ............................... 38, 39

*Frederico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007) ............................................................... 23

*Gelis v. Bayerische Motoren Werke Aktiengesellschaft*,
    2018 WL 6804506 (D.N.J. Oct. 30, 2018) ................................... 11, 12, 22

*Gleike Taxi Inc. v. Challenger CAB, LLC*,
    2016 WL 1450048 (N.D. Ill. Apr. 13, 2016) ........................................... 9

*Gray v. BMW of North America, LLC*,
    22 F. Supp. 3d 373 (D.N.J. 2014) ....................................................... 38

*Gregorio v. Ford Motor Company*,
    2021 WL 778913 (E.D. Mich. Mar. 1, 2021) .......................................... 9

*Grisafi v. Sony Electronics, Inc.*,
    2019 WL 1930756 (D.N.J. Apr. 30, 2019) ......................................... 12, 13

*Grudkowski v. Foremost Insurance Company*,
    556 F. App'x 165 (3d Cir. 2014) ........................................................ 20

*Hart v. Lousiana-Pacific Corp.*,
    2011 WL 13233542 (E.D.N.C. July 18, 2011) ...................................... 11

*Hartley v. Sig Sauer, Inc.*,
    2019 WL 11639620 (W.D. Mo. Mar. 25, 2019) ..................................... 9

*Hassan v. City of New York*
    804 F.3d 277 (3d Cir. 2015) ........................................................................... 32, 34

*Hedges v. United States*,
    404 F.3d 744 (3d Cir. 2005) ............................................................................. 5, 7

*Henderson v. Volvo Cars of North America, LLC*,
    2010 WL 2925913 (D.N.J. Jul. 21, 2010) ............................................................. 10

*Herbstman v. Eastman Kodak Company*,
    68 N.J. 1 (1975) ............................................................................................. 13

*Howard Hess v. Dentsply International, Inc.*,
    602 F.3d 237 (3d Cir. 2010) ............................................................................ 6, 33

*Hughes v. TD Bank, National Association*,
    856 F. Supp. 2d 673 (D.N.J. 2012) ...................................................................... 19

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litigation*,
    2021 WL 5937742 (D.N.J. Dec. 16, 2021) ............................................................. 25

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Product Liability Litigation*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018) .................................................................. 30

*In re IKO Roofing Shingle Products Liability Litigation*,
    757 F.3d 599 (7th Cir. 2014) ............................................................................... 9

*In re K-Dur Antitrust Litigation*,
    338 F. Supp. 2d 517 (D.N.J. 2004) .......................................................... 19, 20, 38

*In re Mercedes-Benz Emissions Litigation*,
    2019 WL 413541 (D.N.J. Feb. 1, 2019) ................................................................ 29

*In re MyFord Touch Consumer Litigation*,
    46 F. Supp. 3d 936 (N.D. Cal. 2014) ..................................................................... 8

*In re MyFord Touch Consumer Litigation*,
    291 F. Supp. 3d 936 (N.D. Cal. 2018) .................................................................... 8

*In re Rumsey Land Company, LLC*,
    944 F.3d 1259 (10th Cir. 2019) ......................................................................... 29

*In re Saturn L-Series Timing Chain Products Liability Litigation*,
    2008 WL 4866604 (D. Neb. Nov. 7, 2008) ............................................................ 14

*In re Subaru Battery Drain Liability Litigation*,
    2021 WL 1207791 (D.N.J. Mar. 31, 2021) ............................................................ 15

*In re Synchronoss Technologies, Inc. Securities Litigation*,
  2020 WL 3118749 (D.N.J. June 12, 2020) ................................................................ 40

*In re Takata Airbag Product Liability Litigation*,
  396 F. Supp. 3d 1101 (S.D. Fla. 2019) ...................................................................... 9

*In re Takata Airbag Product Liability Litigation*,
  462 F. Supp. 3d 1304 (S.D. Fla. 2020) ...................................................................... 26

*In re Takata Airbag Product Liability Litigation*,
  2021 WL 908552 (S.D. Fla. Mar. 9, 2021) ................................................................ 29

*In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, & Product Liability Litigation*,
  754 F. Supp. 2d 1145 (C.D. Cal. 2010) ..................................................................... 18

*In re Volkswagen Timing Chain Product Liability Litigation*,
  2017 WL 1902160 (D.N.J. May 8, 2017).................................... 10, 11, 16, 26, 27, 28, 29, 32, 38

*In re Toyota Motor Corp. Unintended Acceleration Marketing*,
  2012 WL 12929769 (C.D. Cal. May 4, 2012) ............................................................ 26

*Independent Enterprises Inc. v. Pittsburgh Water & Sewer Authority*,
  103 F.3d 1165 (3d Cir. 1997) .................................................................................... 20

*Indiana Michigan Power Company v. Siemens Energy, Inc.*,
  2013 WL 4537066 (S.D. Ohio Aug. 27, 2013) .......................................................... 9

*Jaroslawicz v. M&T Bank Corporation*,
  912 F.3d 96 (3d Cir. 2018) ........................................................................................ 21

*Johnson v. Shop-Vac Corp.*,
  2020 WL 3496957 (D.N.J. June 29, 2020).................................................................. 26

*Julian v. TTE Technology, Inc.*
  2020 WL 6743912 (N.D. Cal. Nov. 17, 2020) ........................................................... 20

*Kearney v. BMW*,
  2018 WL 4144683 (D.N.J. Aug. 29, 2018) ................................................. 10, 16, 26, 34, 38

*Kedra v. Schroeter*,
  876 F.3d 424 (3d Cir. 2017) ...................................................................................... 33

*Keegan v. American Honda Motor Company, Inc.*,
  284 F.R.D. 504 (C.D. Cal. 2012)................................................................................ 9

*Koulajian v. Trek Bicycle Corp.*,
  1992 WL 28884 (S.D.N.Y. Feb. 11, 1992) ................................................................ 14

*Lass v. Bank of America, National Association*,
  695 F.3d 129 (1st Cir. 2012) ................................................................ 19

*Lessin v. Ford Motor Company*,
  2020 WL 6544705 (S.D. Cal. Nov. 6, 2020) ................................... 17, 38

*Livingston v. Trane Inc.*,
  2019 WL 397982 (D.N.J. Jan. 31, 2019) ............................................. 16

*Lohr v. Nissan North America, Inc.*,
  2017 WL 1037555 (W.D. Wash. Mar. 17, 2017) ................................. 11

*Majdipour v. Jaguar Land Rover North America, LLC*,
  2013 WL 5574626 (D.N.J. Oct. 9, 2013) ......................................... 23, 24

*Marshall v. Hyundai Motor America*,
  51 F. Supp. 3d 451 (S.D.N.Y. 2014) .................................................. 38

*Merkin v. Honda North America, Inc.*,
  2017 WL 5309623 (D.N.J. Nov. 13, 2017) .......................................... 27

*Mickens v. Ford Motor Company*,
  900 F. Supp. 2d 427 (D.N.J. 2012) ..................................................... 31

*Mickens v. Ford Motor Company*,
  2011 WL 3444055 (D.N.J. Aug. 5, 2011) ......................................... 5, 14

*Miller v. Chrysler Group LLC*,
  2014 WL 12617598 (D.N.J. June 30, 2014) ......................................... 17

*Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*,
  2020 WL 2394155 (D.N.J. March 31, 2020) ........................................ 39

*Newborn Brothers Company v. Albion Engineering Company*,
  481 F. Supp. 3d 312 (D.N.J. 2020) ..................................................... 26

*Omni Technologies, LLC v. Know Ink, LLC*,
  2020 WL 5239823 (S.D. Ala. Sept. 2, 2020) ...................................... 19

*Opheim v. Volkswagen Aktiengesellschaft*,
  2021 WL 2621689 (D.N.J. June 25, 2021) ................................ 15, 24, 28

*Patrick Rojas v. American Honda Motor Company Inc.*,
  2020 WL 8515177 (C.D. Cal. Nov. 30, 2020) ...................................... 27

*Payne v. Fujifilm U.S.A., Inc.*,
  2007 WL 4591281 (D.N.J. Dec. 28, 2007) ......................................... 9, 11

*Peterson v. Mazda Motor of America, Inc.*,
  2014 WL 12817797 (C.D. Cal. Jul. 3, 2014)................................................................ 16

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ........................................................................................ 6

*Ponzio v. Mercedes-Benz USA, LLC*,
  447 F. Supp. 3d 194 (D.N.J. 2020)...........................................22, 27, 28, 33, 37, 38

*Powell v. Subaru of America, Inc.*,
  2020 WL 6886242 (D.N.J. Nov. 24, 2020) ..............................................15, 37, 38

*Prudential Insurance Company of America v. Bank of America, National Association*,
  14 F. Supp. 3d 591 (D.N.J. 2014)............................................................................. 25

*Reynolds v. FCA US LLC*,
  546 F. Supp. 3d 635 (E.D. Mich. 2021) ................................................................... 9

*Rickman v. BMW of North America*,
  2020 WL 3468250 (D.N.J. June 25, 2020)................................................................ 29

*Rivera v. Ford Motor Company*,
  2017 WL 3485815 (E.D. Mich. Aug. 15, 2017)........................................................ 34

*Roberts v. Estate of Barbagallo*,
  366 Pa. Super. 559 A.2d 1125 (1987) ...................................................................... 30

*Schechter v. Hyundai Motor America*,
  2020 WL 1528038 (D.N.J. Mar. 31, 2020) ..........................................................6, 34

*Schmidt v. Skolas*,
  770 F.3d 241 (3d Cir. 2014) ........................................................................................ 18

*Schuchardt v. President of the United States*,
  839 F.3d 336 (3d Cir. 2016) ......................................................................................6, 7

*Seville Industrial Machinery Corporation v. Southmost Machinery Corporation.*,
  742 F.2d 786 (3d Cir.1984) ........................................................................................ 23

*Skeen v. BMW of North America, LLC*,
  2014 WL 283682, at *12 (D.N.J. Jan. 24, 2014).................................................10, 12

*Sloan v. General Motors LLC*,
  287 F. Supp. 3d 840 (N.D. Cal. 2018)...................................................................... 9

*Snyder v. Farnam Companies*,
  792 F. Supp. 2d 712 (D.N.J. 2011)......................................................................26, 27

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ........................................................ 39

*Stewart v. Beam Global Spirits & Wine, Inc.*,
   877 F. Supp. 2d 192 (D.N.J. 2012) ............................................. 18, 19, 22

*Strzakowlski v. General Motors Corp.*,
   2005 WL 2001912 (D.N.J. Aug. 16, 2005) ..................................... 23, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (7th Cir. 2007) ...................................................... 32, 33

*Tershakovec v. Ford Motor Company*,
   2018 WL 3405245 (S.D. Fla. July 12, 2018) ..................................... 9

*Viking Yacht Company, Inc. v. Composite One, LLC*,
   385 F. App'x 195 (3d Cir. 2010) .................................................. 15

*Wolin v. Jaguar Land Rover North America, LLC*,
   617 F.3d 1168 (9th Cir. 2010) ...................................................... 9

*Yagudayev v. BMW of North America, LLC*,
   2020 WL 6689799 (D.N.J. Nov. 13, 2020) ..................................... 23, 24

*Zuehlsdorf v. FCA US, LLC*,
   2019 WL 2098352 (C.D. Cal. Mar. 06, 2020) ..................................... 38

Statutes

49 U.S.C. § 30118(c) ............................................................... 34
N.C. Gen. Stat. § 25-2-302 ........................................................ 11

Rules

Federal Rule of Civil Procedure 8 ................................................. 25
Federal Rule of Civil Procedure 8(a)(2) .......................................... 6
Federal Rule of Civil Procedure 8(d)(3) ......................................... 19, 20
Federal Rule of Civil Procedure 9(b) ......................................... 6, 22, 23, 24, 25
Federal Rule of Civil Procedure 12 ............................................... 21
Federal Rule of Civil Procedure 12(g)(2) ....................................... 20, 21

Regulations

49 C.F.R. § 573.6 ................................................................ 34

## **INTRODUCTION**

The turbocharger assembly ("Turbocharger") in the Class Vehicles[1] manufactured and sold by Jaguar Land Rover North America, LLC ("JLRNA" or "Defendant") is defective and, after gradually increasing internal damage and diminished performance, will suddenly fail, leaving the vehicle without power even when merging into highway traffic ("Turbocharger Defect"). Plaintiffs each faced varying degrees of danger when their Turbochargers failed, and each faced the choice of paying upwards of $12,000 dollars to fix their vehicles, or simply junking their vehicles long before the end of their useful life. The adequacy of these allegations is not in dispute.

When deciding Defendant's prior motion to dismiss, and assessing the allegations of Plaintiffs' earlier Amended Class Action Complaint, the Court noted one overarching deficiency. Before the Court would allow Plaintiffs to hold JLRNA accountable for the Turbocharger Defect and Plaintiffs' attendant injuries, Plaintiffs needed to allege facts to show JLRNA knew about the Turbocharger Defect. *Flynn-Murphy v. Jaguar Land Rover North America, LLC*, 2021 WL 5448716, at *4-7, 9, 11 (D.N.J. Nov. 19, 2021). The Court reasoned that absent such knowledge, JLRNA could not be held responsible for the Turbocharger Defect because:

- shifting the cost of repairing the defect to Plaintiffs would not be unconscionable for the purposes of the claims for breach of warranties if JLRNA did not know about the defect (*id.* at *4-6);
- lack of knowledge of the defect would mean that Defendant cannot be a wrongdoer for the purposes of Plaintiffs' claims seeking equitable relief, (*id.* at *9); and

---

[1]    The Class Vehicles with the Turbocharger currently are alleged to include the 2012 through 2017 model year 2.0 Liter Land Rover Range Rover Evoque; 2015 through 2017 model year 2.0 Liter Land Rover Discovery Sport; or a 2013 through 2015 model year 2.0 Liter Land Rover LR2. Second Amended Complaint ("SAC") ¶ 3.

- Defendant could not have a duty to disclose facts about a defect about which it did not know and could not correct any of the half-truths in its marketing of the Class Vehicles for the purposes of Plaintiffs' deception-based claims, (*id.* at *11).

With their Second Amended Class Action Complaint ("SAC"), Plaintiffs have addressed the Court's concerns, thus clearing the way to pursue their claims against JLRNA.  As is manifest in the accompanying version of Plaintiffs' operative complaint, redlining the edits and additions to the SAC (Exhibit A hereto), there is now no doubt that Defendant is plausibly alleged to have acted at all relevant times with knowledge of the Turbocharger Defect.  In addition to the basic engineering principles that Defendant would have known when designing the Class Vehicles, Plaintiffs add allegations about the pre-production testing that would have exposed the existence of the Turbocharger Defect, and the testing of the first Turbochargers to have been returned under warranty that would have further confirmed Defendant's knowledge of the defect.  SAC ¶¶ 6-7, 9-10, 142-152.  In addition to the numerous complaints made to the National Highway Traffic Safety Administration ("NHTSA") and the even greater volume of complaints it would have received directly from customers and its dealerships, Plaintiffs add allegations that even a single such complaint about a component like a turbocharger would be reason for alarm, particularly as the first complaint (and failure) came shortly after the first Class Vehicle went on sale.  *Id.* ¶¶ 8,10, 154-59.  That is, Plaintiffs have alleged facts that plausibly establish Defendant not only knew about the Turbocharger Defect but deliberately turned a blind eye to it as it marketed and sold the Class Vehicles, along with their turbocharged engines, as reliable and safe vehicles.[2]

---

[2]    The SAC also adds eleven additional Plaintiffs who have fallen victim to the Turbocharger Defect as well as two additional Defendants, Jaguar Land Rover Automotive PLC and Jaguar Land Rover Limited, who are Defendant's parent companies based in the United Kingdom.  Plaintiffs are in the process of serving these entities.

Defendant renews its motion to dismiss, seemingly indifferent to the new and extensive allegations detailing its knowledge of the Turbocharger Defect, and reiterates other arguments the Court did not reach in its prior order. Having addressed the central concern of the Court, that is, Defendant's alleged knowledge of the Turbocharger Defect, and for the other reasons that follow, Plaintiffs respectfully request that Defendant's renewed Motion to Dismiss be denied.

## FACTUAL BACKGROUND

Turbochargers harness the forces generated by an engine to increase its power. SAC ¶¶ 4, 113-19. As a key component of a vehicle's engine, a Turbocharger is expected to last *at least* 12 years or 200,000 miles, effectively the life of the vehicle. *See, e.g., id.* ¶10. In the case of the "Class Vehicles," Defendant used the Turbocharger to promise the performance, safety, and durability of its six-cylinder vehicles with a leaner, fuel efficient, and environmentally "sustainable" four-cylinder "EcoBoost" engine. *Id.* ¶¶ 160-64. Theory and reality quickly diverged, on account of the Turbocharger JLRNA chose to use. *See, e.g., id.* ¶ 2

Rather than use a standard two-piece assembly, where the turbocharger was separate from the engine's exhaust manifold (and the excessive operational conditions therein), Defendant sought to cut corners and chose a cheaper, integrated assembly made with less durable materials. *Id.* ¶¶ 2, 6, 125. JLRNA's Turbocharger assembly directly integrates the turbocharger into the exhaust manifold and, as conceived and installed in the Class Vehicles, contains the inherent Turbocharger Defect. *Id.* As a result of the Turbocharger Defect, regular vibrations, temperature fluctuations, and other operational forces cause the Turbocharger's internal assembly to crack and catastrophically fail at or near the mechanical juncture between the two components (the exhaust manifold and the integrated turbocharger). *Id.* ¶¶ 127-348.

Unknown to owners, the failure of the Turbocharger begins the first time the vehicle is driven, reducing engine performance long before the sudden, catastrophic failure of the Turbocharger alerts the owner to the defect.  *Id.* ¶¶ 4, 133, 135, 138.  As cracks in the Turbocharger form and grow, pieces of the internal assembly become loose and can dislodge and ricochet around inside the turbo housing, damaging the turbine blades and leading to the complete failure of the Turbocharger.  *Id.*  At this last stage of the Turbocharger Defect, a "check engine" light will typically light up and the engine will derate (going into sudden "limp" mode) no matter where drivers might find themselves.  *Id.* ¶¶ 136-37.  When the Turbocharger fails during operation, the driver is suddenly unable to accelerate safely into or to keep up with the flow of traffic.  *Id.* ¶¶136-38.  Replacement of the Turbocharger will run upwards of $4,000 and resulting repairs can run over $12,000 if the entire engine requires replacement as a result of the Turbocharger failure.  *See, e.g., id.* ¶ 11.

Defendant knew of the Turbocharger Defect even before it marketed and sold the first Class Vehicle.  Pre-production testing of the Turbocharger and the Class Vehicles would have exposed the Turbocharger Defect.  *Id.* ¶¶ 6-7, 9-10, 130-135, 142-152.  The Turbocharger Defect was confirmed by the almost immediate failure of the first Turbochargers only months after the sale of the first of the Class Vehicles, and the resulting complaints to NHTSA and from customers and dealerships.  *Id.* ¶¶ 8,10, 154-59.  Because a single such failure would be cause for alarm by any manufacturer, the resulting analysis of these returned Turbocharges by Defendant would confirm what Defendant already knew:  the Turbochargers were defective.  *Id.* ¶ 150.

Each of the Plaintiffs learned about the Turbocharger Defect the hard way. Notwithstanding Plaintiffs' regular service visits to Defendant's dealerships, at no time did JLRNA alert them to the Turbocharger Defect or offer to replace the defective turbocharger with a non-

defective one. *Id.* ¶¶ 23, 27, 31, 35, 39, 43, 47, 51, 55, 59, 63, 67, 71, 78, 82, 86, 90, 94, 98, 102, 106. Rather, Defendant allowed the Turbocharger Defect to play out in each of the Plaintiffs' vehicles until it led to complete failure of each of the Plaintiffs' Turbochargers, typically after Defendant's obligations under its limited express warranty had passed. *Id.* ¶¶ 22, 26, 30, 34, 38, 42, 46, 50, 54, 58, 62, 66, 70, 77, 81, 85, 89, 93, 97, 101, 105. For example, some of the Plaintiffs were on the highway when the Turbocharger suddenly failed and needed to take evasive action; some just stopped in the middle of the street; and Plaintiff Kabba has already lived through *two* Turbocharger failures. *Id.* ¶¶ 30, 34, 58, 62, 70, 72, 85, 89, 105. Each Plaintiff faced the difficult decision whether to incur thousands of dollars to replace the Turbocharger (and related components) or simply walk away and take the loss, and would certainly have paid less for their vehicle or would not have purchased it at all, had they known. *Id.* ¶¶ 22, 28, 30, 32, 36, 38, 40, 42, 44, 46, 48, 52, 56, 58, 60, 64, 66, 70, 72, 79, 83, 87, 91, 95, 99, 101, 103, 107.

## LEGAL STANDARD

Under 12(b)(6), the burden is on the moving party to show that the plaintiff has not stated a facially plausible claim. *Mickens v. Ford Motor Co*., 900 F. Supp. 2d 427, 434 (D.N.J. 2012) (citing *Hedges v. United States* 404 F.3d 744, 750 (3d Cir. 2005)).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' . . . it [merely] asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), accept as true all allegations that are not legal conclusions, "construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them," *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787-90 (3d Cir. 2016). District courts also "have an obligation to read allegations not in isolation but as a whole and in context." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (citing cases).

In pleading fraud, under Rule 9(b), "a party must plead [its] claim with enough particularity to place defendants on notice of the precise misconduct with which they are charged." *Albers v. Mercedes-Benz USA, LLC*, 2020 WL 1466359, at *5 (D.N.J. Mar. 25, 2020) (citations omitted). "'However, within the context of omission-based claims, such as the one here, district courts should 'apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.'" *Schechter v. Hyundai Motor Am.*, 2020 WL 1528038, at *8 (D.N.J. Mar. 31, 2020). Furthermore, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Defendant cites no authority for its parsing of the factual allegations and demand for a heightened pleading standard to continue to claim its ignorance of the Turbocharger Defect. *See*, *e.g.*, D. Mem. at 31-37. *Twombl*y reaffirmed that Rule 8(a)(2)'s purpose is to afford a defendant "fair notice" of the claim, 550 U.S. at 555, but the Rule does not require "require heightened fact pleading of specifics," *id*. at 570, or "'detailed factual allegations.'" *Phillips v. Cty. of Allegheny*,

515 F.3d 224, 231 (3d Cir. 2008); *see Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016). A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.[3]

# ARGUMENT

## I.    PLAINTIFFS HAVE ADEQUATELY STATED THEIR CLAIM FOR BREACH OF EXPRESS WARRANTY

### A. Plaintiffs Did Not Fail to Comply With Any Presentment for Repair and Mileage Requirements

Defendant argues that its express warranty's "presentment" requirement stands in the way of Plaintiffs' claims for breach of express warranty. D. Mem. at 11. However, Flynn-Murphy, De La Torre, Harrell, and Canizares, meet any applicable presentment and mileage requirements under the California Emission Control System Warranty ("CECSW") and the Federal Emission Control System Warranty ("FECSW"). *See* SAC ¶¶ 29, 30, 31, 41, 45, 46, 47, 49, 50, 51, 61-64. These warranties do not contain any magic words as to how any presentment must occur, providing only

---

[3] JLRNA presents no choice of law analysis indicating which states' laws apply to the various claims of the Plaintiffs, who hail from different states. The SAC alleges a nationwide class, seeking relief under common laws and New Jersey Law and, alternatively, under various state subclasses if a determination is eventually made that a national class under New Jersey law may not proceed. ¶¶ 200-201, 420. Accordingly, JLRNA's assumption, in a footnote, that New Jersey law applies to all of their claims, does not address the applicable choice of law for all of these claims, and thus its request that the Court dismiss the entire SAC is improper. D. Mem. at 10 n.9. This follows because JLRNA bears the threshold burden of persuasion on its motion to dismiss. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). As such, because JLRNA fails to establish which law applies to the Plaintiffs' claims by presenting a choice of law analysis, its motion to dismiss the SAC in its entirety should be denied for this reason alone. *See E. Concrete Materials, Inc. v. Jamer Materials Ltd.*, 2019 WL 6734511, at *9 (D.N.J. Oct. 25, 2019) (denying motion to dismiss absent discovery on issue of where parties' relevant conduct occurred for purposes of choice of law analysis), *report and recommendation adopted*, 2019 WL 6726476 (D.N.J. Dec. 10, 2019); *Bellak v. Wells Fargo & Co.*, 2017 WL 3425177, at *2 (D.N.J. Aug. 9, 2017) (denying motion to dismiss where defendant "assume[d] that New Jersey or Pennsylvania law applies" and failed to present any choice of law analysis).

that if a turbocharger assembly unit "is defective," Defendant will repair or replace it, and owners are responsible for presenting it to Defendant's dealers as soon as a problem exists.  ECF No. 11-2, at 14, 17, 21.  As such, by taking their vehicles to authorized dealerships for repairs as soon as the Turbochargers had obviously failed during the term of the warranties, Plaintiffs adequately pleaded compliance with the terms of the warranty, and thus, their claims should be upheld.  *See* SAC ¶¶ 29, 30, 31, 45, 46, 47, 49, 50, 51, 61-64; *see also In re MyFord Touch Consumer Litig*., 291 F. Supp. 3d 936, 960 (N.D. Cal. 2018) (where repair requests arose out of systemic, underlying defect, plaintiffs' reliance on repair requests concerning "'varying problems [that] were manifestations'" of defect established breach of express warranty claim) (citation omitted); *In re MyFord Touch Consumer Litig*., 46 F. Supp. 3d 936, 972 (N.D. Cal. 2014) (same).

As to the other Plaintiffs, they presented their vehicles for service prior to the cataclysmic failure of the Turbochargers.  *See* SAC ¶¶ 21, 22, 23, 25-27, 29, 30-31, 33-35, 37-39, 41-43, 45, 46, 47, 49, 50, 51, 53-55, 57-59, 61-63, 65-67, 69-71, 76-78, 80-82, 84-86, 88-90, 92-94, 96-98, 100-102, 104-106.   But given Plaintiffs' ignorance of the Turbocharger Defect, JLNRA's knowledge of the inherent defect (*Id.*  ¶¶ 6-11, 14, 15, 140-59; *see also infra* at Section V.C.2), that manifestation of an inherent safety defect is not required, and the variety of symptoms that would be associated with its performance prior to the final, cataclysmic turbocharger failure, such presentment should be sufficient for Defendant (and its dealerships) to recognize the need for repair and replacement of the Turbocharger *under warranty. See Flynn-Murphy*, 2021 WL 5448716, at *4-5 (implying that adequately pled "knowledge" would support showing of presentment); *In re MyFord Touch Consumer Litig*., 291 F. Supp. 3d at 960; *In re MyFord Touch Consumer Litig*., 46 F. Supp. 3d at 972 (same).  Indeed, this is not an unmanifested defect case, but rather the Turbochargers represent an inherent safety defect, and manifestation is immediate,

even if not fully appreciated by Plaintiffs.  SAC ¶¶ 2, 4-6, 132, 135-38, 139, 141-50, 152, 160, 165, 177, 173, 244.  Under such circumstances, the breach of express warranty claims are valid.[4]

In addition, where, as here, Plaintiffs allege that the Turbocharger Defect was not cured by Defendant's repair effort (*i.e.*, was futile), *e.g.*, SAC ¶¶ 22, 26, 27, 30, 38, 101, 239, 240, 241, a breach of express warranty claim is adequately pled.[5]

---

[4]  *See Click v. Gen. Motors LLC*, 2020 WL 3118577, at *12 (S.D. Tex. Mar. 27, 2020) ("These arguments assume that the only manifestation of the product defect is when the engines suffer a catastrophic failure. However, Plaintiffs argue that the defect is manifested immediately as the CP4 fuel pump begins to generate metal shavings as early as the engine's first operation. Plaintiffs also allege that engine failure is inevitable."); *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1121 (S.D. Fla. 2019) ("it was 'premature to dismiss claims at the motion to dismiss stage because of a plaintiff's failure to encounter the alleged defect,' because "even though the[ ] Florida Plaintiffs did not experience [the defect], the alleged breach of express warranty could have manifested itself when their vehicles were assembled.'"); *Hartley v. Sig Sauer, Inc.*, 2019 WL 11639620, at *7 (W.D. Mo. Mar. 25, 2019) ("Here, plaintiffs allege that the absence of a disconnector safety renders the design defective and unsafe. Plaintiffs do not base their claim on a potential defect, but rather, an inherent defect in the pistols."); *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2018 WL 3405245, at *6-9 (S.D. Fla. July 12, 2018); *Benkle v. Ford Motor Co.*, 2017 WL 9486154, at *9-11, 13 (C.D. Cal. Dec. 22, 2017); *In re IKO Roofing Shingle Products Liab. Litig.*, 757 F.3d 599, 603 (7th Cir. 2014) (finding injury occurs at point of sale of inherently defective product, even if defect has not manifested itself); *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 532 (C.D. Cal. 2012); *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010); *Payne v. Fujifilm U.S.A., Inc.*, 2007 WL 4591281 (D.N.J. Dec. 28, 2007) (allowing plaintiff to proceed where camera failed outside the express warranty period but where plaintiff argued the alleged defect *manifested* in camera immediately).

[5]  *See Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 649–50 (E.D. Mich. 2021) ("all Plaintiffs except for Hancock plausibly allege that the Death Wobble was not cured by Defendant's repair effort. . . .  Accordingly, those Plaintiffs will be permitted to proceed on their claims for breach of express warranty.") (citation omitted); *Gregorio v. Ford Motor Co.*, 2021 WL 778913, at *16 (E.D. Mich. Mar. 1, 2021) ("if Plaintiffs' vehicles contain a common defect," and if "the Complaint . . . adequately allege[d] that Ford was consistently unable to fix the defect," warranty would fail its essential purpose under laws of California, Colorado, Florida, and Pennsylvania); *Eady v. Fort Metal Plastic Co.*, 2020 WL 5371461, at *4 (M.D. Ala. Sept. 8, 2020); *Benkle*, 2017 WL 9486154, at *11-13; *Gleike Taxi Inc. v. Challenger CAB, LLC*, 2016 WL 1450048, at *9 (N.D. Ill. Apr. 13, 2016); *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 884 (N.D. Cal. 2018); *Indiana Michigan Power Co. v. Siemens Energy, Inc.*, 2013 WL 4537066, at *9 (S.D. Ohio Aug. 27, 2013) ("A limited remedy may fail of its essential purpose when the seller is unable to repair and replace warranted goods and the buyer is left with no benefit.").

Finally, as discussed immediately hereafter, given Defendant's knowledge of the Turbocharger Defect from prior to the sale of the vehicles, the limitations it seeks to impose on its warranties, D. Mem. at 12-13, like the durational limitations of its warranties, are unconscionable.

## B.  The Warranties' Durational Limitations Are Unconscionable

Plaintiffs can avoid the durational limits on Defendant's warranty by alleging facts sufficient to show that the warranty is unconscionable.  *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160 (D.N.J. May 8, 2017) ("*Timing Chain*"); *Skeen v. BMW of N. Am., LLC*, 2014 WL 283682, at *12 (D.N.J. Jan. 24, 2014) (compiling cases).  There are two types of unconscionability that must be alleged: "substantive" and "procedural."  *Skeen*, 2014 WL 283682, at *13.  Courts will find procedural unconscionability where the plaintiffs had "no meaningful choice" in a warranty negotiation characterized by "a gross disparity in bargaining power."  *Id.* (quoting *Henderson v. Volvo Cars of North America, LLC*, 2010 WL 2925913, at *9 n.6 (D.N.J. Jul. 21, 2010)).  Because determining unconscionability can be a "highly fact dependent" endeavor, it is not generally appropriate for determination on a motion to dismiss.  *Kearney v. BMW, A.G.,* 2018 WL 4144683, at * 16 (D.N.J. Aug. 29, 2018) (collecting cases); *Skeen*, 2014 WL 283682, at *15.[6]

This Court previously held that Plaintiffs failed to plead unconscionability because they "fail[ed] to adequately plead that Defendant knew of the purported turbocharger defect at the time of sale."  *Flynn-Murphy*, 2021 WL 5448716, at *6; *see also* id. at 4-5.  In their amended pleadings,

---

[6] *See also Timing Chain*, 2017 WL 1902160, at *12 (holding that "since [determination of unconscionability exception] is a fact sensitive inquiry, dismissal at this time is inappropriate" where plaintiffs had sufficiently pled facts that warranty was unconscionable).

Plaintiffs have adequately pleaded such "knowledge." *See infra* at Section V.C.2. As such, under the Court's reasoning, they have adequately pled "unconscionability."[7]

Furthermore, even assuming *arguendo* that "knowledge" by itself were not enough to plead "unconscionability," Plaintiffs have pled additional facts that further demonstrate unconscionability. Plaintiffs here have alleged that Defendant had exclusive and superior knowledge of the defect at the time of sale, that given the latent nature of the defective Turbocharger Defendant knew that the majority of failures would occur outside the warranty periods, and that Plaintiffs had no meaningful choice in a warranty negotiation characterized by a gross disparity in bargaining power. SAC ¶¶ 6-11, 14, 15-16, 140-60, 236, 242, 258, 269. That adequately pleads "unconscionability." *See Flynn-Murphy*, 2021 WL 5448716, at *6 (citing cases); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *12-13 (D.N.J. May 8, 2017) (unconscionability adequately pled where plaintiff alleged defendant knew of defect at time of sale, and plaintiffs had "no meaningful choice" in warranty negotiation characterized by "a gross disparity in bargaining power"); *Lohr v. Nissan N. Am., Inc.*, No. C16-1023RSM, 2017 WL 1037555, at *6 (W.D. Wash. Mar. 17, 2017).[8]

---

[7] *See also Payne v. Fujifilm U.S.A., Inc.*, 2007 WL 4591281, at *5 (D.N.J. Dec. 28, 2007) (defendant's knowledge of inherent defect at time of sale supported showing that warranty durational limitations were unconscionable); *Hart v. Lousiana-Pac. Corp.*, 2011 WL 13233542, at *4 (E.D.N.C. July 18, 2011) ("Plaintiff alleges that the Defendant knew of the inherent defect, hid that defect from the public, and issued a one-sided warranty containing unconscionable terms that served only to limit liability. If this is the case, the Court may be empowered to alter the terms of that warranty or void it completely, and then award appropriate damages through N.C. Gen. Stat. § 25-2-302.").

[8] *See also Carlson v. GM Corp.*, 883 F.2d 287, 295-296 (4th Cir. 1989) (reversing grant of motion to dismiss express and implied warranty claims where GM knew of and failed to disclose major, inherent product defects, finding act unconscionable due to relative bargaining power and concealment of important facts); *Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, 2018 WL 6804506, at *6 (D.N.J. Oct. 30, 2018) (breach of warranty alleged due to (1) Plaintiffs' relative lack of power and sophistication and (2) allegations that BMW purposefully manipulated the warranty provision through their superior knowledge); *Timing Chain*, 2017 WL 1902160, at *12.

The Court should reject Defendant's suggestion that there was no disparate bargaining power between Plaintiffs and a sophisticated business entity like Defendant. *See Doe v. Bank of America, N.A.*, 2018 WL 295565 (D.N.J. Jan. 2, 2019) (finding disparate bargaining power where "only [d]efendant was a sophisticated business entity[.]"); *see also Duquesne Light Company v. Westinghouse Electric Corp.*, 66 F.3d at 612 (3d Cir. 1995) (highlighting that both parties were "sophisticated business entities, entrusted with equal knowledge of the facts."). There is no basis to argue that any of the Plaintiffs had a "meaningful opportunity to participate in creating the warranty," because JLRNA is a "national enterprise" that dictates the warranty's terms. *Defrank v. Samsung Elec. Am., Inc.*, 2020 WL 6269277, at \*18 (D.N.J. Oct. 26, 2020); *Gellis v. BMW AG*, 2018 WL 6804506, at \*6 (D.N.J. Oct. 30, 2018). Thus, Plaintiffs have adequately pled unconscionability, demonstrating that the warranty durational limitations do not apply to their breach of express warranty claim.

### C. The SAC Adequately Alleges JLRNA Warranted the Turbocharger's Functionality for the Useful Life of the Engine

Defendant argues that the express warranty claim fails also because Plaintiffs fail to plead an express warranty based on the turbochargers in the vehicles failing to last beyond the warranty period: as long as their useful life (i.e., 12 years or 200,000 miles). D. Mem. at 14-15, 24. The Court did not previously uphold this argument—for good reason. It lacks merit. The decision cited by Defendant, *Grisafi v. Sony Elecs. Inc*., 2019 WL 1930756 (D.N.J. Apr. 30, 2019), is distinguishable because there the "Defendant stated in the [Sony's End User License Agreement] that it may delete functions that consumers may rely on, . . . seemingly negating Plaintiff's

_____

("Just as in *Skeen*, [p]laintiffs have pled that [d]efendant was well aware of the defect" and that plaintiffs had "no meaningful choice" concerning the terms of the warranty, evincing a "gross disparity in bargaining power.").

argument that Defendant made an express warranty to the contrary." *Id.* at *7. Here, the SAC contains no such language. Rather, Defendant warranted the functionality of the Turbocharger for their anticipated useful life. *See* SAC ¶¶ 8, 10, 11, 73, 126, 154, 217, 226, 255; *see also* Ex. A, at 11 (FECSW warranty expressly stating that "Land Rover vehicles are designed, built and equipped so as [to comply with US EPA emissions standards] . . . and are free from defects in factory-supplied materials and workmanship which could cause the vehicles to fail applicable regulations."). The allegations support a reasonable inference that the Turbocharger will survive for the life of the component, beyond the warranty period. "[T]he language used [does not] contemplate[] that . . . defects might occur." *Herbstman v. Eastman Kodak Co.*, 68 N.J. 1, 12 (1975).

### D.  The Warranty Covers the Turbocharger Defect

Defendant argues that the Turbocharger Defect is a "design defect" which is not covered under its warranties of "materials and workmanship" and thus not a basis for a breach of express warranty claim. D. Mem. at 15. Defendant's arguments fail, and, again, this Court previously declined to uphold it.

Defendant cites to, but does not address, the Third Circuit's discussion of the material differences between a "design defect" and a defect in "material and workmanship." *Id.* at 15, 16, 17. In *Coba v. Ford Motor Co.*, 932 F.3d 114, 121 (3d Cir. 2019), the court explained:

> [D]efects in 'workmanship' and 'materials' are flaws pertaining to the construction or manufacture of a product, while defects in 'design' are shortcomings that arise in the plans for a product's creation. More specifically, a 'materials' defect is a failing in the quality of the actual substances used to make a product; a 'workmanship' defect is a deficiency in the execution of a product's assembly or construction; and a 'design' defect is a flaw inherent in the product's intended operation and construction ...

*Id.* at 121. Defendant ignores this interpretation and misconstrues, in its favor, Plaintiffs' allegations as alleging simply a "design defect" rather than a defect in material and workmanship. D. Mem. at

15-17.  Plaintiffs allege, however, that the Turbocharger Defendant chose to use with the EcoBoost engine (in contrast to the one Ford chose in *Coba*) "was less expensive than the one used in the Ford EcoBoost vehicles and utilized lighter and less durable materials."  SAC ¶ 125.  That is, *inferior material* was used in Defendant's Turbocharger.  Accepting the factual allegations as true and drawing all reasonable inferences in Plaintiffs' favor, they plausibly allege a defect in materials or workmanship.

Moreover, several courts have held there is no meaningful distinction between a design defect and a defect in workmanship.  *See, e.g.*, *Koulajian v. Trek Bicycle Corp.*, 1992 WL 28884 (S.D.N.Y. Feb. 11, 1992) (reasoning the warranty's reference to workmanship could refer to design or implementation of those designs in manufacturing process); *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, 2008 WL 4866604, at *14-15 (D. Neb. Nov. 7, 2008) (finding "a defect related to materials and workmanship" and a "design defect" can be substantially the same).  "It would be absurd to interpret a car company's written warranty as *not* covering any defect in 'materials and workmanship' if the defect could simultaneously be attributable to a design implemented by the company in the manufacturing of the car."  *In re Saturn*, 2008 WL 4866604, at *15.

Even assuming that the SAC could be construed as alleging both a materials or workmanship defect and a design defect, [9] dismissal of the express warranty claim is still not

---

[9]  Although Defendant seizes on instances where the SAC uses the word "design," D. Mem. 16-17, these allegations by themselves are not sufficient to characterize the SAC, considered as a whole, as alleging *only* a "design defect" for purposes of Plaintiffs' breach of warranty claims. *See generally Mickens v. Ford Motor Co*., 2011 WL 3444055, at *4 (D.N.J. Aug. 5, 2011) ("While the Complaint does contain some language referring to a design defect, pleading a manufacturing defect, while merely labeling it a 'design defect' does not satisfy the plausible pleading standard."). The Third Circuit specifically held that no design defect is alleged where, as here, plaintiffs allege a failure in the quality of the actual substances used to make a product (a "materials" defect), or "a deficiency in the execution of a product's assembly or construction" (i.e., a "workmanship" defect). *Coba*, 932 F.3d at 121.

warranted.  *See Amato v. Subaru of Am., Inc.*, 2019 WL 6607148, at \*5 (D.N.J. Dec. 5, 2019) ("Prior to discovery, some courts have decided that 'the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and [when] sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives.'").  It is too early, based solely on the allegations, for this Court to decide whether the Turbocharger Defect is the result of a design defect or a materials or workmanship defect.  "Discovery is therefore necessary to determine the nature of the underlying [Turbocharger] defect."  *In re Subaru Battery Drain Liability Litig.*, 2021 WL 1207791, at \*12 (D.N.J. Mar. 31, 2021).[10]  Finally, if the Court agrees with Defendant that a design defect cannot be covered by warranty, JLRNA's limitation of its warranty to defects of material and workmanship would cause the warranty to fail of its essential purpose.  A limited contractual remedy fails of its essential purpose if it fails to give the aggrieved party the benefit of the bargain. *Viking Yacht Co., Inc. v. Composite One, LLC,* 385 F. App'x 195, 208 (3d Cir. 2010).  Plaintiffs bargained for vehicles that were not prone to catastrophic turbo failure, particularly when such failure occurs just out of warranty coverage.

---

[10]  *See also Opheim v. Volkswagen Aktiengesellschaft*, 2021 WL 2621689, at \*10 (D.N.J. June 25, 2021) ("At the motion to dismiss stage, [as to whether facts allege a design defect or manufacturing defect,] the preference in this District has been to let Plaintiffs develop facts in discovery to flesh out the precise source of the problem and their theory of the case.") (citing cases); *Powell v. Subaru of Am., Inc.*, 2020 WL 6886242, at \*17 (D.N.J. Nov. 24, 2020); *Alin v. Am. Honda Motor Co.*, 2010 WL 1372308, at \*6 (D.N.J. Mar. 31, 2010) ("At the pleading stage, where the distinction between defect in design and defect in materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both, the defendant's characterization of the nature of the claim pre-discovery should not control whether the complaint survives.").

## II.    PLAINTIFFS HAVE STATED THEIR CLAIM FOR BREACH OF IMPLIED WARRANTY

Defendant reprises its argument for dismissal of Plaintiffs' claims for breach of implied warranty (D. Mem. 17-18), but again ignores the new allegations.

First, Plaintiffs allege that the Turbocharger is inherently defective and begins to fail as soon as it is exposed to regular operational conditions, with increasingly degraded performance before the final, cataclysmic failure of Turbocharger when an owner will first notice it.[11]   SAC ¶¶ 5, 135; *see also id.* 2, 132, 141-50, 177, 173, 244, 254.  That is, failure begins long before the time limitation set forth in Defendant's Passport to Service passes.  *See Livingston v. Trane Inc.*, 2019 WL 397982, at *15 (D.N.J. Jan. 31, 2019) ("Plaintiff Rainey has plausibly alleged that her system 'w[as] defective at the time of sale,' . . . because "[t]he defect arises from a chemical rust inhibitor' installed before the system was sold") (quoting complaint).  That it took some time before Plaintiffs experienced the failure in the defect's final stage, and that some Plaintiffs continued to drive their

---

[11]   Given the effects of the cataclysmic failure – loss of engine power, all Plaintiffs and putative class members received unmerchantable vehicles at the point of sale and have cognizable claims for breach of implied warranty regardless of the time limitations because "[v]ehicles subject to engine failure cannot be said to be merchantable."  *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1244 (C.D. Cal. 2011) (water leak that could cause catastrophic engine or electrical system failure, "suddenly and unexpectedly," breached implied warranty of merchantability);  *see also Timing Chain*, 2017 WL 1902160, at *15 (plaintiffs sufficiently pled that vehicles were not merchantable where they alleged vehicle ceased operating due to defects in timing chain); *Bang v. BMW of N. Am., LLC*, 2016 WL 7042071, at *7 (D.N.J. Dec. 1, 2016) (finding plaintiffs stated claim for breach of implied warranty where alleged defect could cause "catastrophic engine failure, which may cause a life-threatening accident" and "unreasonable safety hazard" that resulted in multiple named plaintiffs experiencing "severe mechanical failures"); *Peterson v. Mazda Motor of Am., Inc.*, 2014 WL 12817797, at *3 (C.D. Cal. Jul. 3, 2014) (design defect that can lead to safety hazard renders vehicle unmerchantable).

vehicles (either before or after repair or replacement of the Turbocharger), does not mean the Class Vehicles were merchantable.[12]

Second, Defendant continues to ignore the allegations that establish its knowledge of the defect, thus rendering unconscionable its efforts to limit its warranty obligations. *See infra* at Section V.C.2.

## III.  PLAINTIFFS MAY SEEK RELIEF UNDER THE MAGNUSON-MOSS WARRANTY ACT

Defendant argues for dismissal of Plaintiffs' claims under the Magnuson-Moss Warranty Act ("MMWA").  D. Mem. 19-21.  To state a claim under the MMWA, Plaintiffs must plead a cause of action for breach of express or implied warranty under state law.  Claims under the MMWA thus "stand or fall with [the claimant's] express and implied warranty claims under state law."  *Miller v. Chrysler Grp LLC*, 2014 WL 12617598, at *6 (D.N.J. June 30, 2014).  As discussed, Plaintiffs sufficiently allege breach of express and implied warranty claims.[13]  Sections I and II, *supra*.

---

[12]  *See Kearney*, 2018 WL 4144683, at *16 ("[Defendant's] argument that [plaintiff's] vehicle continues to 'fulfill[] the ordinary purpose of a car' and thus remains merchantable simply because [plaintiff] continues to own the vehicle is similarly unavailing."); *Cox v. Chrysler Group, LLC*, 2015 WL 5771400, at *10 (D.N.J. Sept. 30, 2015) (allowing implied warranty claim to proceed even though plaintiffs continued to use their cars after defect manifested); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 545 (D. Md. 2011) (plaintiffs adequately stated claim that vehicles were unmerchantable where torque converter and transmission failed after 98,000 miles); *Burton v. Chrysler Grp. LLC*, 2012 WL 831843, at *4 (D.S.C. Mar. 12, 2012) (refusing to dismiss plaintiffs' breach of implied warranty claim even though they did not allege they stopped driving their trucks due to defect at issue).

[13]  Even if just one warranty claim survives, the MMWA claim survives as well. *See Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 601 (D.N.J. 2016) (allowing MMWA claim to proceed where only implied warranty claim survived).

Defendant's assertion that Plaintiffs are required to exhaust its informal dispute resolution procedure before suing for breach of warranties under the MMWA is not properly raised. Any alleged failure to participate in a warrantor's informal dispute settlement procedure is an affirmative defense that the warrantor may raise, but one that Plaintiffs need not negate in their complaint. *See Lessin v. Ford Motor Co.*, 2020 WL 6544705, at *6 (S.D. Cal. Nov. 6, 2020). The Complaint contains no allegations about any informal dispute resolution procedure, and Defendant improperly relies on documents that are outside and not integral to, or relied upon in, the Complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

Moreover, the mandate of the MMWA is a practical one, and will yield when such proceedings would be futile. Given Defendant's active concealment of the Turbocharger Defect, and alleged exploitation of the warranty limits to shift the burdens of the defect to Plaintiffs, any efforts at informal resolution would be futile. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1189 (C.D. Cal. 2010) ("At the pleadings stage, the Court cannot say whether attempts to comply with the informal dispute settlement procedure put in place by Toyota are futile. Plaintiffs' allegations [of defendant's cover-up and response to the defect] allow for such an inference.").

## IV.  PLAINTIFFS MAY PURSUE THEIR CLAIM FOR UNJUST ENRICHMENT

In arguing that Plaintiffs' claim for unjust enrichment should be dismissed, Defendant reiterates an argument that this Court did not accept when ruling on the previous motion to dismiss—that because Plaintiffs bought their vehicles from third-party dealerships rather than JLRNA, there cannot be a sufficiently "direct relationship" between Plaintiffs and JLRNA to support a claim for unjust enrichment. *See* D. Mem. at 19-20. But this Court held that Plaintiffs *would* state a claim for unjust enrichment so long as they "plausibly plead[] that the manufacturer

18

is something other than an innocent third-party." *Flynn-Murphy*, 2021 WL 5448716, at \*9 (internal quotation marks and alterations omitted) (quoting *Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 200 (D.N.J. 2012)). This Court cited by way of example, *Stewart*, explaining that, there, the court held that the plaintiffs had stated an unjust enrichment claim, even where the plaintiffs had "purchased the relevant products from a third-party retailer," because the plaintiffs had alleged that the "defendants 'engaged in fraudulent conduct and misrepresented' the nature of the product at issue 'through a direct nationwide advertising and marketing scheme.'" *Id.* (quoting *Stewart*, 77 F. Supp. 2d at 200). To be sure, this Court held that, unlike in *Stewart*, Plaintiffs here had not stated an unjust enrichment claim because they had not "plausibly ple[d] that Defendant knew of and failed to disclose the turbocharger defect at the time of sale." *Id.* But Plaintiffs now do so with their SAC, as discussed in Section V.C.2.[14]

Defendant also repeats another argument from its previous motion to dismiss—that Plaintiffs cannot assert an unjust enrichment claim based on the same subject matter covered by express warranties. *See* D. Mem. at 20. But Defendant continues to neglect that we are only at the pleadings stage, where claims for relief, including for unjust enrichment, may be pled in the alternative—even where those claims may be inconsistent with each other. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency.").

---

[14] In addition, the SAC sets out additional extensive allegations as to the relationship between Defendant and its agent-dealerships which establish privity between Plaintiffs and Defendant. *See* SAC ¶¶ 178-92. Plaintiffs specifically allege that Defendant's employees work with the agent-dealerships "on issues related to sales, marketing, technical training, and the service of parts and accessories," *id.* ¶ 180, and further allege that these employees "regularly and systematically work at the dealerships to educate dealership employees regarding the features of Defendants' vehicles, including but not limited to the features regarding the engines and Turbocharger," *id.* ¶ 182. Plaintiffs also allege that Defendant's agent-dealerships are solely responsible for providing warranty service on its vehicles. *See id.* ¶¶ 185-190. These agent-dealerships generally serve at the direction and discretion of Defendant and deal on its behalf directly with Plaintiffs. *See id.* ¶¶ 185-192.

Accordingly, courts routinely deny motions to dismiss based on JLRNA's argument. *See, e.g., Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012); *Omni Techs., LLC v. Know Ink, LLC*, 2020 WL 5239823, at *6 (S.D. Ala. Sept. 2, 2020); *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 445-46 (E.D. Pa. 2013); *Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 680 n.4 (D.N.J. 2012); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (because plaintiffs "are clearly permitted to plead alternative theories of recovery" it would be "premature" to dismiss the unjust enrichment claims on this basis at the motion to dismiss stage).

The purpose of this Rule is particularly clear when, as here, JLRNA is challenging Plaintiffs' claims for breach of warranty, along with the viability of each of Plaintiffs' other legal claims, and will likely continue to do so as the litigation proceeds *See, e.g., Grudkowski v. Foremost Ins. Co.*, 556 F. App'x 165, 170 (3d Cir. 2014) (noting that pleading both breach of contract and unjust enrichment is permitted when the viability of a contract claim is in dispute); *DeFrank*, 2020 WL 6269277, at *21; *Carter v. L'Oreal USA, Inc.*, No. 16-cv-508, 2017 WL 3891666, at *2 (S.D. Ala. Sept. 6, 2017). Indeed, Defendant's argument endeavors to defeat one of Plaintiffs' claims based on another right out of the gate. But the Third Circuit has made clear that "a court may not construe a plaintiff's first claim as an admission against another alternative or inconsistent claim." *See Indep. Enters. Inc. v. Pitt. Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997) (citing Rule 8(d)(3)).[15]

---

[15] Should the Court disagree, and conclude that an unjust enrichment claim cannot be plead while Plaintiffs assert viable legal claims, any dismissal should be *without prejudice* to assert in the event that Plaintiffs' legal claims later fail. *See Julian*, 2020 WL 6743912, at *7 (dismissing unjust enrichment claim "for failure to demonstrate that [plaintiffs'] remedies at law are inadequate," but doing so "without prejudice in the event [p]laintiffs uncover during discovery a basis for claiming that legal remedies are inadequate").

Finally, Defendant offers one new argument for dismissal of Plaintiffs' unjust enrichment claim that it did not offer in its previous motion: that Plaintiffs fail to allege a direct relationship between Defendants and dealership absent allegations of a "profit sharing" arrangement between Defendant and the third-party dealerships, or any other way in which "revenue to any dealer unjustly enriched JLRNA." D. Mem. at 20–21. As an initial matter, Defendant may not raise a new argument that it could have raised during is prior briefing. *See* Fed. R. Civ. P. 12(g)(2) (providing that a party that has previously made a motion under Rule 12 "must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion"); *see also Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 105 n.4 (3d Cir. 2018) (providing that, under Rule 12(g)(2), if an "amended complaint 'contain[s] new information or different allegations making it subject to a defense or objection that was not previously apparent . . . a party may move to dismiss on the basis of the newly discovered ground even if she has filed a Rule 12 motion previously.'"). Here, JLRNA cannot contend that its argument was not previously apparent, and thus the argument is improperly raised for the first time here.

Even if Defendant's new argument were properly raised, it is without merit. The SAC alleges in detail the relationship between Defendant and its authorized dealerships on the one hand and Plaintiffs on the other, making a claim for unjust enrichment proper: "The market for new cars, which involves a manufacturer with an extensive established network of authorized dealers that sell its cars, is structured such that drivers must buy from an authorized dealer and do not have the option to buy directly from JLRNA or the other Defendants," but is intended (as the Dealership Contracts provide) to drive purchases of Defendant's vehicles. SAC ¶¶ 187, 188. Defendant established and maintains its dealership network to enrich itself by ensuring that the dealerships carry out Defendant's business dealings with purchasers as Defendant intends and to drive such

purchases. *Id.* ¶¶ 188-192 (detailing the standards for dealership performance set by the dealership contracts). In other words, Plaintiffs plausibly show that both the dealerships *and, thereby, Defendant* were enriched by Plaintiffs' purchase of vehicles. And as discussed above, Defendant's sale of the Class Vehicles with the known Turbocharger Defect rendered its enrichment unjust. What is not plausible is that Defendant's effort to claim that the sale of the Class Vehicles was of no benefit to it.[16]

Accordingly, Plaintiffs' claim for unjust enrichment should not be dismissed.

## V.   PLAINTIFFS HAVE STATED THEIR FRAUD-BASED AND NEGLIGENT MISREPRESENTATION CLAIMS

### A.   Plaintiffs Have Pled Their Claims with Requisite Particularity

Defendant argues that Plaintiffs have not pled with the requisite particularity the date, time, and place of the fraud for purposes of Rule 9(b). D. Mem. at 21. But this Court did not previously uphold this argument. Rather, the Court held that Plaintiffs failed to satisfy Rule 9(b) by alleging

---

[16]  Defendant cites *Alin v. American Honda Motor Co., Inc.*, No. 08-4825, 2010 WL 1372308, at *15-16 (D.N.J. Mar. 31, 2010), and *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 260 (D.N.J. 2020), in support of this new argument. Both these cases treated the purchase of an automobile from a manufacturer's dealership like the purchase of an Apple computer from Best Buy or Staples. Neither case addressed the kinds of details Plaintiffs allege about the manufacturer's intentional development and use of a network of dealerships. Indeed, appreciating that the privity requirement for unjust enrichment is "non-strenuous," this Court has found that an automotive manufacturer can be unjustly enriched by the sale of a vehicle through one of its dealerships. *See Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, 2018 WL 6804506, at *10 (D.N.J. Oct. 30, 2018) (holding that plaintiffs stated claim for unjust enrichment against automobile manufacturer, even though plaintiffs purchased their vehicles from retailer, and explaining that "purchasing a vehicle from an intermediate retailer is good enough for the non-strenuous privity requirement at hand in light of the court's reasoning in *Stewart*"), *see also Stewart*, 877 F. Supp. 2d at 200-202 (declining to dismiss plaintiff's unjust enrichment claim against manufacturer of "Skinny Girl Margarita" even though plaintiffs purchased drink through retail liquor stores, where manufacturer "made false claims or misrepresentations directed for the purpose of generating retail sales, and where those retails sales could have the effect of increasing the amount of wholesale sales to the manufacturer").

that "he or she relied on the relevant marketing materials or the fact that their vehicle contained the 4-cylinder turbocharged engine as a reason for purchasing their vehicle[s]." *Flynn-Murphy*, 2021 WL 5448716, at *3-5. In any event, Plaintiffs have satisfied Rule 9(b), which is met where the plaintiff (1) pleads the date, place, or time of the fraud; or (2) *otherwise injects precision and some measure of substantiation in the allegations of fraud. See Frederico v. Home Depot*, 507 F.3d 188, 202-03 (3d Cir. 2007).

Moreover, JLRNA does not dispute that "[u]nlike affirmative misrepresentations, alleged omissions are 'not held to the same standard of specificity' because a plaintiff "will not be able to specify the time, place, and specific content of an omission as would a plaintiff in a false representation claim." *Yagudayev v. BMW of N. Am., LLC*, No. CV 20-897, 2020 WL 6689799, at *8 (D.N.J. Nov. 13, 2020) (citing cases); *Majdipour v. Jaguar Land Rover N. Am., LLC*, No. 2:12-CV-07849 WHW, 2013 WL 5574626, at *15 (D.N.J. Oct. 9, 2013). *See* D. Mem. at 29-30. Thus, "courts should apply Rule 9(b) with flexibility and 'should not require plaintiffs to plead issues that may have been concealed by the defendant[ ].'" *Strzakowlski v. Gen. Motors Corp*., No. CIV.A. 04-4740, 2005 WL 2001912, at *6 (D.N.J. Aug. 16, 2005). "Ultimately, pleadings of fraud are sufficient when they put the defendant on notice of the precise misconduct with which it is charged." *Id*. (citing *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984)). JLRNA does not argue it lacks notice of the alleged misconduct.

That said, the SAC is sufficiently particular to satisfy Rule 9(b)'s requirements for purposes of both Plaintiffs' allegations of affirmative misrepresentations and omissions. The SAC details very clearly the nature of Plaintiffs' fraud-based claims, including the specific conduct and omissions alleged to constitute fraud. SAC ¶¶ 140-65. It also specifies the general dates of the alleged fraud insomuch as it provides the months and years when Plaintiffs bought their vehicles

in reliance on Defendant's misrepresentations and omissions, the model years at issue, the years during which JLRNA sold the defective Turbocharger vehicles, the years when it marketed the vehicles, and the years when JLRNA would have been aware of the fraud. *See* SAC ¶¶ 3, 21, 25, 29, 33, 37, 41, 45, 49, 53, 57, 61, 65, 69, 76, 80, 84, 88, 92, 96, 100, 104, 140-65. Thus, JLRNA has been put on notice of the precise misconduct alleged against it and can respond accordingly. *See Majdipour*, 2013 WL 5574626, at *15 (holding that similar allegations against JLRNA satisfied Rule 9(b)); *Strzakowlski*, 2005 WL 2001912, at *6.

Additionally, "[a] plaintiff can carry his Rule 9(b) burden to plead consumer fraud by omission through allegations showing that a manufacturer knew of a defect in its product prior to the plaintiff's purchase and concealed it from consumers." *Yagudayev*, 2020 WL 6689799, at *8. Plaintiffs have adequately pled such knowledge and concealment here. SAC ¶¶ 6-11, 14, 15, 140-59, 160-65. Defendant argues that Plaintiffs fail to satisfy Rule 9(b)'s "particularly" requirement because they "still do not allege that they themselves saw or heard any specific statement." D. Mem. at 25. First, this argument lacks merit because it focuses entirely on "affirmative misrepresentations" and does not dispute that Plaintiffs adequately plead reliance upon "omissions." As this Court has held, a "[P]laintiff[] need not identify specific samples of representations on which they relied which did not contain the allegedly omitted information . . . . Rather, a plaintiff typically need only allege that the defendant failed to disclose material information, and that omission induced the plaintiff to enter into a transaction.'" *Opheim*, 2021 WL 2621689, at *14.

Second, at any rate, JLRNA's argument that "reliance" upon misrepresentations is absent, D. Mem. at 22-24, ignores the allegations. The SAC alleges that Plaintiffs purchased their vehicles "*based on the understanding that the vehicle was safe and reliable, among other material qualities,*

*based on representations or material omissions made by or on behalf of Defendant*, including some like those discussed below in Section E. Plaintiffs decided to purchase the Land Rover Discovery Sport SE due to its reputation of safety and reliability. *[They] relied on Defendants' statements or material omissions to this effect when purchasing her Discovery Sport . . . ."* *See, e.g.*, SAC ¶ 21 (emphasis added).  Section E, in turn, alleges the JLRNA concealed that the Turbocharger presents a safety risk and lacks reliability, pushed the "sustainability" and "safety" of some of the Class Vehicles, and marketed the Class Vehicles with words and phrases such as "efficiency," "performance," "born to perform in the most challenging conditions," delivering capability with composure," and "[c]ombin[ing] design excellence, engineering integrity and exceptional versatility to create a premium compact SUV." SAC ¶¶ 160-65.[17]  Indeed, Defendant used the Turbocharger to promise 6-cylinder performance (including the kind of reliability associated with these larger-engines) out of the leaner 4-cylinder Class Vehicles, but delivered instead the defective Turbocharger. *Id.* ¶ 2.  As this Court has stated in analogous circumstances, "the Complaint alleges that Plaintiffs reviewed the representations . . . and relied on them in

---

[17]  JLRNA also overlooks that under some states' laws, "reliance" is presumed where, as here, the plaintiff has pled that the misrepresentation or omission was material.  *E.g.*, SAC ¶¶ 217-19, 424. *See Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 934 (D.N.J. 2010) ("The Court is satisfied that Clark has sufficiently pled individual reliance. Under the fraud prong, reliance is presumed where a plaintiff has pled facts establishing that a misrepresentation or omission was 'material.' . . . .  Because materiality is normally a factual question, the Court will not attempt to resolve it here.") (discussing California UCL).  Defendant also ignores that Rule 8 and not Rule 9(b) applies where, as here, "[Plaintiffs' allege that] defendant allegedly violated [a consumer fraud statute's] general prohibition of 'unconscionable market practices." *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. CV 19-MD-2904, 2021 WL 5937742, at *21 & n.41 (D.N.J. Dec. 16, 2021); *DuMont v. Litton Loan Servicing, LP*, No. 12 CIV. 2677 ER, 2015 WL 1061138, at *13 (S.D.N.Y. Mar. 11, 2015); *see also Ewalt v. Gatehouse Media Ohio Holdings II, Inc*., No. 2:19-CV-4262, 2021 WL 825978, at *16 (S.D. Ohio Mar. 4, 2021) (applying Rule 8 to Ohio consumer law).   *See* SAC ¶ 423.  JLRNA does not address whether Plaintiffs meet Rule 8 under the applicable consumer protection laws.

making the investments at issue.  What more should the Complaint have said?" *Prudential Ins. Co. of Am. v. Bank of Am., Nat. Ass'n*, 14 F. Supp. 3d 591, 610 (D.N.J. 2014).  Defendant's argument that Plaintiffs point to representations that are not "false" ignores allegations that its representations and omissions were materially misleading.  *See* SAC ¶¶ 217-19, 409-29.

Defendant's argument that it can promise things like "safety" or "sustainability" notwithstanding the Turbocharger Defect, D. Mem. at 23-24, is also baseless.  Such an argument, based on the puffery doctrine, does not apply to omissions-based claims.  *See Kearney*, 2018 WL 4144683, at *11; *see also Corson v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 10068136, at *4 (C.D. Cal. July 18, 2013).

Statements concerning the safety of a product can *never* be considered puffery for clear public policy reasons—a manufacturer should never be permitted to exaggerate the safety of product, particularly a product such an automobile, where safety is a crucial feature of the product. *See, e.g.*, *In re: Toyota Motor Corp. Unintended Acceleration Mktg*., 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012).[18]  The question of whether or not a statement is "'puffery,' except in clear cases, . . . is normally a question of fact for the jury." *Johnson v. Shop-Vac Corp.*, 2020 WL 3496957, at *6 (D.N.J. June 29, 2020), *reconsideration denied,* 2021 WL 791830 (D.N.J. Feb. 26, 2021) (quoting *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 723 (D.N.J. 2011)).

"When analyzing the [advertising] as a whole 'it could fairly be understood . . . to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance.'" *Dopico v. IMS Trading Corp*., 2018 WL 4489677, at *5 (D.N.J. Sept.

---

[18]  *See also In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1318 (S.D. Fla. 2020) (statements concerning safety are not mere puffery where the defendant had actual knowledge that its products were unsafe); *Click v. General Motors LLC*, 2020 WL 3118577, at *5 (similar); *Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 312 (D.N.J. 2020) (similar).

18, 2018) (citation omitted).    Against the backdrop of the common understanding that a turbocharger will last the life of the vehicle, Defendant's maintenance schedule underlines the specificity of such statements.    *Cf. In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *18 (D.N.J. May 8, 2017) (discussing maintenance schedule recommending first inspection at 120,000 miles or ten years).    Defendant's use of the words and phrases discussed above, including "safety," "efficiency," "capability," "performance," and "sustainability," can be fairly understood to represent that Defendant's vehicles are safe and reliable while, as Defendant further promised, minimizing the impact on the planet, representations which are belied by the Turbocharger Defect.[19]

Finally, Plaintiffs did not engage in impermissible group pleading by improperly lumping the Defendant JLRNA, and Jaguar Land Rover Automotive PLC and Jaguar Land Rover Limited. D. Mem. at 25-26.    JLRNA, which represents only itself in its brief, does not explain how the allegations fail to sufficiently inform it of the basis for Plaintiffs' claims against it.    Indeed, JLRNA does not dispute that the allegations against itself are sufficiently specific so as to inform it of the claims against itself.    SAC ¶¶ 19, 30, 33, 110-11, 179-85, 187.    *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *10 (D.N.J. May 8, 2017) ("this Court is satisfied that, with the limited information in Plaintiffs' possession, Plaintiffs have made specific allegations as to Defendant VW America").    Courts in this District have also declined to dismiss similar allegations prior to discovery where the corporate structure of the defendants is complex.    *See*

---

[19]  *See Patrick Rojas v. Am. Honda Motor Co. Inc.*, 2020 WL 8515177, at *4 (C.D. Cal. Nov. 30, 2020) ("Vehicles can be verified to be 'safe' and 'reliable.' . . . The Court thus finds that these statements do not constitute puffery.") (citations omitted); *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 722 (D.N.J. 2011) ("Plaintiffs have pointed to specific affirmations or promises by Defendants regarding the safety of the use of their Products on pets, and therefore their . . . claim survives a motion to dismiss.") (citation omitted).

*Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 226 (D.N.J. 2020); *Merkin v. Honda N. Am., Inc*., 2017 WL 5309623, at *6-7 (D.N.J. Nov. 13, 2017) (citing *In re Volkswagen Timing Chain Prod. Liab. Litig*., 2017 WL 1902160, at *9).   Moreover, the SAC "identifies each Defendant individually, describing each Defendant's principal place of business and the overall corporate structure of their businesses." *Id.   See* SAC ¶¶ 19, 108-112, 181. The SAC also indicates that the Defendants are intertwined.  SAC ¶¶ 108-112.  *See Opheim*, 2021 WL 2621689, at *7 (where "entities . . . are intertwined, . . . more discovery is needed to determine the precise role of each"); *Ponzio*, 447 F. Supp. 3d at 226  ("Plaintiffs emphasize that they 'assert common allegations against MBUSA and Daimler because they are joined through the same corporate structure and act as agents and/or alter egos of each other.'").

## B.    Defendant Had a Duty to Disclose the Turbocharger Defect

Defendant argues that Plaintiffs cannot allege it had a duty to disclose to correct partial disclosures for purposes of the common law fraud and negligent misrepresentations claims.  D. Mem. at 28-29.  This Court previously upheld Defendant's argument on the ground that Plaintiffs failed to adequately plead Defendant's "knowledge" of the defect when Plaintiffs purchased their vehicles.  *See Flynn-Murphy*, 2021 WL 5448716, at *11.  In the SAC, Plaintiffs adequately plead such "knowledge," *see infra* at Section V.C.2, thereby validating their argument that JLRNA had a duty to disclose to correct a partial disclosure.  JLRNA's argument that it lacked "knowledge" of the defect such that the partial disclosure claim cannot survive, D. Mem. at 28-29, thus lacks merit.

"New Jersey law imposes a duty to disclose when a defendant has made a partial disclosure." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *20.[20] Here, Plaintiffs set forth various examples of Defendant's partial disclosures, including in nationwide marketing efforts to promote its Turbocharged engines and their benefits as material part of the Class Vehicles, and through its maintenance schedules and manuals.  SAC ¶¶ 1, 11, 110, 112, 126, 140-41, 160-65, 216-17, 219, 224, 226, 231, 307.   In none of those examples does Defendant disclose that the purported benefits of the Turbocharged engine would be nullified by the defect. Once it chose to speak, Defendant had a duty to disclose all of the facts.  These allegations are sufficient to establish partial disclosures that Defendant thus had an obligation to make true.  *See In re Mercedes-Benz Emissions Litig.*, 2019 WL 413541, at *22-23 (D.N.J. Feb. 1, 2019); *Timing Chain*, 2017 WL 1902160, at *20; *see also In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1273 (10th Cir. 2019); *CashCall, Inc. v. BancFirst*, 2016 WL 9559037, at *5 & n.11 (W.D. Okla. Dec. 15, 2016).[21]

---

[20]  Defendant only addresses a duty to disclose under New Jersey law, D. Mem. at 27-28, thereby waiving the issue of whether Plaintiffs have adequately pleaded fraud and negligent misrepresentation claims under other states' laws to the extent applicable.  Defendant omits the fact that many states recognize other circumstances in which a duty to disclose arises.  "[T]he laws of the majority of [Plaintiffs'] home states recognize a duty to disclose where the defendant possesses exclusive or superior knowledge or actively conceals the omitted information." *Timing Chain*, 2017 WL 1902160, at *19-20, 21 (discussing, *inter alia*, laws of California, Colorado, Florida, Michigan, & Pennsylvania). Plaintiffs adequately allege throughout their Amended Complaint that Defendant had a duty to disclose information concerning the Turbocharger Defect due to its superior and exclusive knowledge of the Defect.  *See, e.g.*, SAC ¶¶ 140-65, 170-76, 193-94, 198, 216-19, 224-26, 241. These allegations "are sufficient to impose a duty to disclose on Defendant" under the laws of the other states.  *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *19; *Rickman v. BMW of N. Am.*, 2020 WL 3468250, at *13-14 (D.N.J. June 25, 2020).  Moreover, in Texas, Defendant owes a duty to disclose safety defects.  *Id.* at 20. Plaintiffs plead a safety risk.  SAC ¶¶ 1, 70, 137, 139, 160, 196-97, 216-18, 429.

[21]  Defendant argues that New Jersey courts have found no fiduciary or special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose. Br. at 27-28.  This Court, however, has rejected that argument, where, as here, the Defendant is alleged to have made partial disclosures.  *See Amato v. Subaru of Am., Inc.*, 2019 WL 6607148, at

Furthermore, a fiduciary or confidential relationship is not necessary to establish a duty to disclose where, as here, an affirmative act of concealment by the Defendant effectively negates the duty-to-disclose requirement.[22]  "In this regard, Plaintiffs do not claim that Defendants were simply silent but rather that they took affirmative steps to conceal the [defective turbocharger]." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1008-1010 (N.D. Cal. 2018) (discussing NJ & PA law).  *See* ¶¶ 2, 94, 111, 115, 135, 168.

Because Plaintiffs have adequately alleged facts that satisfy the various grounds for a duty to disclose, Defendant's argument that Plaintiffs' fraud and negligent misrepresentation claims lack merit due to a failure to allege a fiduciary duty or a special relationship is irrelevant.

Finally, Defendant argues that Plaintiffs' reliance upon a partial representation is an element of a duty to disclose. D. Mem. at 28-29. But Defendant cites no authority that supports this contention, and Plaintiffs are aware of none.  In any event, as noted above, Plaintiffs adequately allege they purchased their Class Vehicles based on Defendant's representations. *See, e.g.*, SAC ¶¶ 21, 25, 29, 33, 37, 41, 45, 49, 53, 57, 61, 65, 69, 76, 80, 84, 88, 92, 96, 100, 104.

### C.    Plaintiffs Adequately Allege Defendant's Knowing Omission for Their Consumer Protection or Common Law Fraud Claims

Defendant makes a two-pronged argument for the dismissal of omission-based claims of misrepresentation.  First, it contends that it needed to have "known with certainty" that the

---

*21 (D.N.J. Dec. 5, 2019).  The Court has further recognized that "courts have permitted negligent misrepresentation claims between consumers and car manufacture[r]s." *Id.* (citation omitted); *see also In re Takata Airbag Prod. Liab. Litig.*, 2021 WL 908552, at *14, 16 (S.D. Fla. Mar. 9, 2021) (upholding defect fraud claims against automobile manufacturer under Florida and Texas law).

[22] *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) (finding plaintiffs had sufficiently pled duty to disclose for fraudulent omission claim where they alleged "defendant actively concealed and failed to disclose material facts that were in its exclusive knowledge"); *Roberts v. Est. of Barbagallo*, 366 Pa. Super. 559, 569, 531 A.2d 1125, 1130 (1987).

Turbocharger would fail after the warranty lapsed.  D. Mem. 29-30.  But this misconstrues the law and the nature of the inherent Turbocharger Defect which was present long before its failure. Second, JLRNA argues that Plaintiffs have not adequately alleged its knowledge of the Turbocharger Defect.  *Id.* 31-37.  Not only does this overstate the specificity required, it also overlooks the additional detailed allegations demonstrating JLRNA's knowledge of the Turbocharger Defect from the development of the Class Vehicles' turbocharged engines through its testing and examination of the earliest failed Turbochargers returned under warranty, to eventual failures, consumer complaints and related service visits.  Indeed, Defendant now tries to hide from the fact that, as alleged, any single failure of a Turbocharger would be room for concern, while a defect on the scale of this one could not be ignored.

1.  **Plaintiffs Allege an Actionable Post-Warranty Omission of a Defect Manifesting Prior to the Lapse of Defendant's Express Warranty**

Plaintiffs allege that mere exposure to "regular operational conditions [leads] the Turbocharger Defendants chose to use in the engines [to] begin[ ] to crack."  SAC ¶ 4.  They explained in detail how the Turbocharger Defect "manifests over time" and how this impacts performance short of catastrophic failure.  *Id.* ¶ 133.[23]  "At first, the purchaser will likely be unaware of the Defect as it gradually degrades the performance of the Turbocharger and engine .

---

[23]  The "internally mounted volute . . . and its supporting structure at the juncture of the exhaust manifold portion of the Turbocharger assembly and the turbocharger[] experience accelerated metal fatigue and premature failure," "often matched with cracking in the manifold," with result that volute "becomes loose and although remaining contained, may rattle around in the exhaust manifold"; eventually, the loose volute "can no longer maintain critical clearances with the turbine and contacts the turbine . . . causing breaking, chipping, and erosion of the metal turbine blades"; the "Turbocharger may fail immediately, or it may continue to run while the damage worsens and performance is increasingly degraded as the turbine blades are eroded"; "[I]n the end, the turbine becomes ineffective."  *Id.*

. . This failure will take a sudden and extreme turn for the worse when the Class Vehicle loses power during operation . . . ." *Id.* ¶ 135.

The damage to the operation of the Turbocharger (and the degradation related to the Defect) begins from the first time the vehicle is used; the later catastrophic failure is only the final "manifestation" of the defect.  Accordingly, the cases that JLRNA relies upon are inapposite.  *See Mickens v. Ford Motor Co.*, 900 F. Supp. 2d at  444  (discussing cases relied on by Defendant here as "distinguishable from cases in which the plaintiffs did not allege that the defect occurred within the warranty period").  Each of JLRNA's cases involved a manifestation that did not occur until after the warranty lapsed, such as the appearance of the "melted crayon smell" in *Alban*.  Here, the Turbocharger Defect was present at the time of sale, and manifested itself in damage to the Turbocharger and its performance far earlier and well within any warranty limits.

The fact that Plaintiffs were ignorant of the defect prior to purchase and before complete failure is irrelevant to Defendant's obligations to disclose and repair a defect about which it knew before the first Plaintiff purchased their vehicle.  Indeed, to the extent any of the warranty limits are relevant to Plaintiffs' consumer protection claims, such limits are unconscionable and no bar to their claims.  *See Timing Chain*, 2017 WL 1902160, at *17; *see also* Section I.B.

## 2.  Defendant Knew of the Turbocharger Defect at All Pertinent Times

Defendant's argument that Plaintiffs do not sufficiently allege its knowledge of the Turbocharger Defect improperly imposes a heightened Rule 9(b) particularly standard, and looks at the bases for its knowledge of the Turbocharger Defect in isolation from each other, rather than as a whole.  *See* D. Mem. 31-37.  In so doing, it ignores that Rule 8 does not require the pleading of "specific" facts, *Hassan v. City of New York,* 804 F.3d at 277 (3d Cir. 2015), *as amended* (Feb. 2, 2016) as well as the depth and breadth of facts alleged that support Defendant's knowledge.  As

this Court has recognized, "the *totality* of allegations pertaining to Defendants' knowledge of the alleged defect, *collectively*, are sufficient to establish Defendants ha[s] presale knowledge of the . . . Defect." *Ponzio*, 447 F. Supp. 3d at 227 (emphasis added); *id.* (rejecting "Defendants address[ing] each point in turn"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (7th Cir. 2007) ("courts must consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard") (emphasis in original); *Estate of Roman v. City of Newark*, 914 F.3d 789, 796-97 (3d Cir. 2019) ("[W]e '*must* consider the complaint in its entirety'") (quoting *Tellabs*, 551 U.S. at 322) (emphasis in original); *Kedra v. Schroeter*, 876 F.3d 424, 441 (3d Cir. 2017); *Howard Hess Dental Labs. Inc.*, 602 F.3d at 256 ("We have an obligation to read allegations not in isolation but as a whole and in context[.]") (citing cases).  More fundamentally, given that Defendant's knowledge is uniquely within Defendant's possession, for the purposes of pleading, Rule 9 provides that "intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

Plaintiffs made significant additions to the specific factual allegations showing that Defendant would have known about the Turbocharger Defect before it sold the first Class Vehicle, and would have received repeated confirmation of the defect thereafter.  SAC ¶¶ 142-152, 154-159.  For example, regarding the NHTSA (and other) complaints made about Defendant's failing Turbocharger,  Plaintiffs add in their operative complaint that a single complaint about the failure of a turbocharger would be significant and should have set off alarm bells within Defendant that there was a serious problem with the Turbocharger, particularly the ones that began in 2012 shortly after the launch of the Class Vehicles: "the fact that the Turbocharger assembly is expected to last

as long as the engine, and requires no special maintenance to do so, the fact that Defendants' Turbocharger assemblies were failing at all and leading to any complaints to NHTSA should have been particularly significant to Defendants." *Id.* ¶¶ 152, 154, 158. This is not a conclusory allegation. Plaintiffs' review of NHTSA complaints of competitor vehicles found that there were typically *no* complaints that even mention turbochargers, leaving Defendant's Turbochargers standing alone and failing in the field and demanding Defendant's attention. *Id.* ¶ 155. Coupled with the fact that such formal complaints to a governmental agency[24] are a mere fraction of the complaints that Defendant would begin to receive starting in 2012, the NHTSA and other complaints alleged in the SAC after the launch of the first Class Vehicle, would themselves have put Defendant on notice about the Turbocharger Defect. *Id.* ¶ 156-58. Consumer complaints to NHTSA (and elsewhere) are sufficient to establish a manufacturer's knowledge of a defect, even if (unlike here) there was no other basis for knowledge. *Kearney*, 2018 WL 4144683, at *11; *see also Rivera v. Ford Motor Co.*, 2017 WL 3485815, at *9 (E.D. Mich. Aug. 15, 2017) (defendant's pre-sale knowledge of defect adequately alleged where, even though listed complaints to NHTSA were not filed until after plaintiff purchased vehicle, "the complaint states that the listed complaints

---

[24] Defendant is required to monitor NHTSA complaints, and does so like it monitors on-line consumer *fora* where additional and early complaints about the Turbocharger Defect would be made. SAC ¶¶ 152, 158; *see also Cirulli v. Hyundai Motor Co.*, 2009 WL 5788762, at *4 (C.D. Cal., Jun. 12, 2009) (plaintiff successfully alleged presale knowledge of a defect largely through allegation that "[Defendant] has . . . constantly tracked the [NHTSA] . . . database to track reports of defective Sonata sub-frames"); *Schechter v. Hyundai Motor Am.*, 2020 WL 1528038, at *10 ("[A]according to Plaintiff, Defendants track the NHTSA website . . . . Viewed as a whole, Plaintiff's factual allegations assert a plausible basis to conclude . . . that Defendants reviewed or monitored the NHTSA website and were, therefore, aware of the posted online consumer complaints."). Although Defendant characterizes this allegation as conclusory or insufficient to support any inferences, it is an allegation of historical fact that must be accepted as true. *Connelly*, 809 F.3d at 789-90; *Hassan*, 804 F.3d at 295-96. Indeed, under federal law, Defendant must monitor NHTSA complaints and report defects within 5 days, thereby providing it with knowledge of the Turbocharger defect. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6.

'are just a small sampling of complaints submitted to the [NHTSA] regarding the Class Vehicles.").

As alleged, however, Defendant already knew about the Turbocharger Defect before the first Class Vehicle was sold. Key among the extensive amendments to the operative complaint, Plaintiffs offer specific allegations about the kind of testing Defendant would have undertaken before it even sold the Class Vehicles, testing that would have shown Defendant that it chose the wrong Turbocharger and would have exposed the Turbocharger Defect. SAC ¶¶ 142-152. Plaintiffs focus on two particular types of testing: Failure Modes and Effected Analysis (FMEA) and Design Validation Plan and Report (DVP&R). *Id*. ¶ 142.

During FMEA analysis, Defendant would have applied the well-established engineering principals that Defendant ignored in choosing its turbocharger (*id.* ¶¶ 121-134), thereby appreciating that turbocharger failure was a "'high risk' priority and to draw additional and more extensive analysis and validation during" development testing such as DVP&R. *Id.* ¶ 143.

DVP&R testing includes three basic kinds of tests: bench scale, engine dynamometer, and vehicle/field testing. *Id.* ¶¶ 144-48. During DVP&R testing, Defendant's Turbocharger gets put through the ringer. Bench testing puts the Turbocharger alone on a testing bench and runs it through operational extremes to expose risks, such as the fractures associated with the Turbocharger Defect. *Id.* ¶ 145. Engine dynamometer testing puts the Turbocharger to work on the engine used in the Class Vehicles under extreme conditions such as maximum temperatures and excessive vibration to ensure robustness and to reveal flaws such as the Turbocharger Defect. 146. Finally, vehicle testing puts the Turbocharger "on the road" through a full range of conditions and extremities—including high exhaust gas temperatures and high turbocharger loads, which would hasten the Turbocharger Defect. *Id.* ¶ 147.

Summarizing the key aspects of each phase of DVP&R testing, Plaintiffs set forth the following chart detailing what Defendant would have learned about the Turbocharger and the Turbocharger Defect based on such testing:

| Test Level | Test Type | Test Duration | Test Description |
|---|---|---|---|
| Bench | Durability | 1000 – 2000 hours | General durability test to validate robustness of component in extended use.  Reveals moderate thermal or mechanical fatigue related defects, like the Turbocharger Defect. |
| Bench | Thermal Shock | 200 – 600 hours | Component is repeatedly heated and cooled which could initiate fractures. Analogous to pouring cold water on hot glass/ceramic.  Reveals defects related to quick fluctuations in temperature expected in vehicle usage, like the Turbocharger Defect. |
| Bench | Vibration | 200 hours | Assess turbocharger robustness to range of expected frequencies.  Reveals turbocharger vulnerability to extended vibrations at frequencies expected in the engine. |
| Engine Dynamometer | Durability | 1000 – 2000 hours | General durability test to validate robustness of the entire engine including the turbocharger, typically at high load, wide-open-throttle conditions.  Exposure to multiple extreme parameters simultaneously should reveal Turbocharger Defect. |
| Engine Dynamometer | Thermal Shock | 500-2000 hours | Engine is operated in cycles with rapid large thermal gradient changes in coolant temperature (-25 °C to 120 °C) to thermally shock critical engine components.  Meant to confirm, in part, that the turbocharger can withstand real engine temperature fluctuations, such as those that make the Turbocharger Defect manifest. |
| Engine Dynamometer | Multicycle Throttling | 200-600 hours | Cycle engine between full throttle and idling.  Repeated transient cycles can assess thermal fatigue limit.  As with the above thermal extreme tests, would reveal the Turbocharger Defect. |
| Vehicle | Durability | 20k miles | Assess general durability of engine and turbo during vehicle usage. The tests may include severe duty cycles to accelerate (simulated) mileage and life accumulation. Testing is |

| | | | |
|---|---|---|---|
| | | | generally intended to represent the equivalence of 10 years and 150,000 miles. These tests will reveal flaws far more minor than the Turbocharger Defect that could be expected through customer use. |
| Vehicle | Hot Weather | 10k miles | Assess vehicle durability and turbo durability during extended high temperature conditions. Such high temperatures expose the turbocharger to more randomized thermal cycling which is more likely to reveal thermal fatigue defects, such as the Turbocharger Defect. |
| Vehicle | Cold Weather | 10k miles | Assess vehicle durability and turbo durability during start-up from cold temperature conditions. Such low temperatures expose the turbocharger to more randomized thermal cycling which is more likely to reveal thermal fatigue defects, such as the Turbocharger Defect. |

*Id.* ¶ 148

Assuming, as Plaintiffs must without the benefit of discovery, and accepting as true the allegations as the Court must, that such testing was properly completed, "the operational extremes marked out by these tests and others that would have been conducted involving exhaust temperatures and engine vibration, would have led to the failure of Defendants' turbocharger assembly and their knowledge of the Defect." *Id.* ¶ 149. Such allegations are more than sufficient, *on their own*, to establish JLRNA's knowledge. *Ponzio*, 447 F. Supp. 3d at 229 (knowledge sufficiently pled where plaintiffs alleged auto manufacturer "would have" discovered alleged defect.). This is particularly true given the new allegations that the first warranty returns that would inevitably underpin such early complaints would have been a "red flag" for a part like the Turbocharger, which should have led to further testing and analysis to determine the nature of the defect, if it was not already known in full by Defendant, and to appropriate remedial measures to ensure the safety of owners and their passengers. SAC ¶ 150.

Defendant's retort to these extensive allegations is simply to dismiss them as conclusory—"they plead no facts to support these conclusory allegations"—and to demand "*factual* allegations that any specific tests were conducted, how they were conducted, which Defendant conducted them, and what the results were, if any." D. Mem. at 32. But Plaintiffs have alleged the kind of testing and analysis Defendant would have completed; the details of the actual testing undertaken, who conducted the tests, and what the actual test results were can only be established through discovery.

When seen as a whole, the allegations amply satisfy any relevant pleading standard. *See Amato v. Subaru of N. Am.*, 2019 WL 6607148, at *16; *see also Powell*, 2020 WL 6886242, at *22 ("While the NHTSA complaints might not be sufficient to survive dismissal on their own, the Court finds that they are relevant to its assessment[.]"). This Court and others have routinely sustained an inference of pre-sale knowledge based on similar (and sometimes fewer) factual allegations considered collectively. *Francis v. Gen. Motors, LLC*, 2020 WL 7042935, at *14 (E.D. Mich. Nov. 30, 2020) (pre-release testing allegations, warranty and repair data, and NHTSA complaints establish pre-sale knowledge); *Lessin*, 2020 WL 6544705, at *11 (same); *Timing Chain*, 2017 WL 1902160, at *4-5, 19; *Zuehlsdorf*, 2019 WL 2098352, at *9 (same); *Kearney*, 2018 WL 4144683, at *11 (same); *see also Ponzio,* 447 F. Supp. 3d at 229; *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 460 (S.D.N.Y. 2014); *Gray v. BMW of N. Am., LLC*, 22 F. Supp. 3d 373, 383 (D.N.J. 2014).

## VI.  PLAINTIFFS MAY SEEK EQUITABLE RELIEF

Finally, Defendant reiterates the same arguments for dismissing Plaintiffs' requests for equitable relief that this Court already rejected. Specifically, Defendant argues that Plaintiffs' requests for equitable relief should be dismissed because they have not alleged: (1) the inadequacy

of a legal remedy; and (2) a sufficient likelihood of future injury, such that they have standing to seek injunctive relief.  D. Mem. at 37-39.  Plaintiffs allege both.

As to the inadequacy of a legal remedy, Defendant's argument continues to fail to recognize that legal and equitable claims may be plead in the alternative, even where those claims are inconsistent.  *See, e.g.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (rejecting argument that plaintiffs' unjust enrichment claim must be dismissed based on the existence of an adequate remedy at law, and noting that because plaintiffs "are clearly permitted to plead alternative theories of recovery" it would be "premature" to dismiss unjust enrichment claims on this basis at the motion to dismiss stage).

Again, Defendant relies principally on the Ninth Circuit's decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020), which, as this Court previously explained, "is not binding" and "addressed the dismissal of a claim for restitution at a very different point in the case," namely "after four years of litigation and two months before the trial."  *Flynn-Murphy*, 2021 WL 5448716, at *12 n.7.  Indeed, in *Sonner*, the plaintiff voluntarily dismissed her sole damages claim "[o]n the brink of trial," leaving only equitable claims for restitution and injunctive relief. 971 F.3d at 836.  The plaintiff did so for "[a] singular and strategic purpose . . .  to try the class action as a bench trial rather than to a jury."  *Id.*

But as courts have recognized—both before and after *Sonner*—while the inadequacy of a legal remedy may *ultimately* be required to obtain equitable relief, at the pleadings stage, a plaintiff may seek equitable relief in the alternative to claims for monetary damages.  *See, e.g.*, *Francis v. Gen. Motors, LLC*, 504 F. Supp 3d 659, 692 (E.D. Mich. 2020); *Minnesota by Ellison v. Sanofi-Aventis U.S. LLC*, 2020 WL 2394155, at *21 (D.N.J. March 31, 2020).  Like the plaintiffs in those cases, Plaintiffs here have sought both monetary and equitable relief, as they are entitled to do at

39

the pleadings stage regardless of whether those requests are consistent.  And Plaintiffs have not—like the plaintiff in *Sonner*—voluntarily abandoned a viable legal claim for monetary damages that would have provided adequate relief.

No more availing is Defendant's renewed argument that Plaintiffs lack an imminent injury sufficient to confer standing to seek injunctive relief.  Like the Amended Complaint, the Second Amended Complaint alleges an ongoing injury: Defendants have "not issued a recall for the defective Turbocharger, and have refused to repair or replace the Turbocharger outside of the time periods covered by the manufacturer's warranties."  SAC ¶ 13.  Moreover, Plaintiffs allege that "any replacement Turbocharger suffers from the same Turbocharge defect," and thus even those Plaintiffs that receive a replacement Turbocharger will continue to suffer harm.  *Id.* ¶ 14.  Such allegations of ongoing injury are sufficient to support standing to seek injunctive relief at the pleadings stage.  *See, e.g.*, *Durham v. City & Cnty. of Erie*, 171 F. App'x 412, 414 (3d Cir. 2006) (explaining that standing exists where "the injury sustained from the challenged conduct is still ongoing).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendant's motion to dismiss.[25]

DATED: May 12, 2022                    Respectfully submitted,


                                       By  <u>s/ *Christopher A. Seeger*    </u>
                                       Christopher A. Seeger
                                       Christopher L Ayers
                                       Scott A. George

---

[25]  In the event the Court grants Defendant's motion, either in whole or in part, Plaintiffs respectfully request leave to amend.  *See, e.g.*, *In re Synchronoss Techs., Inc. Sec. Litig.*, 2020 WL 3118749, at *7 & n.6 (D.N.J. June 12, 2020) (citing cases).

**SEEGER WEISS LLP**
55 Challenger Road, 6th Fl.
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com
cayers@seegerweiss.com
sgeorge@seegerweiss.com

James E. Cecchi
Caroline F. Bartlett
James A. O'Brien III
**CARELLA, BYRNE, CECCHI,**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
jobrien@carellabyrne.com

*Counsel for Plaintiffs and the Proposed Classes*