Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
Telephone: (973) 639-9100
Facsimile: (973) 584-9393
Email: cseeger@seegerweiss.com

James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com

*Counsel for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER BULLARD, NATALIE BUSH, LEO CANIZARES, LYNN COHN, RAYMOND DARBENZIO, JAMES DAVIES, LILIANA DE LA TORRE, LORETTA FLYNN-MURPHY, WILLIAM GILCHRIST, JAIME GONZALEZ, EMILY HARRELL, TOM HERBENER, JEFFREY HERZOG, RODNEY HOWARD, MANAGAYA KABBA, BILL LIQUORI, KELLY MCNEW, ANGELA PICK, SYDNEY POSTLE, LOLITHA SHEPHERD, and JEFFREY WILBUR, Individually And On Behalf Of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> JAGUAR LAND ROVER AUTOMOTIVE PLC, JAGUAR LAND ROVER LIMITED, and JAGUAR LAND ROVER NORTH AMERICA, LLC, <br><br> Defendants. | Civil Action No.  2:20-cv-14464-JMV-JBC <br><br> **THIRD AMENDED CLASS ACTION COMPLAINT and <u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION AND VENUE .......................................................... 7

III.  PARTIES ............................................................................................. 8

   A.    Plaintiffs ...................................................................................... 8

      i.     Plaintiff Bullard ................................................................. 8

      ii.    Plaintiff Bush ................................................................... 10

      iii.   Plaintiff Canizares ........................................................ 122

      iv.    Plaintiff Cohn ................................................................... 13

      v.     Plaintiff Darbenzio ........................................................ 166

      vi.    Plaintiff Davies ................................................................ 18

      vii.   Plaintiff De La Torre ....................................................... 19

      viii.  Plaintiff Flynn-Murphy ................................................... 21

      ix.    Plaintiff Gilchrist ............................................................. 23

      x.     Plaintiff Gonzalez ............................................................ 25

      xi.    Plaintiff Harrell ............................................................... 27

      xii.   Plaintiff Herbener ............................................................ 29

      xiii.  Plaintiff Herzog ............................................................... 31

      xiv.   Plaintiff Howard .............................................................. 33

      xv.    Plaintiff Kabba ................................................................ 35

      xvi.   Plaintiff Liquori ............................................................... 37

      xvii.  Plaintiff McNew .............................................................. 39

      xviii. Plaintiff Pick .................................................................... 40

      xix.   Plaintiff Postle ................................................................. 42

|  | xx. | Plaintiff Shepherd ................................................................ 44 |

|  | xxi. | Plaintiff Wilbur ................................................................... 46 |

B.      Defendants ................................................................................... 49

**IV.    FACTUAL ALLEGATIONS** ..........................................................51

      A.      Turbocharger Operation .............................................................. 51

      B.      The Class Vehicles' Engine & Defendants' Turbocharger ................................. 55

      C.      The Turbocharger Defect ............................................................ 57

      D.      Defendants Knew About the Turbocharger Defect ............................................ 62

      E.      Defendants Falsely Marketed the Class Vehicles (and Turbocharged Engines) .. 81

      F.      Relevant Warranties ................................................................... 86

      G.      Defendants' Dealership Agreements, Contracts and Dissemination of Warranties ................................................................................................ 88

**V.     TOLLING OF THE STATUTE OF LIMITATIONS/DUTY TO DISCLOSE** ...........92

**VI.    CLASS ACTION ALLEGATIONS** ................................................94

**VII.   CLAIMS FOR RELIEF** ................................................................98

      A.      Claims Brought on Behalf of the Nationwide Class (and all Subclasses) ............ 98

**COUNT I** Violation of the New Jersey Consumer Fraud Act ("NJCFA") ................................. 98

**COUNT II** Violation of the New Jersey Consumer Fraud Act .................................................. 100

**COUNT III** Fraud ................................................................................... 102

**COUNT IV** Negligent Misrepresentation .............................................. 104

**COUNT V** Breach of Express Warranty ................................................. 106

**COUNT VI** Breach of Implied Warranty ................................................ 109

**COUNT VII** Violation of the Magnuson-Moss Warranty Act ("MMWA" 15 U.S.C. § 2301, *et seq.*) ................................................................................................ 112

**COUNT VIII** Unjust Enrichment ........................................................... 115

B.    Claims on Behalf of Certain Alternative Subclasses (in Addition to Counts I-VI Which Are Asserted for All Alternative Subclass(es)) ...................................... 116

**COUNT IX** Violation of the Arizona Consumer Fraud Act (on behalf of Plaintiff Herbener and the Arizona Sub-Class) ................................................................................ 116

**COUNT X** Violation of the California Unfair Competition Law (on behalf of Plaintiff Gonzalez and the California Sub-Class) ......................................................................... 120

**COUNT XI** Violation of the California Consumer Legal Remedies Act (on behalf of Plaintiff Gonzalez and the California Sub-Class).................................................................. 124

**COUNT XII** Violation of the Colorado Consumer Protection Act (on behalf of Plaintiff Wilbur and the Colorado Sub-Class) ....................................................................... 125

**COUNT XIII** Violation of the Florida Unfair & Deceptive Trade Practices Act (on behalf of Plaintiffs Herzog and Gilchrist and the Florida Sub-Class)........................................... 129

**COUNT XIV** Violation of the Illinois Consumer Fraud and Deceptive Practices Act (on behalf of Plaintiff Harrell and the Illinois Sub-Class) ............................................... 133

**COUNT XV** Violation of the Massachusetts Consumer Protection Act (on behalf of Plaintiff Postle and the Massachussetts Sub-Class) ...................................................... 137

**COUNT XVI** Violation of the Michigan Consumer Protection Act (on behalf of Plaintiff Cohn and the Michigan Sub-Class) .......................................................................... 140

**COUNT XVII** Violation of the Nevada Deceptive Trade Practices Ac (on behalf of Plaintiff Postle and the Massachussetts Sub-Class) ...................................................... 145

**COUNT XVIII** Violation of the Ohio Consumer Sales Practices Act (on behalf of Plaintiff Shepherd and the Ohio Sub-Class) ................................................................. 149

**COUNT XIX** Violation of Oklahoma Consumer Protection Act (on behalf of Plaintiff McNew and the Oklahoma Sub-Class)........................................................................ 153

**COUNT XX** Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (on behalf of Plaintiff Canizares and the Pennsylvania Sub-Class) ...................... 157

**COUNT XXI** Violation of the South Carolina Unfair Trade Practices Act (on behalf of Plaintiff Howard and the South Carolina Sub-Class) ................................................. 161

**COUNT XXII** Violation of the Texas Deceptive Trade Practices – Consumer Protection Act (on behalf of Plaintiff De La Torre and the Texas Sub-Class)............................................ 165

**COUNT XXIII** Violation of the Virginia Consumer Protection Act (on behalf of Plaintiff Liquori and the Virginia Sub-Class)................................................................. 168

**COUNT XXIV** Violation of the Washington Consumer Protection Act (on behalf of Plaintiff Bullard and the Washington Sub-Class)........................................................................ 172

**COUNT XXV** Violation of the Wisconsin Deceptive Trade Practices Act(on behalf of Plaintiff Bush and the Wisconsin Sub-Class) ............................................................ 176

**PRAYER FOR RELIEF**............................................................................................180

**DEMAND FOR JURY TRIAL**................................................................................182

Plaintiffs Jennifer Bullard, Natalie Bush, Leo Canizares, Lynn Cohn, Raymond Darbenzio, James Davies. Liliana De La Torre, Loretta Flynn-Murphy, William Gilchrist, Jaime Gonzalez, Emily Harrell, Tom Herbener, Jeffrey Herzog, Rodney Howard, Managaya Kabba, Bill Liquori, Kelly McNew, Angela Pick, Sydney Postle, Lolitha Shepherd, and Jeffrey Wilbur, individually and on behalf of all others similarly situated (the "Class" or "Classes"), bring this class action against Jaguar Land Rover Automotive PLC ("JLR PLC") and Jaguar Land Rover Limited ("JLR LTD," together "JLR UK"), and Jaguar Land Rover North America, LLC, ("JLRNA" and with JLR UK, "Defendants") based upon personal knowledge as to themselves and their own acts and upon the investigation of counsel and review of public documents as to all other matters, and allege as follows:

## I.    INTRODUCTION

1.    This case involves a dangerous undisclosed defect ("Turbocharger Defect") in the turbocharger assembly (also referred to as the "Turbocharger") in tens of thousands of Land Rover vehicles.  The Turbocharger Defect in the Class Vehicles involves Defendants' decision to trade-off Turbocharger durability for short-term engine performance.  To wit, Defendants purposely designed the Class Vehicles with a turbocharger assembly that not only placed the turbocharger in closer proximity to the operational extremes of the engine, but also was of a lighter material that cannot withstand that environment, in order to increase short-term performance at the expense of durability, but which results in cracking and failure of the Turbocharger.

2.    The Turbocharger Defect causes the Turbocharger to fail under ordinary operating conditions, causing catastrophic damage to the vehicle's engine and exposing the occupants to hazardous driving conditions including the loss of power when accelerating onto highways and other roads.  Put simply, the vehicle is left without power and the occupants are left to the mercy of other drivers and vehicles on the road.

1

3.     When working properly, a turbocharger is a system that helps an engine produce more power and torque through forced induction, using the power of a vehicle's hot exhaust to drive more clean air into each cylinder as the engine is in operation.  It can make a smaller engine perform like a larger engine.  But a turbocharger is operating in extreme conditions - extremes of heat, vibration and torque - and the turbocharger design chosen by Defendants was uniquely vulnerable to each of these extremes, especially when harnessed in vehicles the size and weight of the Class Vehicles.

4.     The Turbochargers are inherently and materially defective because they begin to fail and crack when exposed to operational conditions.  These cracks typically occur at or near the mechanical structure that supports the Turbocharger operation where it mounts to the engine, leading to pieces of the component cracking, becoming loose, and dislodging and ricocheting around inside the housing, damaging the turbine blades and leading swiftly to the failure of the Turbocharger and, often, severe internal damage to the engine.

5.     The Turbocharger Defect will eventually lead the Turbocharger to suddenly and catastrophically fail.  When this happens, the Class Vehicles lose engine power, causing a loss in the ability to accelerate, maintain speed, and/or adequately control the steering wheel or fully engage the brakes.  Because the engine can fail at any time, under any driving condition, and at any speed, drivers and occupants of the Class Vehicles are at risk for rear-end collisions and other accidents as a result of Defendants' failure to disclose the existence of the Turbocharger Defect and corresponding safety risk.

6.     Defendants knew from the outset that the Turbocharger was defective, not fit for its ordinary and expected use in the Class Vehicles, and nowhere close to the premium product

Defendants represented to the public.  The Turbocharger Defect was a result of Defendants' design decision, and use of insufficient and inappropriate materials and parts.

7.     The nature of the Defect and its consequences described herein were and are material to Plaintiffs and any reasonable consumer.  Defendants had exclusive knowledge of the Defect yet chose to conceal it from purchasers.  Defendants' pre-sale knowledge of the Defect is evident in at least four ways:

8.     First, Defendants made the deliberate choice of design and materials to emphasize short-term engine performance at the expense of the durability of the Turbocharger. However, Defendants' choice of design and materials was at variance with well-established engineering principles as well as the choices of design and materials by other manufacturers using the same base engine.

9.     Second, the Defendants' routine pre-production testing is designed to expose or, as is the case here, confirm defects like the Turbocharger Defect that will increasingly manifest over use and time.  Such testing, including durability and aging tests performed in extreme operational environments and aggressive conditions cause the Turbocharger to fail, with evident material stress, fissures, cracking and breakage, that alerted Defendants of the design defect early on.

10.     Third, Defendants knew about the Turbocharger Defect and that it led to premature engine failure from the earliest customer complaints made to their dealers and the National Highway Traffic Safety Administration ("NHTSA"), and related warranty claims long before any of the Plaintiffs purchased their vehicles.    Any complaints and warranty claims for failed turbochargers – a crucial component of the engine and one intended and reasonably expected to last for 12 years or 200,000 miles - would be a red flag that no manufacturer could ignore, particularly when the failure is still within the standard warranty.  However, the first NHTSA

complaint about turbocharger failure was in July 2012, only months after the first Class Vehicles went on sale and before any of the Plaintiffs' purchased their vehicles.

11.     Fourth, Defendants gained even more knowledge about the Turbocharger Defect and why it led to catastrophic engine failure when they examined the Turbochargers they replaced under warranty and conducted failure analyses.  Any such failure of a turbocharger is a great concern for vehicle owners and manufacturers alike. Again, given that the first complaint of turbocharger failure occurred months after the first sale, Defendants were fully apprised of the Defect before any of Plaintiffs purchased their vehicles.

12.     Notwithstanding Defendants' exclusive and superior knowledge of the Turbocharger Defect, Defendants wrongfully and intentionally concealed the dangerous and defective design of the Turbocharger, which can fail at any time, forcing Plaintiffs and members of the Classes to incur out of pocket costs to repair or replace the damaged engine parts or their entire engine.  At a minimum, repairs will exceed $4,000.  In some cases, repairs can cost more than $12,000 when the entire engine needs to be replaced as a result of the Turbocharger Defect. No reasonable consumer expects to spend thousands of dollars to repair or replace essential engine components (or, as is often the case after turbocharger failure, the entire engine) during the first 12 years or 200,000 miles, which is the intended and reasonably expected life of the engine and core components like the Turbocharger.  Indeed, Defendants' Warranty and Maintenance Schedules for the Class Vehicles do not even recommend or include any inspections of or scheduled maintenance for the Turbocharger for the first 10 years or 100,000 miles.

13.     The Turbocharger Defect substantially reduces the value of the Class Vehicles.  As a result of the Turbocharger Defect, the Turbochargers expose owners not only to sudden and severe risks of catastrophic engine failure, but also leave owners with thousands of dollars in repair

bills and a Hobson's choice between fixing the Turbocharger at great expense or junking their vehicles when they are only worth nominally more than the costs of replacing the Turbocharger.

14.     Notwithstanding the fact that the Turbocharger should operate normally in vehicles for at least 12 years or 200,000 driven miles, Defendants have not issued a recall for the defective Turbocharger and have refused to repair or replace the Turbocharger outside of the time periods covered by the manufacturer's warranties.  Accordingly, Defendants have unfairly, falsely and deceptively transferred the cost of repair or replacement of the Turbocharger to Plaintiffs and members of the Classes by fraudulently concealing the existence of the defect, which Defendants know can occur after the expiration of the relevant warranties.  Defendants' obligation to repair and replace the defective Turbocharger did not expire with the manufacturer's warranty.

15.     Making matters worse, any replacement Turbocharger suffers from the same Turbocharger Defect.  Thus, Defendants have refused, and continue to refuse, to provide a meaningful remedy to those who have suffered economic harm as a result of the Turbocharger Defect.

16.     Defendants jointly developed sales and marketing materials, including its website, brochures for the Class Vehicles and the substance of the Monroney labels that were affixed to each and every Class Vehicle, all of which omitted any reference to the Turbocharger Defect, rendering these statements only partial disclosures.   In fact, on the Monroney labels for the Class Vehicles, Defendants touted the features of the engine and its turbocharger ("2.0L I4 16V GDI DOHC TURBO"),[1] but did not disclose the Turbocharger Defect.  Plaintiffs and others who

---

[1]  This description stands for 2.0 Liter Inline 4-cylinder 16 Valve Gasoline Direct Injection Dual Overhead Camshaft TURBO.  The key features being the smaller 2-liter engine and the Turbocharger.

purchased their vehicles new saw the Monroney labels in connection with their purchases of the Class Vehicles, and such information was material to them.

17.     Defendants knew, or should have known, that the Turbocharger Defect was material to owners and lessees of the Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles, or before the warranties on their Class Vehicles expired.  Because of their exclusive knowledge of the Turbocharger Defect, Plaintiffs reposed trust and confidence in Defendants to provide full disclosures of material aspects of the Class Vehicles, like the engine and its Turbocharger Defect. And yet, Defendants have intentionally concealed that the Turbocharger is defective, prone to premature failure, and presents a safety risk rather than disclosing this risk to consumers, including Plaintiffs and members of the Classes, and the public.

18.     Because of Defendants' failure to disclose the full truth in their advertising and marketing statements, on their website, and on the Monroney stickers, among other places, consumers continue to purchase and drive Class Vehicles with the Turbocharger Defect every day – on road trips, commutes, and weekend errands alike – unaware that their Turbocharger may cause catastrophic engine failure at any time.  This lawsuit seeks redress from Defendants for the overcharge premium paid by Plaintiffs and Class members for Class Vehicles at the point of sale. Plaintiffs also seek damages for, among other things: (1) out-of-pocket expenses for repair or replacement of the Turbocharger, other engine parts, or the entire engine; (2) costs for future repairs or replacements; (3) sale of their vehicle at a loss; and/or (4) diminished value of their vehicles.

19.     Had Plaintiffs known about the Turbocharger Defect in Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.  Plaintiffs and Class

members have consequently suffered ascertainable losses and actual damages, including, but not limited to, loss of the benefit of the bargain and diminished value of their Class Vehicle, as a result of Defendants' unlawful conduct.

20.    The vehicles with the Turbocharger Defect include the 2012 through 2017 model year 2.0 Liter Land Rover Range Rover Evoque; 2015 through 2017 model year 2.0 Liter Land Rover Discovery Sport; and 2013 through 2015 model year 2.0 Liter Land Rover LR2 (the "Class Vehicles") all designed, manufactured, marketed, sold, and distributed by Defendants.

## II.    JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendants, and  greater than two-thirds of the members of the Classes reside in states other than the states in  which Defendants are citizens.  This Court has jurisdiction over supplemental state law claims  pursuant to 20 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by  virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

22.    Personal jurisdiction exists over JLRNA because JLRNA maintains its principal executive offices in this District. Jurisdiction exists over JLR PLC because JLR PLC is ultimately responsible for the management strategy, operation, and risks facing Defendants. JLR PLC monitors and reports the financial statements of Defendants, manages the overall strategy of the companies, allocates capital and evaluates strategy, performance, responsibility and accountability.

23.     Jurisdiction exists over JLR LTD because JLR LTD's principal activity is the design, development, manufacture and sale of vehicles bearing the Jaguar and Land Rover marques. The JLR UK entities have sufficient minimum contacts with this District by virtue of incorporating their subsidiary, JLRNA, in this District. Moreover, the JLR UK entities transact substantial business in this District and its agents are located here.

24.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendant JLRNA is headquartered in Mahwah, New Jersey, and Defendants have marketed, advertised, sold, and/or leased the Class Vehicles within this District through numerous dealers doing business in the District, including in Englewood (Bergen County), Eatontown (Monmouth County), and Cherry Hill (Camden County).

## III.    PARTIES

### A.    Plaintiffs

#### i.    Plaintiff Bullard

25.     Plaintiff Jennifer Bullard is a citizen of the State of North Carolina and resides in Fayetteville, North Carolina. On or around January 1, 2018, Plaintiff purchased a used 2015 Land Rover Discovery Sport SE, with approximately 22,793 miles, in Spokane, Washington for personal use. Unbeknownst to Plaintiff Bullard at the time of purchase in 2018, Plaintiff's vehicle contained the Turbocharger Defect.

26.     Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

27.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

28.    While driving her vehicle in August 2021, Plaintiff noticed a decrease in power while trying to accelerate. On or around September 1, 2021, at approximately 66,700 miles, Plaintiff brought her vehicle into the Land Rover Dealer in Raleigh, where the service personnel told her that the Turbocharger was failing and needed to be replaced. Plaintiff received an estimate of $5,000.00 for the repairs, which she could not afford. Plaintiff did not drive the car for approximately three (3) months.  On or around November 29, 2021, at approximately 66,700 miles, Plaintiff confirmed that her Land Rover Warranty would cover the cost of the repairs so she then brought her vehicle in for the repairs, which took one (1) month to complete. Given that she had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed her vehicle was safe to drive, when it was not.

29.    Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

9

30.     As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require replacement, months of non-use and related costs, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### ii.     Plaintiff Bush

31.     Plaintiff Natalie Bush is a citizen of the State of Wisconsin and resides in West Bend, Wisconsin. On or around May 1, 2018, Plaintiff purchased a used 2013 Range Rover Evoque with approximately 51,576 miles, in Wisconsin for personal use. Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

32.     Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

33.     Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

10

34.    While driving the car in September 2021, Plaintiff noticed the "check engine" light came on, and had the car tested, which revealed an error code for the car's Turbocharger.  After replacement of the sensors failed to resolve the problem, her vehicle began to drive sluggishly, with noticeably reduced power.  Along with the lack of power, the engine was noisy, rattling and revving loudly.  Due to an approximate 3 month wait list for repairs at Defendants' dealership, Plaintiff sought assistance from independent mechanics who determined that the Turbocharger had failed and required replacement.

35.    Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

36.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendant and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendant disclosed that the defects in the Turbocharger would require Plaintiff to spend over five thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### iii.    Plaintiff Canizares

37.    Plaintiff Leo Canizares is a citizen of the State of Pennsylvania and resides in Bethlehem, Pennsylvania. On or around March 1, 2020, Plaintiff purchased a used 2016 Land Rover Discovery Sport with approximately 22,000 miles from Brown Daub Fiat Motors in Easton, Pennsylvania for personal use.  Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

38.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

39.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

40.    Approximately one year following purchase of his 2016 Land Rover Discovery Sport, and having only driven the vehicle approximately 3,000 miles, the engine in Plaintiff's vehicle stopped running in the middle of the street.  An independent mechanic determined the Turbocharger had failed, so Mr. Canizares took the car to the Land Rover dealership in Allentown, Pennsylvania.  The repair department at this dealership kept Plaintiff's vehicle for over one month, after which time they informed Plaintiff that his vehicle required a new engine.  At the time, there

were only 26,000 original miles on the car. Plaintiff contacted JLRNA to see if the corporate office would be able to help him with the repairs since he had not even owned the car for a year and it had low mileage. JLRNA explained that the warranty on his Land Rover Discovery Sport had expired months earlier, on July 29, 2020, and that they would not be offering any assistance. Plaintiff ultimately paid nearly $10,000 for the repairs necessitated by the Turbocharger Defect.

41.     Plaintiff had presented his vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

42.     As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger, the engine, and related engine components at a cost of over $10,000. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over ten thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

      **iv.     Plaintiff Cohn**

43.     Plaintiff Lynn Cohn is a citizen of the State of Michigan and resides in West Bloomfield Township. On or around January 1, 2016, Plaintiff purchased new a 2015 Land Rover

Evoque from a JLRNA authorized dealer, Land Rover Farmington Hills, in Farmington Hills, Michigan, for personal use.  Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

44.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

45.    As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

46.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

47.    On or around September 2019, at approximately 90,000 miles, Plaintiff's 2015 Land Rover Evoque experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine while Plaintiff was driving on the highway, requiring that Plaintiff take

evasive action when the car would go no faster than 30 mph. The vehicle was brought to the dealer for service, and Plaintiff Cohn informed the dealer that the vehicle lost power and was unable to accelerate over 30mph. The dealer noted: "the turbo, radiator and cooling system needed to be replaced."

48.    Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.  Furthermore, the dealership offered a trade-in value of nearly one-third the price of the remaining loan. Given she had not noticed signs or symptoms of Turbocharger Defect failure prior to the failure of the Turbocharger, Plaintiff believed her vehicle was safe to drive, when it was not.

49.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger, radiator and cooling system. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over four thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

**v.     Plaintiff Darbenzio**

50.    Plaintiff Raymond Darbenzio is a citizen of the State of Florida and resides in Port Charlotte. On or around April 1, 2014, Plaintiff purchased new a 2014 Land Rover Evoque from a JLRNA authorized dealer, Land Rover Princeton in Princeton, New Jersey, for personal use. Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

51.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

52.    As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

53.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

16

54.    Beginning around May 2020, at approximately 50,000 miles, Plaintiff's 2014 Land Rover Evoque experienced the Turbocharger failure, and began to suffer performance issues, including inability to properly accelerate, especially when on the highway.  By December 2020, Plaintiff had to have his vehicle towed to the dealership where the battery was replaced and wider inspection found that the turbocharger was failing.  The dealership quoted Plaintiff $7,500-$8,000 for replacement of the Turbocharger.

55.    Plaintiff had presented his vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

56.    As a result of the cost of replacement, Plaintiff has been unable to replace the Turbocharger and does not have a properly or safely functioning vehicle. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over seven thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

17

vi.      **Plaintiff Davies**

57.      Plaintiff James Davies is a citizen of the State of New Jersey and resides in Cape May. On or around August 1, 2013, Plaintiff purchased new a 2013 Range Rover Evoque from a JLRNA authorized dealer, Ray Catena Land Rover in Edison, New Jersey, for personal use. Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

58.      Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

59.      As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

60.      Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

18

61.    In or around October 2020, at approximately 92,000 miles, Plaintiff's 2013 Rand Rover Evoque began to exhibit performance issues, particularly lack of acceleration and slow engine response.  On or around November 24, 2020, after the check engine light had come on, Plaintiff brought their 2013 Land Rover Evoque to a JLRNA dealership which determined that the Turbocharger had failed, became cracked, and required replacement at a cost of over $4,000.

62.    Plaintiff had presented his vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

63.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over four thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased their vehicle, or would have paid less for his vehicle.

### vii.    Plaintiff De La Torre

64.    Plaintiff Liliana De La Torre is a citizen of the Commonwealth of Pennsylvania and resides in Warrington. On or around October 1, 2014, Plaintiff purchased new a 2014 Land Rover Evoque from a JLRNA authorized dealer, Land Rover San Antonio, in San Antonio, Texas,

for personal use.  Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

65.     Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

66.     As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

67.     Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

68.     On or around October 2020, at approximately 69,000 miles, Plaintiff's 2014 Land Rover Evoque experienced the Turbocharger failure, which caused increasing and repeated performance issues, leaving the vehicle unable to go over 30 mph.  Plaintiff took the vehicle to a JLRNA dealership which determined that the Turbocharger needed to be replaced, and quoted over

$4,000.  Plaintiff ultimately took the vehicle to an independent mechanic for the replacement to be completed at a lower cost.

69.     Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

70.     As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger, radiator and cooling system. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend thousands of dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### viii.     Plaintiff Flynn-Murphy

71.     Plaintiff Loretta Flynn-Murphy is a citizen of the State of New York and resides in the town of Monroe.  On or around May 1, 2017, Plaintiff purchased used a 2015 Land Rover LR2 from a JLRNA authorized dealer, Land Rover Paramus, in Paramus, New Jersey, for personal use. Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

21

72.     Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

73.     Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

74.     On or around April 2020, at approximately 20,000 miles, Plaintiff Flynn-Murphy's 2015 Land Rover LR2 experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine.   The vehicle was brought to the dealer multiple times for service related to performance problems with the engine, and Plaintiff informed the dealer of the performance issues as well as an odor coming through the vents.   The dealer noted: "crack in manifold/turbo."

75.     Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger.   Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.   At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

22

76.     As a result of the Turbocharger failure, Plaintiff Flynn-Murphy was forced to replace the Turbocharger and incurred related expenses.  None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles.  Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend hundreds of dollars associated with the failure and to repair or replace the Turbocharger, other engine parts, and/or the engine, Plaintiff would not have purchased her vehicle or would have paid less for her vehicle.

### ix.     Plaintiff Gilchrist

77.     Plaintiff William Gilchrist is a citizen of the State of Florida and resides in Oakland Park, Florida. On or around November 11, 2017, Plaintiff purchased a used 2015 Range Rover Evoque from JM Lexus in Margate, Florida, for personal use.  Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

78.     Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

79.     Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the

expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

80.     On or around July 10, 2021, at approximately 58,000 miles, Plaintiff's 2015 Range Rover Evoque started to experience Turbocharger failure while Plaintiff was attempting to start his vehicle to commute to work. Plaintiff started his vehicle and heard a strange noise come from the front end of the vehicle, however, it seemed fine and drove normally. The next day, Plaintiff again started his vehicle to begin his commute and heard the noise again, as he drove, he noticed a severe lack in acceleration.  Given the loss of power, Plaintiff had to take sideroads rather than highway to avoid quick maneuvers. He then parked his vehicle for approximately 3 days until he could get it to a mechanic who saw that the Turbocharger had failed. Given that he had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed his vehicle was safe to drive, when it was not.

81.     Plaintiff had presented his vehicle at one of Defendants' dealerships prior to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. Moreover, Plaintiff was never notified about the Turbocharger Defect and was not offered a non-defective Turbocharger replacement at any earlier service visits. At no time was Plaintiff aware of Turbocharger Defect until the aforementioned catastrophic failure occurred.

82.     As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that

the defects in the Turbocharger would require Plaintiff to spend over three thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

**x.    Plaintiff Gonzalez**

83.    Plaintiff Jaime Gonzalez is a citizen of the State of California and resides in Hawthorne. On or around March 1, 2014, Plaintiff was the first retail purchaser of a 2013 Land Rover LR2, and purchased his vehicle from Kinecta Federal Credit in Manhattan Beach, California, for personal use.  Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

84.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

85.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

86.    On or around October 2019, at approximately 90,000 miles, Plaintiff's 2013 Land Rover LR2 experienced catastrophic Turbocharger failure.  Plaintiff Gonzalez was driving in the middle lane of a highway at or near 60 miles per hour with his wife and three month old infant on

board his Class Vehicle.  His vehicle suddenly lost power and was unable to accelerate, forcing him to cross several lanes of highway traffic.  The vehicle was towed to the dealer for service, and Plaintiff Gonzalez informed a JLRNA dealership that his vehicle had lost power suddenly.  After replacing the timing chain, a repair Plaintiff Gonzalez paid several thousand dollars to complete, the dealership discovered that the Turbocharger had failed and required replacement.  Facing another repair requiring over three thousand dollars for the part alone, Plaintiff Gonzalez declined that procedure.  He retained the vehicle in that condition for several months and could only use it, when it is used at all, for local and slow transportation.  When the vehicle would not pass emissions inspections, he ultimately had to pay for the replacement, incurring over $4,000.00 in repairs so that the vehicle could be registered and legally driven.

87.     Plaintiff had presented his vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

88.     As a result of the Turbocharger failure, Plaintiff did not have a fully-functional vehicle for nearly two years which he is unable to afford to repair.  Plaintiff was given the ultimatum to repair his failed Turbocharger to pass his smog inspection, which he had to pay using a credit card, or he would not have a legally registered vehicle.  Even after the Turbocharger was replaced, he continues to experience intermittent engine light illuminations during his holiday road trip to Mexico. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes

contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over four thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

### xi.    Plaintiff Harrell

89.    Plaintiff Emily Harrell is a citizen of the State of North Carolina and resides in Whitsett, North Carolina. On or around November 4, 2015, Plaintiff purchased a new 2015 Land Rover 2 ("LR2") from Howard Orloff Imports in Chicago, Illinois, for personal use.  Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

90.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

91.    As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

92.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on

representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

93.     In October 2019 at approximately 32,000 miles, while driving in mixed traffic, a loud noise came from her engine and her vehicle suddenly lost power and would not accelerate no matter how much she pressed the accelerator. Following this incident, Plaintiff purchased a replacement Turbocharger and had an independent mechanic complete the repair. Given that she had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed her vehicle was safe to drive, when it was not.

94.     Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

95.     As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over three thousand dollars to

repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### xii.    Plaintiff Herbener

96.    Plaintiff Tom Herbener is a citizen of the State of Arizona and resides in the city of Phoenix. On or around January 1, 2013, Plaintiff purchased a new 2013 Land Rover LR2 from Land Rover in Arizona, for personal use.  Unbeknownst to Plaintiff at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

97.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

98.    As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

99.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the

expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

100.    On or around May 1, 2021, at approximately 50,000 miles, Plaintiff's 2013 Land Rover LR2 experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine. Plaintiff first noticed a very loud whistle noise emitting from the vehicle approximately 6 months prior to failure. Plaintiff's vehicle began to experience a loss in power during acceleration and the check engine light came on, it was then Plaintiff brought the vehicle into a Land Rover dealership where it was diagnosed with the Turbocharger failure. Based on the cost quoted by the dealership of over $7,000 for the repair, Plaintiff made the decision to tow his vehicle to a private mechanic where he had the Turbocharger failure repaired for around $5,000. Given that she had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed his vehicle was safe to drive, when it was not.

101.    Plaintiff had presented his vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

102.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed that the defects in the Turbocharger

would require Plaintiff, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

### xiii.    Plaintiff Herzog

103.    Plaintiff Jeffrey Herzog is a citizen of the State of Florida and resides in Trinity, Florida. On or around September 1, 2015, Plaintiff was a first-time purchaser of a new 2016 Land Rover Discovery Sport from Reeves Import Motorcars in Tampa, Florida, for personal use. Unbeknownst to Plaintiff Herzog at the time of purchase in 2015, Plaintiff's vehicle contained the Turbocharger Defect.

104.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

105.    As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

106.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the

expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

107.    On or around July 39, 2021, at approximately 55,000miles, Plaintiff's 2016 Land Rover Discovery Sport experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine. Plaintiff was driving his young son and nephew, and brother from vacation on the highway when the vehicle suddenly lost power, the "check engine" light went on, and the vehicle could not go faster than 40 mph even when the accelerator pedal was flush to the floor. Plaintiff was faced with the hazard of navigating across three lanes of traffic which was going past his disabled vehicle at speeds of 70 mph.  After slowly making his way home, Plaintiff immediately called Reeves Land Rover Tampa dealership to make an appointment for this issue. After the dealership replaced the vacuum pump (which did not restore power to the vehicle, it was determined that the turbocharger had failed, and it and many components in the engine needed to be replaced for nearly $12,000.  Given that he had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed her vehicle was safe to drive, when it was not.  Facing such an expensive repair, Plaintiff declined to repair and still owns a Class Vehicle which is unsafe to drive.

108.    Plaintiff had presented his vehicle at one of Defendant's dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement. At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

109.   As a result of the Turbocharger failure, Plaintiff has owned a non-operational vehicle for months and faces an enormous expense to repair it. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect or that the defects in the Turbocharger would require Plaintiff to spend over eleven thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

### xiv.   Plaintiff Howard

110.   Plaintiff Rodney Howard is a citizen of the State of Georgia and resides in Atlanta, Georgia. On or around January 22, 2019, Plaintiff purchased a used 2013 Range Rover Evoque, with approximately 50,600 miles, from Land Rover Hilton Head in Hardeeville, South Carolina, for personal use. Unbeknownst to Plaintiff Howard at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

111.   Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

112.   Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on

representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

113.    Less than one week following purchase of his 2013 Range Rover Evoque Plaintiff noticed the smell of gasoline and emissions fumes in the cabin. When he called the dealership from which he purchased the vehicle, they explained this can be normal for turbo cars. On or around April 17, 2019, at approximately 53,000 miles, Plaintiff brought his vehicle into Hennessy Jaguar Land Rover Buckhead in Atlanta, Georgia regarding the continuing issue with fumes and smells, and upon inspection they stated no fuel leaks are present. On or around October 31, 2020, at approximately 54,600 miles, less than 5,000 miles after he purchased the vehicle, Plaintiff's 2013 Range Rover Evoque experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine. Plaintiff was merging onto highway and attempted to pass another vehicle when the vehicle completely powered down. He had to take evasive action and the vehicle needed to be towed off the highway, eventually to his home. Following this incident, Plaintiff ordered a replacement Turbocharger and had it installed in his vehicle. Given that he had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed his vehicle was safe to drive, when it was not.

114.    Plaintiff had presented his vehicle at one of Defendant's dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not

offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

115.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over five thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

**xv.    Plaintiff Kabba**

116.    Plaintiff Mangaya Kabba is a citizen of the State of New Jersey and resides in Jackson. On or around April 1, 2015, Plaintiff purchased new a 2016 Land Rover Discovery Sport from a JLRNA authorized dealer, Land Rover Monmouth, in Eatontown, New Jersey, for personal use.  Unbeknownst to Plaintiff Kabba at the time of purchase in 2016, Plaintiff's vehicle contained the Turbocharger Defect.

117.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

118.    As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the

Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

119.   Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

120.   On or around October 2020, at approximately 71,000 miles, Plaintiff's 2016 Land Rover Discovery Sport experienced the Turbocharger failure, which caused increasing and repeated performance issues, and required several service visits to an authorized JLRNA dealership to diagnose Turbocharger failure as the source of the issues.   Thereafter, the replacement Turbocharger failed and also required replacement.

121.   Plaintiff had presented their vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.   At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

122.   As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger, radiator and cooling system. None of the marketing materials, advertisements or

other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over four thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### xvi.     Plaintiff Liquori

123.     Plaintiff Bill Liquori is a citizen of the State of Nevada and resides in Washington, DC, under military orders. On or around August 1, 2015, Plaintiff purchased a Certified Pre-Owned 2013 Land Rover LR2 from Land Rover Tyson's Corner in Vienna, Virginia, for personal use.  Unbeknownst to Plaintiff Liquori at the time of purchase in 2015, Plaintiff's vehicle contained the Turbocharger Defect.

124.     Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

125.     Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

126.    On or around December 30, 2020, at approximately 108,000 miles, Plaintiff's 2013 Land Rover LR2 experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine while Plaintiff's daughter was driving on the highway, shortly after merging, causing the vehicle to fail in traffic in an area with no shoulder or other safe area to pull over away from traffic, requiring emergency towing from the police to get the vehicle off the highway. Once off the highway, Plaintiff's 2013 Land Rover LR2 was immediately towed to Land Rover Alexandria where they diagnosed the Turbocharger failure. Given that he had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed his vehicle was safe to drive, especially for his daughter, when it was not.

127.    Plaintiff had presented his vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

128.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over ten thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

### xvii.    Plaintiff McNew

129.    Plaintiff Kelly McNew is a citizen of the State of Oklahoma and resides in Noble Township. On or around January 1, 2017, Plaintiff purchased used a 2015 Land Rover Evoque from a JLRNA authorized dealer, Land Rover Oklahoma City, in Oklahoma City, Oklahoma, for personal use.  Unbeknownst to Plaintiff at the time of purchase in 2017, Plaintiff's vehicle contained the Turbocharger Defect.

130.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

131.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

132.    Between February 2020 and August 2020, Plaintiff's 2015 Land Rover Evoque experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine at approximately 80,000 miles while Plaintiff was driving on the highway, requiring that Plaintiff take evasive action when the car lost power. The vehicle had been brought to the dealer for service in February 2020, and Plaintiff informed the dealer that the vehicle is having performance issues. The dealer neglected the problem with the Turbocharger, but replaced the power transfer unit

instead. In August 2020, Plaintiff's vehicle was serviced again due to continuing performance issues and the catastrophic failure. The dealer noted: "vehicle is unsafe to drive as turbo and wheel bearings needed to be replaced."

133. Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any of earlier service visit and not offered a non-defective Turbocharger replacement. At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

134. As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and power transfer unit. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over four thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### xviii. Plaintiff Pick

135. Plaintiff Angela Pick is a citizen of the Arizona and resides in Maricopa, Arizona. On or around September 1, 2017, Plaintiff purchased a Certified Pre-Owned 2014 Range Rover Evoque from Guadin Porsche in Las Vegas, Nevada, for personal use. Unbeknownst to Plaintiff Pick at the time of purchase in 2017, Plaintiff's vehicle contained the Turbocharger Defect.

136.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

137.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

138.    On or around April 20, 2020, at approximately 80,000 miles, Plaintiff's 2014 Range Rover Evoque experienced the Turbocharger failure, which caused catastrophic failure of the vehicle's engine while Plaintiff was driving her vehicle back from the Jaguar Land Rover Chandler dealership after picking it up for service on another issue. Plaintiff noticed the check engine light had illuminated after she had difficulty shifting the gear box, she immediately turned around to bring her vehicle back to the Jaguar Land Rover Chandler dealership. Plaintiff's 2014 Range Rover Evoque was diagnosed with the Turbocharger failure. Given that she had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed her vehicle was safe to drive, when it was not.

139.    Plaintiff had presented her vehicle at one of Defendant's dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger, including the day of failure. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the

Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement. At no time did Defendant notify or warn Plaintiff about the Turbocharger Defect.

140.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components and incur costs and expenses related to the defect. None of the marketing materials, advertisements or other disclosures or representations made by Defendant and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendant disclosed that the defects in the Turbocharger would require Plaintiff to repair or replace the Turbocharger (with an equally defective Turbocharger), other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### xix.    Plaintiff Postle

141.    Plaintiff Sydney Postle is a citizen of the State of Rhode Island and resides in Pawtucket, Rhode Island. On or about March 1, 2013, Plaintiff purchased a new 2013 Range Rover Evoque, from Jaguar Land Rover Sudbury in Sudbury, Massachusetts for personal use. Unbeknownst to Plaintiff Postle at the time of purchase in 2013, Plaintiff's vehicle contained the Turbocharger Defect.

142.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

143.    As a person who purchased their vehicle new, Plaintiff saw the Monroney labels for the vehicle they ultimately purchased, which label touted the engine and its turbocharger, which information was material to Plaintiff.  Defendants did not disclose the Turbocharger Defect on the Monroney label or in any other marketing material, despite their superior and exclusive knowledge of the defect and the fact that a reasonable consumer would find the Turbocharger Defect to be material to the purchase.

144.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

145.    Plaintiff first became aware of problems with her Turbocharger in March, 2019 when car had 100,000 miles on it.  Plaintiff was driving up a hill and suddenly had a reduction of power, and her "check engine" light turned on. When Plaintiff brought the car to one of Defendants' dealerships for service, she was told that the exhaust manifold of the turbocharger assembly was cracked.  Having lost confidence in Defendants and their dealerships, and facing a costly repair out of warranty, she continued to use her vehicle on local and slow trips, but there was significant reduction in power and acceleration. On or about March 24, 2020, Plaintiff brought her car to an independent mechanic and had the Turbocharger replaced for approximately $1,600.00 in labor, after paying thousands for the replacement Turbocharger.  Given that he had

not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed her vehicle was safe to drive, when it was not.

146.    Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

147.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger and related engine components. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over five thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### xx.    Plaintiff Shepherd

148.    Plaintiff Lolitha Shepherd is a citizen of the State of Ohio and resides in Cleveland, Ohio. On or around January 1, 2018, Plaintiff purchased a used 2013 Land Rover LR2 in Ohio for personal use.  Unbeknownst to Plaintiff Shepherd at the time of purchase, Plaintiff's vehicle contained the Turbocharger Defect.

149.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing

her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

150.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.  Plaintiff's purchase was premised on the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

151.    While she was driving her vehicle the car in September of 2020, the "check engine" light went on and suddenly lost power when trying to accelerate. She then took the car to an independent mechanic in Cleveland Heights, Ohio, where she was told the Turbocharger had failed.  The independent mechanic called the Land Rover Dealer in Cleveland, Ohio and the dealer responded that they could not assist with the repairs.  Plaintiff brought the car home but was advised by the mechanic not to drive it as "parts of the turbo could break off and get stuck in the engine causing it to lock up."  On or about June 10, 2021, at approximately 103,550 miles, Plaintiff then returned her vehicle to the independent mechanic for an estimate to repair her vehicle repairing the damaged turbocharger, and was told it would cost over $10,00.00 to fix.  She has not yet had her vehicle repaired due to the high cost.  Given that she had not noticed any signs or symptoms of Turbocharger Defect prior to the Turbocharger failing, Plaintiff believed her vehicle was safe to drive, when it was not.

152.    Plaintiff had presented her vehicle at one of Defendants' dealerships on other occasions prior to the failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to

know, and did not know, about the Turbocharger Defect.  However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

153.    As a result of the Turbocharger failure, Plaintiff will be forced to replace the Turbocharger and related engine components in order to keep the car. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the Turbocharger would require Plaintiff to spend over ten thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased her vehicle, or would have paid less for her vehicle.

### xxi.    Plaintiff Wilbur

154.    Plaintiff Jeffrey Wilbur is a citizen of the State of Colorado and resides in Longmont. On or around May 1, 2018, Plaintiff purchased used a 2014 Land Rover LR2 from Audi Denver, in Denver, Colorado, for personal use.  Unbeknownst to Plaintiff Wilbur at the time of purchase in 2018, Plaintiff's vehicle contained the Turbocharger Defect.

155.    Plaintiff relied on Defendants' material omissions regarding the Turbocharger Defect and partial statements regarding the safety and reliability of the vehicle when purchasing her Discovery Sport and would not have purchased it or paid a premium price for it if she knew about the Turbocharger Defect and the related safety and reliability issues.

156.    Plaintiff decided to purchase a Land Rover due to Defendants' on-going efforts to associate its vehicles with safety, durability, and reliability.   Plaintiff's purchase was premised on

the understanding that the vehicle was safe and reliable, among other material qualities, based on representations, partial representations, or material omissions made by or on behalf of Defendant, including representations substantially like those discussed below in Section E, regarding the expected performance and durability of the vehicle's 4-cylinder turbocharged engine (which would be as good as or better than the 6-cylinder engine it replaced), and the safety of the Class Vehicles.

157.    On or around January 8, 2021, at approximately 69,500 miles, Plaintiff brought his 2014 Land Rover LR2 in for service at a JLRNA dealership and was told that his vehicle was in perfect condition.  On January 12, 2021, Plaintiff was driving at or near 70 miles per hour on a highway on his way to work when his vehicle suddenly lost power and was unable to exceed 40 miles per hour.  Plaintiff Wilbur exited the highway as soon as he was able, and found his way to the dealership through back roads.  The JLRNA dealership informed Mr. Wilbur that his Turbocharger had failed and quoted approximately $4,000 to replace the failed Turbocharger.

158.    Plaintiff had presented his vehicle at one of Defendants' dealerships on other occasions prior to the service visit related to the final failure of the Turbocharger. Unlike Defendants, Plaintiff had no basis to know, and did not know, about the Turbocharger Defect. However, Plaintiff was not told about the Turbocharger Defect at any earlier service visit and not offered a non-defective Turbocharger replacement.  At no time did Defendants notify or warn Plaintiff about the Turbocharger Defect.

159.    As a result of the Turbocharger failure, Plaintiff was forced to replace the Turbocharger. None of the marketing materials, advertisements or other disclosures or representations made by Defendants and received by Plaintiff and members of the Classes contained any disclosure relating to the defect or premature failure of the Turbocharger in the Class Vehicles. Had Defendants disclosed the Turbocharger Defect, or that the defects in the

47

Turbocharger would require Plaintiff to spend approximately four thousand dollars to repair or replace the Turbocharger, other engine parts, and for associated costs and expenses, Plaintiff would not have purchased his vehicle, or would have paid less for his vehicle.

160.    When Plaintiffs and members of the Classes purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Turbocharger would last 12 years or 200,000 miles without the need for repair or replacement and/or would not pose and sudden and unexpected safety risk. Had Defendants disclosed that the Turbocharger was prone to premature failure and/or a sudden and unexpected safety risk, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles. Further, had Defendants disclosed that the Turbocharger in the Class Vehicles would not last for 12 years or 200,000 miles, which is the expected life of the engine and core components like the Turbocharger, Plaintiffs and members of the Classes would have demanded repair or replacement during the relevant warranty periods at no cost to Plaintiffs and members of the Classes – as provided for in Defendants' warranties.

161.    The Class Vehicles were operated in a reasonably foreseeable manner and as the vehicles were intended to be used. Plaintiffs and members of the Classes have suffered an ascertainable loss as a result of Defendants' deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Turbocharger defect, including but not limited to, out-of-pocket losses and/or the costs of future repairs or replacements, and diminished performance and value of their respective vehicles.

162.    Neither Defendants nor any of its agents, dealers, or other representatives informed Plaintiffs and members of the Classes of the premature failure of the Turbocharger and/or the defective nature of the Turbocharger prior to the purchase or lease of the Class Vehicles.

### B.  Defendants

163.    Defendant JLR PLC is ultimately responsible for the management strategy, operation, and risks facing Defendants.[2] However, the wider organization is responsible for the proactive day-to-day management and control of those risks. In its role for managing the Jaguar and Land Rover entities, JLR PLC monitors and reports the financial statements of Defendants, manages the overall strategy of the companies, allocates capital and the Board evaluates strategy, performance, responsibility and accountability. JLR PLC carefully considers the "economic, geopolitical, and environmental factors" facing Defendants and creates and manages strategies to navigate those risks.[3] Simply put, JLR PLC is the brains of the Jaguar and Land Rover operations and at all relevant times directed and controlled the activities of Defendants. Upon information and belief, JLR PLC is organized under the laws of the United Kingdom and maintains its registered office at Abbey Road, Whitley, Coventry, CV3 4LF, England.

164.    Defendant JLR LTD is the operating company of JLR PLC, and its principal activity is the design, development, manufacture and sale of vehicles bearing the Jaguar and Land Rover marques. Part of its operation is to review key risks to monitor the progress of remediation actions.[4] Indeed, its Risk Management Committee provides oversight of current and emerging risks at a detailed level that are reviewed against acceptable levels of exposure.[5] Principal risks and exceptions are reported to the Audit Committee regularly to assist in the decision making

---

[2]    2021 Jaguar Land Rover Automotive PLC, *Annual Report 2020/2021*, available at https://media.jlrms.com/2021-07-19/pdf/ec889077-c450-4849-99f9-791e35eb65b4/Annual%20Report_compressed.pdf?VersionId=XQ_UeGywZN8eq21ZzQk.rUVy7SSITrAv (last accessed January 10, 2022).

[3]    *Id.*

[4]    *Id.*

[5]    *Id.*

process and ensure adequate controls are in place to provide sufficient protection for Defendants.[6]

Accordingly, as part of its ordinary operations JLR LTD received material information concerning the existence of the Defect. Upon information and belief, JLR LTD is organized under the laws of the United Kingdom and maintains its registered office at Abbey Road, Whitley, Coventry, CV3 4LF, England.

165.    Defendant Jaguar Land Rover North America, LLC ("JLRNA") is an automobile company that distributes, markets, services, warrants, repairs, sells and leases passenger vehicles designed and manufactured by JLR UK, including the Class Vehicles, in North America. It maintains its corporate headquarters and principal place of business in Mahwah, New Jersey. This entity was created in connection with Ford Motor Company's sale of its Land Rover branded business entities to Tata Motors Limited. Land Rover is a subsidiary of Jaguar Cars Limited, a United Kingdom business entity that is a subsidiary of Jaguar Land Rover Limited, another United Kingdom business entity which, in turn, is a subsidiary of Tata Motors, a business entity of the Republic of India.

166.    At all relevant times, JLRNA acted as the authorized agent, representative, servant, employee and/or alter egos of JLR UK while performing activities including but not limited to advertising, warranties, warranty repairs, dissemination of technical information and monitoring the performance of Land Rover vehicles in the United States, including substantial activities that occurred within this jurisdiction.

167.    At all times relevant to this action, Defendants manufactured, distributed, sold, leased, and warranted the Class Vehicles under the Land Rover brand name throughout the United States. Defendants and/or their agents designed, manufactured, and/or installed the defective

---

[6]    *Id.*

Turbocharger in the Class Vehicles. Defendants and/or their agents also developed and disseminated the owner's manuals and warranty booklets, Monroney stickers, USA Warranty and Maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

## IV.    FACTUAL ALLEGATIONS

### A.    Turbocharger Operation

168.    Turbochargers have been used in engine applications for many years. The first applications were on diesel engines which required a higher air to fuel ratio, and were the mechanism to force additional air to the engine.  Similarly, turbochargers have been used in gasoline powered aircraft engines in order to compensate for the reduction in air density at flying altitude. In automotive applications, turbochargers (and a similar technology, the supercharger, in high performance race cars) have been used for many years.  Since the 1970s, turbochargers have been used occasionally in standard automotive applications as a way to improve fuel economy and reduce emissions by reducing weight.  More recently, as fuel economy and emission standards have tightened further, and turbocharger design and technology have advanced, turbochargers have become ubiquitous in diesel engines, and are also much more common in gasoline engines.

169.    A turbocharger works by using pressurized, high temperature engine exhaust to spin a turbine impeller, which is connected to the compressor by a common shaft and turned by the turbine.  The compressor then pressurizes the air going into the cylinders via the intake manifold.[7]  This is known as "boosting."

---

[7] https://auto.howstuffworks.com/turbo.htm (last visited 10/12/2020).



170.     Turbochargers are a forced induction system that compresses air flowing into a vehicle's engine, allowing the engine to burn more fuel by forcing more air into the vehicle's cylinders.  This translates to greater power and power density (which is the power divided by the displacement of the engine).  That is, it allows a smaller engine to perform like a bigger engine.



171.    A turbocharger is attached to the exhaust manifold of the engine, where it harnesses the energy of the hot exhaust leaving the engine to drive a compressor which forces more air into the engine.  Exhaust is channeled from each cylinder of the engine through the volute in the turbocharger which directs and focuses the force of the exhaust over the turbine.  Since the amount of fuel consumed is limited by the amount of air available for the combustion process, the additional air flow provided by the turbocharger, allows for more fuel to be used thus increasing the power output.  In addition, the thermodynamic efficiency of the engine is improved by taking advantage of otherwise wasted exhaust energy.

172.    A turbocharger is subject to a wide range of exhaust flows and temperatures (among the other conditions) that change often and quickly as the engine's speed and load change dynamically during the many accelerations and decelerations encountered in typical driving. For example, when a vehicle is first started, the exhaust side of the turbocharger will be close to ambient temperature, while at full load operation the exhaust temperature can reach 2000 degrees Fahrenheit.  The hot pressurized exhaust stream is not uniformly smooth, but rather rapidly pulsing in nature owing to the fact that the cylinder exhaust values open and close multiple times during each revolution of engine.   These non-steady events create stresses on the structure of the turbocharger.  Further, at some engine speeds, a resonant frequency may be achieved whereby the forces imparted on internal components are significantly amplified.

173.    The demands of the modern turbocharger have increased these extremes which must be accounted for in the design and materials used.  To maximize performance, thermal losses between the engine cylinders and the inlet to the turbo are minimized.  To prevent heat loss, the exhaust manifold is typically enclosed with a metal shroud (jacket or housing) with an insulating air gap.  Relatedly, the turbocharger is attached to the exhaust manifold but located close to the

engine block to reduce heat loss or heat storage in the exhaust manifold.  That is, the turbocharger is put into close contact with the engine block.

174.    In such an extreme environment, the turbocharger must operate with precision.  The shaft connecting the turbine to the compressor will spin at a rate of tens of thousands of revolutions per minute and upwards of 200,000 rotations of the turbocharger axle each minute when operating at maximum speed.  To ensure long and efficient operation of a turbocharger, the design must accommodate such extreme operational environments and maintain critical clearances and tolerances.

175.    As Defendants describe it in their "Turbocharger Manual,"[8] the Turbocharger needs to accommodate and be protected from the extreme conditions in which it operates:

> The Turbocharger is an exhaust-driven centrifugal air compressor which increases power output by supplying compressed air to the engine. The turbine wheel of the Turbocharger uses the engine's exhaust gasses to drive the compressor wheel at speeds of up to 195,000 RPM. The compressor wheel draws in fresh air which is compressed and delivered through a charge air cooler to the engine cylinders.
>
> By turbocharging the engine, the pressure and density of the air entering the cylinders is increased, and therefore so is the amount of oxygen. This enables a greater quantity of fuel to be injected, thus increasing the engine's power output, improving fuel consumption and the ability to maintain power at higher altitudes.
>
> The internal components are oil and coolant cooled. Engine oil and coolant are circulated through the center housing which acts as a heat barrier between the "hot" turbine and the "cold" compressor. The bearing is a sleeve type and is lubricated by engine oil. Oil is circulated to the Turbocharger center housing and returned to the sump through an oil drain to the cylinder block.

---

[8]    *See* Evoque Manual: Fuel Charging and Controls – Turbocharger – GTDi 2.0L Petrol – Turbocharger – System Operation and Component Description (published 09-Jun-2011), Exhibit 1 hereto (Pg. 15 of PDF) (Retrieved from https://cardiagn.com/evoque-2011-13-fuel-charging-and-controls-gtdi-2-0l-petrol/) (last visited 10/12/2020).

### B.     The Class Vehicles' Engine & Defendants' Turbocharger

176.     The Class Vehicles are equipped with a 2.0 liter in-line 4-cylinder gasoline engine that were first introduced by Defendants in the 2011, for its 2012 model year.  This 2.0 liter engine is a Ford-designed "EcoBoost" engine, and, like Ford's rigorous preproduction testing regimen (which is discussed later), was one of the continuing legacies of Ford's brief ownership of Land Rover (Defendants' predecessor) from 2000-2008.

177.     Both Ford and Defendants utilized the EcoBoost engine in their larger, utility vehicles, and necessarily used a turbocharger to enhance this smaller 4-cylinder engine.  Both Ford and Defendants' needed a turbocharger to increase the power to weight ratio of these smaller engines, which is critical to provide the level of performance expected by consumers and to meet increasingly stringent fuel efficiency and tailpipe emissions standards.  But Ford and Defendants each chose very different turbochargers for their vehicles.

178.     Ford, for example, used the EcoBoost engine in its Explorer and Edge vehicles, replacing the standard 6-cylinder engine with its lighter and more fuel efficient 4-cylinder EcoBoost engine.  The lowest gross vehicle weight of the Ford vehicles equipped with the EcoBoost engine is the Edge at 5,380 pounds.  Because of the extreme operational conditions (e.g. extreme temperature and vibration surges) generated by the EcoBoost engine to deliver the kind of power and performance needed from the engine in these SUVs, Ford used a standard two-piece assembly turbocharger with well-established, durable materials in both the exhaust manifold and the appurtenant turbocharger.  In this common two-piece configuration, the exhaust manifold is bolted to the EcoBoost engine block and the turbocharger unit is attached to the exhaust manifold. While more expensive, particularly given the materials that were used by Ford in the exhaust

manifold and the separate turbocharger, this assembly was sufficiently robust to meet the operational needs of these EcoBoost-outfitted SUVs.

179.    In contrast, Defendants replaced the standard 6-cylinder engine with the lighter and smaller 4-cylinder EcoBoost engine, but chose a turbocharger assembly that traded-off durability for increased engine performance.  Defendants' Class Vehicles also had a gross vehicle weight topping out at over 5,500 pounds, larger than Ford's vehicles, and demanding even more performance and power from the EcoBoost.

180.    Defendants chose to use a turbocharger assembly that was inappropriate. Defendant's Turbocharger is less expensive than the one used in the Ford EcoBoost vehicles and utilized lighter, inferior and less durable materials.   Moreover, Defendants' Turbocharger incorporates the turbocharger housing into the exhaust manifold as a single assembly. The weight reduction and reduced heat transfer are gained, but this design choice incorporates the Turbocharger further into the engine and power train than the typical turbocharger assembly, exposing it more directly to the operational extremes of the engine, and making Defendants' design and materials choices insufficient to account for these extremes.  Defendants' Turbocharger is indistinct from the exhaust manifold and effectively incorporated directly into the engine:



E133482

181.    As an integrated component to the engine and power train, the Turbocharger is expected to last 12 years or 200,000 miles, which is as long as the useful life of the engine without the need for repair or replacement. Moreover, owners and lessors of Class Vehicles were provided with Warranty and Maintenance schedules that do not show any Turbocharger inspection or maintenance, even at longer intervals exceeding 10 years or 100,000 miles. Recognizing this fact, Defendants placed the Turbocharger in such a location in the engine that replacement requires over a day of highly skilled shop labor, adding to the significant cost of a replacement Turbocharger.

### C.    The Turbocharger Defect

182.     Defendants' knowing choice of the design and materials used, which were insufficient for the task, and which Defendants were aware of, created the Turbocharger Defect they never disclosed to purchasers.

57

183.    Pulling more power out of smaller engines created operational environments including thermal loads and increased levels of vibration that placed excess stress on associated structures, such as the exhaust manifold and turbocharger. Extremes in temperature variation create larger thermal stress, thermo-mechanical fatigue and cracks on the associated structures can be observed during engine durability tests, such as thermal shock tests among other tests, that Defendants should have undertaken for the Class Vehicles, and will manifest if the associated component – here the Turbocharger – is not sufficiently robust in design and materials.

184.    One study published by SAE International (formerly the Society of Automotive Engineers), reflects the industry's well-established understanding at the time Defendants first selected its Turbocharger, of the link between increased demands on smaller engines and the kinds of failures that are hallmark of the Turbocharger defect:

> Because of increasing performance and emission demands, turbo charged gasoline engines are becoming popular in the passenger car market. These downsized engines have higher thermal loads and experience increased levels of vibration. The exhaust manifold metal temperature can rapidly increase from ambient temperature to about 900°C and large transient temperature gradient can occur. The larger temperature variation causes a larger thermal stress on the structure. Due to cyclic thermal loads, thermo mechanical fatigue cracks on exhaust manifold and gasket sealing failure are often observed during engine durability tests, such as thermal shock test. Table 1 summarizes the failure mode analysis of exhaust manifolds of turbo charged gasoline engines.[9]

185.    Figure 1 of the SAE study noted structural cracking as a key mode of failure based on, among other root causes, insufficient component properties in the extreme operational temperatures:

---

[9]  Chen, M., Wang, Y., Wu, W., and Xin, J., "Design of the Exhaust Manifold of a Turbo Charged Gasoline Engine Based on a Transient Thermal Mechanical Analysis Approach," SAE Int. J. Engines 8(1):75-81, https://doi.org/10.4271/2014-01-2882.

58

| Type of Issues | Root causes | Influencing factors |
|---|---|---|
| Cracks on exhaust manifold | Extreme magnitude of gas temperature | Engine calibration |
| | High metal temperature gradient | Manifold shape design |
| | Extreme vibration level (HCF) | Vibration mode of exhaust system |
| | Material property not meet requirements | |
| | Local stress exceeds the yield stress under high thermal loading, cyclic plastic straining of the material (TMF) | Geometric shape and stiffness distribution, thermal expansion |
| | Casting defect | |
| | Wall thickness not meet design guideline | |

186.    In the expected, albeit extreme, operational environment of the Class Vehicles' engine (which, on information and belief, exceed the thermal threshold discussed in the SAE paper, and reach upwards of 950-1050 degrees Celsius), the internally mounted volute (the part that channels the force of the exhaust to the turbine), and its supporting structure at the juncture of the exhaust manifold portion of the Turbocharger assembly and the turbocharger, experience accelerated metal fatigue and premature failure. This is often matched with cracking in the manifold.  As a result, the volute becomes loose and although remaining contained, may rattle around in the exhaust manifold. Eventually, the loose volute can no longer maintain critical clearances with the turbine and contacts the turbine (which is spinning at a high rate of speed), causing breaking, chipping, and erosion of the metal turbine blades. The Turbocharger may fail immediately, or it may continue to run while the damage worsens and performance is increasingly

59

degraded as the turbine blades are eroded.  In the end, the turbine becomes ineffective in extracting power from the exhaust and the compressor fails to provide the desired level of intake air pressure, or "boost," and ultimately provides no boost at all.

187.    Adding to the structural stress that Defendants needed to account for when selecting its Turbocharger, is the size and weight of the catalytic converter used in Defendants' vehicles. The catalytic converter in the Class Vehicles is bolted onto the Turbocharger, and creates further stress and torque on the Turbocharger, increasing the rate at which the Turbocharger Defect will manifest:



188.    The effect of the Turbocharger Defect are disastrous and can be sudden.  At first, it gradually degrades the performance of the Turbocharger and engine, including sluggish performance, high emissions, and diminished fuel efficiency.  This failure will make a sudden and extreme turn for the worse when the Class Vehicle loses power during operation, and an owner may be left unable to accelerate safely into or with traffic, and become stranded along the roadside.

189.    When the Turbocharger fully fails as a result of the Turbocharger Defect, the owner will find the vehicle loses power and acceleration.  By the time of complete failure, the "check engine" light will typically go on, and the vehicle's owner will be left requiring immediate service assistance.

190.    More importantly, the failure of the Turbocharger creates a hazard.  When the Turbocharger fails completely, the engine becomes nonresponsive and the vehicle will not accelerate and loses power.   This condition makes the vehicle unsafe to drive in many instances, including but not limited to, accelerating to enter a freeway on-ramp, or accelerating to avoid another vehicle, especially when such performance is an expected feature of the vehicle's operation.  In addition, the maximum speed of the vehicle will be compromised such that it may not be possible to keep up with traffic in highway or freeway conditions, particularly if the road grades are significant.

191.    As a result of the Turbocharger Defect, the Turbochargers can (and do) fail at any time and long before 12 years or 200,000 miles, the expected life of the engine.  However, as Defendants knew, the Turbocharger will often fail due to the Turbocharger Defect just after the relevant warranty period has lapsed, leaving the owner to face not only the unsafe and highly polluting conditions created by the failure of the Turbocharger, but also the substantial costs of replacement for a known defective component.  The Turbocharger is sufficiently integrated into the engine such that removal and replacement can require 15-20 hours of labor.  In addition to the thousands of dollars for the replacement parts, the total cost of labor and additional parts lead to a total repair cost upwards of $6,000, or more.  This leaves owners with the unenviable choice of paying a substantial fraction of the value of the vehicle to repair this defect or selling the vehicle at a substantial loss.

61

192.    Defendants' failure to issue a recall and replace the defective Turbocharger was unreasonable and caused economic damages and environmental and safety hazards for the Class Members.

**D.    Defendants Knew About the Turbocharger Defect**

193.    Knowledge and information regarding the Turbocharger Defect was in the exclusive and superior possession of Defendants (and their dealers) before Plaintiffs purchased their vehicles, and that information was not provided to Plaintiffs and members of the Classes.

194.    The consequences of Defendants' decision to use the Turbocharger, and trade-off durability for performance would take time for consumers to realize, but were known to Defendants when they made their choice to use the Turbocharger, and was confirmed by the kinds of testing Defendants put the Turbocharger through during development of the Class Vehicles.

195.    Prior to the sale of any of the Class Vehicles, Defendants – like any other reasonable Original Equipment Manufacturer (OEM) seeking to manufacture and sell vehicles on the U.S. market – completed a multitude of analyses and testing that exposed the existence of the Turbocharger Defect, including most notably Failure Modes and Effects Analysis (FMEA) and Design Validation Plan and Report (DVP&R).

196.    The purpose of the FMEA is to define, based on known and established engineering facts like those asserted by Defendants and SAE (as discussed above), potential risks of failures and rank them by severity, likelihood and ability to detect failure.  Any conditions resulting in failure, like those associated with the Turbocharger Defect and causing failure of Defendants' turbocharger assembly and, consequently, the engine's operation, would result in a "high risk" priority and draw additional and more extensive analysis and validation testing during the FMEA and DVP&R phases.  Given the later reports of failures after sale, including those suffered by

Plaintiffs as well as others (discussed further below), these processes were designed to show the various modes of failure caused by the Turbocharger Defect and confirm what Defendants already knew about its design decision and the Turbocharger Defect.

197.    For example, the DVP&R phase includes an extensive battery of tests and other work necessary to validate the robustness of any design, and includes three basic types of testing: bench scale, engine dynamometer, and vehicle/field testing, each to be discussed immediately hereafter.

198.    Bench scale testing is component-specific and is often completed by the supplier in coordination with the OEM to establish the strict set of specifications and guidelines to ensure that the component will operate reliably and durably in foreseeable operating conditions. During this phase of testing, Defendants' Turbocharger was "bench tested," that is, set up on various machinery to simulate certain operating extremities and conditions to confirm whether it meets the necessary specifications and guidelines set by the supplier in coordination with Defendants. Discovery is expected to reveal that Defendants received the detailed results of the bench testing and resulting Technical Control Documents (TCDs) from the supplier which outline the operating limitations of Defendants' turbocharger assembly along with the potential risks associated with installation in the Class Vehicles, including the Turbocharger Defect.[10] Similarly, discovery is expected to show that bench testing of the Turbochargers confirmed what Defendant already knew about its design choice--that use of the Turbocharger was inappropriate on the EcoBoost engine.

---

[10]    Defendant is in the exclusive possession of the specific information regarding each phase of testing, including the exact tests conducted and reports received from the testing. Plaintiffs make this allegation based on their own reasonable investigation of Defendants' procedures and the nature of the Turbocharger Defect.

199.    Engine dynamometer testing is one of the most important types of testing to ensure durability and performance of the engine and its components, including Defendants' turbocharger assembly.  In the engine dynamometer test, the Turbocharger is installed on a complete engine and operated under extreme conditions such as maximum temperatures or excessive vibration.  Engine dynamometer testing is intended to demonstrate engine robustness and reveal necessary improvements or flaws such as the Turbocharger Defect.  Discovery is expected to confirm that engine dynamometer testing of the Turbochargers revealed material stress, fissures, cracks and breaks and/or outright failure of the Turbocharger and, thereby, the Turbocharger Defect.

200.    Finally, among other testing, Defendants tested their turbocharger assembly in actual vehicles, both prototype vehicles and pre-production line vehicles, including specific engine and powertrain calibration and development.  In these tests, vehicles with the Turbochargers are driven through a full range of conditions and extremities that are encountered once a vehicle is sold to the public.  These vehicle-specific development tests include mapping extreme engine operating conditions with high exhaust gas temperatures and high turbocharger loads, which are the kinds of modes that manifest the Turbocharger Defect.  Discovery is expected to evidence that Turbochargers in such in-vehicle testing either failed or clearly show the Turbocharger Defect by virtue of material stress, fissures, cracks, and breaks.

201.    Through the rigors of these three phases of DVP&R testing, Defendants' Turbocharger was exposed repeatedly to conditions that cause the Turbocharger Defect to manifest.  A short list of the specific type of standard validation tests that Defendants conduct during DVP&R include, but is not limited to:

| Test Level | Test Type | Test Description |
|---|---|---|
| Bench | Durability | General durability test to validate robustness of component in extended use.  Reveals moderate thermal |

|  |  | or mechanical fatigue related defects, like the Turbocharger Defect |
|---|---|---|
| Bench | Thermal Shock | Component is repeatedly heated and cooled which could initiate fractures. Analogous to pouring cold water on hot glass/ceramic. Reveals defects related to quick fluctuations in temperature expected in vehicle usage, like the Turbocharger Defect. |
| Bench | Vibration | Assess turbocharger robustness to range of expected frequencies. Reveals turbocharger vulnerability to extended vibrations at frequencies expected in the engine. |
| Engine Dynamometer | Durability | General durability test to validate robustness of the entire engine including the turbocharger, typically at high load, wide-open-throttle conditions. Exposure to multiple extreme paramteters simultaneously should reveal Turbocharger Defect. |
| Engine Dynamometer | Thermal Shock | Engine is operated in cycles with rapid large thermal gradient changes in coolant temperature (-25 °C to 120 °C) to thermally shock critical engine components. Meant to confirm, in part, that the turbocharger can withstand real engine temperature fluctuations, such as those that make the Turbocharger Defect manifest. |
| Engine Dynamometer | Multicycle Throttling | Cycle engine between full throttle and idling. Repeated transient cycles can assess thermal fatigue limit. As with the above thermal extreme tests, would reveal the Turbocharger Defect. |
| Vehicle | Durability | Assess general durability of engine and turbo during vehicle usage. The tests may include severe duty cycles to accelerate (simulated) mileage and life accumulation. Testing is generally intended to represent the equivalence of 10 years and 150,000 miles. These tests will reveal flaws far more minor than the Turbocharger Defect that could be expected through customer use. |
| Vehicle | Hot Weather | Assess vehicle durability and turbo durability during extended high temperature conditions. Such high temperatures expose the turbocharger to more randomized thermal cycling which is more likely to reveal thermal fatigue defects, such as the Turbocharger Defect. |
| Vehicle | Cold Weather | Assess vehicle durability and turbo durability during start-up from cold temperature conditions. Such low temperatures expose the turbocharger to more randomized thermal cycling which is more likely to reveal thermal fatigue defects, such as the Turbocharger Defect. |

202.    As a former division of Ford, Defendants inherited a rigorous FMEA and DVP&R testing regimen which would expand significantly on these sorts of baseline tests, and provided even more opportunity for Defendant to confirm the Turbocharger Defect.  Similarly, Defendants, as a former division of Ford, followed ISO 9001 discipline in quality testing which requires not just thorough documentation of the testing, testing procedures, and testing outcomes (which will be the subject of discovery in this litigation as to the Turbochargers), but also the commitment to continually improve testing and the related standards of quality based on prior testing and experience.  Such experience would include durability failures, in-warranty failures, sales of service parts for out-of-warranty failures, and NHTSA reports, each of which the Turbochargers were the subject of and each of which is discussed immediately below.

203.    The Turbochargers were subjected by Defendants to at least one additional realm of testing: the testing of Turbochargers replaced under warranty and returned to Defendants for analysis and storage.  Given that turbochargers are expected to last at least 12 years or 200,000 miles, any part failing under any of the warranties is a "red flag."  Given that this component is also considered an emissions "part" covered by specific extended emissions warranty required by California and states following California emissions standards, Defendants must examine, test, analyze, and report failed Turbocharger assemblies under the California Air Resources Board (CARB) defect reporting program.  Given that the Turbocharger Defect leads to the total failure of the turbocharger assembly and the loss of power from the engine, Defendants must have examined, tested, and analyzed these returned parts.  The Turbocharger Defect would again have been evident through such testing, just as it was during development.

204.    Another source of Defendants' knowledge are the complaints submitted by their customers to the National Highway Traffic Safety Administration (NHTSA), which Defendants

are required to monitor. These complaints, including those that were made as early as 2012, shortly after the first of the Class Vehicles with Defendants' turbocharger assembly was sold and well before any Plaintiffs purchased or leased their vehicles, confirmed what Defendants already knew from their development testing.

205.    Below is a sampling of consumer complaints made to NHTSA (with emphases added) regarding failures of Defendants' Turbocharger shortly after the launch of the first vehicle with the Turbocharger defect through to the present:

    a.  **NHTSA ID Number: 10474124**
        **Incident Date July 28, 2012**
        **Consumer Location: Annapolis, MD**
        **Vehicle Make/Model/Year: 2012 Evoque**
        **Vehicle Identification No. (VIN): SALVV2BG2CH\*\*\*\***

ON JULY 28, 2012 MY MOTHER AND I WERE DRIVING TO NEW ENGLAND FROM MARYLAND THROUGH INTERMITTENT THUNDERSTORMS *AT SPEEDS ABOVE 65 MILES PER HOUR. I ATTEMPTED TO ACCELERATE TO PASS A VEHICLE WHEN THE ENGINE BEGAN TO LOSE POWER AND TOOK OVER 30 SECONDS TO REACH 40 MILES PER HOUR. I OBSERVED THE SPEED WARNING LIGHT AND THE AMBER 'CHECK ENGINE' LIGHT COME ON. I TRIED TO ACCELERATE TO PULL OFF OF THE ROAD BUT COULD ONLY DRIVE APPROXIMATELY 35-40 MILES PER HOUR UNTIL THE NEXT EXIT WHICH WAS OVER 2 MILES AHEAD (AS CARS UNSAFELY HAD TO SUDDENLY STOP BEHIND ME ON I-95 AS I MANEUVERED BACK INTO THE RIGHT TRAVEL LANE)* SINCE THE VEHICLE WOULD NOT GO ANY FASTER. ONCE OFF OF THE ROAD (THE RAIN HAD CEASED) I TURNED OFF THE VEHICLE AND REMOVED THE 74 MILE AN HOUR SPEED WARNING AND THE AMBER 'CHECK ENGINE' LAMP WENT OFF AFTER TEN MINUTES OF DRIVING. I RESUMED MY TRIP THROUGH THE ON-AND-OFF-AGAIN RAIN FOR ANOTHER THREE HOURS AND DID NOT ATTEMPT TO ACCELERATE AGAIN. I LATER TOLD MY HUSBAND THAT I THOUGHT THAT THE SUDDEN SLOW ENGINE ACCELERATION AND SPEED IMPEDIMENT WAS A FUNCTION OF THE SPEED WARNING AND ASSUMED THAT TO BE THE CAUSE OF THE LACK OF SPEED AND ABILITY TO ACCELERATE. NEEDLESS TO SAY THIS WAS A FRIGHTENING EXPERIENCE FOR ME AND MY MOTHER.

ON AUGUST 25TH MY HUSBAND AND I WERE DRIVING FOR OVER AN HOUR IN HEAVY RAIN AND IT HAPPENED AGAIN. UNLIKE MY EXPERIENCE, A WARNING MESSAGE THAT SAID 'RESTRICTED PERFORMANCE' CAME UP ON THE DASHBOARD AND THE AMBER CHECK ENGINE LIGHT WAS ON (THERE WAS ALSO AN AMBER HAZARD SIGNAL ON THE DASHBOARD). WHEN WE PULLED OVER, WE LOOKED IN THE OWNERS MANUAL UNDER THE FOLLOWING WORDS: ?PERFORMANCE, ENGINE, AND WARNINGS, TO FIND THE RESTRICTED PERFORMANCE WARNING AND WHAT IT MEANT TO NO AVAIL. THE RAIN CONTINUED ON THIS EVENING AND WE DROVE (SLOWLY) HOME FOR THE REMAINING 20 MINUTES WHILE THE CHECK ENGINE LIGHT REMAINED RED

**b.  NHTSA ID Number: 10478209**
**Incident Date: September 13, 2012**
**Consumer Location: Fair Oaks Ranch, TX**
**Vehicle Make/Model/Year: 2012 Evoque**
**Vehicle Identification No. (VIN): SALVV2BG2CH\*\*\*\***

WHILE DRIVING IN RAINY WEATHER FOR APPROXIMATELY ONE HOUR, *I WENT TO ACCELERATE TO PASS A CAR AND THERE WAS A LOSS OF POWER, AMBER WANING LIGHT CAME ON, ENGINE LIGHT CAME ON AND I COULD NOT GO FASTER THAN 35 MPH. THIS COULD HAVE CAUSED A SERIOUS ACCIDENT* BUT I WAS ABLE TO SLOW DOWN ENOUGH TO GET BACK IN THE SLOW LANE. CAR HAD TO BE TOWED TO DEALER THE NEXT DAY. THE LOANER EVOQUE THEY GAVE ME DID THE SAME THING IN RAINY WEATHER ON SEPTEMBER 16, 2012.

**c.  NHTSA ID Number: 10508351**
**Incident Date: November 7, 2012**
**Consumer Location: Houston, TX**
**Vehicle Make/Model/Year: 2012 Evoque**
**Vehicle Identification No. (VIN): SALVT2BG7CH\*\*\*\***

I WAS DRIVING VEHICLE AT ABOUT 65-70 MPH ON FREEWAY FOR ABOUT ONE HOUR. EXITED FREEWAY. STOPPED AT TRAFFIC LIGHT. WHEN LEAVING LIGHT, ACCELERATED NORMAL & INSTANTLY NOTICED THERE WAS VERY POOR ACCELERATION. THE ENGINE SERVICE LIGHT DISPLAYED & VEHICLE WOULD NOT GO OVER 35MPH. I THEN PULLED INTO PARKING LOT, TURNED CAR OFF FOR 2 MINUTES, RESTARTED & NO CHANGE IN PROBLEM. TOOK CAR TO DEALERSHIP WHERE I PURCHASED & VEHICLE WAS FIXED AT NO CHARGE

68

d. **NHTSA ID Number: 10704618**
   **Incident Date: December 11, 2014**
   **Vehicle Make/Model/Year: 2012 Evoque**
   **Consumer Location: COLORADO SPRINGS, CO**
   **Vehicle Identification Number: SALVP2BG5CH****

   I TOOK MY CAR IN TO THE LAND ROVER SERVICE DEPT WHERE I PURCHASED MY VEHICLE *BECAUSE I SMELLED EXHAUST THROUGH THE VENTS AND I WAS GETTING HEADACHES EVERY TIME I DROVE. ON MY FIRST VISIT THEY TOLD ME THEY COULD NOT FIND ANYTHING WRONG. AFTER A MONTH OF CONTINUED EXHAUST ISSUES I TOOK IT TO A DIFFERENT LAND ROVER SERVICE DEPT AND THEY EVENTUALLY FOUND A HAIRLINE FRACTURE IN THE TURBO.* THEY QUOTED ME $6,500 FOR THE REPAIR AND ADVISED ME THAT IT WAS NOT COVERED BY WARRANTY. THEY TOLD ME TO SIMPLY RUN MY AIR/HEATER ON MANUAL VERSUS AUTOMATIC AND DRIVE WITH A WINDOW CRACKED. I AM CURRENTLY TRYING TO FIND SOMEONE THAT WILL WORK ON MY EVOQUE THAT COULD POSSIBLY WELD THE FRACTURE RATHER THAN REPLACING THE ENTIRE SYSTEM BUT HAVING DIFFICULTY. *TR

e. **NHTSA ID Number: 10870035**
   **Incident Date: May 10, 2016**
   **Vehicle Make/Model/Year: 2013 Evoque**
   **Consumer Location: PONCE, PR**
   **Vehicle Identification Number: SALVN2BG1DH****

   MY EVOQUE ONLY 3 YEARS 63,000 MILES AND THE TURBO IS BROCKEN THE DEALER LAND ROVER SAN JUAN PUERTO RICO SORRY NO WARRANTY FOR WHAT MY EVOQUE ONLY 3 YEARS

f. **NHTSA ID Number: 10897792**
   **Incident Date: August 8, 2016**
   **Consumer Location: North Tustin, CA**
   **Vehicle Make/Model/Year: 2013 Evoque**
   **Vehicle Identification No. (VIN): SALVR2BG2DH****

   ENGINE MISFIRES *CAUSING CAR TO LOSE POWER AND GO INTO 'RESTRICTED MODE'. THIS IS VERY DANGEROUS. IT HAPPENED AT HIGH SPEED, MAKING IT VERY UNSAFE TO PULL OVER TO THE SIDE OF THE HIGHWAY - ALMOST CAUSING A MULTIPLE VEHICLE ACCIDENT.* TAKEN TO DEALER 3 TIMES AND THEY HAVE NOT RESOLVED THE ISSUE. INFORMED LANDROVER USA ABOUT MY

69

CONCERNS AND THEY HAVE NOT BEEN HELPFUL - SAYING TAKE THE VEHICLE BACK TO THE DEALER AND PAY AN ADDITIONAL $380 FOR DIAGNOSTICS AFTER ALREADY PAYING THEM $200 AS THE CAR IS NO LONGER UNDER WARRANTY. VEHICLE HAS $59,250 MILES. OTHER EVOQUE OWNERS ALSO EXPERIENCE SIMILAR PROBLEM

**g.  NHTSA ID Number: 11042631**
**Incident Date: March 28, 2017**
**Consumer Location BEVERLY HILLS, FL**
**Vehicle Make/Model/Year: 2004 Evoque**
**Vehicle Identification Number: N/A**

WHILE DRIVING THE VEHICLE I EXPERIENCED A LOSS IN ENGINE POWER AND IT SEEMED TO BE AT A VERY HIGH RPM FOR A LOW SPEED. THE VEHICLE WOULD NOT GO OVER 30MPH AND HAD TO BE DRIVEN TO THE SHOP. IT WAS DIAGNOSED AS A BLOWN TURBO AND THE TURBO HAD TO BE REPLACE.

**h.  NHTSA ID Number: 11061155**
**Incident Date: October 5, 2017**
**Consumer Location: Unknown**
**Vehicle Make/Model/Year: 2014 Evoque**
**Vehicle Identification Number: EH883207****

WHILE DRIVING THE VEHICLE I EXPERIENCED A LOSS IN ENGINE POWER AND IT SEEMED TO BE AT A VERY HIGH RPM FOR A LOW SPEED. THE VEHICLE WOULD NOT GO OVER 30MPH AND HAD TO BE DRIVEN TO THE SHOP. IT WAS DIAGNOSED AS A BLOWN TURBO AND THE TURBO HAD TO BE REPLACE. ABOUT A MONTH LATER THE ENGINE NEEDS TO BE REPLACED. I BELIEVE A DIRECT CORRULATION BETWEEN THE TURBO AND ENGINE.

**i.  NHTSA ID Number: 11102828**
**Incident Date: June 3, 2018**
**Consumer Location HIGHLANDS, NC**
**Vehicle Make/Model/Year: 2013 Evoque**
**Vehicle Identification Number: N/A**

VEHICLE HAS JUST OVER 50,000 MILES, WARRANTY EXPIRES AT 50,000. LOOKING ON THE INTERNET I FOUND ***THAT THE 2013-2015 MODELS OF THIS CAR HAS HAD HUNDREDS OF PROBLEMS WITH THE TURBO WHICH GOES OUT BEFORE AND AFTER 50,000 MILE ,MOST OF THE TIME LAND ROVER WILL NOT COVER ALWAYS BLAMING THE CONSUMER , I FOUND WELL OVER A MILLION HITS ON THE INTERNET CONCERNING THIS PROBLEM , BUT LAND ROVER***

70

*REFUSES TO DO A RECALL, CAR ACTUALLY LOSES ALL POWER AND STOPS DEAD ANYWHERE WHEN IT BLOWS* , IF YOU GO ON THE INTERNET YOU'LL SEE A CLUB THAT FORMED IN ENGLAND CONCERNING THIS , THERE ARE LITERALLY THOUSANDS OF COMPLAINTS ON THE FAULTY TURBO'S ON THE ENGINE ON THE 2013-2015 RANGE ROVER EVOQUES,. LAND ROVER N.A. CUSTOMER SERVICE ACTUALLY BLAMED ME FOR NOT DOING OIL CHANGES , WHICH I HAVE ALL RECEIPTS , SOCIAL MEDIA HAS HUNDREDS OF PAGES RELATING TO THE EVOQUES TURBO FAILURES, ALSO CONSUMER AFFAIRS HAS SEVERAL PAGES ON THE RANGE ROVER EVOQUES ENGINE AND TURBO PROBLEMS AND FAILURES , WHY HASNT THE U SGOVERMNENT FORCED A RECALL ON THIS SERIOUS SAFETY ISSUE, LIKE I PREVIOUSLY STATED , *THIS HAPPENS WHEN I VEHICLE WAS ON THE INTERSTATE , I READ WHERE ONE GIRL IN OHIO WAS IN THE MIDDLE LANE OF AN INTERSATE AND HER CAR STOPPED DEAD ,ALMOST GETTING REAR ENDED , PLEASE ADDRESS THIS ISSUE*

**j.  NHTSA ID Number: 11162020**
**Incident Date: November 7, 2018**
**Consumer Location ALSIP, IL|**
**Vehicle Make/Model/Year: 2012 Evoque**
**Vehicle Identification Number: SALVT2BG3CH****

TL* THE CONTACT OWNS A 2012 LAND ROVER RANGE ROVER EVOQUE. WHILE DRIVING FOR AN EXTENDED PERIOD OF TIME, *THE CONTACT FELT SICK, SLEEPY, AND SUFFERED HEADACHES AND VOMITING. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE CONTACT'S SON NOTICED AN ABNORMAL ODOR IN THE VEHICLE. THE CONTACT TOOK THE VEHICLE TO THE DEALER* (LAND ROVER HINSDALE, 300 E OGDEN AVE, HINSDALE, IL, 301-521-3426) WHERE IT WAS DIAGNOSED THAT *THERE WAS A CRACK IN THE TURBO MANIFOLD THAT NEEDED TO BE REPLACED*. THE VEHICLE WAS NOT REPAIRED. *THE CONTACT WENT TO THE HOSPITAL AND FOUND CARBON MONOXIDE IN HER BLOODSTREAM.* THE MANUFACTURER WAS MADE WARE OF THE FAILURE AND INFORMED THE CONTACT THAT HER WARRANTIES HAD EXPIRED. NO FURTHER ASSISTANCE WAS PROVIDED. THE FAILURE MILEAGE WAS 49,000.

**k.  NHTSA ID Number: 11192765**
**Incident Date: November 13, 2018**
**Consumer Location: HAYWARD, CA**
**Vehicle Make/Model/Year: 2013 Range Rover**
**Vehicle Identification Number: SALVR2BG7DH****

71

I HAVE 50234 MILEAGE IN MY VEHICLE AND MY TURBO WENT OUT I TOOK IT THE DELLER SHOP AND THEY DON'T COVER OR GIVE ME ANY KIND OFF DISCOUNT IF I NEW FROM THE BEGINNING I WELL NOT GONNA BY THIS CAR. I THOUGHT THIS CAR IS SUPPORT TO BE RELIABLE CAR I WANT SOME ONE TO ANSWER THIS FOR ME OR I WELL TAKE FATHER ACTION ASAP

l.  **NHTSA ID Number: 11152296**
    **Incident Date: November 17, 2018**
    **Consumer Location: Garland, TX**
    **Vehicle Make/Model/Year: 2017 Evoque**
    **Vehicle Identification No. (VIN): SALVP2BG2HH\*\*\*\***

THE ***VEHICLE COMPLETELY SHUT DOWN WHILE I WAS DRIVING ON A MAJOR HIGHWAY CAUSING A LIFE-THREATENING SITUATION***. THIS IS THE SECOND TIME THE ISSUE HAS OCCURRED. THE FIRST TIME I WAS EXITING A HIGHWAY AND MANAGED TO GET TO THE ACCESS ROAD BEFORE THE ENGINE SHUT DOWN AGAIN. IT WILL RESTART AND IMMEDIATELY SHUT DOWN. IT SEEMS TO OCCUR WHEN SLOWING DOWN FOLLOWING HIGHWAY DRIVING AT 55+MPH. BOTH INCIDENTS REQUIRED POLICE ASSISTANCE TO REDIRECT HEAVY                                                                            TRAFFIC.

m.  **NHTSA ID Number: 11186830**
    **Incident Date: February 20, 2019**
    **Consumer Location: DAYTON, WA**
    **Vehicle Make/Model/Year: 2015 Evoque**
    **Vehicle Identification Number: SALVP2BG8FH\*\*\*\***

THE TURBO FAILED AT 42000 MILES, WAS REPLACED UNDER WARRANTY BY RANGE ROVER OF PORTLAND. THE TURBO HAS FAILED AGAIN AT 84000 MILES. ***BOTH FAILURES OCCURRED WHILE DRIVING ON A HIGHWAY PASSING ANOTHER VEHICLE AT APPROXIMATELY 65 MPH.*** I HAVE BEEN ADVISED BY AN AUTHORIZED RANGE ROVER REPAIRMAN. MESSER AUTOWERKS OF KENNEWICK, WA. THAT THE TURBOS FOR THE EVOQUE AND LR2 HAVE A DESIGN FLAW, THERE IS AN INTERNAL COMPONENT THAT BREAKS OFF AND CAUSES THE TURBO TO FAIL. I RESEARCHED WITH YOUR WEBSITE AND RANGE ROVER THERE IS NO RECALL IN PLACE FOR MY MODEL AN YEAR

n.  **NHTSA ID Number: 11348546**
    **Incident Date: March 1, 2019**
    **Consumer Location MCLOUD, OK**

72

Vehicle Make/Model/Year: 2014 Evoque
Vehicle Identification Number SALVR2BG8EH****

TURBO STOPPED WORKING FOR SECOND TIME AT 51,000 MILES, JUST OUT OF WARRANTY. THIS IS A KNOWN FAILURE AND SHOULD BE RECALLED.

o. **NHTSA ID Number: 11192381**
**Incident Date: March 2, 2019**
**Consumer Location: DIX HILLS, NY**
**Vehicle Make/Model/Year: 2015 Evoque**
**Vehicle Identification Number: SALVP2BG8FH****

JUST PURCHASED MY CAR IN JULY 2018. WAS A PREVIOUS LEASED CAR WITH REGULAR MAINTENANCE. *I WAS DRIVING ON THE HIGHWAY AND MY CAR SUDDENLY WOULD NOT SHIFT GEARS NO PICKUP IN THE CAR. LUCKILY I WAS ABLE TO PULL TO SIDE OF THE ROAD TO PREVENT AN ACCIDEN*T AND TURN CAR OFF AND BACK ON AGAIN. CHECK ENGINE LIGHT CAME ON. WAS ABLE TO DRIVE TO AN AUTHORIZED LAND ROVER DEALER TO WHICH THEY STATE TURBOCHARGER HAS AN INTERNAL DEFECT AND A COMMON PROBLEM WITH MY MAKE AND MODEL CAR.

p. **NHTSA ID Number: 11192373**
**Incident Date: March 12, 2019**
**Consumer Location: DENVER, CO**
**Vehicle Make/Model/Year: 2013 Evoque**
**Vehicle Identification Number: SALVR2BG2DH****

UPON STARTING THE ENGINE IN THE GARAGE WITH THE HEAT SYSTEM ON THE *EXHAUST FROM THE ENGINE ENTERS THE CABIN OF THE CAR WITH CARBON MONOXIDE FUMES. SMELL IS SICKENING, POISONOUS, AND DANGEROUS. THE CAUSE AS PER MY REPAIRMAN: THE EXHAUST MANIFOLD HAS A FAULTY DESIGN*. THE PIECES ARE WELDED, THE WELDING FAILS, A CRACK ALLOWS CARBON MONOXIDE TO LEAK INTO THE CABIN OF THE VEHICLE. THE EXHAUST MANIFOLD AND TURBO CHARGER ARE ONE PIECE. REPAIR COSTS OVER $3000. THE CAR HAS 44,000 MILES ON IT. THE NEWLY INSTALLED EXHAUST MANIFOLD/TURBO CHARGER IS THE SAME DESIGN THAT FAILED, LAND ROVER HASN'T MADE ANY CHANGES. IT'S LIKELY THIS NEW PART WILL FAIL AS WELL.

q. **NHTSA ID Number: 11209915**
**Incident Date: May 24, 2019**
**Consumer Location: Branford, CT**
**Vehicle Make/Model/Year: 2017 Discovery Sport**

**Vehicle Identification Number: SALCP2BG1HH\*\*\*\***

I WAS DRIVING ON MAIN ROAD AT THE SPEED LIMIT (45 MPH). I HAD SLOWED DOWN AS I OBSERVED A CAR PULLING OUT AHEAD OF ME ONTO THE ROAD. *AS I GAVE MY VEHICLE GAS IN ORDER TO GET BACK UP TO SPEED, I FELT A PAUSE IN THE ENGINE AND THEN THE CAR COMPLETELY LOST POWER- THE ENGINE STOPPED*, THE RED BATTERY ICON APPEARED ON THE DASH, AND MESSAGE APPEARED ON THE SCREEN WITH THE HEADING "SPECIAL PROGRAM SUSPENDED" OR SOMETHING TO THAT EFFECT-- I HAD NO TIME TO READ THAT MESSAGE AS I HAD TO STEER MY CAR AS FAR TO THE RIGHT AS I WAS ABLE TO. I TRIED TO RESTART THE VEHICLE, IT WOULD NOT START AND THE MESSAGE DISAPPEARED-- I HAD NO CHANCE TO READ IT AS *I WAS ON A BUSY AND HEAVY TRAVELED ROAD AND HAD TO ENSURE I WAS SAFELY PULLED OVER*.

UNKNOWN AT THIS TIME AS TO WHAT CAUSED THIS MALFUNCTION. THIS CREATED AN UNSAFE CONDITION AS THE CAR LOST POWER WITH NO FOREWARNING. I AM LUCKY THAT IT DID NOT HAPPEN ON THE HIGHWAY ON WHICH I TRAVEL MOST OF THE TIME.

I CONTACTED LAND ROVER ROADSIDE ASSISTANCE AND THE CAR WAS PUT ON A FLATBED AND BROUGHT TO THE DEALER.

r.   **NHTSA ID Number: 112444271**
   **Incident Date: August 14, 2019**
   **Consumer Location NEWARK, OH**
   **Vehicle Make/Model/Year: 2013 Evoque**
   **Vehicle Identification Number: SALVP2BG9DH\*\*\*\***

76K MILES AND TURBO CHARGER NEEDS REPLACED. $3,454.00. RIDICULOUS. NO TEPAIR SHOULD BE THIS MUCH. MANY ONLINE COMPLAINTS AT SIMILAR MILES. FOR A 4 CYLINDER ENGINE THIS IS HORRIBLE! NOTICED SLOW ACCELERATION WHEN ATTEMPTING TO GO UP HILLS.

s.   **NHTSA ID Number: 11277829**
   **Incident Date: September 22, 2019**
   **Consumer Location LOUISVILLE, KY**
   **Vehicle Make/Model/Year: 2015 Evoque**
   **Vehicle Identification Number: SALVR2BG7FH\*\*\*\***

TURBO BLOWS UP/GOES OUT WHILE DRIVING. MAKING INCLINED SPEEDS HARD TO REACH TO MOVE OUT OF WAY OF VEHICLES. HAS

NO PEP BEHIND IT.

**t.  NHTSA ID Number: 11278366**
**Incident Date: September 27, 2019**
**Consumer Location: GASSVILLE, AR**
**Vehicle Make/Model/Year: 2015 Evoque**
**Vehicle Identification Number: SALVP2BG3FH\*\*\*\***

LOSS OF POWER. HIGH RPM, ECO MODE NOT WORKING. CHECK ENGINE LIGHT ON WITH CODE FOR TURBO LOSS OF POWER. ONLY 47K MILES. WILL NOT SHIFT PROPERLY. MAJOR POWER LOSS

**u.  NHTSA ID Number:  11270220**
**Incident Date:  October 6, 2019**
**Consumer Location: Hawthorne, CA**
**Vehicle Make/Model/Year: 2013 LR2**
**Vehicle Identification Number: SALFR2BG0DH\*\*\*\***

***DRIVING AT A SAFE FREEWAY SPEED 70MPH, THE MOTOR SUDDENLY STOP WITH NO WARNING.*** AS THE CAR SLOWED DOWN, I WAS ABLE TO TURN ON HAZARD LIGHTS, MOVE TO NEUTRAL AND SAFELY MAKE MY WAY TO RIGHT SHOULDER. THE CAR WAS UNABLE TO START FOR OVER THREE WEEKS SINCE THEN. THE CAR IS CURRENTLY WITH DEALER. ***IT WAS A DANGEROUS SITUATION WITH MY 3-MONTH OLD AND WIFE WITH ME***, HOW DOES A CAR JUST STOP ON                                          A                                          HIGHWAY

**v.  NHTSA ID Number: 11291924**
**Incident Date: December 26, 2019**
**Consumer Location EL PASO, TX**
**Vehicle Make/Model/Year: 2013 Evoque**
**Vehicle Identification Number: SALVN2BG8DH\*\*\*\***

***WHILE DRIVING MY CAR ON A ROAD AND ATTEMPTING TO MERGE ONTO A HIGHWAY (I10) IT LOST THE ABILITY TO ACCELERATE***. THE VEHICLE WOULD THEN NOT SHIFT ABOVE 3RD GEAR (AUTOMATIC). WHEN I PLACED IT MANUALLY INTO HIGHER GEARS IT TRIED TO AUTOMATICALLY DOWNSHIFT. I WAS UNABLE TO ACCELERATE TO MERGE ONTO THE HIGHWAY. ***I HAD TO PLACE ON MY FOUR WAYS AND MAKE AN EMERGENCY STOP TO AVOID AN ACCIDENT CAUSING A VERY UNSAFE DRIVING SITUATION. THE DEALERSHIP SAID THAT THE TURBO COMPONENT HAD FAILED AND NEEDED TO BE REPLACED. AFTER IT WAS REPLACED I ASKED WHAT HAD CAUSED THE FAILURE AND THEY SAID THAT NOTHING I DID CAUSED IT. IT IS APPARENTLY A COMMON ISSUE FOR THE TURBO COMPONENT TO***

*FAIL* IN THE 2012-2014 MODELS. I WAS NOT WARNED ABOUT THIS SAFETY ISSUE AND THEY SAID IT IS CAUSED BY A KNOWN MECHANICAL ISSUE. THEY ALSO SAID THE REPLACED THE TURBO COMPONENT WITH AN ALTERNATE PART NUMBER BECAUSE THE ONE ORIGINALLY IN MY VEHICLE FAILS SO OFTEN THEY NO LONGER USE IT. THIS OCCURS OFTEN ENOUGH THEY ALREADY HAD THE PART IN STOCK. I THINK THEY SHOULD BE FORCED TO RECALL THESE FAULTY TURBO PARTS. I HAVE THE SERVICE RECORD IF NEEDED.

**w.  NHTSA ID Number: 11319199**
**Incident Date: March 22, 2020**
**Consumer Location BLOOMFIELD HILLS, MI**
**Vehicle Make/Model/Year: 2015 Evoque**
**Vehicle Identification Number: SALVT1BG6FH\*\*\*\***

I WAS DRIVING ON THE HIGHWAY *GOING APPROXIMATELY THE SPEED LIMIT OF 75 MPH WHEN ALL THE SUDDEN THE CAR BEGAN MAKING A KNOCKING NOISE & STARTED LOSING POWER AND RAPIDLY DECELERATING OUT OF MY CONTROL.* MY RPMS BEGAN RUNNING 7K+ AND I NEEDED TO JAM DOWN ON THE GAS PEDAL IN ORDER TO TRY AND MAINTAIN SPEED AND AVOID AN ACCIDENT, WHICH WORKED FOR A SECOND AND ACTUALLY ALLOWED ME TO GAIN BACK SPEED. HOWEVER, WITH THE GAS ALL THE WAY DOWN IT ONLY KEPT SPEED FOR A SHORT PERIOD UNTIL THE CHECK ENGINE LIGHT POPPED ON AND I BEGAN DROPPING DOWN SPEED AGAIN. I COULD NOT MAINTAIN SPEED. I IMMEDIATELY CHANGED TO THE RIGHT LANE AND WAS ABLE TO PULL OVER AT A REST STOP. I READ THE MANUAL, AND ACCORDING TO THE WARNING TRANSMISSION SIGNAL WHICH DISPLAYED, MY CAR MAY BE DRIVEN BUT PERFORMANCE MAY BE REDUCED AND *I SHOULD IMMEDIATELY TAKE IT INTO A DEALER, WHICH I DID. I WAS LATER TOLD BY AN AUTHORIZED DEALER THAT "MY TURBO HAD BLOWN" WITH CRACKS* ALONG WITH A DESTROYED SOLENOID AND OTHER PARTS RELATING TO THE SPEED OF MY CAR. IT CURRENTLY HAS UNDER 80K MILES AND IS IN THE REPAIR SHOP AS WE SPEAK. IT HAS HAD ROUTINE MAINTENANCE AND JUST UNDERWENT SERVICE CARE (REPLACED OIL/ OIL FILTER, TRANSMISSION FLUID, ETC) LESS THAN 2 MONTHS AGO. THE TOTAL ESTIMATED REPAIR COST RELATING TO THIS SAFETY CONCERN IS ROUGHLY $5,200 USD FROM AN AUTHORIZED DEALER (A NEW TURBO, SOLENOID, LABOR, ETC).

**x.  NHTSA ID Number: 11328560**
**Incident Date: June 12, 2020**
**Consumer Location KING, NC**

Vehicle Make/Model/Year: 2015 Evoque
Vehicle Identification Number: SALVR2BG3FH****

THE TURBOCHARGER HAS GONE OUT AND THE VEHICLE HAS LESS THAN 60K MILES ON IT. HOW CAN THIS BE POSSIBLE? AREN'T LAND ROVERS A HIGH END VEHICLE??? THERE IS NO REASON THAT MY AMERICAN MADE CAR IS OLDER THAN THIS VEHICLE AND I HAVE HAD NO COSTLY REPAIRS ON IT. SOMEONE NEEDS TO REVIEW THESE TURBOCHARGERS AND ENSURE A BETTER QUALITY BECAUSE THESE CARS ARE TOO EXPENSIVE AS IT IS AND NOW TO FIX THIS I NEED TO PAY OVER $3000!!! IT'S NOT RIGHT! THE VEHICLE WILL ACCELERATE SLOWLY AND DRIVE ROUGH WHEN GEARS ARE CHANGING. THE CODES WE GET ARE FOR THE TURBO CHARGER

y. **NHTSA ID Number: 11331837**
**Incident Date: June 27, 2020**
**Consumer Location: MELISSA, TX**
**Vehicle Make/Model/Year: 2014 Evoque**
**Vehicle Identification Number: SALVP2BG6EH****

IT IS KNOWN THE 2014 RANGE ROVER/ENVOQUE HAS A TERRIBLE AND REPEATED PROBLEM WITH THE TURBO /SUPER CHARGER OVER BOOST CONDITION. IT COSTS THOUSANDS OF DOLLARS TO REPAIR. THIS IS DUE TO A FAILED DESIGN WITH THE EXHAUST SYSTEM AS RANGE ROVER CAME UP WITH A NEW DESIGN AFTER 2014

z. **NHTSA ID Number: 11342410**
**Incident Date: July 18, 2020**
**Consumer Location: Cincinnati, OH**
**Vehicle/Make/Model/Year: 2017 Discovery Sport**
**Vehicle Identification No. (VIN): SALCR2BG3HH****

THE VEHICLE WOULD ACCELERATE NORMALLY THAN *OUT OF THE BLUE. IT LOOSES POWER*, ENGINE LIGHT ILLUMINATING ADVISING NOT TO CONTINUE DRIVING. CODE ADVISING P0299 "TURBO CHARGER"COMMON PROBLEM APPARENTLY MECHANICS ADVISING ONLINE FORUMS AND REPAIR IDEAS. VEHICLE ONLY HAS APPROXIMATELY 60,000 ON IT AND ALL APPROVED MAINTENANCE. NOW THEY ARE DENYING MAJOR REPAIR THAT IS A COMMON ISSUE!!

aa. **NHTSA ID Number: 11342277**
**Incident Date: July 26, 2020**
**Consumer Location: Newark, OH**
**Vehicle/Make/Model/Year: 2016 Discovery Sport**
**Vehicle Identification No. (VIN): SALCP2BG8GH****

THE TURBO CHARGER IN MY 2016 LR DISCOVERY SPORT IS BAD AND NOW NEEDS REPLACED, OTHERWISE THERE IS MINIMAL ACCELERATION (ACCELERATION WORSE THAN OF A SMALL COMPACT 4-CYLINDER CAR). IT IS ALSO VERY NOISY DUE TO THE BROKEN PART. IT ONLY HAS 60K MILES ON IT. LEARNED FROM A RESPECTED AUTO BODY SHOP THAT SERVICES HIGH END VEHICLES THIS IS A VERY COMMON PROBLEM.

bb. **NHTSA ID Number: 11375748**
**Incident Date: October 16, 2020**
**Consumer Location: Granger, IN**
**Vehicle Make/Model/Year: 2013 Evoque**
**Vehicle Identification No. (VIN): SALVT2BG2DH\*\*\*\***

WAS DRIVING AND *ALL OF A SUDDEN THERE WAS A LOUD WIND SOUND AND THEN ALL ENGINE POWER WAS LOST*, IT ALSO WOULDN?T SHIFT BECAUSE OF THE LOSS OF ENGINE POWER. BUT I HAD TO AT LEAST MAKE IT HOME AND ON MY WAY HOME I WAS ON THE BYPASS AND I COULDN?T GET THE CAR TO GO ABOVE 65. IT WAS DEFINITELY STRUGGLING. I WENT TO SHOP AND GOT DIAGNOSED AND THEY CAME TO THE CONCLUSION THAT THE TURBO HAS GONE OUT AND THAT HAS BEEN A COMMON PROBLEM WITH THE EVOQUE. SO NOW IT?S A HEFTY REPAIR DUE TO FAULTY MANUFACTURING OF THE TURBOCHARGER. I LOOKED IT UP AND IT SEEMS THAT MANY EVOQUE OWNERS HAVE HAD THE SAME ISSUE WITH THEIR TURBOS GOING OUT

cc. **NHTSA ID Number: 11375786**
**Incident Date: November 20, 2020**
**Consumer Location: Sterling, Va**
**Vehicle Make/Model/Year: 2017 Discovery**
**Vehicle Identification No. (VIN): SALRRBBV8HA\*\*\*\***

THERE IS A VERY SERIOUS ISSUE IN LANDROVER DISCOVERY 2017 THAT *ABRUPTLY SHUTS DOWN THE ENGINE FOR NO APPARENT REASON. ON NOV 20TH, 2020 MY WIFE WAS TRAVELLING TO PITTSBURGH PA ON ROUTE 76 PA TURNPIKE. NEAR BRADFORDFORD, PA THE ENGINE SUDDENLY SHUT ITSELF DOWN WITHOUT ANY PRE-WARNING. THE CAR STALLED WITH NO ABILITY OR AMPLE TIME FOR HER TO STEER TO THE SHOULDER. UNTIL HIGHWAY PATROL ARRIVED, SHE WAS COMPLETELY LEFT IN A HELPLESS AND LIFE THREATENING SITUATION. ANY BIG TRUCK COULD'VE EASILY REAR ENDED HER AND KILLED HER.*

HIGHWAY PATROL AND TURNPIKE AUTHORITY SERVICE

78

PERSONNEL ARRIVED ONSITE, INSPECTED THE CAR BUT DID NOT FIND ANY APPARENT ISSUE. WITHOUT ANYTHING DONE ON THE CAR, AFTER 15 MINS OR SO THE ENGINE STARTED NORMALLY AS IF NOTHING HAPPENED.

**dd. NHTSA ID Number: 11490298**
**Incident Date June 21, 2021**
**Consumer Location Woodmere, OH**
**Vehicle/Make/Model/Year: 2016 Discovery Sport**
**Vehicle Identification Number SALCP2BG9GH\*\*\*\***

**I EXPERIENCED THREE INCIDENTS ATTRIBUTABLE TO A MALFUNCTION OF THE TURBOCHARGER INTEGRATED EXHAUST MANIFOLD. THE FIRST TWO OCCASIONS THE VEHICLE SUDDENLY AND INEXPLICABLY LOST POWER SLOWING TO APPROXIMATELY 5 MPH. ACCELERATION ONLY MADE THE ENGINE REV UP BUT DID NOT INCREASE POWER. NO PRIOR INDICATIONS FROM THE FUNCTION OF ENGINE NOR ANY WARNING INDICATORS ACTIVATED AT THE TIME THE FIRST TWO INCIDENTS OCCURRED**. I HAD ONLY OWNED THE VEHICLE FOR TWO TO THREE MONTHS WHEN THE FIRST INCIDENT OCCURRED. BEING MY FIRST EXPERIENCE WITH A VEHICLE EQUIPPED WITH PADDLES AFFIXED TO THE STEERING WHEEL AND NOT HAVING ANY PRIOR WARNINGS I PRESUMED I HAD INADVERTENTLY AND INCORRECTLY TOUCHED THE PADDLES. THE LOSS OF POWER LASTED ONLY MINUTES BUT RENDERED THE VEHICLE UNABLE TO MAINTAIN SPEED TO SAFELY MANEUVER THROUGH AND MOVE FROM TRAVEL LANES. **THE MOST RECENT OCCURRENCE HAPPENED WHILE TRAVELING AT HIGHWAY SPEED ON AN INTERSTATE. THIS TIME THE VEHICLE AGAIN IMMEDIATELY LOST POWER AND MY SPEED ABRUPTLY DROPPED TO ABOUT 30 MPH AND FOR THE FIRST TIME ILLUMINATED THE CHECK ENGINE LIGHT. FORTUNATELY, TRAFFIC WAS LIGHT AND I WAS WITHIN 1 MILE OF THE NEXT EXIT. I WAS ABLE TO MANEUVER TO THE SHOULDER AND EVENTUALLY EXITED THE HIGHWAY.** THE VEHICLE RECOVERED FUNCTION AND I TRAVELLED APPROXIMATELY 10 MILES BACK TO A LAND ROVER DEALERSHIP. **DIAGNOSTIC TESTS PULLED CODE DTC P0299 AND RECOMMENDED THAT THE TURBOCHARGER BE REPLACED.** . . . IN 2020 4 COMPLAINTS WERE FILED WITH NHTSA (11342410, 11342277, 11375748, AND 11375786) REGARDING TURBOCHARGER FAILURE AND SUDDEN LOSS OF POWER. **MY VEHICLE HAS BEEN PARKED AT A DEALERSHIP SINCE JULY 8, 2021 BECAUSE THE UNFORESEEABLE LOSS OF POWER RENDERS THE VEHICLE UNRELIABLE AND AT RISK OF ACCIDENT AND INJURY.**

206.    Turbochargers are expected to last as long as the engine, and require no special maintenance to do so.  The fact that Defendants' Turbochargers were failing at all and leading to any complaints to NHTSA is significant for any entity, like Defendants, who follow ISO 9001 discipline.

207.    In contrast, a review of NHTSA complaints related to competitor vehicles (e.g. Mercedes) found that there are typically ***no*** complaints that even mention "turbochargers."   And, when a NHTSA complaint about a competitor vehicle mentions "turbochargers" (again, not necessarily relating to its failure), and the number of competitor vehicles sold is considered, reported turbocharger ***failure*** is almost exclusively a problem in Class Vehicles.

208.    While the existence of ***any*** reports to NHTSA about the failure of Defendants' Turbocharger is significant, the number of these NHTSA complaints must be understood as a mere fraction of the reports and complaints related to the Turbocharger Defect Defendants received and were otherwise aware of starting soon after the first of the Class Vehicles were sold in 2012.  This is so, because NHTSA complaints are only a fraction of the number of complaints actually made by consumers, who are more inclined to go to websites hosting vehicle owner forums, or directly to Defendants' dealerships or to Defendants themselves when components fail.

209.    Defendants also became aware of the Turbocharger Defect when Defendants directly reviewed and responded to consumer complaints beginning in 2012, because a number reported discussing the Turbocharger Defect with their local dealership or Defendants directly.

210.    Finally, discovery will confirm that there was an increase of warranty claims made by consumers for repairs for defective Turbochargers associated with the Turbocharger Defect. Given the expected life of a turbocharger, being the life of the engine, any such claim would be

80

significant, and a volume of such claims is tantamount to irrefutable knowledge of the Turbocharger Defect.

211.    Even as the number of Defendants' turbocharger assemblies that failed within warranty (when Defendants were responsible for the cost of replacement) continued to grow, Defendants did not do anything to correct the problems associated with the Turbocharger Defect, leaving the consumers to be responsible for the costs as the Turbocharger Defect and the failure of Defendants' turbocharger assemblies continued to balloon after the relevant warranties lapsed.

**E.    Defendants Falsely Marketed the Class Vehicles (and Turbocharged Engines)**

212.    Notwithstanding Defendants' exclusive and superior knowledge of the Turbocharger Defect, Defendants failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the Defect through the at least the 2017 model year and/or Defendants made partial statements about the Class Vehicles that did not include any information about the Turbocharger Defect.

213.    Because of Defendants had exclusive knowledge of the Turbocharger Defect and were thus in a superior position as to Plaintiffs, Plaintiffs necessarily reposed trust and confidence in Defendants to provide full disclosures (not merely partial disclosures) of material aspects of the Class Vehicles, like the engine and its Turbocharger Defect.  The fact of the Turbocharger Defect was basic to the transaction and Plaintiffs purchased their Class Vehicles in the mistaken belief that the Turbocharger was not defective.

214.    Defendants have intentionally concealed that the Turbocharger is defective, prone to premature failure and presents a safety risk rather than disclosing these risks to consumers,

including Plaintiffs and members of the Class and Sub-Classes, and the public, through the many channels they used to market the engines and Turbochargers in the Class Vehicles as a key feature.

215.    Defendants jointly drafted and approved the Monroney labels that were affixed to each and every Class Vehicle and which refer to the engine and the Turbocharger, but did not disclose the Turbocharger Defect to consumers.  Plaintiffs and all others who purchased their Class Vehicles new saw the information contained in the Monroney labels prior to making their purchase decisions, but were not informed about the Turbocharger Defect.

216.    Similarly, Defendants marketed the turbocharged engines as a key value of the Class Vehicles, but never made any corrective disclosures about the Turbocharger Defect through any of the many channels they used to market the Class Vehicles to Plaintiffs and other purchasers for whom such facts were material.  Plaintiffs relied on Defendants' partial representations about the Class Vehicles and their turbocharged engines when making the decision to purchase their vehicles.

217.    Defendants promised that there will be no compromise with the down-grade to a 4 cylinder engine because of their advanced Turbocharger.  For example:

- For the 2013 LR2, Defendants stressed that the turbo driven 2.0 liter engine in the Class Vehicles "provide[s] performance greater than that of the 3.2 liter engine it replaces . . . ."[11]

---

[11]                    2013        LR2        Catalogue        Brochure,        https://www.auto-brochures.com/makes/landrover/LR2/Land%20Rover_US%20LR2_2013.pdf (last visited Feb. 4, 2021), at p. 12.

- For the 2014 and 2015 LR2 and the 2016 Discovery Sport,[12] the "2.0 liter four-cylinder engine provides … turbocharged efficiency with the refinement and performance of a six-cylinder . . . ."[13]

218.    While Defendants knew that the turbocharger assembly would fail under regular driving conditions due to the Turbocharger Defect, they also marketed the Class Vehicles as:

- "born to perform in the most challenging conditions" to "ensure[] you arrive at your destination in the most unruffled and relaxed way."[14]

- "epitomiz[ing] the values of the designers and engineers who have created them. Each one instilled with iconic British design cues, delivering capability with composure."[15]

- "Combin[ing] design excellence, engineering integrity and exceptional versatility to

---

[12]        2016 Discovery Sport Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2016.pdf (last visited Feb. 4, 2021), at p. 27.

[13]        2014 LR2 Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/LR2/Land%20Rover_US%20LR2_2014.pdf (last visited Feb. 4, 2021), at p. 27.
2015 LR2 Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/LR2/Land%20Rover_US%20LR2_2015.pdf (last visited Feb. 4, 2012), at p, 25.

[14]  2014 LR2 Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/LR2/Land%20Rover_US%20LR2_2014.pdf (last visited Jan. 16, 2021), at pp 11-12..

[15]  2016 Discovery Sport Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2016.pdf (last visited Jan. 16 2021), at p. 2.  2016 Evoque Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Evoque/Land%20Rover_US%20Evoque_2016.pdf (last visited Jan. 16, 2021, at p. 2.  2017 Discovery Sport Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2017.pdf (last visited Jan. 16, 2021), at p. 2.

create a premium compact SUV."[16]

219.    Defendants touted that these engines with their turbocharger "offer[ed] improved fuel efficiency" while minimizing "the impact on the planet."[17]  Additionally, Defendants claimed the Class Vehicles' had "advanced turbocharging and twin independent variable valve timing" which allegedly "lower[ed] fuel consumption and CO2 emissions. . . ."[18]  Defendants even highlighted "a unique exhaust manifold for quicker warm-up and lower emissions" as a selling point of the Class Vehicles' 2.0 liter engine,[19] while pushing "SAFETY AND

---

[16]  2016 Discovery Sport Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2016.pdf (last visited Jan. 16 2021), at p. 4. 2017 Discovery Sport Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2017.pdf (last visited Jan. 16, 2021), at p. 4.

[17]  2014 Evoque Catalog Brochure, https://cdn.dealereprocess.net/cdn/brochures/landrover/2014-rangeroverevoque.pdf (last visited Feb. 4, 2021) at p. 23. 2015 Evoque    Catalogue    Brochure,    https://www.auto-brochures.com/makes/landrover/Evoque/Land%20Rover_US%20Evoque_2015.pdf, (last visited Feb. 4 2021) at p. 23.

[18]    2013    Evoque    Catalog    Brochure,    https://www.auto-brochures.com/makes/landrover/Evoque/Land%20Rover_US%20Evoque_2013.pdf (last visited Feb. 4, 2021), at 15.

2013    LR2    Catalogue    Brochure,    https://www.auto-brochures.com/makes/landrover/LR2/Land%20Rover_US%20LR2_2013.pdf (las visited Feb. 4, 2021), at p. 12.

2016    Evoque    Catalogue    Brochure,    https://www.auto-brochures.com/makes/landrover/Evoque/Land%20Rover_US%20Evoque_2016.pdf (last visited Feb. 4, 2021), at p. 25.

2017    Discovery    Sport    Brochure,    https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2017.pdf (last visited Feb. 4, 2021), at p. 44.

[19]    2012    Evoque    Catalog    Brochure,    https://www.auto-brochures.com/makes/landrover/Evoque/Land%20Rover_US%20Evoque_2012-1.pdf    (last visited Feb. 4, 2021), at 23.

2016    Evoque    Catalogue    Brochure,    https://www.auto-brochures.com/makes/landrover/Evoque/Land%20Rover_US%20Evoque_2016.pdf (last visited Feb. 4, 2021), at p. 25).

SUSTAINABILITY" [20] of some Class Vehicles or touting the "SUSTAINABILITY"[21] of others based on the vehicles' powertrain, including the Turbocharger.

220.    Plaintiffs viewed or heard these statements in Defendants' online advertising, including on Defendants' website and on television, in online forums supported by Defendants, and/or at Defendants' dealerships where sales personnel were trained to extol the virtues of the EcoBoost engine with the Turbocharger, but who failed to mention the Turbocharger Defect.

221.    Defendants concealed the Turbocharger Defect, and nonetheless marketed the Class Vehicles with additional knowledge of the defect via consumer complaints such as those made to NHTSA.  Defendants have a duty to monitor NHTSA and similar consumer complaints as part of their continuous obligation to identify potential defects in their vehicles.

222.    Defendants did not fully and truthfully disclose to their customers the true nature of the Turbocharger defect, including the safety risk it posed and the lack of reliability it caused (factors that were not readily discoverable by the consumer, if at all, until years later).  As a result, Plaintiffs and the other Class members were fraudulently induced to purchase or lease the Class Vehicles without knowledge of the Turbocharger Defect and all of the resultant safety and reliability problems.

---

2017 Discovery Sport Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2017.pdf (last visited Feb. 4, 2021), at p. 44

[20] 2013 Evoque Catalog Brochure, https://www.auto-brochures.com/makes/landrover/Evoque/Land%20Rover_US%20Evoque_2013.pdf (last visited Feb. 4, 2021), at 28.

[21] 2016 Discovery Sport Catalogue Brochure, https://www.auto-brochures.com/makes/landrover/Discovery%20Sport/Land%20Rover_US%20Discovery%20Sport_2016.pdf (last visited Feb. 4, 2021), at p. 32.

F.     **Relevant Warranties**

223.    Defendants' basic New Vehicle Limited Warranty provides bumper-to-bumper coverage for four years or 50,000 miles during which time Defendants will repair or replace components defective in materials or workmanship.

224.    Because the performance of the Turbocharger is critical to maintain the emissions performance of the engine, it is covered under two governmentally mandated warranties: the Federal Emissions Control System Warranties and the California Emissions Control System Warranties.

225.    The Federal Warranty provides a baseline of two years or 24,000 miles warranty that the vehicle will pass emissions inspections (which is increased as part of most manufacturers express limited warranties), and 8 year, 80,000 mile coverage for select parts (not including the turbocharger assembly).

226.    The California Emissions Control System Warranties established by the California Air Resources Board, establishes a baseline period of three years or 30,000 miles where defective emissions components are to be replaced without charge, and 7 years, or 70,000 miles for select emissions-related components, including the turbocharger assembly.  Although promulgated in California, several other states have adopted California's Emissions Warranty, sometimes called the Section 177 states, after the California regulatory provision.  The Section 177 states include Connecticut, Delaware, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, and Vermont.

227.    Notwithstanding Defendants' obligation to repair or replace defective components, and their knowledge of the Turbocharger Defect, Defendants took no action to repair or replace the Turbochargers in Plaintiffs' Class Vehicles or the vehicles of the Class members.

228.    In fact, Defendants made the calculated, intentional decision to continue to sell the Class Vehicles, knowing that the Turbocharger Defect would continue to manifest and that consumers would be forced to pay to have the Turbocharger replaced.

229.    No recall has been implemented by Defendant.  As alleged above, when it has replaced the defective Turbocharger, it has been with yet another defective Turbocharger.

230.    Given that Defendants is (and has been) aware of the Turbocharger Defect while still engaged in the manufacture and sale of the Class Vehicles, Defendants had (and still has) a duty to disclose and remedy the defect in the Turbocharger.   To be clear, Defendants' obligation with respect to the Turbocharger Defect did not expire after four years or 50,000 miles (i.e., Defendants' basic New Vehicle Limited Warranty).

231.    Defendants concealed material information regarding the Turbocharger Defect. This concealment allowed Defendants to continue to sell the Class Vehicles to Class members and avoid the expense of the repair or redesign necessary to properly address the Turbocharger Defect.

232.    Defendants had the knowledge and capability to notify purchasers of the Turbocharger Defect, and to repair (at their own expense) those defective parts of the Class Vehicle.  Indeed, within the first years of selling the Class Vehicles, if not from the very outset, Defendants were aware that the defective Turbocharger's design and/or manufacturing process causes premature failure.

233.    Defendant, however, chose to conceal the Turbocharger Defect and let purchasers drive defective Class Vehicles or suffer out-of-pocket repair costs and reduction in value of their Vehicles.  Indeed, rather than issuing a recall or repairing the Defect, Defendants chose to make (and continues to make) substantial revenues off their defective Turbochargers – all at the expense and detriment to their customers.

234.    In sum, Defendants have sold a uniformly "inferior" and inherently "defective" product that does not meet industry standards.  Defendants used and continues to use unfair, false, and deceptive tactics to fend off, minimize, ignore, and deny customer complaints and warranty claims.  As a result of Defendants' wrongdoing, Plaintiff and Class members suffered multiple injuries, including paying (and overpaying) for Class Vehicles that they otherwise would not have bought, and paying more for repairs than they otherwise would have.

### G.    Defendants' Dealership Agreements, Contracts and Dissemination of Warranties

235.    JLRNA is not an innocent third party in Plaintiffs' purchase transaction for the Class Vehicles.  JLRNA along with the JL UK Defendants jointly drafted, approved, and affixed the Monroney labels to the Class Vehicles and selected what partial information about the Class Vehicles' engines to disburse into the stream of commerce to Plaintiffs and class members, which omitted any information about the Turbocharger Defect. Defendants, including JLRNA, could have disclosed material information about the Turbocharger Defect directly to Plaintiffs through the many channels of communication open between JLRNA and Plaintiffs, but they chose to profit from silence.

236.    As to the warranties provided with the Class Vehicles, the Dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under those warranties; the warranties were designed by Defendants for and intended to benefit purchasers and lessors of the Class Vehicles only, not the dealers who were to act on the behalf of Defendants in providing service to the purchasers and lessors under the warranties.

237.    At all relevant times, JLRNA provided maintenance and repair services to the Class Vehicles through its many authorized dealerships and agents located throughout the United States, and established official protocols and procedures for the maintenance and repair services.

238.    Upon information and belief, Defendants' employees work with the Jaguar Land Rover dealerships in the United States on issues related to sales, marketing, technical training, and the service of parts and accessories. Upon information and belief, Defendants reimburse these employees for travel and personal expenses related to their job responsibilities.

239.    Upon information and belief, the Jaguar Land Rover dealers have executed dealer agreements with JLRNA, and through JLRNA, with JLR UK. Upon information and belief, these dealer agreements set forth franchise standards established by JLRNA and other requirements enumerated by Defendants that dealers must comply with.

240.    Upon information and belief, Defendants regularly, continuously, and systematically provide support to and control over the Jaguar Land Rover dealerships. Upon information and belief, Defendants' employees regularly and systematically work at the dealerships to educate dealership employees regarding features of Defendants' vehicles, including but not limited to features regarding the engines and Turbocharger. Upon information and belief, various positions at JLRNA require working at the dealerships.

241.    Upon information and belief, through its exclusive agents, instrumentalities and representatives, JLRNA provides new car warranty service on Class Vehicles. Upon information and belief, JLRNA warrants to the original and each subsequent owner of a Class Vehicle that any authorized dealer will make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period. Upon information and belief, all such warranty work is paid for by JLRNA.

242.    Upon information and belief, JLRNA provides Passport to Service Booklets ("Booklets") to its customers, including those customers that purchased or leased Class Vehicles. The Booklets direct Defendants' consumers in the first instance to Defendants'

dealerships for warranty service, maintenance, guidance and questions regarding the vehicle and any warranty or service issues.

243.    Upon information and belief, the dealerships located within the United States are JLRNA's exclusive agents, instrumentalities, and representatives for the provision of all new warranty service for Jaguar and Land Rover vehicles sold both within the United States. Upon information and belief, if a customer of Defendants' needs to have new car warranty repairs performed, Defendants requires the Jaguar or Land Rover customer to have the work performed at the authorized dealer.

244.    Plaintiffs and members of the Nationwide Class have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract between Defendants, on the one hand, and Plaintiffs and members of the Nationwide Class, on the other hand.  For example, the Plaintiffs and Class Members received warranties provided by Defendants upon the purchase of their vehicles.  The warranties were prepared and disseminated by Defendants

245.    Further, Plaintiffs and each of the other Nationwide Class  members are intended third-party beneficiaries of contracts between Defendants and dealers of the Class Vehicles.

246.    The market for new cars, which involves a manufacturer with an extensive established network of authorized dealers that sell its cars, is structured such that drivers must buy from an authorized dealer and do not have the option to buy directly from JLRNA or the other Defendants.  The dealership contracts ("contracts") entered into between Defendants and dealers of the Class Vehicles nonetheless show that Defendants and the dealers intended for Plaintiffs to derive a benefit from the contracts.

247.    The contracts provide that they "[c]ombine Dealer with Company and with other dealers into a distribution system dedicated to delivering to the automotive consumer in the United

States an ownership experience that has never been previously enjoyed resulting in unparalleled repeat purchases of" Defendants' Class Vehicles.

248.    The contracts further state: "[t]he Land Rover Customer is a discriminating consumer with high quality and service expectations.  Dealer, therefore, is expected by the Company to:

> Maintain a staff of highly trained professionals who are genuinely enthusiastic about Land Rover products *and equally dedicated to deliver the ultimate ownership experience*.

> Implement operating procedures applicable to all Dealers *so that the customer will receive consistent, quality service from every Land Rover product Dealer*, regardless of location.

(Emphasis added).

249.    In discussing "Standards of Performance," the contracts state: "To achieve the highest level of customer satisfaction possible in the sales, performance of warranty and maintenance process . . . the parties agree to achieve exceptional standards of performance.  In addition to meeting these high standards, the parties agree that the standards themselves will move to even higher levels as . . . consumer tastes and demands change.  Thus the parties recognize that customer satisfaction is dependent upon Company's development of the Marque Values and that Dealer will provide the highest level of sales and service satisfaction through a dedicated, well-trained staff that meets and/or exceeds customer expectations."  The contracts between Defendants and its dealers also provide that the contracts authorize dealers to "service" Defendants' products.

250.    In a separate, standalone paragraph, the contracts provide:

> <u>Customer Satisfaction.</u> Dealer shall at all times strive to achieve and consistently maintain customer satisfaction at or above the market or national average, whichever is higher, for so long as Dealer is authorized by a Dealer Agreement to conduct Land Rover operations. The measure of customer satisfaction will be determined and defined by the Land Rover Customer Satisfaction Index (LRCSI), which Dealer hereby acknowledges to be reasonable, or by such other method for measuring customer satisfaction applicable to all dealers as determined by JLRNA.

251. In yet another section of the contracts entitled "Customer Relations and Retention," the contracts provide:

> Customer satisfaction is the key to the development and maintenance of a unique retail environment. Dealer will provide prompt, professional, considerate service to all Owners of Land Rover Products, regardless of the selling dealer and recognizes that Dealer's obligations of training, supply of spare parts and service capacity are the foundation to satisfactory Customer relations. Dealer agrees to participate in Company's programs to measure and improve Customer Satisfaction.
>
> Dealer will investigate and resolve in a manner satisfactory to Company all complaints by Owners of Land Rover Vehicles in a prompt and businesslike fashion. Any complaint which Dealer cannot remedy promptly shall be reported to Company and Dealer will keep Company informed of progress on its resolution of such problems. Dealer will at all times of operation designate one employee at the Dealer Premises whose responsibility shall be Customer relations and will serve as the interface with Company on the resolution of any Customer complaints. Dealer and Company will develop remedial programs as necessary to improve Dealer rating in Customer satisfaction and Dealer will implement these programs.

252. The foregoing contract provisions that JLRNA required in its Dealer agreements were so that JLRNA could satisfy its customers, including Plaintiffs and class members, with the direct goal of keeping customers, including Plaintiffs, brand loyal. JLRNA executed these agreements so that Plaintiffs and class members would have a consistent JLR-branded experience and to benefit JLRNA and the other Defendants by increasing sales and other economic transactions with their dealerships.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS/DUTY TO DISCLOSE

253. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Turbocharger Defect and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Turbocharger Defect and could not reasonably discover the latent nature of the defect.

254.    Knowledge and information regarding the Turbocharger Defect was in the exclusive and superior possession of Defendants and their dealers, and was not provided to Plaintiffs and members of the Classes, who could not reasonably discover the defect through due diligence. Based on pre-production testing, design failure mode analysis, and consumer complaints to dealers, *inter alia*, Defendants were aware of the premature failure of the turbocharger in the Class Vehicles and fraudulently concealed the defect from Plaintiffs and members of the Classes.

255.    Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Classes could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Turbocharger Defect.

256.    Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a latent defect and/or that the Class Vehicles contained an exhaust manifold/Turbocharger component prone to premature failure or safety risk. As alleged herein, the existence of the Turbocharger Defect and safety risk were material to Plaintiffs and members of the Classes at all relevant times.

257.    At all times, Defendants is and was under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality and grade of the Class Vehicles, to make full and complete disclosures (rather than the partial disclosures it actually made) about the true nature of their engines, including the Turbocharger, and associated maintenance, and to disclose the Turbocharger Defect and potential safety risk associated with the premature failure of the system.

258.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein including the Turbocharger Defect. Plaintiffs and members of the Classes reasonably  relied on Defendants' knowing, active and affirmative concealment. Knowledge

259.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants is estopped from relying on any statutes of limitations in defense of this action.

## VI.     CLASS ACTION ALLEGATIONS

260.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of a Class defined as follows:

> All persons or entities in the United States that purchased or leased a Class Vehicle (the "Nationwide Class" or Class")

261.     In addition or as an alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure Rule 23(c)(5) and/or the respective state statute(s), Plaintiffs may seek to represent all members of the following Subclass or Subclasses of the Class (to the extent the laws of any state are substantially similar to the laws of any state in which Plaintiffs purchased their Class Vehicles), as well as any subclasses or issue classes as Plaintiffs may propose and/or this Court may designate at the time of class certification, including but not limited to claims under the laws of each of the jurisdictions below:

> All persons or entities in the United States that purchased or leased a Class Vehicle in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

262.    Excluded from the Class and Sub-Class is Defendants and their parents, subsidiaries and corporate affiliates. Plaintiffs reserve the right to revise the definition of the Class and Sub-Class based upon subsequently discovered information and reserves the right to establish additional subclasses where appropriate. The Class and Sub-Class are collectively referred to herein as the "Classes."

263.    The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of proposed members of the Classes throughout the United States.

264.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

    **a.**    Whether the exhaust Turbocharger in the Class Vehicles is defective and prone to premature failure;

    **b.**    Whether the Turbocharger in the Class Vehicles presents a safety risk;

    **c.**    Whether Defendants knew or should have known about the Turbocharger Defect;

    **d.**    Whether Defendants breached their duty to disclose the existence of the Turbocharger Defect;

    **e.**    Whether Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts about the Turbocharger Defect;

    **f.**    Whether Defendants negligently falsely misrepresented or omitted material facts including the existence of the Turbocharger Defect;

    **g.**    Whether Defendants breached their express and/or implied contractual duties to Plaintiffs and members of the Classes;

**h.**  Whether Defendants breached their express and/or implied warranties;

**i.**  Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. and/or any other statutory duties under state laws;

**j.**  Whether Defendants were unjustly enriched by the conducted alleged herein;

**k.**  Whether Defendants actively concealed material facts from Plaintiffs and members of the Classes in order to, *inter alia*, sell more Class Vehicles and/or transfer the costs associated with repair or replacement of the Turbocharger to Plaintiffs and the Classes; and

**l.**  Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

265.  Plaintiffs' claims are typical of the claims of the Classes Plaintiffs seek to represent. As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same illegal actions and conduct by Defendant.

266.  Plaintiffs are willing and prepared to serve the Class and Sub-Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiffs will fairly and adequately protect the interests of the Class and Sub-Class and has no interests adverse to or in conflict with the interests of the other members in the Classes.

267.  Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes.  Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

268.  Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

269.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude their maintenance as a class action.

270.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

271.    The Classes may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

272.    The Classes may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

273.    The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

VII.    **CLAIMS FOR RELIEF**

A.    **Claims Brought on Behalf of the Nationwide Class (and all Subclasses)**

**COUNT I**
**Violation of the New Jersey Consumer Fraud Act ("NJCFA")**
**Unconscionable Acts**

274.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

275.    Plaintiffs bring this claim on behalf of themselves and the members of the Nationwide Class (and alternately, by Plaintiffs Flynn-Murphy, Kabba, Darbenzio and Davies on behalf of a New Jersey Sub-Class).

276.    The NJCFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . ." N.J.S.A. § 56:8-2.

277.    Plaintiffs and members of the Class are consumers who purchased or leased Class Vehicles for personal, family, or household use.

278.    In violation of the NJCFA, Defendants employed unconscionable commercial practices by selling Class Vehicles that contain the Turbocharger Defect. Plaintiffs assert that Defendants' actions caused Plaintiffs and members of the Class ascertainable losses.

279.    It is unconscionable to knowingly distribute or sell vehicles that contain an undisclosed safety risk and to continue to ignore such risks. Had Defendants disclosed to Plaintiffs

and Class members the problems with the turbocharger design and the associated Turbocharger Defect at the time of purchase, including the resulting safety hazard posed by the Defect and the monetary cost of repair, they would not have bought the Class Vehicles or would have paid less for them.

280.    Further, Defendants knew that the Turbocharger Defect would cause the Turbocharger to fail before 12 years or 200,000 miles, thereby unlawfully transferring the costs of repair of the Turbocharger to Plaintiffs and members of the Class. Had Defendants disclosed that the Turbochargers in the Class Vehicles would not last beyond the warranty periods without need for repair or replacement, Plaintiffs and members of the Class would have demanded repair or replacement during the warranty periods at no cost to Plaintiffs and members of the Class—as provided for in Defendants' warranties.

281.    As a direct and proximate result of Defendants' unconscionable conduct in violation of the NJCFA, Plaintiffs and Class members have suffered and continue to suffer harm by the threat of sudden and unexpected failure of the Turbocharger and consequential safety risks and risks of harm and/or actual damages in the amount of the cost to replace the Turbocharger, essential engine parts or the entire engine, and damages to be determined at trial. Plaintiffs and Class members have also suffered the ascertainable loss of the diminished value of their vehicles.

282.    As a result of Defendants' unconscionable, conduct, Plaintiffs and the Class members are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. *See* N.J.S.A. § 56:8-19.

283.    Plaintiffs the Class members also seek an order enjoining Defendants' unlawful, fraudulent and/or deceptive practices, and any other just and proper declaratory or equitable relief available under the NJCFA.  *See* N.J.S.A. § 56:8-19.

**COUNT II**
**Violation of the New Jersey Consumer Fraud Act**
**Misrepresentations, Deceptions and/or Omissions**

284.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

285.    Plaintiffs bring this claim on behalf of themselves and the members of the Nationwide Class (and alternately, by Plaintiffs Flynn-Murphy, Kabba, Darbenzio and Davies on behalf of a New Jersey Sub-Class).

286.    The NJCFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . ."  N.J.S.A. § 56:8-2.

287.    Plaintiffs and members of the Class are consumers who purchased or leased Class Vehicles for personal, family, or household use.

288.    In violation of the NJCFA, Defendants misrepresented the standard, quality or grade of the Class Vehicles which were sold or leased with the latent Turbocharger Defect, and/or made incomplete, partial representations about the Class Vehicles and their engines, and failed to disclose the Turbocharger Defect and corresponding safety risk in violation of the NJCFA.

100

289.    Defendants' misrepresentations and omissions were material to Plaintiffs and members of the Class. When Plaintiffs and members of the Class purchased or leased their Class Vehicles, they reasonably expected that the Turbochargers were not defective and would last a reasonable life, but failed long before this, and posed an unavoidable safety risk.

290.    Defendants knowingly concealed, suppressed and/or omitted the existence of the Turbocharger Defect and safety risk in the Class Vehicles at the time of sale or lease and at all relevant times thereafter.

291.    Defendants owed a duty to disclose the Turbocharger defect and its corresponding safety risk to Plaintiffs and Class members because Defendants possessed superior and exclusive knowledge regarding the Defect and the risks associated with the Turbocharger's failure Plaintiffs expressly reposed a trust and confidence in Defendants to provide them with full – not partial – information about the Class Vehicles, including the Turbocharger Defect.  Rather than disclose the Defect, Defendants intentionally concealed the Defect with the intent to mislead Plaintiffs and the Class members in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the defective Turbocharger and/or failed engine to Plaintiffs and the Class members.

292.    Defendants knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

293.    As a direct and proximate result of Defendants' wrongful conduct in violation of the NJCFA, Plaintiffs and Class members have suffered and continue to suffer harm by the threat

of sudden and unexpected failure of the Turbocharger and/or actual damages in the amount of the cost to replace the Turbocharger, essential engine parts or the entire engine, and damages to be determined at trial. Plaintiffs and Class members have also suffered the ascertainable loss of the diminished value of their vehicles.

294.    Had Plaintiffs and the Class members known the truth about the Turbocharger Defect at the time of purchase, including the safety hazard posed by the Defect and the monetary cost of repair, they would not have bought the Class Vehicles or would have paid less for them.

295.    As a result of Defendants' fraudulent and/or deceptive conduct, misrepresentations and/or knowing omissions, Plaintiffs and the Class members are entitled to actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial. *See* N.J.S.A. § 56:8-19.

296.    Plaintiffs the Class members also seek an order enjoining Defendants' unlawful, fraudulent and/or deceptive practices, and any other just and proper declaratory or equitable relief available under the NJCFA. *See* N.J.S.A. § 56:8-19.


## COUNT III
### Fraud

297.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

298.    Plaintiffs bring this count on behalf of themselves and the members of the Classes.

299.    Defendants intentionally and knowingly falsely misrepresented, concealed, suppressed and/or omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Turbocharger in the Class Vehicles is defective and prone to

premature failure, exposing drivers, occupants and members of the public to worsened performance and safety risks with the intent that Plaintiffs and members of the Nationwide Class would purchase the Class Vehicles and forego repairs under warranty. As a direct result of Defendants' fraudulent conduct, members of the Nationwide Class have suffered actual damages.

300. As a result of Defendants' failure to disclose to members of the Nationwide Class the material fact that the turbocharger component installed in the Class Vehicles is defective and prone to premature failure, owners and lessors of the Class Vehicles are required to spend thousands of dollars to repair or replace the Turbocharger. The fact that the Turbocharger is defective and prone to premature failure is material because no reasonable consumer expects that he or she will have to spend thousands of dollars for diagnosis, repair or replacement of the Turbocharger before 12 years or 200,000 miles, which is the expected life of the engine, and because Plaintiffs and members of the Classes had a reasonable expectation that the vehicles would not suffer from a premature failure of the Turbocharger that would present a safety risk.

301. The fact that the Turbocharger is defective and prone to premature failure is also material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. When the Turbocharger fails, drivers may be unable to accelerate or maintain speed or may experience catastrophic engine failure. Drivers and occupants of the Class Vehicles are at risk for rear-end collisions or other accidents caused by the inability to maintain an appropriate speed, and the general public is also at risk for being involved in an accident with a Class Vehicle that suddenly stops or is unable to maintain an appropriate speed. Plaintiffs and members of the Classes would not have purchased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the

Class Vehicles and existence of the Turbocharger Defect, or would have paid less for the Class Vehicles.

302.    Defendants knew their false misrepresentation, concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendants knew their concealment and suppression of the Turbocharger Defect would sell  more Class Vehicles and would discourage Plaintiffs and Class members from seeking replacement or repair of the exhaust manifold/Turbocharger component within the warranty periods.  Further, Defendants intended to induce Plaintiffs and members of the Nationwide Class into purchasing or leasing the Class Vehicles and discourage them from seeking replacement or repair of the turbocharger component within the warranty periods, thereby unlawfully transferring the cost of repair  or replacement from Defendants to Plaintiffs and Class members, in order to decrease costs and  increase profits.

303.    Defendants acted with malice, oppression and fraud.

304.    Plaintiffs and members of the Classes reasonably  relied upon  Defendants' knowing, affirmative and active false representations, concealment and omissions.  As a direct and proximate result of Defendants' false representations, omissions and active  concealment of material facts regarding the Turbocharger Defect, Plaintiffs and members of  the Nationwide Class have suffered actual damages in an amount to be determined at trial.

## COUNT IV
### Negligent Misrepresentation

305.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

306.    Plaintiffs bring this count on behalf of themselves and the members of the Classes.

307.    Defendants owed a duty to disclose the defective turbocharger and their corresponding safety risk to Plaintiffs and members of the Classes because Defendants made partial statements about the Class Vehicles' engines and possessed superior and exclusive knowledge regarding the Defect and the risks associated with the Turbocharger's failure and falsely and misleadingly marketed and touted the robustness of the Turbocharger and engine.

308.    Defendants' partial statements about the Class Vehicles' engines caused Plaintiffs to purchase the Class Vehicles without full knowledge of the Turbocharger Defect.    Plaintiffs placed their trust in Defendants to give them all the details necessary to make an informed purchase decision, but Defendants provided only partial disclosure of facts basic to the transaction – i.e., Defendants failed to disclose that the Class Vehicles contained a Turbocharger Defect.

309.    Defendants negligently misrepresented and omitted material facts including the standard, quality or grade of the Class Vehicles and the fact that the Turbocharger installed  in the Class Vehicles is defective and prone to premature failure, exposing drivers, occupants and members of the public to safety risks. As a direct result of Defendants' negligent conduct, members of the Classes have suffered actual damages.

310.    As a result of Defendants' failure to disclose, in owners' manuals, maintenance schedules or elsewhere, to members of the Classes the material fact that the Turbocharger installed in the Class Vehicles is defective and prone to premature failure, owners and lessors of the Class Vehicles are required to spend thousands of dollars to repair or replace the Turbocharger or sell their vehicles  at a substantial loss.  The fact that the Turbocharger installed in the Class Vehicles is prone  to premature failure is material because no reasonable consumer expects that he or she will have  to spend thousands of dollars for diagnosis, repair or replacement of the Turbocharger before 12 years or 200,000 miles  which is the expected

life of the engine, and because Plaintiffs and members of the Class had a reasonable expectation that the vehicles would not suffer from a premature failure of the Turbocharger that would present a safety risk.

311.    The fact that the Turbocharger installed in the Class Vehicles is prone to premature failure is also material because it presents a safety risk and places the driver and occupants and members of the public at risk of serious injury or death. When the Turbocharger fails, drivers may be unable to accelerate or maintain speed or may experience catastrophic engine failure. Drivers and occupants of the Class Vehicles are at risk for rear-end collisions or other accidents caused by the inability to maintain an appropriate speed, and the general public is also at risk for being involved in an accident with a Class Vehicle that suddenly stops or is unable to maintain an appropriate speed. Plaintiffs and members of the Classes would not have purchased the Class Vehicles but for Defendants' negligent false representations and omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Turbocharger Defect, or would have paid less for the Class Vehicles.

312.    Plaintiffs and members of the Classes justifiably relied upon Defendants' negligent false representations and omissions of material facts. As a direct and proximate result of Defendants' negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the Turbocharger Defect, Plaintiffs and members of the Nationwide Class have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT V
## Breach of Express Warranty

313.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

314.    Plaintiffs bring this count on behalf of themselves and the members of the Classes.

315.    Defendants marketed the Class Vehicles as innovative, high-performance, dynamic, and environmentally friendly  vehicles.  Such representations formed the basis of the bargain in Plaintiffs' and Class Members'  decisions to purchase or lease the Class Vehicles.

316.    Defendants is and w as at all relevant times a merchant and seller of motor vehicles as defined under the Uniform Commercial Code.

317.    With respect to leases, Defendants is and was at all relevant times a lessor of motor vehicles as defined under the Uniform Commercial Code.

318.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

319.    In connection with the purchase or lease of each of the Class Vehicles, Defendants provided warranty coverage for the Class Vehicles under one or more manufacturer's warranties.  Under the warranties provided to members of the Classes, Defendants promised  to repair or replace covered defective engine components arising out of defects in materials and/or workmanship, including the Turbocharger, at no cost to owners and lessors of the Class Vehicles.

320.    However, given the latent nature of the defective Turbocharger, Defendants knew or should have known that the majority of failures would occur outside the warranty periods, leaving Class Members with substantial repair bills.

321.    Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and members of the Classes purchased or leased their Class Vehicles.

322.    Plaintiffs and the members of the Classes experienced the existence of  the Turbocharger Defect but had no knowledge of the existence of the defect, which was known and

concealed by Defendant. Despite the existence of the warranties, Defendants failed to inform Plaintiffs and members of the Classes that the Class Vehicles contained the Turbocharger Defect during the warranty periods, and thus, wrongfully transferred the costs of repair or replacement of the Turbocharger to Plaintiffs and members of the Classes.

323.    Defendants breached the express warranties by promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied, but failing to do so during the terms of the warranties.

324.    On information and belief, Defendants have not repaired or replaced the Turbocharger free of charge for Plaintiffs and members of the Classes despite the Turbocharger Defect in the Class Vehicles at the time of sale or lease.

325.    Defendants were provided notice of the Turbocharger Defect by numerous consumer complaints made to authorized dealers nationwide, complaints to NHTSA, and through their own testing. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because Defendants have known of and concealed the Turbocharger Defect and, on information and belief, has refused to repair or replace the Turbocharger Defect free of charge outside of the warranty periods despite the defect's existence at the time of sale or lease of the Class Vehicles.

326.    Defendants' attempt to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and the Class members. Among other things, Plaintiffs and the Class members had no meaningful choice in determining

these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendants and Class members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Turbocharger would fail well before 12 years or 200,000 miles.

327.    Further, the warranties promising to repair and/or correct a manufacturing defect fails in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other members of the Classes whole because, on information and belief, Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

328.    Defendants knew that the Class Vehicles were inherently defective and did not conform to their warranties and Plaintiffs and the members of the Classes were induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

329.    As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and the members of the Classes have been damaged in an amount to be determined at trial.

330.    Finally, because of Defendants' breach of express warranty as set forth herein, Plaintiffs and the members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

## COUNT VI
## Breach of Implied Warranty

331.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

332.    Plaintiffs bring this count on behalf of themselves and members of the Classes.

333.    Plaintiffs and Class Members purchased or leased the Class Vehicles from Defendants by and through Defendants' authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party. At all relevant times, Defendants were the manufacturer, distributor, warrantor, and/or seller of Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

334.    Defendants is and was at all relevant times merchants and sellers of motor vehicles as defined under the Uniform Commercial Code.

335.    With respect to leases, Defendants is and was at all relevant times lessors of motor vehicles as defined under the Uniform Commercial Code.

336.    The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

337.    Defendants impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

338.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherently defective Turbocharger (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Defendants breached their implied warranty of merchantability.

339.    Under normal circumstances, a properly designed and manufactured Turbocharger should last for the life of the engine without the need for repair or replacement. Defendants cannot disclaim this implied warranty as it knowingly sold or leased a defective product.

110

340.    Defendants were provided notice of the Turbocharger Defect by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA, and through their own testing.  Affording Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because Defendants have known of and concealed the Turbocharger defect and, on information and belief, has refused to repair or replace the Turbocharger free of charge outside of the warranty periods despite the defect's  existence at the time of sale or lease of the Class Vehicles.

341.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

342.    Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs and the Class members. Among other things, Plaintiffs and the Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendants and Class members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Turbocharger would fail well before their expected lives.

343.    Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Further, given the latent nature of the Turbocharger defect,

Defendants knew  or should have known that the majority of Turbocharger failures likely would occur outside of the warranty periods and have wrongfully transferred the costs of repair or replacement to Plaintiffs and members of the Classes through Defendants' fraudulent concealment of the defect.  These costs are significant and range in the thousands of dollars, and no reasonable consumer  expects to incur such costs during the first 12 years or 200,000 miles.

344.    The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule, fraudulent concealment and the terms of the express warranty.

**COUNT VII**
**Violation of the Magnuson-Moss Warranty Act**
**("MMWA" 15 U.S.C. § 2301, *et seq.*)**

345.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

346.    Plaintiffs bring this count on behalf of themselves and the members of the Classes.

347.    Plaintiffs satisfy the MMWA jurisdictional requirement because they allege diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2).

348.    Plaintiffs and members of the Classes are "consumers" within the  meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

349.    Defendants is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

350.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

351.     The MMWA provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty,  2310(d)(1).

352.     Defendants provided Plaintiffs and members of the Classes with one or more express  warranties, which are covered under 15 U.S.C. § 2301(6). For illustrative purposes, Defendants currently  provides a "Limited Warranty" for new vehicles, which covers the vehicle for four years or 50,000 miles, whichever comes first, as well as a six-year/unlimited-mileage corrosion perforation warranty, plus various emissions warranties.[22] Under warranties provided to members of the Classes, Defendants promised to repair or replace covered defective engine components arising out of defects in materials and/or workmanship, including the Turbocharger, at no cost to owners and lessors of the Class Vehicles.  However, given the latent nature of the defective Turbocharger, Defendants knew or should have known that the majority of Turbocharger failures often and predictably occur outside of the warranty terms.

353.     Any attempt by Defendants to  disclaim  or limit their express  or implied warranties is unconscionable and unenforceable here. Specifically, Defendants' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers about the  defect. The  time limits contained in Defendants' warranty  periods were also unconscionable and inadequate to protect Plaintiffs and the Class members.  Among other things, Plaintiffs and the Class members had no meaningful choice in determining  these time limitations, the terms of which unreasonably favored Defendant.  A gross disparity in bargaining power existed between Defendants and Class members, and Defendants knew or should have known that the Class Vehicles were defective at the time of sale or lease and that the Turbocharger would fail well before 12 years or 200,000 miles.

---

[22] https://www.landroverusa.com/ownership/vehicle-warranty.html (last visited 10/12/2020)

354.    Defendants breached these warranties by misrepresenting the standard, quality or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Turbocharger defect. Without limitation, the Class Vehicles share a common Turbocharger defect in design, material, manufacturing and/or workmanship that is prone to premature failure and fails to operate as represented by Defendant. Defendants have acknowledged that the Class Vehicles are not of the standard, quality or grade that Defendants represented at the time of purchase or lease and contain the Turbocharger Defect.

355.    Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle and all relevant times thereafter, Defendants knew of the material misrepresentations and omissions concerning the standard, quality or grade of the Class Vehicles and the existence of the Turbocharger Defect, but failed to repair or replace the Turbocharger and/or disclose the Turbocharger Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

356.    Plaintiffs and the members of the Classes would suffer economic hardship if they returned their Class Vehicles, but did not receive the return of all payments made by them to Defendant. Thus, Plaintiffs and members of the Classes have not re-accepted their Class Vehicles by retaining them.

357.    The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

114

358.    Plaintiffs, individually and on behalf of the Classes, seek all damages permitted by law, including diminution in the value of the Class Vehicles, in an amount to be proven at trial.

## COUNT VIII
## Unjust Enrichment

359.    Plaintiffs incorporate and reallege each preceding paragraph as though fully set forth herein.

360.    Plaintiffs bring this count on behalf of themselves and the members of the Classes.

361.    Plaintiffs and members of the Classes conferred a benefit on Defendants by leasing or purchasing the Class Vehicles on the mistaken belief that the Class Vehicles did not contain the Turbocharger Defect. Defendants were and should have been reasonably expected to provide Class Vehicles free from the Turbocharger Defect.

362.    JLRNA is not an innocent third-party retailer in the relationship between Plaintiffs and Defendants. JLRNA created an integrated and consistent JLR-branded consumer experience that was geared solely and completely to gain Plaintiffs' trust and loyalty so that Plaintiffs would lease or purchase Class Vehicles and/or perform repair work at Defendants' dealerships, which necessarily conferred a benefit on Defendants through increased sales of Vehicles and/or replacement Turbochargers.

363.    Defendants engaged in conduct that justifies recovery against it. Namely, Defendants unjustly profited from the lease and sale of the Class Vehicles at inflated prices and/or from repairs of defective Turbochargers as a result of their false representations, omissions and fraudulent concealment of the Turbocharger Defect in the Class Vehicles.

364.    As a proximate result of Defendants' false representations, omissions and concealment of the Turbocharger Defect in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Classes. It would be inequitable for Defendants to retain its ill-gotten profits without paying the value thereof to Plaintiffs and members of the Nationwide Class.

365.    Plaintiffs and members of the Classes are entitled to restitution of the amount of Defendants' ill-gotten gains, benefits and profits, including interest, resulting from its unlawful, unjust and inequitable conduct.

366.    Plaintiffs and members of the Classes seek an order requiring Defendants to disgorge its gains and profits to Plaintiffs and members of the Classes, together with interest, in a manner to be determined by the Court.

**B.    Claims on Behalf of Certain Alternative Subclasses (in Addition to Counts III-VIII Which Are Asserted for All Alternative Subclass(es))[23]**

**COUNT IX**
**Violation of the Arizona Consumer Fraud Act**
**(on behalf of Plaintiff Herbener and the Arizona Sub-Class)**

367.    Plaintiff Herbener incorporates and realleges each preceding paragraph as though fully set forth herein.

368.    Plaintiff brings this count on behalf of himself and members of the Nevada Sub-Class.

_____

[23] The Subclasses include an alternative New Jersey Subclass for which Counts I through VIII are also asserted.

369.    Defendants, Plaintiff, and members of the Arizona Sub-Class are "persons" and consumers within the context of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

370.    The Class Vehicles are "merchandise" within the context of Ariz. Rev. Stat. § 44-1521(5).

371.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, ... misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale ... of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

372.    In the course of its business, Defendants violated the Arizona CFA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Arizona Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

373.    Specifically, in marketing the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed by the Arizona CFA:

a.    Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

b.    Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

117

    c.   Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

    d.   Selling Class Vehicles knowing that a service, replacement or repair was needed.

374.   Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Arizona Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

375.   Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Arizona Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the Arizona Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Arizona Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

376.   Plaintiff and the Arizona Sub-Class had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose.

377.    Defendants knew or should known known that its conduct violated the Arizona CFA.

378.    Defendants' unfair, unconscionable, and deceptive acts and practices, affirmative misrepresentations, and/or material omissions regarding the Turbocharger Defect were intended to and did in fact deceive regulators and reasonable consumers, including Plaintiff.

379.    Defendants had an ongoing duty to Plaintiff and the Arizona Sub-Class to refrain from unfair and deceptive practices under the Arizona CFA in the course of its business. Specifically, Defendants owed Plaintiff and the Arizona Sub-Class members a duty to disclose all the material facts concerning the Class Vehicles, and, specifically, the Turbocharger Defect because it possessed exclusive knowledge, it intentionally concealed such material facts from the Arizona Sub-Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

380.    Defendants violated the Arizona CFA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbocharger contained defects and would require replacement.

381.    Plaintiff and members of the Arizona Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, and incurred other substantial monetary damages and inconvenience.

382.    Plaintiff and the Arizona Sub-Class suffered ascertainable loss and actual damages as a direct and proximate result of JLR's misrepresentations and its concealment of and failure to disclose material information.

383. Plaintiff and the Arizona Sub-Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiff and the Arizona Sub-Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

384. Plaintiff and members of the Arizona Sub-Class demand judgment against Defendants for monetary relief and Defendants in an amount to be determined at trial. Plaintiff and the Arizona Sub-Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind, and any other just and proper relief available under the Arizona CFA.

## COUNT X
### Violation of the California Unfair Competition Law
### (on behalf of Plaintiff Gonzalez and the California Sub-Class)

385. Plaintiff Gonzalez incorporates and realleges each preceding paragraph as though fully set forth herein.

386. Plaintiff brings this count on behalf of himself and members of the California Sub-Class.

387. The California Unfair Competition Law (hereinafter "UCL"), prohibits all unlawful, unfair or deceptive business practices. *See* Cal. Bus. & Prof. Code § 17200. Defendants' conduct as alleged herein constitutes unlawful, unfair and deceptive business practices.

388. Defendants' breach of its express and implied warranties as described herein violates § 2313 of California's Commercial Code and § 1792 *et seq.* of California's Civil Code (Song-Beverly Consumer Warranty Act). Defendants' conduct further violates § 1770 *et seq.* of California's Civil Code (the Consumers Remedies Act). These violations are independent and unlawful unfair and deceptive business practices.

120

389.    Defendants' sale of Class Vehicles without disclosing the existence of the Turbocharger defect while misrepresenting the supposed quality and reliability attributes of these vehicles is an unlawful unfair and deceptive business practice within the context of the UCL. This conduct was unlawful, unfair and deceptive because it was intended to, and did in fact, mislead and deceive Plaintiff Gonzalez and members of the California Sub-Class. Had Defendants disclosed to Plaintiff Gonzalez and members of the California Sub-Class that Class Vehicles incorporated a defective Turbocharger they would not have purchased their respective vehicles or paid less for their respective Class Vehicle.

390.    Defendants knowingly concealed, suppressed and/or omitted material facts regarding the defective Turbocharger and its corresponding safety risk and performance issues, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Gonzalez and members of the California Sub-Class. Plaintiff and members of the California Sub-Class could not reasonably have known about the Turbocharger Defect and its corresponding safety risk as the information was in the superior and exclusive control of Defendant.

391.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the California Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end

121

collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

392.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

393.    Defendants owed a duty to disclose the Turbocharger Defect and its corresponding safety risk to Plaintiff and members of the California Sub-Class because they possessed superior and exclusive knowledge regarding the defect and the risks associated with the Turbocharger aand falsely and misleadingly marketed and touted the robustness of the Turbocharger and engine. Rather than disclose the defect, Defendants engaged in unfair, unconscionable and deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Turbocharger to Plaintiff and members of the California Sub-Class.

394.    Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger defect were intended to mislead consumers and misled Plaintiff and members of the California Sub-Class.

395.    At all relevant times, Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or omissions regarding the Turbocharger Defect and its corresponding safety risk were material to Plaintiff and members of the California Sub-Class.

When Plaintiff and members of the California Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Turbochargers were free from latent defects and would last beyond the periods of the manufacturer's warranties. Had Defendants disclosed that the Turbocharger was prone to premature failure and/or an unavoidable safety risk, Plaintiff and members of the California Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

396.    Defendants had a continuous duty to Plaintiff and members of the California Sub-Class to refrain from unfair and deceptive practices under the UCL and to disclose the Turbocharger defect. Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger Defect and corresponding safety risk are substantially injurious to consumers. As a result of Defendants' knowing, intentional concealment, suppression and/or omission of the Turbocharger defect in violation of the UCL, Plaintiff and members of the California Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the Turbocharger and/or actual damages in the amount of the cost to replace the Turbocharger, essential engine parts or the entire engine, and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' unfair, unconscionable and deceptive acts and practices in the course of their business.

397.    Plaintiff and members of the California Sub-Class demand judgment against Defendants for multiple damages, interest, costs and attorneys' fees.

## COUNT XI
### Violation of the California Consumer Legal Remedies Act
### (on behalf of Plaintiff Gonzalez and the California Sub-Class)

398.    Plaintiff Gonzalez incorporates and realleges each preceding paragraph as though fully set forth herein.

399.    Plaintiff brings this count on behalf of himself and members of the California Sub-Class.

400.    The California Consumer Legal Remedies Act prohibits, among other things, "[r]epresenting that goods . . . have . . . characteristics, . . . , uses, [or] benefits . . . that they do not have," Cal. Civ. Code. § 1770(a)(5), "[r]epresenting that goods or services are of a particular standard, quality, [or] grade . . . if they are of another" *id.* § 1770(a)(7), "[a]dvertising goods or services with intent not to sell them as advertised," *id.* § 1770(a)(9), and "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not," *id.* § 1770(a)(16).

401.    Defendants violated Cal. Civ. Code § 1770(a)(5) by representing that Class Vehicles have characteristics, uses, benefits and/or qualities which they do not possess.

402.    Defendants violated Cal. Civ. Code § 1770(a)(7) by representing that Class Vehicles are of a particular standard, quality, or grade, when they are not, and in particular, by supplying vehicles which contain a defect which involves a safety issue.

403.    Defendants violated Cal. Civ. Code § 1770(a)(9) by advertising Class Vehicles with the intent not to sell them as advertised.

404.    Defendants violated Cal. Civ. Code § 1770(a)(16) by representing that the subject of a transaction has been supplied in accordance with a previous representation when it was not.

405.    Defendants violated the Consumers Legal Remedies Act, Cal. Civ. Code § 1770 *et seq.* and committed other unfair and deceptive business practices as described in this complaint. Plaintiff and members of the California Sub-Class request equitable and injunctive relief authorized by the Consumers Legal Remedies Act and for such additional relief as necessary.

406.    Defendants already received notice of the Class member's intent to seek damages in this litigation, but has failed to cure.  Plaintiffs also sent to Defendant, through its counsel, via certified mail, return receipt requested, and informally by email on February 11, 2021, formal notice pursuant to Cal. Civ. Code § 1782 concerning its wrongful conduct as alleged by Plaintiff and the other California Sub-Class members.  However, such further notice is futile because Defendants have yet to offer relief to the Class members, despite being on notice of its unfair, deceptive, and fraudulent conduct.  Plaintiff reserves the right to amend the complaint to seek damages pursuant to Section 1782(d).

### COUNT XII
**Violation of the Colorado Consumer Protection Act**
**(on behalf of Plaintiff Wilbur and the Colorado Sub-Class)**

407.    Plaintiff Wilbur incorporates and realleges each preceding paragraph as though fully set forth herein.

408.    Plaintiff brings this count on behalf of himself and members of the Colorado Sub-Class.

409.    Plaintiff and members of the Colorado Sub-Class are persons within the context of the Colorado Consumer Protection Act (hereinafter "CCPA"). Col. Rev. Stat. § 6-1-102(6).

410.    Plaintiff and members of the Colorado Sub-Class are consumers within the context of the CCPA, who purchased and/or leased Class Vehicles for personal, family, or household use. *See* Col. Rev. Stat. § 6-1-113(a).

125

411.    The CCPA prohibits, among other things, "knowingly or recklessly mak[ing] a false representation as to the characteristics, . . . uses, [or] benefits . . . of goods," Col. Rev. Stat. § 6-1-105(e), "[r]epresent[ing] that goods . . . are of a particular standard, quality, [or] grade . . . if he knows or should know that they are of another," *id.* § 6-1-105(g)," and "[f]ail[ing] to disclose material information concerning goods . . . which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction," *id.* § 6-1-105(u).

412.    Defendants is engaged in deceptive trade practices within the context of the CCPA. *See* Col. Rev. Stat. § 6-1-105(e), (g), (u).

413.    Defendants knowingly and intentionally violated CCPA § 6-1-105(e) by representing Class Vehicles have characteristics, uses, and benefits which they do not possess.

414.    Defendants knowingly and intentionally violated CCPA § 6-1-105(g) by representing Class Vehicles are of a particular standard, quality, or grade, when they are not.

415.    Defendants violated CCPA § 6-1-105(u) by deception, fraud, false pretense, false premise, misrepresentation, knowing concealment, suppression, and/or omission of material facts concerning Class Vehicles with the intent to deceive Plaintiff and members of the Colorado Sub-Class.

416.    Defendants knowingly concealed, suppressed and/or omitted material facts regarding the defective Turbocharger and its corresponding safety risk and performance issues, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and members of the Colorado Sub-Class. Plaintiff and members of the Colorado Sub-Class could not reasonably have known about the Turbocharger Defect and its corresponding safety risk as the information was in the superior and exclusive control of Defendant.

126

417.    Defendants intentionally and knowingly misrepresented and concealed, and suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Colorado Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

418.    Defendants owed a duty to disclose the Turbocharger Defect and its corresponding safety risk to Plaintiff and members of the Colorado Sub-Class because they possessed superior and exclusive knowledge regarding the defect and the risks associated with the Turbocharger and falsely and misleadingly marketed and touted the robustness of the Turbocharger and engine. Rather than disclose the defect, Defendants engaged in unfair, unconscionable and deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Turbocharger to Plaintiff and members of the Colorado Sub-Class.

419.    Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger defect were intended to mislead consumers and misled Plaintiff and members of the Colorado Sub-Class.

420.    At all relevant times, Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or omissions regarding the Turbocharger Defect and its corresponding safety risk were material to Plaintiff and members of the Colorado Sub-Class. When

Plaintiff and members of the Colorado Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Turbochargers were free from latent defects and would last beyond the periods of the manufacturer's warranties. Had Defendants disclosed that the Turbocharger was prone to premature failure and/or an unavoidable safety risk, Plaintiff and members of the Colorado Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

421.    Defendants had a continuous duty to Plaintiff and members of the Colorado Sub-Class to refrain from unfair and deceptive practices under the CCPA and to disclose the Turbocharger defect. Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger Defect and corresponding safety risk are substantially injurious to consumers. As a result of Defendants' knowing, intentional concealment, suppression and/or omission of the Turbocharger defect in violation of the CCPA, Plaintiff and members of the Colorado Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the Turbocharger and/or actual damages in the amount of the cost to replace the Turbocharger, essential engine parts or the entire engine, and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' unfair, unconscionable and deceptive acts and practices in the course of their business.

422.    Plaintiff and members of the Colorado Sub-Class demand judgment against Defendants for restitution, disgorgement, statutory and actual monetary damages including multiple damages, interest, costs, attorneys' fees and injunctive relief including a declaratory

judgment and an appropriate court order prohibiting Defendants from further deceptive acts and practices described in this complaint.

## COUNT XIII
### Violation of the Florida Unfair & Deceptive Trade Practices Act
### (on behalf of Plaintiffs Herzog and Gilchrist and the Florida Sub-Class)

423.    Plaintiffs Herzog and Gilchrist incorporates and realleges each preceding paragraph as though fully set forth herein.

424.    Plaintiffs bring this count on behalf of himself and members of the Florida Sub-Class.

425.    Plaintiffs and members of the Florida Sub-Class are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

426.    Defendants engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

427.    FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.

428.    In the course of its business, Defendants violated the FUDTPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Florida Sub-Class. Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendants engaged in unfair methods of competition, unconscionable

129

acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Fla. Stat § 501.204(1). This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons. Specifically, in marketing the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed by the FUDTPA:

     a.  Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

     b.  Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

     c.  Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

     d.  Selling Class Vehicles knowing that a service, replacement or repair was needed.

429.   Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiffs and members of the Florida Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Florida Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

430.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

431.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiffs and the Florida Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and members of the Florida Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the Florida Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

432.    Plaintiffs and Florida Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that

Defendants had concealed or failed to disclose. Plaintiffs and Florida Sub-Class members did not, and could not, unravel Defendants' deception on their own.

433.     Defendants violated the FUDTPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbochargers contained defects and would require replacement.

434.     Defendants had an ongoing duty to Plaintiffs and Florida Sub-Class members to refrain from unfair or deceptive practices under the FUDTPA in the course of their business. Specifically, Defendants owed Plaintiffs and Florida Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because Defendants possessed exclusive knowledge, intentionally concealed the defect from Plaintiffs and Florida Sub-Class members, and/or made misrepresentations that were misleading because they were contradicted by withheld facts.

435.     Defendants' violations present a continuing risk to Plaintiffs and Florida Sub-Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

436.     Plaintiffs and the Florida Sub-Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

437.     Plaintiffs and members of the Florida Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

438.     Plaintiffs and the Florida Sub-Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

439.    Plaintiffs and the Florida Sub-Class demand judgment against the Defendants for actual monetary damages including multiple damages, interest, costs, attorneys' fees and injunctive relief including a declaratory judgment and an appropriate court order prohibiting Defendants from further deceptive acts and practices described in this complaint, and any other just and proper relief available under the FUDTPA.

440.    Plaintiffs and Florida Sub-Class members demand judgment against the Defendants for actual monetary damages including multiple damages, interest, costs, and attorneys' fees. Pursuant to Fla. Stat. § 501.211, Plaintiffs and Florida Sub-Class members seek an order enjoining Defendants' unfair or deceptive acts or practices, including a declaratory judgment and an appropriate order prohibiting Defendants from further deceptive acts and practices as described in this complaint, and awarding any other just and proper relief available under the FUDTPA.

### COUNT XIV
### Violation of the Illinois Consumer Fraud and Deceptive Practices Act
### (on behalf of Plaintiff Harrell and the Illinois Sub-Class)

441.    Plaintiff Harrell incorporates and realleges each preceding paragraph as though fully set forth herein.

442.    Plaintiff brings this count on behalf of herself and members of the Illinois Sub-Class.

443.    Defendants, Plaintiff, and members of the Illinois Sub-Class are "persons" as that term is defined in 815 ILCS 505/1(c).

444.    Members of the Illinois Sub-Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

445.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or

employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

446.    In the course of their business, Defendants violated the Illinois CFA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Illinois Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons. By misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by 815 ILCS 505/2.

447.    Specifically, in marketing the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed ty the Illinois CFA:

    a.    Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

    b.    Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

    c.    Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

134

d.  Selling Class Vehicles knowing that a service, replacement or repair was needed.

448.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Illinois Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

449.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Illinois Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

450.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Illinois Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the Illinois Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Illinois Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

451.    Plaintiff and Illinois Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Illinois Sub-Class members did not, and could not, unravel Defendants' deception on their own.

452.    Defendants violated the Illinois CFA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbochargers contained defects and would require replacement.

453.    Defendants had an ongoing duty to Plaintiff and Illinois Sub-Class members to refrain from unfair or deceptive practices under the Illinois CFA in the course of their business. Specifically, Defendants owed Plaintiff and Illinois Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Illinois Sub-Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

454.    Defendants' violations present a continuing risk to Plaintiff and Illinois Sub-Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

455.    Plaintiff and the Illinois Sub-Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment, misrepresentations, and/or failure to disclose material information. As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiff and members of the Illinois Sub-Class have suffered injury-in-fact and/or actual damage.

456.    Pursuant to 815 ILCS 505/10a(a), the Illinois Sub-Class seeks monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent. Plaintiff and the Illinois Sub-Class also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

**COUNT XV**
**Violation of the Massachusetts Consumer Protection Act**
**(on behalf of Plaintiff Postle and the Massachussetts Sub-Class)**

457.    Plaintiff Postle incorporates and realleges each preceding paragraph as though fully set forth herein.

458.    Plaintiff brings this count on behalf of herself and members of the Massachussets Sub-Class.

459.    Defendants, Plaintiff, and the Massachusetts Sub-Class members are "persons" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(a).

460.    Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws Ch. 93A, § 1(b).

461.    The Massachusetts Consumer Protection Act ("Massachusetts CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ch. 93A, § 2.

462.    In the course of its business, Defendants violated the Massachusetts CPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Massachusetts Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons.

Specifically, in marketing the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed ty the Massachusetts CPA:

      a.  Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

      b.  Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

      c.  Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

      d.  Selling Class Vehicles knowing that a service, replacement or repair was needed.

463.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Arizona Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

464.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Massachusetts Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth

with the intention that Plaintiff and members of the Massachusetts Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Massachusetts Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

465.    Plaintiff and the Massachusetts Sub-Class had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose.

466.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

467.    Defendants had an ongoing duty to Plaintiff and the Massachusetts Sub-Class to refrain from unfair and deceptive practices under the Massachusetts CPA in the course of its business. Specifically, Defendants owed Plaintiff and the Massachusetts Sub-Class members a duty to disclose all the material facts concerning the Class Vehicles, and, specifically, the Turbocharger Defect because it possessed exclusive knowledge, it intentionally concealed such material facts from the Massachusetts Sub-Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

468.    Defendants violated the Massachusetts CPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbochargers contained defects and would require replacement.

469.    Plaintiff and the Massachusetts Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

470.    Plaintiff and members of the Massachusetts Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

471.    Pursuant to Mass. Gen. Laws Ch. 93A, § 9, Plaintiff seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiff are entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

472.    Defendants were provided notice of the issues raised in this Count and this Complaint, as detailed above and in the initial filing of this litigation. Because JLR failed to remedy their unlawful conduct within the requisite time period, Plaintiff and the Massachusetts Sub-Class seek all damages and relief to which they are entitled.

## COUNT XVI
### Violation of the Michigan Consumer Protection Act
### (on behalf of Plaintiff Cohn and the Michigan Sub-Class)

473.    Plaintiff Cohn incorporates and realleges each preceding paragraph as though fully set forth herein.

140

474.    Plaintiff Cohn brings this count on behalf of herself and members of the Michigan Sub-Class.

475.    Plaintiff Cohn and members of the Michigan Sub-Class are "persons" within the meaning of the Michigan Consumer Protection Act ("MCPA"). *See* Mich. Comp. Laws § 445.902(1)(d).

476.    Plaintiff Cohn and members of the Michigan Sub-Class are permitted to bring this action for injunctive relief and actual damages under the MCPA. *See* Mich. Comp. Laws § 445.911.

477.    Defendants is a "person" engaged in "trade or commerce" within the meaning of the MCPA. *See* Mich. Comp. Laws § 445.902(1)(d) and (g).

478.    The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . " Mich. Comp. Laws § 445.903(1). Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the MCPA, including, inter alia: "[r]epresenting that goods or services have . . . characteristics. . . that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

479.    Defendants violated the MCPA by employing unfair, unconscionable, or deceptive acts or practices, and/or by engaging in fraud, misrepresentations, concealment,

suppression and/or omissions of material facts with the intent that others rely upon such concealment, suppression and/or omissions, in connection with the sale and/or lease of Class Vehicles.

480.    Defendants knowingly concealed, suppressed and/or omitted material facts regarding the defective Turbocharger and its corresponding safety risk and performance issues, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Cohn and members of the Michigan Sub-Class. Plaintiff Cohn and members of the Michigan Sub-Class could not reasonably have known about the Turbocharger Defect and its corresponding safety risk as the information was in the superior and exclusive control of Defendant.

481.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff Cohn and members of the Michigan Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

482.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk

of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

483.    Defendants  owed  a  duty  to  disclose  the Turbocharger Defect  and  its corresponding safety risk to Plaintiff Cohn and members of the Michigan Sub-Class because  they possessed superior and exclusive knowledge regarding the defect and the risks associated  with the  Turbocharger  and  falsely  and  misleadingly  marketed  and  touted  the  robustness  of  the Turbocharger and engine.  Rather than disclose the defect, Defendants engaged in  unfair, unconscionable and deceptive trade practices in order to  sell  additional  Class  Vehicles  and wrongfully transfer the cost of repair or replacement of the Turbocharger to Plaintiff  Cohn and members of the Michigan Sub-Class.

484.    Defendants'    unfair,    unconscionable    and    deceptive    acts,    affirmative misrepresentations and/or material omissions regarding the Turbocharger defect were  intended to mislead consumers and misled Plaintiff Cohn and members of the Michigan Sub-Class.

485.    At all relevant times, Defendants' unfair, unconscionable and deceptive acts, affirmative  misrepresentations and/or omissions regarding the Turbocharger Defect and  its corresponding safety risk were material to Plaintiff Cohn and members of the Michigan  Sub-Class. When  Plaintiff  Cohn  and  members  of  the  Michigan  Sub-Class  purchased  or  leased their  Class  Vehicles,  they  reasonably  relied  on  the  reasonable  expectation  that  the  Class Vehicles' Turbochargers were free from latent defects and would last beyond the periods  of the manufacturer's  warranties.  Had  Defendants  disclosed  that  the  Turbocharger  was  prone  to

143

premature failure and/or an unavoidable safety risk, Plaintiff Cohn and members of the Michigan Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

486.   Defendants had a continuous duty to Plaintiff Cohn and members of the Michigan Sub-Class to refrain from unfair and deceptive practices under the MCPA and to disclose the Turbocharger defect. Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger Defect and corresponding safety risk are substantially injurious to consumers.  As a result  of Defendants' knowing, intentional concealment, suppression and/or omission of the Turbocharger defect in violation of the MCPA, Plaintiff Cohn and members of the Michigan Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the Turbocharger and/or actual damages in the amount of the cost  to replace the Turbocharger, essential engine parts or the entire engine, and damages to be determined at trial.  Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' unfair, unconscionable and deceptive acts and practices in the course of their business.

487.   Defendants' unfair, unconscionable and deceptive acts and practices occurred in the conduct of trade or commerce.

488.   Defendants have knowingly and willfully engaged in the unfair, unconscionable and deceptive acts and practices alleged herein.  Further, Defendants unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed latent defect and corresponding safety risk.

489.    Defendants' unfair, unconscionable and deceptive acts and practices affect the public interest and present a continuing safety risk to Plaintiff Cohn and members of the Michigan Sub-Class as well as the public.

490.    As a direct and proximate result of Defendants' violations of the MCPA, Plaintiff Cohn and members of the Michigan Sub-Class have suffered actual damages and/or injury in fact.

491.    As a result of Defendants' unlawful conduct, Plaintiff Cohn and members of the Michigan Sub-Class are entitled to actual damages, costs of litigation, attorneys' fees, injunctive and other equitable relief. *See* Mich. Comp. Laws § 445.911.

## COUNT XVII
### Violation of the Nevada Deceptive Trade Practices Ac
### (on behalf of Plaintiff Postle and the Massachussetts Sub-Class)

492.    Plaintiff Pick incorporates and realleges each preceding paragraph as though fully set forth herein.

493.    Plaintiff brings this count on behalf of herself and members of the Nevada Sub-Class.

494.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq.* prohibits deceptive trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or

145

lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

495.    In the course of its business, Defendants violated the Nevada DTPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Nevada Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons. Specifically, in marketing the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed ty the Nevada DTPA:

a.    Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

b.    Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

c.    Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

d.    Selling Class Vehicles knowing that a service, replacement or repair was needed; and

e.    Intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles, as detailed above.

496.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendant engaged in unfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Nev. Rev. Stat. § 598.0915.

497.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Nevada Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

498.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Nevada Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

499.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Nevada Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the Nevada Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the

Nevada Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

500.    Plaintiff and Nevada Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Nevada Sub-Class members did not, and could not, unravel Defendants' deception on their own.

501.    Defendants had an ongoing duty to Plaintiff and Nevada Sub-Class members to refrain from unfair or deceptive practices under the Nevada DTPA in the course of their business. Specifically, Defendants owed Plaintiff and Nevada Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Nevada Sub-Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

502.    Defendants violated the Nevada DTPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that the Turbocharger would require replacement.

503.    Defendants' violations present a continuing risk to Plaintiff and Nevada Sub-Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

504.    Nevada Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

505. Plaintiff and members of the Nevada Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, and incurred other substantial monetary damages and inconvenience.

506. Pursuant to Nev. Rev. Stat. §§ 41.600, Plaintiff and Nevada Sub-Class members seek an order enjoining Defendants unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Nevada DTPA.

## COUNT XVIII
### Violation of the Ohio Consumer Sales Practices Act
### (on behalf of Plaintiff Shepherd and the Ohio Sub-Class)

507. Plaintiff Shepherd incorporates and realleges each preceding paragraph as though fully set forth herein.

508. Plaintiff brings this count on behalf of herself and members of the Ohio Sub-Class.

509. Defendants, Plaintiff, and the Ohio Sub-Class members are "persons" within the meaning of the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01(B) ("Ohio CSPA").

510. Defendants are each a "supplier" as defined by Ohio Rev. Code § 1345.01(C).

511. Plaintiff and the Ohio Sub-Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

512. Ohio Rev. Code § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

513. In the course of their business, Defendants violated the Ohio CSPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically the Turbocharger Defect, with the intent to deceive Plaintiff and the Ohio Sub-Class.

This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons. Specifically, in marketing the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed by the Ohio CSPA:

> f.  Representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have;
>
> g.  Representing that Class Vehicles are of a particular standard, quality, and grade when they are not; and
>
> h.  Representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not.

Ohio Rev. Code § 1345.02(A), (B)(1), (2), and (4).

514.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Ohio Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

515.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Ohio Sub-Class.

516.    Defendants knew or should have known that its conduct violated the Ohio CSPA.

517.     The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the types of acts and omissions of Defendants in this Complaint—including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a substantial defect—constitute deceptive sales practices in violation of the CSPA. These cases include, but are not limited to, the following:

     i.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

    ii.   *State ex rel. Betty D. Montgomery v. Ford Motor Co.* (OPIF #10002123);

   iii.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

   iv.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

    v.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525(Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

   vi.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

  vii.   *Cranford v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

 viii.   *Brown v. Spears* (OPIF #10000403);

   ix.   *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

    x.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

   xi.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524).

518.     Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Ohio Sub-Class. Defendants misrepresented, concealed, or failed to disclose the truth with the intention that

Plaintiff and members of the Ohio Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Ohio Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

519.    Plaintiff and Ohio Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Ohio Sub-Class members did not, and could not, unravel Defendants' deception on their own.

520.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

521.    Defendants had an ongoing duty to Plaintiff and the Ohio Sub-Class to refrain from unfair and deceptive practices under the Ohio CSPA in the course of its business. Specifically, Defendants owed Plaintiff and the Ohio Sub-Class members a duty to disclose all the material facts concerning the Class Vehicles, and, specifically, the Turbocharger Defect because it possessed exclusive knowledge, they intentionally concealed such material facts from the Ohio Sub-Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

522.    Defendants violated the Ohio CSPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbochargers contained defects and would require replacement.

523.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiff and the Ohio Sub-Class, about the true safety profile of the Class Vehicles, the quality of Defendants' brands, and the true value of the Class Vehicles.

524.    Defendants' violations present a continuing risk to Plaintiff and the Ohio Sub-Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

525.    Plaintiff and Ohio Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

526.    Plaintiff and members of the Ohio Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

527.    Pursuant to Ohio Rev. Code § 1345.09, Plaintiff and the Ohio Sub-Class members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages - trebled, and attorneys' fees, costs, and any other just and proper relief under the Ohio CSPA.

## COUNT XIX
### Violation of Oklahoma Consumer Protection Act
### (on behalf of Plaintiff McNew and the Oklahoma Sub-Class)

528.    Plaintiff McNew incorporates by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

153

529.    Plaintiff McNew asserts this count on behalf of herself and members of the Oklahoma Sub-Class.

530.    Plaintiff McNew and members of the Oklahoma Sub-Class are persons within the context of the Oklahoma Consumer Protection Act, Okla. Stat. Tit. 15 § 752 (hereinafter "OCPA") who purchased or leased class vehicles in a "consumer transaction" for "personal, household, or business," specifically, Okla. Stat. Tit. 15 § 752(2).

531.    Defendants is a person within the context of OCPA § 752(2), and Defendants' actions set forth herein occurred in the conduct of trade or commerce.

532.    The OCPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics… uses, [or] benefits of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* Okla. Stat. Tit. 15, § 753.

533.    In the course of their business, Defendants violated the OCPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff McNew and the Oklahoma Sub Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons. Specifically, in marketing the Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed ty the OCPA:

534.    Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

535.    Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

536.    Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

537.    Selling Class Vehicles knowing that a service, replacement or repair was needed.

538.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff McNew and the Oklahoma Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff McNew and members of the Oklahoma Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff McNew and the Oklahoma Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

539.    Defendants violated the OCPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbochargers contained defects and would require replacement.

540.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods. This unfair, unconscionable, and/or illegal

conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

541.    Defendants had an ongoing duty to Plaintiff McNew and the Oklahoma Sub-Class to refrain from unfair and deceptive practices under the OCPA in the course of their business. Specifically, Defendants owed the Sub-Class members a duty to disclose all the material facts concerning the Class Vehicles and, specifically, the Turbocharger Defect because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff McNew and the Oklahoma Sub-Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

542.    Plaintiff McNew and the Oklahoma Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

543.    Plaintiff McNew and members of the Oklahoma Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience

544.    Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiff McNew and the Oklahoma Sub-Class demand judgment against the Defendants for restitution, disgorgement, statutory and actual monetary damages including multiple damages, interest, costs, attorneys' fees and injunctive relief including a declaratory judgment and an appropriate court order prohibiting Defendants from further deceptive acts and practices described in this complaint.

**COUNT XX**
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**(on behalf of Plaintiff Canizares and the Pennsylvania Sub-Class)**

545.     Plaintiff Canizares incorporates and realleges each preceding paragraph as though fully set forth herein.

546.     Plaintiff brings this count on behalf of himself and members of the Illinois Sub-Class.

547.     Defendants, Plaintiff, and Pennsylvania Sub-Class members are "persons" within the meaning of 73 P.S. § 201-2(2).

548.     The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.

549.     In the course of their business, Defendants violated the Pennsylvania UTPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Pennsylvania Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons., as detailed above.

550.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendants engaged in one or more unfair or deceptive business practices prohibited by the Pennsylvania UTPA:

        a.   representing that the Class Vehicles and/or the Turbocharger have characteristics, uses, benefits, and qualities which they do not have;

b.   representing that the Class Vehicles and/or the Turbocharger are of a particular standard, quality, and grade when they are not;

c.   advertising the Class Vehicles and/or the Turbocharger with the intent not to sell or lease them as advertised;

d.   engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

551.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Pennsylvania Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

552.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Plaintiff and Pennsylvania Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

553.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Pennsylvania Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the Pennsylvania Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Pennsylvania Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

554.    Plaintiff and Pennsylvania Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Pennsylvania Sub-Class members did not, and could not, unravel Defendants' deception on their own.

555.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

556.    Defendants had an ongoing duty to Plaintiff and Pennsylvania Sub-Class members to refrain from unfair or deceptive practices under the Pennsylvania UTPA in the course of its business. Specifically, Defendants owed Plaintiff and Pennsylvania Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because

they possessed exclusive knowledge, they intentionally concealed the defect from Plaintiff and Pennsylvania Sub-Class members, and/or they made misrepresentations that were misleading because they were contradicted by withheld facts.

557.    Defendants violated the Pennsylvania UTPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbochargers contained defects and would require replacement.

558.    Defendants' violations present a continuing risk to the Pennsylvania Sub-Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

559.    Plaintiff and Pennsylvania Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

560.    Plaintiff and members of the Pennsylvania Sub-Class experienced premature Turbocharger failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

561.    As a direct and proximate result of Defendants' violations of the Pennsylvania UTPA, Pennsylvania Sub-Class members have suffered injury-in-fact and/or actual damage.

562.    Pursuant to 73 P.S. § 201-9.2, Plaintiff and the Pennsylvania Sub-Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages - trebled, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Pennsylvania UTPA.

## COUNT XXI
### Violation of the South Carolina Unfair Trade Practices Act
### (on behalf of Plaintiff Howard and the South Carolina Sub-Class)

563.    Plaintiff Howard incorporates and realleges each preceding paragraph as though fully set forth herein.

564.    Plaintiff brings this count on behalf of himself and members of the South Carolina Sub-Class.

565.    Defendants, Plaintiff, and the South Carolina Sub-Class are "persons" within the meaning of S.C. Code § 39-5-10(a).

566.    Defendants are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5-10(b).

567.    The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a).

568.    In the course of their business, Defendants violated the South Carolina UTPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the South Carolina Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons. Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by S.C. Code Ann. § 39-5-20(a).

569.    Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed by the Pennsylvania CPA:

e.    Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

f.    Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

g.    Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

h.    Selling Class Vehicles knowing that a service, replacement or repair was needed.

570.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the South Carolina Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

571.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive

162

reasonable consumers, including Plaintiff and South Carolina Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

572.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the South Carolina Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the South Carolina Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the South Carolina Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

573.    Plaintiff and South Carolina Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and South Carolina Sub-Class members did not, and could not, unravel Defendants' deception on their own.

574.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

575.    Defendants had an ongoing duty to Plaintiff and South Carolina Sub-Class members to refrain from unfair or deceptive practices under the South Carolina UTPA in the course of their business. Specifically, Defendants owed Plaintiff and South Carolina Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because Defendants possessed exclusive knowledge, intentionally concealed the Turbocharger Defect from Plaintiff and South Carolina Sub-Class members, and/or made misrepresentations that were misleading because they were contradicted by withheld facts.

576.    Defendants violated the South Carolina UTPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbocharger was defective and would require replacement.

577.    Defendants' violations present a continuing risk to Plaintiff and South Carolina Sub-Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

578.    Plaintiff and the South Carolina Sub-Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

579.    Plaintiff and members of the South Carolina Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

580.    Pursuant to S.C. Code § 39-5-140(a), Plaintiff and the South Carolina Sub-Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, actual damages, treble damages for willful and knowing violations, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the South Carolina UTPA.

**COUNT XXII**
**Violation of the Texas Deceptive Trade Practices – Consumer Protection Act**
**(on behalf of Plaintiff De La Torre and the Texas Sub-Class)**

581.    Plaintiff De La Torre incorporates and realleges each preceding paragraph as though fully set forth herein.

582.    Plaintiff brings this count on behalf of herself and members of the Texas Sub-Class.

583.    Plaintiff and members of the Texas Sub-Class are persons and consumers within the context of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Comm. Code §§ 17.41 *et seq.* (hereinafter "TDTPA") who purchased or leased Class Vehicles for personal, family or household use, specifically § 17.45(3) and (4).

584.    Defendants is a person within the context of TDTPA § 17.45(3) who sell goods within the context of TDTPA § 17.45(1).

585.    The sale and lease of Class Vehicles in Texas constitutes trade and commerce of consumer goods affecting the people of the state of Texas within the context of TDTPA § 17.45(6).

586.    Defendants knowingly and intentionally violated TDTPA § 17.46(b)(5) by representing Class Vehicles have characteristics, uses, and benefits which they do not possess.

587.    Defendants knowingly and intentionally violated TDTPA § 17.46(b)(7) by representing Class Vehicles are of a particular standard, quality, or grade, when they are not.

588.    Defendants violated TDTPA § 17.46(b)(24) by deception, fraud, false pretense, false premise, misrepresentation, knowing concealment, suppression, and/or omission of material facts concerning Class Vehicles with the intent to deceive Plaintiff and members of the Texas Sub-Class.

589.    Defendants knowingly concealed, suppressed and/or omitted material facts regarding the defective Turbocharger and its corresponding safety risk and performance issues,

and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and members of the Texas Sub-Class. Plaintiff and members of the Texas Sub-Class could not reasonably have known about the Turbocharger Defect and its corresponding safety risk as the information was in the superior and exclusive control of Defendant.

590.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Texas Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

591.    Defendants owed a duty to disclose the Turbocharger Defect and its corresponding safety risk to Plaintiff and members of the Texas Sub-Class because they possessed superior and exclusive knowledge regarding the defect and the risks associated with the Turbocharger and falsely and misleadingly marketed and touted the robustness of the Turbocharger and engine. Rather than disclose the defect, Defendants engaged in unfair, unconscionable and deceptive trade practices in order to sell additional Class Vehicles and wrongfully transfer the cost of repair or replacement of the Turbocharger to Plaintiff and members of the Texas Sub-Class.

592.    Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger defect were intended to mislead consumers and misled Plaintiff and members of the Texas Sub-Class.

593.     At all relevant times, Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or omissions regarding the Turbocharger Defect and its corresponding safety risk were material to Plaintiff and members of the Texas Sub-Class. When Plaintiff and members of the Texas Sub-Class purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles' Turbochargers were free from latent defects and would last beyond the periods of the manufacturer's warranties. Had Defendants disclosed that the Turbocharger was prone to premature failure and/or an unavoidable safety risk, Plaintiff and members of the Texas Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

594.     Defendants had a continuous duty to Plaintiff and members of the Texas Sub-Class to refrain from unfair and deceptive practices under the TDTPA and to disclose the Turbocharger defect. Defendants' unfair, unconscionable and deceptive acts, affirmative misrepresentations and/or material omissions regarding the Turbocharger Defect and corresponding safety risk are substantially injurious to consumers. As a result of Defendants' knowing, intentional concealment, suppression and/or omission of the Turbocharger defect in violation of the TDTPA, Plaintiff and members of the Texas Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the Turbocharger and/or actual damages in the amount of the cost to replace the Turbocharger, essential engine parts or the entire engine, and damages to be determined at trial. Owners and lessees of Class Vehicles also suffered an ascertainable loss in the form of the diminished value of their vehicles as a result of Defendants' unfair, unconscionable and deceptive acts and practices in the course of their business.

595.    Defendants committed unfair and deceptive acts in the course of trade and commerce within the context of the TDTPA as described in this complaint in violation of TDTPA § 17.46.

596.    The conduct of Defendants offends public policy as established by statutes and common law; is immoral, unethical, oppressive and/or unscrupulous and caused unavoidable and substantial injury to Class Vehicle owners (who were unable to have reasonably avoided the injury due to no fault of their own) without any countervailing benefits to consumers.

597.    Plaintiff and members of the Texas Sub-Class provided notice pursuant to TDTPA § 17.505 to Defendant, through its counsel, via certified mail, return receipt requested, and informally by email on February 11, 2021.  However, sending pre-suit notice pursuant to TDTPA § 15.505 is an exercise in futility for Plaintiffs, as Defendants have already been informed of the allegedly unfair and unlawful conduct as described with the initiation of the litigation on behalf of a National Class, and Defendants have not offered Class members a remedy in accordance with similar consumer protection statutes.

598.    Plaintiff and members of the Texas Sub-Class demand judgment against Defendants for restitution, disgorgement, statutory and actual monetary damages including multiple damages, interest, costs, attorneys' fees and injunctive relief including a declaratory judgment and an appropriate court order prohibiting Defendants from further deceptive acts and practices described in this complaint.

## COUNT XXIII
### Violation of the Virginia Consumer Protection Act
### (on behalf of Plaintiff Liquori and the Virginia Sub-Class)

599.    Plaintiff Liquori incorporates and realleges each preceding paragraph as though fully set forth herein.

600. Plaintiff brings this count on behalf of himself and members of the Virginia Sub-Class.

601. Defendants, Plaintiff, and the Virginia Sub-Class are "persons" within the meaning of Va. Code § 59.1-198.

602. Defendants are each a "supplier[s]" within the meaning of Va. Code § 59.1-198.

603. The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices." Va. Code § 59.1-200(A).

604. In the course of their business, Defendants violated the Virginia CPA by misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Virginia Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons, as detailed above.

605. Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendants engaged in one or more unfair or deceptive business practices prohibited by the Virginia CPA, including:

      a. Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

      b. Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

      c. Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

d.  Selling Class Vehicles knowing that a service, replacement or repair was needed.

606.   Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Virginia Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

607.   Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Plaintiff and Virginia Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

608.   Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Virginia Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the Virginia Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the

Virginia Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

609.    Plaintiff and Virginia Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants' had concealed or failed to disclose. Plaintiff and Virginia Sub-Class members did not, and could not, unravel Defendants' deception on their own.

610.    Defendants had an ongoing duty to Plaintiff and Virginia Sub-Class members to refrain from unfair or deceptive practices under the Virginia CPA in the course of their business. Specifically, Defendants owed Plaintiff and Virginia Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because Defendants possessed exclusive knowledge, intentionally concealed the defect from Plaintiff and Virginia Sub-Class members, and/or made misrepresentations that were misleading because they were contradicted by withheld facts.

611.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the Virginia Sub-Class.

612.    Defendants knew or should have known that their conduct violated the Virginia CPA.

613.    Defendants violated the Virginia CPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that the Turbochargers contained defects and would require replacement.

614.    Plaintiff and members of the Virginia Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

171

615.    Defendants' violations present a continuing risk to the Virginia Sub-Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

616.    Plaintiff and Virginia Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

617.    Pursuant to Va. Code § 59.1-204(A)–(B), the Virginia Sub-Class is entitled to the greater of actual damages or $500 for each Virginia Sub-Class member, attorneys' fees, and costs. Because Defendants' actions were willful, Virginia Sub-Class members should each receive the greater of treble damages or $1,000. *Id.*

## COUNT XXIV
### Violation of the Washington Consumer Protection Act
### (on behalf of Plaintiff Bullard and the Washington Sub-Class)

618.    Plaintiff Bullard incorporates and realleges each preceding paragraph as though fully set forth herein.

619.    Plaintiff brings this count on behalf of herself and members of the Washington Sub-Class.

620.    Defendants, Plaintiff, and the Washington Sub-Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

621.    Defendants engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(2).

622.    The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

172

623.     In the course of their business, Defendants violated the Washington CPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Washington Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons, as detailed above.

624.     Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Wash. Rev. Code § 19.86.020.

625.     Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed by the Washington CPA:

> i.     Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;
>
> j.     Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;
>
> k.     Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and
>
> l.     Selling Class Vehicles knowing that a service, replacement or repair was needed.

626.     Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and

173

members of the Washington Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

627.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Washington Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

628.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Washington Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the Washington Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Washington Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

629.    Plaintiff and Washington Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that

Defendants had concealed or failed to disclose. Plaintiff and Washington Sub-Class members did not, and could not, unravel Defendants' deception on their own.

630.    Further, and without regard to any representations Defendants may have made, Defendants engaged in unfair, unconscionable, and/or illegal practices by: (a) selling vehicles with the Turbocharger Defect, which created a safety hazard and exposed Plaintiffs and others to risk of harm; (b) knowingly selling the Class Vehicles with the undisclosed Turbocharger Defect to to transfer the costs of repair to purchasers and deny them the knowledge and opportunity to seek to repair the defect during relevant warranty periods.  This unfair, unconscionable, and/or illegal conduct caused Plaintiffs and others (a) to purchase vehicles they would not or overpaying for them; (b) incurring repair and other costs related to the Turbocharger Defect.

631.    Defendants had an ongoing duty to Plaintiff and Washington Sub-Class members to refrain from unfair or deceptive practices under the Washington CPA in the course of its business. Specifically, Defendants owed Plaintiff and Washington Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because Defendants possessed exclusive knowledge, intentionally concealed the defect from Plaintiff and Washington Sub-Class members, and/or made misrepresentations that were misleading because they were contradicted by withheld facts.

632.    Defendants violated the Virginia CPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbocharger contained defects and would require replacement.

633.    Plaintiff and members of the Washington Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

175

634.    Defendants' violations present a continuing risk to Plaintiff and Washington Sub-Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

635.    Washington Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

636.    Pursuant to Wash. Rev. Code § 19.86.090, the Washington Sub-Class seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Washington CPA. Because Defendants' actions were willful and knowing, Washington Sub-Class members' damages should be trebled.

## COUNT XXV
### Violation of the Wisconsin Deceptive Trade Practices Act
### (on behalf of Plaintiff Bush and the Wisconsin Sub-Class)

637.    Plaintiff Bush incorporates and realleges each preceding paragraph as though fully set forth herein.

638.    Plaintiff brings this count on behalf of herself and members of the Nevada Sub-Class.

639.    Wisconsin Sub-Class members are "persons" and members of "the public" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1). Wisconsin Sub-Class members purchased or leased one or more Class Vehicles.

640.    Defendants are each a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

641.    The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

642.    In the course of their business, Defendants violated the Wisconsin DTPA by knowingly misrepresenting and intentionally concealing material facts regarding the Class Vehicles and specifically, the Turbocharger Defect, with the intent to deceive Plaintiff and the Wisconsin Sub-Class. This conduct is injurious to the public interest because it injured other persons, had the capacity to injure other persons and/or has the capacity to injure other persons, as detailed above.

643.    Specifically, by misrepresenting the Class Vehicles as safe and/or free from defects, and by failing to disclose and actively concealing the dangers and risk posed by the Class Vehicles and/or the Turbocharger Defect, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce, as prohibited by Wis. Stat. § 100.18(1).

644.    Defendants engaged in one or more of the following unfair or deceptive acts or practices that are proscribed by the Wisconsin DTPA:

      a.  Representing that the Class Vehicles have characteristics, uses, benefits and/or qualities they do not possess;

      b.  Representing that the Class Vehicles are of a particular standard, quality, or grade, when they are not;

      c.  Advertising the Class Vehicles with the intent not to sell them as advertised, and failing to state a material fact that deceives or tends to deceive; and

      d.  Selling Class Vehicles knowing that a service, replacement or repair was needed.

645.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Turbocharger Defect with the intent to mislead Plaintiff and members of the Wisconsin Sub-Class. Defendants knew, or should have known, that the Turbocharger defect was a latent defect and that the Turbocharger was likely to fail outside of the periods of the manufacturer's warranties. Defendants also knew, or should have known, that the Turbocharger Defect in the Class Vehicles could cause catastrophic engine failure leading to a loss of engine power while the vehicle was operating. Further, Defendants knew, or should have known, that such loss of power could cause the Class Vehicles to become involved in rear-end collisions or other accidents, putting vehicle operators, passengers, and other motorists at risk for injury.

646.    Defendants' unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and/or suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and Wisconsin Sub-Class members, about the true safety and reliability of Class Vehicles, the quality of the Class Vehicles, and the true value of the Class Vehicles.

647.    Defendants' scheme and concealment of the true characteristics of the Class Vehicles and, specifically, the Turbocharger Defect, were material to Plaintiff and the Wisconsin Sub-Class, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and members of the Wisconsin Sub-Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiff and the Wisconsin Sub-Class would not have purchased the Class Vehicles, or would have paid significantly less for them.

648.    Plaintiff and Wisconsin Sub-Class members had no way of discerning that Defendants' representations were false and misleading and/or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Wisconsin Sub-Class members did not, and could not, unravel Defendants' deception on their own.

649.    Defendants had an ongoing duty to Plaintiff and Wisconsin Sub-Class members to refrain from unfair or deceptive practices under the Wisconsin DTPA in the course of its business. Specifically, Defendants owed Plaintiff and Wisconsin Sub-Class members a duty to disclose all the material facts concerning the Turbocharger Defect in the Class Vehicles because Defendants possessed exclusive knowledge, intentionally concealed the defect from Plaintiff and Wisconsin Sub-Class members, and/or made misrepresentations that were misleading because they were contradicted by withheld facts.

650.    Defendants violated the Wisconsin DTPA by failing to inform class vehicle owners prior to purchase and/or during the warranty period that Turbocharger contained defects and would require replacement.

651.    Plaintiff and members of the Wisconsin Sub-Class experienced premature class engine failure, diminution of class vehicle resale value, increased repair and maintenance costs and incurred other substantial monetary damages and inconvenience.

652.    Defendants' violations present a continuing risk to Plaintiff and Wisconsin Sub-Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

653.    Wisconsin Sub-Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information.

179

654.    As a direct and proximate result of Defendants' violations of the Wisconsin DTPA, the Wisconsin Sub-Class has suffered injury-in-fact and/or actual damage.

655.    The Wisconsin Sub-Class seeks damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs and the Class and Sub-Classes, and award the following relief:

1.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and  Sub-Class, and Plaintiffs' counsel as counsel for the Class and Sub-Class;

2.    An order awarding declaratory relief and enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and  practices alleged herein;

3.    Injunctive and equitable relief in the form of a comprehensive program to repair or replace the Turbocharger in all Class Vehicles, and/or buyback all Class Vehicles,  and  to fully  reimburse  and  make  whole  all  Class  and  Sub-Class  members for all costs and economic losses;

4.    A declaration that Defendants is financially responsible for all Class notice and the administration of Class relief;

5. An order awarding costs, restitution, disgorgement, punitive damages, treble damages and exemplary damages under applicable law, and compensatory damages for economic loss and out-of-pocket costs in an amount to be determined at trial;

6. An order awarding any applicable statutory and civil penalties;

7. A declaration that Defendants is required to engage in corrective advertising;

8. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

9. An award of costs, expenses and attorneys' fees as permitted by law; and

10. Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


DATED: January 4, 2023                    Respectfully submitted,


                                          By  /s/ *Christopher A. Seeger*
                                          Christopher A. Seeger
                                          Christopher L Ayers
                                          Scott A. George
                                          **SEEGER WEISS LLP**
                                          55 Challenger Road, 6th Fl.
                                          Ridgefield Park, NJ 07660
                                          Telephone: (973) 639-9100
                                          Facsimile: (973) 639-8656
                                          cseeger@seegerweiss.com
                                          cayers@seegerweiss.com
                                          sgeorge@seegerweiss.com

                                          James E. Cecchi
                                          Caroline F. Bartlett
                                          **CARELLA, BYRNE, CECCHI,**
                                          **OLSTEIN, BRODY & AGNELLO, P.C.**
                                          5 Becker Farm Road
                                          Roseland, New Jersey 07068
                                          Telephone: (973) 994-1700
                                          Facsimile: (973) 994-1744
                                          jcecchi@carellabyrne.com
                                          cbartlett@carellabyrne.com

                                          *Counsel for Plaintiffs and the Proposed Classes*