**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JENNIFER BULLARD, NATALIE BUSH,
LEO CANIZARES, LYNN COHN,
RAYMOND DARBENZIO, JAMES
DAVIES, LILIANA DE LA TORRE,
LORETTA FLYNN-MURPHY, WILLIAM
GILCHRIST, JAIME GONZALEZ, EMILY
HARRELL, TOM HERBENER, JEFFREY
HERZOG, RODNEY HOWARD,
MANAGAYA KABBA, BILL LIQUORI,
KELLY MCNEW, ANGELA PICK,
SYDNEY POSTLE, LOLITHA
SHEPHERD, and JEFFREY WILBUR,
individually and on behalf of all others
similarly situated,

      *Plaintiffs*,

   v.

JAGUAR LAND ROVER AUTOMOTIVE
PLC, JAGUAR LAND ROVER LIMITED,
and JAGUAR LAND ROVER NORTH
AMERICA, LLC,

      *Defendants*.

Civil Action No. 20-14464

**OPINION**

**John Michael Vazquez, U.S.D.J.**

     In this putative class action, Plaintiffs allege that Defendants knew that a turbocharger in certain motor vehicles would eventually fail but did not disclose the defect to consumers. Twenty-one plaintiffs, on behalf of themselves and those similarly situated (collectively, "Plaintiffs"), sue Jaguar Land Rover North America, LLC ("JLRNA"); Jaguar Land Rover Automotive PLC ("JLR PLC"); and Jaguar Land Rover Limited ("JLR Ltd."). Currently pending before the Court is

JLRNA's motion to dismiss the Fourth Amended Complaint ("Fourth AC").  D.E. 94.[1]  The Court

reviewed the parties' submissions[2] and decided the motion without oral argument pursuant to Fed.

R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the following reasons, JLRNA's motion to dismiss is

**GRANTED in part** and **DENIED in part**.[3]

### I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[4]

Plaintiffs each owned a Land Rover sport utility vehicle[5] which experienced a turbocharger

failure.  "The Class Vehicles are equipped with a 2.0 liter in-line 4-cylinder gasoline engine" with

---

[1] The Court previously ruled on motions as to the First Amended Complaint, D.E. 35, 36, and Second Amended Complaint, D.E. 80, 81.  While the present motion initially applied to the Third Amended Complaint ("TAC"), Plaintiffs later filed a motion to amend the TAC.  D.E. 104. Plaintiffs request that the amendments "be deemed to have been made *nunc pro tunc*" to the TAC such that the motions to dismiss apply to the Fourth AC.  *Id.*  Defendants do not oppose the request. For good cause shown, it is hereby granted, and the Court considers the Fourth AC as the operative pleading.

[2] The submissions for JLRNA's motion to dismiss consist of JLRNA's motion, D.E. 94; Plaintiffs' opposition, D.E. 103; and JLRNA's reply, D.E. 108.

[3] JLR PLC and JLR Ltd. also filed a motion to dismiss under Fed. R. Civ. P. 12(b)(2) and 12(b)(6). D.E. 95.  The Opinion in connection with that motion is being filed concurrently with this Opinion.

[4] The factual background is taken from Plaintiffs' Fourth Amended Complaint.  D.E. 104-3.  The Court also considers the "Passport to Service," D.E. 11-2, which sets forth the relevant warranties, and the "Dispute Resolution Supplement," D.E. 11-3, which provides for a dispute resolution procedure as a prerequisite to bringing a claim under the Magnuson-Moss Warranty Act, as these documents are integral to the SAC.  *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (explaining that when deciding a motion to dismiss under Rule 12(b)(6), a court may rely on "a document *integral to or explicitly relied* upon in the complaint" (emphasis in original) (citation omitted)).  While JLRNA did not attach these documents to the present motion, they were attached to the Motion to Dismiss the Amended Complaint, D.E. 11, and are relied upon in the present motion.  Thus, the Court accepts them as attachments to JLRNA's present motion as it did in its prior Opinion, D.E. 80.  Moreover, the Court considers the sample Monroney label, attached to JLRNA's motion, as a document on which Plaintiffs' claims are based.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").

[5] Plaintiffs allege that the following vehicles are the "Class Vehicles": "2012 through 2017 model year 2.0 Liter Land Rover Range Rover Evoque; 2015 through 2017 model year 2.0 Liter Land

a turbocharger.  Fourth AC ¶ 176.  "A turbocharger is a system that helps an engine produce more power and torque through forced induction, using the power of a vehicle's hot exhaust to drive more clean air into each cylinder as the engine is in operation.  It can make a smaller engine perform like a larger engine."  *Id.* ¶ 3.  Plaintiffs explain that a turbocharger operates under "extreme conditions" including heat, vibrations, and torque, and that "the turbocharger design chosen by Defendants was uniquely vulnerable to each of these extremes, especially when harnessed in vehicles the size and weight of the Class Vehicles."  *Id.* ¶ 3.  Plaintiffs allege that "Defendants chose to use a turbocharger assembly that was inappropriate . . . less expensive . . . and utilized lighter, inferior and less durable materials."  *Id.* ¶ 180.  Plaintiffs add that "Defendants' Turbocharger incorporates the turbocharger housing into the exhaust manifold as a single assembly" and "incorporates the Turbocharger further into the engine and power train than the typical turbocharger assembly, exposing it more directly to the operational extremes of the engine, and making Defendants' design and materials choices insufficient to account for these extremes."  *Id.* ¶ 180.  Plaintiffs also claim that "[t]he catalytic converter in the Class Vehicles is bolted onto the Turbocharger, and creates further stress and torque on the Turbocharger, increasing the rate at which the Turbocharger defect will manifest[.]"  *Id.* ¶ 187.  Plaintiffs conclude that the turbochargers are "inherently and materially defective because they begin to fail and crack when exposed to operational conditions."  *Id.* ¶ 4.  The "Turbocharger Defect" leads the turbocharger to "suddenly and catastrophically fail[,]" resulting in a loss of power and inability to accelerate.  *Id.* ¶ 5.

---

Rover Discovery Sport; and 2013 through 2015 model year 2.0 Liter Land Rover LR2[.]"  Fourth AC ¶ 20.

Plaintiffs allege that JLRNA "distributes, markets, services, warrants, repairs, sells and leases passenger vehicles designed and manufactured by [JLR PLC and JLR Ltd.], including the Class Vehicles, in North America." *Id.* ¶ 165. Plaintiffs contend that the Defendants knew or should have known that the turbocharger was defective based on a variety of factors. The Court discussed these factors in its prior Opinions, D.E. 35 at 8-10, D.E. 80 at 9-10, and incorporates those discussions by reference here. Below, the Court discusses Plaintiffs' new allegations which they claim support knowledge. In brief, the Fourth AC's new allegations claim that Defendants "completed a multitude of analyses and testing that exposed the existence of the Turbocharger Defect." Fourth AC ¶ 195. According to Plaintiffs, this "pre-production testing is designed to expose or . . . confirm defects like the Turbocharger Defect" and ultimately "alerted Defendants of the design defect early on." *Id.* ¶ 9.

Each Class Vehicle came with multiple warranties. *See* D.E. 11-2. "Defendants' basic New Vehicle Limited Warranty provides bumper-to-bumper coverage for four years or 50,000 miles during which time Defendants will repair or replace components defective in materials or workmanship" (the "Limited Warranty"). Fourth AC ¶ 223; D.E. 11-2 at 5. The vehicles also have a government mandated Federal Emissions Control System Warranty ("Federal Warranty"), which "provides a baseline of two years or 24,000 miles warranty that the vehicle will pass emissions inspections[.]" Fourth AC ¶ 225; D.E. 11-2 at 11. JLRNA, however, voluntarily extended the Federal Warranty to four years or 50,000 miles so that it is coextensive with the Limited Warranty. D.E. 11-2 at 11. Another government mandated warranty, the California Emissions Control System Warranty[6] ("California Warranty"), provides coverage for "7 years, or

---

[6] The California warranty only applies to vehicles registered in California, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington. D.E. 11-2 at 14. Plaintiffs do not allege where any Class Vehicle was

70,000 miles for select emissions-related components, including the turbocharger assembly." Fourth AC ¶ 226; D.E. 11-2 at 7.  To claim coverage under any of these warranties, the vehicle must be presented to an "authorized Land Rover retailer" or to "any facility authorized by Jaguar Land Rover North America, LLC, to perform such work or service" within the applicable time and mileage limitations.  D.E. 11-2 at 21-22.

As to each named Plaintiff, the SAC alleges when each vehicle was purchased by the Plaintiff (with many having been bought used), the Plaintiff's state of citizenship and state where they purchased their vehicle (though not where the vehicle was registered), the model and year of the vehicle, and when the Turbocharger Defect manifested.  *See e.g.*, Fourth AC ¶¶ 25, 28, 31, 34, 37, 40, 43, 47.

On November 19, 2021, the Court dismissed the Amended Complaint without prejudice. D.E. 35; D.E. 36.  On November 21, 2022, the Court largely dismissed the Second Amended Complaint without prejudice but allowed Plaintiffs Flynn-Murphy and Canizares to proceed on their claims under the California Warranty and Magnuson-Moss Warranty Act.  D.E. 80, 81. Plaintiffs filed the Third Amended Complaint on January 4, 2023.  D.E. 86.  The present motion followed, D.E. 94, and Plaintiffs thereafter filed a motion to amend accompanied by the Fourth AC, D.E. 104.  Plaintiffs requested that the motions to dismiss apply against the Fourth AC, and Defendants did not oppose.  Thus, the Fourth AC is the operative pleading and the present motion is deemed to apply to its allegations.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to

---

registered.  The Court, however, accepts the reasonable inference that each Class Vehicle was registered in the particular Plaintiff's state of citizenship.

survive dismissal under Rule 12(b)(6), it must contain sufficient factual allegations to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).  In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth.  *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011).  The Court, however, "must accept all of the complaint's well-pleaded facts as true" and give a plaintiff the benefit of all reasonable inferences therefrom.  *Fowler*, 578 F.3d at 210.

## III.   ANALYSIS

### A.  Choice of Law

The Court has twice applied New Jersey law in considering prior motions to dismiss and will continue to do so given the parties acquiescence in that approach.  *See* D.E. 35; D.E. 80; *Powell v. Subaru of Am., Inc.*, 502 F. Supp. 3d 856, 875 (D.N.J. 2020).

### B.  Breach of Express Warranty

In its most recent prior Opinion, D.E. 80, the Court dismissed Plaintiffs' breach of express warranty claims except that the claim survived as to Plaintiffs Canizares and Flynn-Murphy under the California Warranty.  As to the remaining Plaintiffs, the SAC did not allege presentment within the time and mileage requirements of any express warranty, and Plaintiffs had not sufficiently alleged any other theory allowing them to recover under those warranties.  JLRNA argues that the Fourth AC has not remedied this error, and that no Plaintiff, other than Canizares, has pled compliance with the presentment requirement.  Br. at 9-12.

To state a claim for breach of an express warranty under New Jersey law, a plaintiff must allege "(1) that Defendant made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pacific LLC*, 945 F. Supp. 2d 543, 568 (D.N.J. 2013) (citing N.J. Stat. Ann. § 12A:2-313).  As noted above, the Limited Warranty "provides bumper-to-bumper coverage for four years or 50,000 miles," whichever comes first, "during which time Defendants will repair or replace components defective in materials and workmanship."  Fourth AC ¶ 223; D.E. 11-2 at 5.  The Federal Warranty was also extended to provide the same coverage period, and the California Warranty provides coverage as to the Turbocharger for seven years or 70,000 miles, whichever comes first.  Fourth AC ¶ 225-26; D.E. 11-2 at 7, 11.

The Court previously found that Plaintiff Flynn-Murphy adequately pled compliance with the California Warranty's presentment requirements.  D.E. 80 at 8.  JLRNA argues that that TAC introduced a new inconsistency by referring to Flynn-Murphy's Land Rover LR2, and later to her Discovery Sport.  Br. at 11.  This error, however, was corrected in the Fourth AC, which now alleges that Flynn-Murphy owned a used 2015 Land Rover LR2 and that the same vehicle was

later presented for service.  Fourth AC ¶¶ 71, 74.  Thus, Flynn-Murphy again adequately pleads a breach of express warranty claim under the California Warranty.

Plaintiffs claim that "JLRNA ignores that this Court previously held, or recognized, that Plaintiffs Canizares, De La Torre, Harrell, and Murphy met the presentment requirement."  D.E. 103 at 10.  The Court only previously held that Plaintiffs Canizares and Flynn-Murphy met the presentment requirement, and explicitly stated that the SAC failed to do so as to Harrell and De La Torre.  D.E. 80 at 7-8.  Plaintiff Harrell still is not alleged to have brought her vehicle to an authorized retailer or facility as required by the warranties, and thus her express warranty claim fails.  As to Plaintiff De La Torre, the TAC inconsistently alleged the model of her vehicle, but that error was corrected in the Fourth AC.  De La Torre now claims that she purchased a new 2014 Land Rover Evoque on or around October 1, 2014 and presented that vehicle to a JLRNA dealership in October 2020 with 69,000 miles.  Fourth AC ¶ 64, 68.  These allegations place De La Torre within the seven-year, 70,000 mile requirements of the California Warranty, and thus the Fourth AC adequately states a claim for breach of the California Warranty as to De La Torre.  In sum, only Plaintiffs Canizares, Flynn-Murphy, and De La Torre have plausibly pled compliance with any express warranty's time/mileage presentment requirements.

Plaintiffs raise several additional arguments, all of which the Court previously addressed, to excuse the remaining Plaintiffs' lack of compliance with the presentment requirements. Plaintiffs again claim that each remaining Plaintiff "presented their vehicles for service *prior to* the cataclysmic failure of the turbochargers" and that such presentment should be sufficient given JLRNA's knowledge of the Turbocharger Defect.  Br. at 10 (emphasis added).  Plaintiffs, however, have twice failed to adequately allege that JLRNA knew of the defect.  D.E. 80 at 9; D.E. 35 at 8-11.  The Fourth AC, however, adds new allegations as to such knowledge.

8

Plaintiffs allege that Defendants completed pre-production testing which exposed the Turbocharger Defect.  Specifically, Plaintiffs claim that "[p]rior to the sale of any of the Class Vehicles, Defendants . . . completed a multitude of analyses and testing that exposed the existence of the Turbocharger Defect, including most notably Failure Modes and Effects Analysis (FMEA) and Design Validation Plan and Report (DVP&R)."  Fourth AC ¶ 195.  In the DVP&R phase, Plaintiffs claim that the turbocharger undergoes "an extensive battery of tests and other work necessary to validate the robustness of any design." *Id.* ¶ 197.  Plaintiffs assert that, for example, the "Turbocharger was 'bench tested'" which simulates operating extremes. *Id.* ¶ 198.  Plaintiffs add that Defendants performed "engine dynamometer testing," which examines the turbocharger while installed on an engine and also simulates "extreme conditions such as maximum temperatures or excessive vibration." *Id.* ¶ 199.  Such tests, Plaintiffs explain, "are intended to demonstrate engine robustness and reveal necessary improvements or flaws such as the Turbocharger Defect." *Id.*  The Fourth AC continues that "Defendants tested their turbocharger assembly in actual vehicles" by driving the vehicles "through a full range of conditions and extremities that are encountered once a vehicle is sold to the public." *Id.* ¶ 200.  Plaintiffs claim that these tests "include mapping extreme engine operating conditions with high exhaust gas temperatures and high turbocharger loads, which are the kinds of modes that manifest the Turbocharger Defect." *Id.*  Plaintiffs explain that "[t]hrough the rigors of these three phases of DVP&R testing, Defendants' Turbocharger was exposed repeatedly to conditions that cause the Turbocharger Defect to manifest." *Id.* ¶ 201.  Plaintiffs further claim that "[a]s a former division of Ford, Defendants inherited a rigorous FMEA and DVP&R testing regimen which would expand significantly on these sorts of baseline tests, and provided even more opportunity for Defendants to confirm the Turbocharger Defect." *Id.* ¶ 202.  Likewise, as a former division of Ford, Plaintiffs

allege that Defendants "followed ISO 9001 discipline in quality testing which requires not just thorough documentation of the testing, testing procedures, and testing outcomes . . . but also the commitment to continually improve testing and the related standards of quality based on prior testing and experience." *Id.*

Plaintiffs allege post-production testing as well. They claim that Defendants also tested "Turbochargers replaced under warranty and returned to Defendants for analysis and storage." *Id.* ¶ 203. According to Plaintiffs, "[g]iven that the Turbocharger Defect leads to the total failure of the turbocharger assembly and the loss of power from the engine, Defendants must have examined, tested, and analyzed these returned parts. The Turbocharger Defect would again have been evident through such testing, just as it was during development." *Id.*

These allegations plausibly plead that JLRNA had pre-sale knowledge of the Turbocharger Defect. The Court previously compared Plaintiffs' allegations to those in *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 104 (3d Cir. 2013). The Court stated as follows:

> For instance, in *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 104 (3d Cir. 2013), the Third Circuit found that asserting that a defendant "should have been aware" of a defect "through its own '[b]ooks of [k]nowledge, internal testing, information on dealership repair orders, warranty data, [and] records of customer complaints'" was "insufficient to establish [defendant's] knowledge" where the plaintiff did not "provide any facts relating to the alleged books of knowledge, internal testing, or dealership repair orders." Similarly, Plaintiffs have not alleged any specific facts as to the testing that JLRNA conducted or the results of that testing. Plaintiffs merely claim that certain testing *should have* been conducted based on industry practice and that, *assuming* it was, it *would have* led to certain results and conclusions, which is insufficient.

D.E. 80 at 10 (emphasis in original). Plaintiffs no longer merely allege that certain testing *should have* been done or that a hypothetical reasonable manufacturer would have completed certain tests; they now claim that *Defendants* "*completed* a multitude of analyses and testing that *exposed the*

10

*existence of the Turbocharger Defect*.” Fourth AC ¶ 195 (emphases added).  Plaintiffs also provide

details of the testing that Defendants conducted and how such testing would lead to the discovery

of a defective turbocharger, making their allegations of knowledge plausible.  *Id.* ¶¶ 9, 195-202

(“Through the rigors of these three phases of DVP&R testing, Defendants’ Turbocharger was

exposed repeatedly to conditions that cause the Turbocharger Defect to manifest.”).

The Court also previously compared the allegations to those in *Ponzio v. Mercedes-Benz*

*USA, LLC*, 447 F. Supp. 3d 194 (D.N.J. 2020).  The Court observed that

> *Ponzio* is distinguishable.  In that case, plaintiffs alleged that the
> defendant Mercedes “developed ‘Mercedes SAE Standards and
> Testing’” which were specific to the defendant and were “‘used in
> connection with the testing of its vehicle, including . . . a test relating
> to the Coating/Painting . . .’ and other various tests concerning the
> performance of the paint used on its vehicles.” *Ponzio*, 447 F. Supp.
> 3d at 227-28.  Additionally, plaintiffs in that case “explicitly
> allege[d] that ‘Mercedes *engaged* in at least *four years* of
> development and testing prior to utilizing” the allegedly defective
> paint. *Id.* at 228 (emphasis in original).  By contrast, Plaintiffs here
> only allege industry-accepted pre-production testing that a
> “reasonable Original Equipment Manufacturer” would have
> completed which “would have exposed the existence of the
> Turbocharger Defect.”  SAC ¶ 142.  Plaintiffs continue that
> “[a]ssuming that Defendants completed testing on an adequate and
> statistically significant quantity” of Turbochargers, such testing
> “would have led to the failure of Defendants’ turbocharger assembly
> and their knowledge of the Defect.” *Id.* ¶ 149.  Without more
> specific allegations of what testing JLRNA engaged in specifically,
> *Ponzio* is distinguishable.

D.E. 80 at 10-11.  Plaintiffs have also remedied this deficiency.  The Fourth AC alleges, as in

*Ponzio*, that specific testing was “completed” by Defendants, provides details as to the testing

process, and explains how such testing would cause the Turbocharger Defect to manifest resulting

in Defendants’ knowledge of that defect.  Fourth AC ¶¶ 9, 195-202.  These allegations are

sufficient to create the reasonable inference that Defendants had pre-sale knowledge of the

Turbocharger Defect.

JLRNA argues that Plaintiffs' new allegations are still insufficient because the Fourth AC does not allege "any specific test results that JLRNA received."  D.E. 94-1 at 28.  The Court disagrees.  Plaintiffs allege that Defendants completed certain tests designed to expose defects like the Turbocharger Defect, that such defect was in fact exposed, and that "discovery is expected to confirm" that the testing results showed "material stress, fissures, cracks and breaks and/or outright failure of the Turbocharger."  Fourth AC ¶¶ 198-200.  The allegations that Defendants conducted testing which was designed to show, and did in fact show, that the turbocharger was defective creates a reasonable inference that Defendants knew of the Turbocharger Defect pre-sale.

JLRNA also argues that the Fourth AC "never alleges a single specific test that JLRNA (as opposed to the other Defendants) conducted[.]"  D.E. 94-1 at 28.  JLRNA continues that that allegations are deficient because "they all rely on impermissible group pleading" and "Plaintiffs have not—and cannot—allege that JLRNA (as opposed to [other Defendants]) conducted pre-production testing."  *Id.* at 28-29.  However, the Court declines to dismiss on this basis, as have other judges in this District considering auto-defect cases, where the Defendants are intertwined corporate entities and discovery can clarify the precise role of each.  *See Opheim v. Volkswagen Aktiengesellschaft*, No. 20-02483, 2021 WL 2621689, at *7 (D.N.J. June 25, 2021) ("[T]he entities here are intertwined, and more discovery is needed to determine the precise role of each.  In such circumstances, there is no need to dismiss the complaint."); *In re Volkswagen Timing Chain Liab. Litig.*, No. 16-2765, 2017 WL 1902160, at *10 (D.N.J. May 8, 2017) ("Plaintiffs cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery."); *see also Ponzio*, 447 F. Supp. 3d at 226; *Merkin v. Honda N. Am., Inc.*, No. 17-3625, 2017 WL 5309623, at *6 (D.N.J. Nov. 13, 2017).

Even though Plaintiffs have now plausibly pled that Defendants had pre-sale knowledge of the Turbocharger Defect, the Court previously noted that "it is not clear that the outcome on the *prima facie* breach of express warranty claim would be different" with such allegations.  D.E. 80 at 13.  The Court stated as follows:

> Courts in this District have "rejected the argument that, even though a defect does not manifest until after the expiration of a warranty agreement, a plaintiff can nonetheless maintain breach of warranty claims by alleging that the manufacturer knew about the defect at the time of the purchase." *Alban v. BMW of N. Am.*, No. 09-5398, 2011 WL 900114, at *8-9 (D.N.J. Mar. 15, 2011) (dismissing breach of warranty claims where plaintiff alleged that defendant "knew of the defect . . . knew that the defect would not become apparent until after" the warranty term expired, that defendant "concealed material information that prevented [plaintiff] from bargaining for a warranty that would cover the known defect," and that there was "a gross disparity in bargaining power"); *see also* [*In re Caterpillar, Inc. C13 & C15 Prods. Liab. Litig.*, No. 14-3722, 2015 WL 4591236, at *19-22 (D.N.J. July 29, 2015)] (finding that the "recent trend" in the District of New Jersey, which is "consistent with the prevailing approach elsewhere" is that a motion to dismiss should be granted "where plaintiffs allege[] a manufacturer's knowledge of a latent defect that would manifest outside the warranty period").  Because Plaintiffs similarly only plead knowledge of a defect that would (or could) become apparent outside of the warranty periods, they have not stated a claim for breach of express warranty.

D.E. 80 at 13-14.  Thus, even though Plaintiffs have now adequately pled pre-sale knowledge of the Turbocharger Defect, they have failed to remedy the shortcoming outlined above.

Plaintiffs further argue that presentment for service of the turbochargers would have been futile, and thus that requirement should be excused, making the breach of express warranty claims adequately pled.  D.E. 103 at 11.  As pled, the Court disagrees.  They claim, without citation to TAC or Fourth AC, to have pled that "Defendant was consistently unable to fix the defect[,] and that any repairs or mitigation that Defendant offered were insufficient."  D.E. 103 at 12.  Plaintiffs cite *In re Chevrolet Bolt EV Battery Litig.*, No. 20-13256, 2022 WL 4686974, at *32-33 (E.D.

13

Mich. Sept. 30, 2022), in support.  But in that case, the court noted that the defendant "specifically told customers that no battery replacements were yet available" and held that it "would not dismiss warranty claims brought by Plaintiffs who did not present their vehicles for repair" when defendant explicitly told customers that repair/replacement was not available.  *Id.* at \*33.  Here, Defendants are not alleged to have similarly dissuaded vehicle owners from presenting their vehicles for service.  Plaintiffs do allege that Defendants "have refused to repair or replace the Turbocharger *outside of the time periods covered by the manufacturer's warranties*," Fourth AC ¶ 14 (emphasis added), but such is their right under the relevant warranties.  Refusing to waive the time limitations of a warranty certainly cannot be a basis for breach of warranty claim or, at a minimum, Plaintiffs have not cited any authority in support.  Plaintiffs present no further authority or argument regarding futility.

Plaintiffs also argue that the warranty time and mileage limitations are unconscionable and therefore their compliance with those requirements should be excused.  D.E. 103 at 12.  "[C]ourts may refuse to enforce contracts, or discrete contract provisions, that are unconscionable." *Rodriguez v. Raymours Furniture Co., Inc.*, 138 A.3d 528, 541 (N.J. 2016).  To determine whether a contract is unconscionable, a court evaluates both procedural and substantive unconscionability.  *Id.*  Procedural unconscionability "refers to unfairness in the formation of the contract, and may be shown by a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process."  *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 595 (D.N.J. 2016) (quoting *Muhammad v. Cnty. Bank of Rehoboth Beach*, 912 A.2d 88, 96 (N.J. 2006)) (internal quotations omitted).  Substantive unconscionability occurs when a contract term is "excessively disproportionate and involves an exchange of obligations so one-sided as to shock

14

the court's conscience." *Id.* (quoting *Delta Funding Corp. v. Harris*, 912 A.2d 104, 120 (N.J. 2006)) (internal quotations omitted). "Courts have held that a warranty is substantively unconscionable when a car manufacturer knew 'that class engines would fail after the end of the warranty period but before the vehicle's expected useful life.'" *Opheim*, 2021 WL 2621689, at \*8 (quoting *Gelis v. Bayerische Motoren Weke Aktiengesellschaft*, No. 17-07386, 2018 WL 6804506, at \*6 (D.N.J. Oct. 30, 2018)). "Courts have held that a warranty is procedurally unconscionable when the manufacturer knew of the defect and concealed it while the consumer had no means to negotiate the warranty." *Id.* (citing *DeFrank v. Samsung Elecs. Am., Inc.*, No. 19-21401, 2020 WL 6269277, at \*18 (D.N.J. Oct. 26, 2020)). Deciding whether a contract is unconscionable is a fact specific inquiry. *Delta Funding Corp.*, 912 A.2d at 110. Courts generally apply "a sliding-scale approach to determine overall unconscionability, considering the relative levels of both procedural and substantive unconscionability." *Id.*

"'[A] manufacturer's knowledge that a part may ultimately fail does not, alone, make a time/mileage limitation unconscionable.'" *Ponzio*, 447 F. Supp. 3d at 256 (quoting Merkin, 2017 WL 5309623, at \*5). A plaintiff must plead additional facts to demonstrate unconscionability. *See e.g.*, *Skeen v. BMW of N. Am., LLC*, No. 13-1531, 2014 WL 283628, at \*13 (D.N.J. Jan. 24, 2014) (concluding that allegations that manufacturer knew engine component would fail, manipulated the warranty terms to avoid paying for repair, and unfairly took advantage of its disparate bargaining power were sufficient to allege unconscionability).

As discussed, Plaintiffs now adequately plead that Defendants had pre-sale knowledge of the Turbocharger Defect and that Defendants concealed the defect. *See* Fourth AC ¶ 7 ("Defendants had exclusive knowledge of the Defect yet chose to conceal it from purchasers."); ¶ 12 ("Notwithstanding Defendants' exclusive and superior knowledge of the Turbocharger Defect,

Defendants wrongfully and intentionally concealed the dangerous and defective design of the Turbocharger.").  Plaintiffs have also plausibly pled that they had "no meaningful choice in determining these time limitations" and that there was a "gross disparity in bargaining power" between Defendants and Plaintiffs, Fourth AC ¶ 326, which is sufficient to allege procedural unconscionability, *Timing Chain*, 2017 WL 1902160, at *11.  Plaintiffs further allege that Defendants knew that "the Turbocharger will often fail due to the Turbocharger Defect just after the relevant warranty period has lapsed," but before the end of the useful life of the vehicle, and thus plausibly plead substantive unconscionability.  Fourth AC ¶¶ 14, 191, 343; *see Gelis*, 2018 WL 6804506, at *6 ("[T]he terms [of a warranty] do 'shock the conscience' if . . . [defendant] set them with specific knowledge that class engines would fail after the end of the warranty period but before the vehicle's expected useful life."); *Opheim*, 2021 WL 2621689, at *8.  Thus, Plaintiffs have adequately pled that the warranty time and mileage limitations are unconscionable— JLRNA's motion to dismiss the Complaint's breach of express warranty claims is denied as to all Plaintiffs.[7]

### C.  Breach of Implied Warranty

In its most recent prior Opinion, the Court stated as follows:

> In its previous Opinion, the Court dismissed Plaintiffs' breach of implied warranty claim after finding that JLRNA "expressly limited these implied warranties" to the time period covered by the written warranties, as is permitted by New Jersey law, and that Plaintiffs had not "plausibly allege[d] that their turbochargers failed within the express warranty limitations."  [D.E. 35] at 13; *see also Gladden v. Cadillac Motor Car Div., Gen Motors Corp.*, 83 N.J. 320 (1980)

---

[7] Importantly, the Court is not currently *finding* that the warranty terms are, in fact, unconscionable. The Court merely finds that Plaintiffs have pled sufficient facts to proceed to discovery on this issue.  *See Timing Chain*, 2017 WL 1902160, at *12 ("[S]ince this is a fact sensitive inquiry, dismissal at this stage is inappropriate."); *Henderson v. Volvo Cars of N. Am., LLC*, No. 09-4146, 2010 WL 2925913, at *9 (D.N.J. July 21, 2010) ("Whether Plaintiffs can *demonstrate* that the express warranty was unconscionable remains to be seen, however, this Court will not dismiss Plaintiffs' breach of express warranty claims at this early stage." (emphasis added)).

> (citing N.J. Stat. Ann. § 12A:2-316). As noted above, the SAC also
> fails to adequately allege, with the exception of Plaintiffs Flynn-
> Murphy and Canizares as to the California Warranty, that any
> vehicle's Turbocharger failed and was presented for service within
> the time and mileage limitations of the written warranties. Thus, the
> breach of implied warranty claim is again dismissed as to all
> Plaintiffs other than Flynn-Murphy and Canizares.

D.E. 80 at 15. While Plaintiffs (other than Flynn-Murphy, Canizares, and De La Torre) have again

failed to allege compliance with the time and mileage limitations, they have sufficiently pled that

such limitations are unconscionable, as discussed, and such analysis applies equally to the implied

warranties.

However, even if the contractual time and mileage restrictions do not apply, the law

applicable to the implied warranty of merchantability remains. The Court previously explained as

follows:

> "A claim for breach of implied warranty must ordinarily arise
> shortly after purchase—there will typically be no claim for breach
> of implied warranty 'where plaintiffs have driven their cars without
> problems for years.'" *Skeen*, 2014 WL 283628, at *16 (quoting
> *Sheris v. Nissan N. Am. Inc.*, No. 07-cv-2516, 2008 WL 2354908, at
> *6 (D.N.J. June 3, 2008) (dismissing plaintiff's claim for breach of
> implied warranty of merchantability where plaintiff "was able to
> drive his [vehicle] for 20,618 miles and for about two years before
> he needed to replace his brake pads and rotors")).

D.E. 80 at 15-16. The Court then dismissed the breach of implied warranty claims as to Flynn-

Murphy and Canizares because each had driven their vehicles for approximately five years which

"substantially exceed[ed] the two years present in *Sheris*, demonstrating that these Plaintiffs have

failed to sufficiently plead that their vehicles were unmerchantable." D.E. 80 at 16. Here, the

shortest alleged time period between initial purchase and turbocharger failure is approximately

four years. Fourth AC ¶¶ 43, 47 (Plaintiff Cohn); *id.* ¶¶ 89, 93 (Plaintiff Harrell). Thus, all alleged

time periods "substantially exceed the two years present in *Sheris*, demonstrating that these Plaintiffs have failed to sufficiently plead that their vehicles were unmerchantable." D.E. 80 at 16.

Plaintiffs respond that "the Turbocharger was inherently defective and not merchantable at the point of sale," and that "the vehicles were not fit for providing safe transportation." D.E. 103 at 17-18. But, again, the earliest point at which a turbocharger allegedly failed is approximately four years after initial purchase, demonstrating that the Class Vehicles provided safe transportation for at least years. No turbocharger is alleged to have failed "shortly after purchase," and therefore Plaintiffs have not sufficiently alleged a breach of implied warranty claim.[8] *Skeen*, 2014 WL 283628, at *16. The breach of implied warranty claim fails as to all Plaintiffs.

### D. Magnuson Moss Warranty Act

"The [Magnuson-Moss Warranty Act ("MMWA")] provides a private right of action in federal court for consumers who are 'damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation . . . under a written warranty, [or] implied warranty.'" *Guardavacarro v. Home Depot*, No. 16-8796, 2017 WL 3393812, at *9 (D.N.J. Aug. 8, 2017) (quoting 15 U.S.C. § 2310(d)(1)). "MMWA claims are coextensive with underlying state law breach of warranty claims and are therefore, dependent on, and derivative of, said state claims for survival in a motion to dismiss." *Id.* (citing *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 254 (3d Cir. 2010)); *see also Tobin v. Samsung Elecs. Am., Inc.*, No. 18-12473, 2019 WL 1399557, at *7 (D.N.J. Mar. 27, 2019) (explaining that the plaintiff's MMWA claims "stand or fall with [the claimant's] express and implied warranty claims under state law" (internal quotation omitted)).

---

[8] While Plaintiffs claim that the Turbocharger Defect can manifest "at any time," the factual allegations show that the earliest failure in terms of time occurred approximately four years after initial purchase (Plaintiffs Cohn and Harrell).

Because an MMWA claim is "coextensive with the underlying state law breach of warranty claims," *Guardavacarro*, 2017 WL 3393812, at *9, such claims may proceed to the same extent as the breach of express warranty claims, discussed above. However, the statute also "declares it to be [Congress'] policy to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms." 15 U.S.C. § 2310(a)(1). Where such a procedure is established by the warrantor, "a class of consumers may not proceed in a class action . . . unless the named plaintiffs . . . initially resort to such procedure." 15 U.S.C. § 2310(a)(3).

JLRNA argues that the MMWA claim should be dismissed because Plaintiffs have failed to satisfy the mandatory, informal dispute resolution process. D.E. 94-1 at 15. Plaintiffs' first response, which they raised in opposition to the prior motion as well, is that "[a]ny alleged failure to participate in a warrantor's informal dispute settlement procedure is an affirmative defense that the warrantor may raise, but one that Plaintiffs need not negate in their complaint." D.E. 103 at 20 (citation omitted). In its prior opinion, the Court rejected this argument, reasoning as follows:

> [A] court may consider granting a motion to dismiss based on an affirmative defense "if the predicate establishing the defense is apparent from the face of the complaint." *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 n.10 (3d Cir. 1978); *cf. Jones v. Bock*, 549 U.S. 199, 216-17 (2007) (holding that exhaustion of administrative remedies under the Prison Litigation Reform Act is an affirmative defense, but noting that "[w]hether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground"). In the SAC, Plaintiffs state that "the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied." SAC ¶ 271. This statement acknowledges by implication both the existence of the informal dispute resolution process and the fact that Plaintiffs did not make an attempt to use it. Those admissions coupled with

the Dispute Resolution Supplement itself, which is integral to the pleading, demonstrate that the affirmative defense is present on the face of the SAC.  Thus, the Court may consider whether the MMWA claim should be dismissed on this basis.

D.E. 80 at 18.  The Fourth AC contains the same allegations, word for word.  Fourth AC ¶ 355. Plaintiffs argue that the Court should reconsider its prior decision that the Dispute Resolution Supplement is integral to the complaint, D.E. 103 at 21, however, none of the amendments in the Fourth AC affect that decision.  The Dispute Resolution Supplement, D.E. 11-3, is explicitly referenced in the Passport to Service, D.E. 11-2 at 25, which is the basis for Plaintiff's warranty claims.[9]  And again, the Complaint acknowledges by implication the existence of the informal dispute resolution process.  Fourth AC ¶ 355.  Thus, the Court may again "consider whether the MMWA claim should be dismissed on this basis."  D.E. 80 at 18.

While Plaintiffs appear to concede that they did not comply with the informal dispute resolution program requirement, they again claim that participation would have been futile.  Fourth AC ¶ 355; D.E. 103 at 22-23.  As in its prior Opinion, D.E. 80 at 18, the Court again will not dismiss the Magnuson-Moss Warranty Act claim at this time.  *George v. Jaguar Land Rover N. Am. LLC*, No. 20-17561, 2021 WL 5195788, at *8 (D.N.J. Nov. 8, 2021) (permitting MMWA claims to "proceed past the dismissal stage" because "resolution of this issue is not clear from the

---

[9] While Plaintiffs argue that "JLRNA's *warranty* does not set forth any requirement of participation in any informal dispute process prior to pursuing legal remedies," D.E. 103 at 22 (emphasis added), the Passport to Service directs consumers to refer to the Dispute Resolution Supplement.  D.E. 11-2 at 25.  Plaintiffs also claim that "even the [Dispute Resolution Supplement] itself does not clearly require an initial resort to any informal dispute resolution procedure."  D.E. 103 at 22.  The Court disagrees.  The Dispute Resolution Supplement refers to a "BBB Auto Line Arbitration Program" and states that "the federal Magnuson-Moss Consumer Warranty Act . . . requires you to use this arbitration program before seeking any remedies in accordance with that law."  D.E. 11-3 at 3.

face of the Complaint" but noting that "Defendant may revisit the question on summary judgment").

### E. Unjust Enrichment

The Court previously applied the following standards to the unjust enrichment claim, and will again do so here:

> "To establish a claim for unjust enrichment under New Jersey law, a plaintiff must allege 'both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 505 (D.N.J. 2006) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)). A direct relationship between the plaintiff and defendant is essential to an unjust enrichment claim. *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 283 (D.N.J. 2011). But whether a direct relationship exists is "a term of art," and "will depend heavily on the facts of the individual case." *DeFrank v. Samsung Elecs. Am., Inc.*, No. 19-21401, 2020 WL 6269277, at *23 (D.N.J. Oct. 26, 2020). Accordingly, courts have determined that a direct relationship exists if a plaintiff plausibly pleads that the manufacturer is "something other than [an] innocent third-part[y]." *Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 200 (D.N.J. 2012). In *Stewart*, for example, the plaintiffs purchased the relevant products from a third-party retailer. *Id.* at 195. The *Stewart* court concluded that the plaintiffs stated an unjust enrichment claim against the manufacturer defendants through allegations that the defendants "engaged in fraudulent conduct and misrepresented" the nature of the product at issue "through a direct nationwide advertising and marketing scheme." *Id.* at 200; *see also DeFrank*, 2020 WL 6269277, at *23 (concluding that although they purchased the product from a third-party intermediary, the plaintiffs stated an unjust enrichment claim against a manufacturer based on plausible allegations that the manufacturer concealed a known defect that would render the product inoperable and engaged in a false and misleading marketing campaign by failing to disclose the defect).

D.E. 80 at 18-19. In its prior Opinions, the Court dismissed Plaintiffs' unjust enrichment claim because Plaintiffs failed to plausibly plead "a direct relationship between Plaintiffs and JLRNA" or that JLRNA "knew of and failed to disclose the Turbocharger Defect at the time of sale" such

that they are "something other than an innocent third-party."  D.E. 80 at 20; D.E. 35 at 18.  JLRNA seeks to dismiss the Fourth AC's unjust enrichment claim for the same reasons.

Plaintiffs do not argue that they have a direct relationship with JLRNA in the obvious sense—*i.e.*, they acknowledge "the indisputable fact that [JLRNA] sold its vehicles to Plaintiffs through its network of dealerships, not directly."  D.E. 103 at 23.  Instead, they argue that JLRNA is not an "innocent third-party," and thus liability can attach.  *Id.*  As explained above, Plaintiffs have now plausibly pled that Defendants had pre-sale knowledge of the Turbocharger Defect.  Thus, the plausible allegations that JLRNA "knew of and failed to disclose the turbocharger defect at the time of sale" while profiting from the omission makes them "something other than an innocent third-party" such that Plaintiffs have sufficiently pled an unjust enrichment claim.  The motion to dismiss is denied as to this claim.

JLRNA also argues that the unjust enrichment claim should be dismissed because this quasi-contractual claim "will not lie where 'an express contract exists concerning the identical subject matter.'"  D.E. 94-1 at 17-18 (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983)).  While quasi-contract *liability* will not be imposed where there is an express contract, the Federal Rules of Civil Procedure permit a party to *plead* in the alternative.  Fed. R. Civ. P. 8(d); *see In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (refusing to dismiss an unjust enrichment claim despite defendants' argument that equitable remedies "will not be granted where an adequate remedy at law exists" because a plaintiff is "clearly permitted to plead alternative theories of recovery").  Thus, the Court will not dismiss on this basis.

### F. Fraud, Negligent Misrepresentation, and State Consumer Protection Claims

JLRNA largely addresses Plaintiffs' NJCFA, common law fraud, negligent misrepresentation, and other state consumer protection statute claims as a whole.  JLRNA first argues that these claims are not pled with particularity under Rule 9(b).  D.E. 94-1 at 18.  JLRNA largely focuses on the fact that Plaintiffs have not "adequately allege[d] any specific actionable misrepresentations made by JLRNA that Plaintiffs read (or heard)—let alone when it was made, where it was made, by whom, or to whom."  *Id.* at 19.  Plaintiffs essentially agree—they argue that their claims are "based on Defendant's silence" as opposed to affirmative misrepresentations.  D.E. 103 at 25 (referring to these claims as "Plaintiffs' omission-based misrepresentation claims").

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).  Thus, "a party must state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b).  A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue."  *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (citation omitted).  Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'"  *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)).  Where a fraud claim is based on omissions, however, the Rule 9(b) heightened pleading standard "is somewhat relaxed."  *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 451 (D.N.J. 2021).  "This is because 'a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific conduct of an omission as precisely as would a plaintiff in

a false representation claim.'" *Majdipour v. Jaguar Land Rover N. Am., LLC*, No. 12-07849, 2013 WL 5574626, at *15 (D.N.J. Oct. 9, 2013) (quoting *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007)). "A plaintiff can carry his Rule 9(b) burden to plead consumer fraud by omission through allegations showing that a manufacturer knew of a defect in its product prior to the plaintiff's purchase and concealed it from consumers." *Yagudauev v. BMW of N. Am., LLC*, No. 20-897, 2020 WL 6689799, at *8 (D.N.J. Nov. 13, 2020) (citation omitted).

The Court agrees with Plaintiffs that the Fourth AC adequately puts Defendants on notice of the allegedly fraudulent conduct such that Rule 9(b) is satisfied. Plaintiffs' theory is straightforward—Defendants knew that the turbocharger was defective before each Plaintiff purchased their Class Vehicle, but nonetheless chose not to disclose the defect in an effort to protect their sales. Rule 9(b) does not require a plaintiff to plead exactly when, where, or how an *omission* occurred so long as the plaintiff "otherwise inject[s] precision or some measure of substantiation into a fraud allegation." *Feingold*, 516 F. App'x at 226 (citation omitted). Plaintiffs have satisfied Rule 9(b) by plausibly alleging the Turbocharger Defect, pre-sale knowledge by Defendants, and pre-sale omission with intent to profit therefrom.[10]

JLRNA next argues that the common law fraud and negligent misrepresentation claims should be dismissed because Plaintiff has not alleged sufficient facts to show a duty to disclose. D.E. 94-1 at 26. In the Court's most recent prior Opinion, it ruled that Plaintiffs failed to allege a basis for a duty to disclose the Turbocharger Defect. D.E. 80 at 21-22. Plaintiffs now argue that JLRNA had a duty to disclose the Turbocharger Defect because (1) they made partial disclosures about the Turbocharger, and (2) the Plaintiffs "reposed trust" in JLRNA. D.E. 103 at 30-34.

---

[10] JLRNA argues that the fraud claims should be dismissed due to impermissible group pleading. D.E. 94-1 at 24. For the reasons discussed above, the Court declines to dismiss on this basis at this stage where Defendants are related corporate entities.

Under New Jersey law, an omission may form the basis for a fraud or negligent misrepresentation claim if the party had a duty to disclose the information or if the "disclosure is necessary to make a previous statement true." *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 602-03 (D.N.J. 2016) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir 1993)). "[A] party has no duty to disclose information to another party in a business transaction unless a fiduciary relationship exists between them, unless the transaction itself is fiduciary in nature, or unless one party 'expressly reposes a trust and confidence in the other.'" *N.J. Econ. Dev. Auth. v. Pavonia Rest., Inc.*, 319 N.J. Super. 435, 446 (App. Div. 1998) (quoting *Berman v. Gurwicz*, 189 N.J. Super. 89, 93-94 (Ch. Div. 1981)). "[O]n numerous occasions, New Jersey courts have found no special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose on the manufacturers." *Schechter v. Hyundai Motor Am.*, No. 18-13634, 2020 WL 1528038, at *16 (D.N.J. Mar. 31, 2020) (internal quotation marks and citation omitted) (collecting cases).

Plaintiffs first claim that "Defendants' partial disclosures about the Turbocharger establish a duty to disclose," and point to the Monroney labels,[11] the maintenance schedules and manuals, and JLRNA's marketing efforts. D.E 103 at 30-33. Beginning with the Monroney labels, the only reference to the turbocharger is the following text in the upper right-hand corner: "Engine: 2.0L I4

---

[11] JLRNA submitted a sample Monroney label as an exhibit to their motion. D.E. 94-2. As noted, the Court may rely on this document in deciding the motion to dismiss because Plaintiffs' claims are based, in part, on the substance of the Monroney labels. *See, e.g.*, Fourth AC ¶ 16; *Pension Benefit Guar. Corp.*, 998 F.2d at 1196. The Monroney labels are allegedly affixed to new Class Vehicles only and only "Plaintiffs and others *who purchased their vehicles new*" are alleged to have seen them. Fourth AC ¶ 16 (emphasis added). Thus, the Monroney labels are only relevant as to Plaintiffs Cohn, Darbenzio, Davies, De La Torre, Harrell, Herbener, Herzog, Kabba, and Postle, who allegedly purchased their vehicles "new" and indicate that they saw the Monroney labels. While Plaintiff Gonzalez was allegedly the "first retail purchaser" of his Class Vehicle, he does not allege that he saw the Monroney label. Moreover, Plaintiffs do not clarify the difference between purchasing a vehicle "new" and being the "first retail purchaser."

16V GDI DOHC Turbo." D.E. 94-2. Plaintiffs allege that "[t]his description stands for 2.0 Liter Inline 4-cylinder 16 Valve Gasoline Direct Injection Dual Overhead Camshaft TURBO." Fourth AC ¶ 16 n.1. JLRNA argues that this label "simply discloses that the vehicle contains a turbocharger" and "certainly does not tout any benefits of the 'turbocharger.'" D.E. 94-1. The Court agrees. The Monroney labels only note that the engine contains a turbocharger—a true fact—and no disclosure is necessary to correct that representation. *Lightning Lube*, 4 F.3d at 1185 (noting that disclosure must be "necessary to make a previous statement true").

Plaintiffs also allege that "Warranty and Maintenance schedules" provided with the Class Vehicles "do not show any Turbocharger inspection or maintenance," Fourth AC ¶¶ 181, and apparently conclude that this is a material misrepresentation that the Turbocharger will last for 12 years or 200,000 miles—the useful life of the vehicle. JLRNA argues that "it would be unreasonable to leap from a table about periodic *maintenance* to an inference that unlisted parts will never require *replacement*." D.E. 94-1 at 23 (emphasis in original). The Court agrees with JLRNA. The mere absence of the Turbocharger in the maintenance schedules, without more, is not a misrepresentation that the part will last for any period.

Plaintiffs further point to JLRNA's "nationwide marketing efforts to promote its Turbocharged engines." D.E. 103 at 30. Plaintiffs allege that Defendants made the following representations:

> For the 2013 LR2, Defendants stressed that the turbo driven 2.0 liter engine in the Class Vehicles "provide[s] performance greater than that of the 3.2 liter engine it replaces . . . ."

> For the 2014 and 2015 LR2 and the 2016 Discovery Sport, the "2.0 liter four-cylinder engine provides . . . turbocharged efficiency with the refinement and performance of a six-cylinder . . . ."

Fourth AC ¶ 217 (footnotes omitted).  Plaintiffs also claim that Defendants marketed the Class

vehicles as

> "born to perform in the most challenging conditions" to "ensure[]
> you arrive at your destination in the most unruffled and relaxed
> way"[;]
>
> "epitomiz[ing] the values of the designers and engineers who have
> created them.  Each one instilled with iconic British designed cues,
> delivering capability with composure"[; and]
>
> "[c]ombin[ing] design excellence, engineering integrity and
> exceptional versatility to create a premium compact SUV."

Fourth AC ¶ 218 (footnotes omitted).  Additionally, Plaintiffs allege as follows:

> Defendants touted that these engines with their Turbocharger
> "offer[ed] improved fuel efficiency" while minimizing "the impact
> on the planet."   Additionally, Defendants claimed that the Class
> Vehicles' [*sic*] had "advanced turbocharging and twin independent
> variable valve timing" which allegedly "lower[ed] fuel consumption
> and CO2 emissions . . . ."  Defendants even highlighted a "unique
> exhaust manifold for quicker warm-up and lower emissions" as a
> selling point of the Class Vehicles' 2.0 liter engine, while pushing
> "SAFETY AND SUSTAINABILITY" of some Class Vehicles or
> touting the "SUSTAINABILITY" of others based on the vehicles'
> powertrain, including the Turbocharger.

Fourth AC ¶ 219 (footnotes omitted).

JLRNA asserts that either Plaintiffs have failed to demonstrate that these statements are

false or that the statements are non-actionable puffery.  D.E. 94-1 at 20-21.  While Plaintiffs cited

to the above advertising language, they did not analyze the representations in detail or argue that

they constitute more than mere puffery.  "Advertising that amounts to mere puffery is not

actionable because no reasonable consumer relies on puffery.  The distinguishing characteristics

of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions."

*Ponzio*, 447 F. Supp. 3d 194, 234 (citation and internal quotation marks omitted).  Seemingly

vague statements about "integrity," "performance," "safety," or "sustainability" do not cross this

line—they are mere puffery and insufficient to state a claim for fraud or negligent misrepresentation. *Opheim*, 2021 WL 2621689, at \*13 (finding that plaintiffs' allegations that defendants "promoted the 'high quality,' 'reliability,' 'superior performance,' and 'safety' of their vehicles" were mere puffery and insufficient to state a fraud claim); *see also Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 101 (D. Mass. 2021) ("[G]eneral statements about big-picture concepts such as trust, security, reputation and safety are non-actionable puffery." (citation omitted)).  Thus, Plaintiffs' allegations fall short.

Plaintiffs further argue that they have plausibly alleged a duty to disclose because they reposed trust in JLRNA.  D.E. 103 at 33-34.  The Fourth AC alleges the following:

> Because of Defendants had [*sic*] exclusive knowledge of the Turbocharger Defect and were thus in a superior position as to Plaintiffs, Plaintiffs necessarily reposed trust and confidence in Defendants to provide full disclosure (not merely partial disclosures) of material aspects of the Class Vehicles, like the engine and its Turbocharger Defect.

Fourth AC ¶ 213; *see also* ¶¶ 17, 291.  Plaintiffs, however, cite no binding authority establishing that merely having "exclusive knowledge" of a defect or being in a "superior position" is sufficient to create a special relationship such that omissions can constitute fraud—particularly in the context of a business transaction.  Plaintiffs have failed to plausibly allege that they expressly reposed trust and confidence in JLRNA, or that any other "special" or fiduciary relationship exists such that JLRNA had a duty to disclose the Turbocharger Defect.  Thus, Plaintiffs' claims for common law fraud (Count III) and negligent misrepresentation (Count IV) are dismissed.

Plaintiffs also bring claims under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2, and consumer protection statutes from various states.[12]   JLRNA fails to specifically address these statutory causes of action.  "To state a claim under the NJCFA, a plaintiff must allege '(1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss.'"  *Rapoport v. Caliber Home Loans, Inc.*, 617 F. Supp. 3d 241, 246 (D.N.J. 2022) (quoting *Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1086 (N.J. 2007)).  "It is well-established that NJCFA claims must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)."  *Schechter v. Hyundai Motor Am.*, No. 18-13634, 2020 WL 1528038, at *8 (D.N.J. Mar. 31, 2020) (citation and internal quotation marks omitted).  The NJCFA states in relevant part as follows:

> The act, use or employment by any person of any *commercial practice that is unconscionable* or abusive, deception, *fraud*, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or *omission of any material fact* with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]

N.J.S.A. § 56:8-2 (emphases added).  Thus, under the NJCFA, a knowing omission coupled with intent that a person rely on such omission is unlawful conduct, and no additional duty to disclose is required.  *Stockroom, Inc.*, 941 F. Supp. 2d at 547 ("Unlike omission under the NJCFA, fraudulent omission under common law requires a duty to disclose.");  *see also Sarlo v. Wells Fargo Bank, N.A.*, 175 F. Supp. 3d 412, 426 (D.N.J. 2015).  Moreover, "[a] practice can be

_____

[12] These statutory causes of action arise under the laws of Arizona, California, Colorado, Florida, Illinois, Massachusetts, Michigan, Nevada, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia, Washington, and Wisconsin.

unlawful [under the NJCFA] even if no person was in fact misled or deceived thereby." *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (citation omitted).

Plaintiffs appear to raise two theories under the NJCFA.  First, they allege that "Defendants employed unconscionable commercial practices by selling Class Vehicles that contain the Turbocharger Defect" because "[i]t is unconscionable to knowingly distribute or sell vehicles that contain an undisclosed safety risk and continue to ignore such risks."  Fourth AC ¶¶ 278-79 (Count I).  Second, they allege that Defendants intentionally "failed to disclose the Turbocharger Defect and corresponding safety risk."  Fourth AC ¶¶ 288-91 (Count II).  As explained above, Plaintiffs have plausibly pled that Defendants were aware of the Turbocharger Defect before any relevant sales but did not disclose the defect to consumers.  A defect in an essential mechanical component of the vehicle would certainly be a material fact for an ordinary consumer.  Moreover, there is a reasonable inference that Defendants engaged in such omission with the intent to protect sales of the Class Vehicles.  Fourth AC ¶ 291.  Thus, Plaintiffs have plausibly pled a violation of the NJCFA and Counts I and II survive the motion.

JLRNA has also not presented the Court with any arguments specifically addressing the consumer protection statutory claims in Counts IX through XXV.  As the burden at this stage is on the party seeking dismissal, the Court declines to address each statute's requirements *sua sponte*.  *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 299 n.4 (3d Cir. 2016) ("[T]he defendant bears the burden of showing that the plaintiff has not stated a claim." (citation omitted)).  Counts IX through XXV thus survive the motion to dismiss.

**IV.    CONCLUSION**

For the reasons stated herein, JLRNA's motion to dismiss, D.E. 94 is **GRANTED in part** and **DENIED in part**.   Plaintiffs' implied warranty, common law fraud, and negligent misrepresentation claims are dismissed as to JLRNA.  Plaintiffs shall have thirty (30) days to file an amended complaint that cures the deficiencies noted herein.  If Plaintiffs do not file an amended complaint within that time, the claims dismissed herein will be dismissed with prejudice.  The motion to dismiss is otherwise **DENIED**.  An appropriate Order accompanies this Opinion.

Dated: July 28, 2023

John Michael Vazquez, U.S.D.J.

31