<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**LORETTA FLYNN-MURPHY, et al., individually and on behalf of all others similarly situated,**

*Plaintiffs,*

v.

**JAGUAR LAND ROVER NORTH AMERICA, LLC, et al.,**

*Defendants.*

---

Civil Action No. 20-14464

OPINION

---

ARLEO, UNITED STATES DISTRICT JUDGE

**THIS MATTER** comes before the Court by way of Class Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Class Representative Service Awards.[1]  <u>See</u> ECF No. 176 ("Motion").  The Motion is opposed, <u>see</u> ECF No. 182, and has been the subject of extensive briefing and argument, <u>see</u> ECF Nos. 187, 188, 195, 200, 201, 204.  For the reasons stated below, Class Counsel's Motion is **GRANTED** as modified.

## I.    FACTUAL BACKGROUND

This is a consumer class action lawsuit related to defective turbochargers in certain vehicles sold, designed, marketed, and/or manufactured by Defendants Jaguar Land Rover North America, LLC ("JLRNA"), Jaguar Land Rover Automotive plc ("JLR plc"), and Jaguar Land Rover Limited ("JLR Ltd," collectively with JLR plc, the "UK Defendants," and collectively with

---

[1] Class Counsel consists of two firms, Carella, Byrne, Cecchi, Brody & Agnello, P.C. ("Carella Byrne") and Seeger Weiss LLP ("Seeger Weiss").

JLRNA and JLR plc, "Defendants"). The defective turbochargers can cause damage to the Class Vehicles' turbochargers and engines, requiring expensive repairs.[2]

After more than four years of litigation, the underlying case settled in September 2024. See ECF No. 165.2, Decl. of James E. Cecchi in Supp. of Mot. for Preliminary Approval of Class Action Settlement, Ex. A, Settlement Agreement ("Settlement Agmt.").[3] The Settlement Agreement provides retrospective and prospective relief for Class Members through four general components: (1) reimbursements to class members for out-of-pocket costs incurred for turbocharger repairs; (2) reimbursements to class members for out-of-pocket costs incurred for engine repairs; (3) an extended warranty covering future turbocharger repairs; and (4) an extended warranty covering future engine repairs. See Settlement Agmt. § 3.1. It caps reimbursements for out-of-pocket costs incurred for turbocharger repairs at $3,750 and reimbursements for out-of-pocket costs incurred for engine repairs at $12,000. See id. It also imposes certain time and mileage qualifications that impact the amount of reimbursements for which class members may be eligible. See id.

The Settlement Agreement also establishes the procedure under which Class Counsel could apply to the Court for an award of attorneys' fees and costs, which "will not operate to . . . affect

---

[2] The "Class Vehicles" include 41,543 of Defendants vehicles falling within three models: (1) the 2013-2016 Land Rover Range Rover Evoques; (2) the 2015-2017 Land Rover Discovery Sport; and (3) the 2013-2015 Land Rover LR2, each of which were originally equipped with a brazed scroll turbocharger. See ECF No. 208, Order Granting Final Approval of Class Action Settlement ("Final Approval Order"), at ¶ 4 n.2; see also ECF No. 176.2, Decl. of James E. Cecchi in Supp. of Mot. for Award of Att'ys' Fees, Reimbursement of Expenses, and Pls.' Service Awards ("Cecchi Decl. I"), at ¶ 26.

[3] The Settlement Class is defined as "[a]ll Persons who, as of the date of the execution of the settlement agreement, are current or former owners or lessees of a Class Vehicle sold and registered in the District of Columbia or one of the fifty (50) states of the United States." See Final Approval Order ¶ 4. The Settlement Class Representatives are named Plaintiffs Jennifer Bullard, Lynn Cohn, Raymond Darbenzio, James Davies, Liliana De La Torre, Loretta Flynn-Murphy, William Gilchrist, Jamie Gonzalez, Emily Harrell, Tom Herbener, Rodney Howard, Kelly McNew, Angela Pick, Sydney Postie, Lolitha Shepherd, and Jeffrey Wilbur. Id. at 1.

or delay the finality of any judgment approving the Settlement." See id. §§ 13.1–13.5. To that end, while the instant Motion was pending (and subjected to additional briefing at the Parties' request), the Court held a final approval hearing and ultimately granted final approval of the Settlement Agreement. See ECF No. 200, Tr. of Final Approval Hearing (Sept. 30, 2025) ("FAH Tr."); Final Approval Order. Now, the Court addresses Class Counsel's request to approve an attorneys' fees award totaling $6.6 million (the "Fee Award"), reimbursement of expenses totaling $171.502.81, and class representative service awards totaling $45,000.

### A.     Relevant Litigation History

This case has an extensive litigation history. Class Counsel spent more than 3,600 hours[4] of attorney, professional, and paraprofessional time shepherding this case to its resolution.[5] See Cecchi Decl. I ¶ 31. Their work included: (1) investigating claims related to the turbocharger defect; (2) filing five complaints; (3) engaging in three full rounds of motion to dismiss proceedings (which involved subsequent motion practice for reconsideration); (4) engaging in preliminary discovery; and (5) participating in extensive mediation and settlement discussions. See id. ¶¶ 5–22. A complete accounting of this case's litigation history helps capture the scope of Class Counsel's efforts.

Class Counsel's work began before any complaint was filed. Specifically, Class Counsel conducted a thorough pre-suit investigation into the possible allegations and claims associated with the Class Vehicles' defective turbochargers. See id. ¶ 4. This included interviewing potential

---

[4] This total does not account for the time Class Counsel has spent preparing for final approval and litigating the current request for attorneys' fees. It also does not include the time Class Counsel will devote to future issues related to claims administration or an appeal of this Opinion and Order.

[5] It is undisputed that Class Counsel are considered highly qualified attorneys with substantial experience litigating large-scale class actions and multidistrict litigations. See Cecchi Decl. I, Exs. A-3 & B-3 (Carella Byrne and Seeger Weiss Firm Resumes); ECF No. 182, Defs.' Opp. to Pls.' Mot. for Att'ys' Fees, Reimbursement of Expenses, and Pls.' Service Awards, at *20.

class members to assess the scope of the issue and determine who could serve as effective lead plaintiffs representing the class.  See ECF No. 206, Decl. of Scott Alan George in Further Supp. of Pls.' Mot. for Award of Att'ys' Fees, Reimbursement of Expenses, and Pls.' Service Awards, at ¶ 7 ("George Decl.").  It also included collecting turbochargers and vehicles for inspection and consulting with experts to understand the nature of the turbocharger defect and the information that would be known to the Defendants in the development and production of the Class Vehicles. See id.; see also Cecchi Decl. I ¶ 4.

On October 14, 2020, Class Counsel drafted the initial putative Class Action Complaint against JLRNA on behalf of Plaintiffs Loretta Flynn-Murphy, Kelly McNew, and Lynn Cohn.  See ECF No. 1.  The initial Complaint alleged that JLRNA's manufacturing, marketing, and sale of certain vehicles posed a safety risk because they contained defective turbochargers, and sought damages and equitable relief.  See generally id.  JLRNA moved to dismiss the initial Complaint. See ECF No. 11.

On February 15, 2021, Plaintiffs responded to Defendants motion by filing the First Amended Complaint ("FAC").  See ECF No. 18.  It included six new named plaintiffs and asserted additional allegations regarding the turbocharger defect.  See generally id.  JLRNA moved to dismiss the FAC.  See ECF No. 25.  Plaintiffs opposed the motion.  See ECF No. 30.  On November 19, 2021, the Court granted the motion dismissing the FAC with leave to amend.  See ECF Nos. 38–39.

On January 18, 2022, Plaintiffs filed the Second Amended Complaint ("SAC"), adding the UK defendants.  See ECF No. 41.  On April 29, 2022, Plaintiffs served the SAC pursuant to Article 10 of the Hague Service Convention.  See ECF Nos. 56–57.  It also included twelve additional named plaintiffs, ten additional statutory claims, and additional allegations regarding the

turbocharger defect.  See generally SAC.  JLRNA moved to dismiss the SAC.  See ECF No. 49. The UK Defendants separately moved to dismiss the SAC, including for lack of personal jurisdiction.  See ECF No. 70.  Plaintiffs opposed both motions.  See ECF Nos. 55, 76.  On November 21, 2022, the Court granted in part and denied in part JLRNA's motion to dismiss and reserved on the challenge to jurisdiction presented by the UK Defendants.  See ECF Nos. 80–81. The Court allowed Plaintiffs leave to amend to address certain pleading deficiencies, including a need for additional factual allegations supporting Defendants' alleged knowledge of the turbocharger defect.  See generally ECF No. 80.

On January 4, 2023, Plaintiffs filed the Third Amended Complaint ("TAC").  See ECF No. 86 ("TAC").  Defendants again separately moved to dismiss, including a renewed motion from the UK Defendants to dismiss for lack of personal jurisdiction.  See ECF No. 94 (JLRNA's motion to dismiss); ECF No. 95 (UK Defendants' motion to dismiss).  Plaintiffs again opposed both motions.  See ECF Nos. 103, 105.  Meanwhile, JLRNA filed its Answer to the claims sustained by the Court's previous November 21, 2022 Opinion and Order.  See ECF No. 97.  Plaintiffs also separately filed a motion for leave to amend the TAC to correct "scrivener's errors" contained therein.  ECF No. 104.  Defendants did not oppose that motion.  See id. at 2.

On July 28, 2023, the Court granted in part and denied in part Defendants' motions to dismiss the TAC.  See ECF No. 128–31.  The Court concluded that Plaintiffs had adequately alleged Defendants' knowledge of the turbocharger defect and denied the UK Defendants' challenge to the Court's jurisdiction.  See generally ECF No. 128, 130.  The Court also granted Plaintiffs' motion for leave to amend.  See ECF No. 129.

On August 28, 2023, Plaintiffs responded to the Court's decisions by filing the operative Fourth Amended Complaint ("FOAC").  See ECF No. 140.  Instead of filing an answer to the

FOAC, the UK Defendants continued to assert their challenge to the Court's jurisdiction and moved for reconsideration of the Court's motion to dismiss decision (or alternatively for interlocutory certification to appeal that decision), see ECF No. 134, which Plaintiffs opposed, see ECF No. 141.  On March 28, 2024, the Court denied that motion in its entirety.  See ECF No. 155.  It separately stayed Defendants deadline to answer the FOAC as settlement discussions between the Parties advanced.  See ECF No. 146.

Throughout the various rounds of motion to dismiss briefing, the Parties were also engaged in other procedural disputes.  This included a dispute related to the appointment of interim class counsel.  See ECF No. 52, 65, 66.  They were also actively engaged in discovery.  See Cecchi Decl. I ¶ 19.  The initial scheduling conference was held on February 14, 2023.  See ECF No. 91.  Over the course of the next eight months, the Parties served written discovery, met and conferred regarding their respective responses and objections thereto, negotiated aspects of an ESI Protocol and the substantive terms of a discovery confidentiality order, and engaged in several rounds of document production with the UK Defendants.  See id.  In total, the Parties conducted twenty-two meet-and-confers and attended nine discovery status conferences with Magistrate Judge Clark.  See FAH Tr. at 24:6–9.  While these cooperative efforts were largely successful, the Parties also raised discovery disputes with the Court.  See ECF Nos. 119–120, 122.

### B.    Settlement

In July 2023, as discovery was ramping up, the Parties began to explore the possibility of settlement.  See Cecchi Decl. I ¶ 20.  The Parties engaged retired United States Magistrate Judge Diane M. Welsh of JAMS to assist with their settlement negotiations.  See id. ¶ 21.  They exchanged Mediation Statements and met with Judge Welsh on November 27, 2023 to establish the foundational terms of the Settlement.  See id.  Within the context of these on-going settlement discussions, Defendants also produced additional data to provide Class Counsel with information

regarding the Class Vehicles and the composition of the potential Settlement Class that enabled the Parties to have more comprehensive settlement negotiations.  See id.

With the assistance of Judge Welsh, the Parties held multiple settlement negotiation sessions.  See id. ¶ 22.  The Parties' also engaged in numerous settlement communications via telephone, email, and videoconference, both before and after the formal mediation session with Judge Welsh.  See id.  During the ensuing months, the Parties debated, negotiated, and finalized the material terms and conditions of the benefits for the proposed Settlement Class.  See id.

The Parties began arm's-length negotiations for attorneys' fees, expenses, and class representative service awards after they agreed to the material benefits for the Settlement Class. See id. at ¶ 23.  The Parties met with Judge Welsh on April 1, 2024, but were unable to agree on the amount of attorneys' fees, expenses, and class representative service awards.  See id.  Instead, the Parties agreed that Plaintiffs would seek approval from the Court for their fees, reimbursement of expenses and service awards to be paid by JLRNA separate and apart from the settlement amount provided to the Class.  See id.

In September 2024, after more than a year of substantive negotiations, the Parties finalized the Settlement Agreement and submitted it to the Court for preliminary approval.  See ECF No. 165.  Pursuant to the Settlement Agreement's procedure to seek attorneys' fees and costs, the instant Motion was then filed.  See ECF No. 176.

## II.    LEGAL STANDARD

Following the settlement of a class action lawsuit, the court, in its discretion, may award attorneys' fees that are "authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h); see also Rossi v. Procter & Gamble Co., No. 11-7238, 2013 WL 5523098, at *9 (D.N.J. Oct. 3, 2013).  Before awarding attorneys' fees, the court must "evaluate what class counsel actually did and how it benefitted the class" to ensure that the requested amount is reasonable.  In re AT&T

Corp., 455 F.3d 160, 166–67 (3d Cir. 2006) (quotation marks omitted). If the court determines an attorneys' fees award is warranted, it must "clearly set forth [its] reasoning" for the award. In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 301 (3d Cir. 2005).

**III.    DISCUSSION**

### A.    Methodology Used to Evaluate the Fee Award's Reasonability

As a threshold matter, the Parties dispute how the Court should evaluate whether Class Counsel's requested Fee Award is reasonable. Class Counsel contend that the Court should primarily evaluate the Fee Award under the percentage-of-recovery method. Defendants, in contrast, argue that the Court should assess the Fee Award under the lodestar method. The Court agrees with Defendants.

Attorneys' fees are assessed under either the percentage-of-recovery method or the lodestar method. See AT&T, 455 F.3d at 164. The court has discretion about which method to apply, but each has "distinct advantages for certain kinds of actions." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 821 (3d Cir. 1995). Regardless of whichever method the court determines is most appropriate, it is prudent to use the other as a cross-check to confirm the reasonableness of the requested amount of attorneys' fees. See id.

The percentage-of-recovery method is generally used if the case results in a common settlement fund. See id. at 821. Courts apply this method to evaluate both true common funds—i.e., where the attorneys' fees award is derived directly from the common settlement fund, see AT&T, 455 F.3d at 164, and "constructive" common funds—i.e., where the attorneys' fees award and the settlement funds are separately negotiated and agreed upon but are both paid by the defendant and thus, in "economic reality," create a common fund, Gen. Motors, 55 F.3d at 821. The lodestar method, on the other hand, is generally used if: (1) the case involves statutory fee shifting provisions; or (2) "the nature of the settlement evades the precise evaluation needed for

the percentage of recovery method." See id.; see also Gelis v. BMW of N. Am., LLC, 49 F.4th 371, 379 (3d Cir. 2022).

In this case, it is appropriate to primarily analyze the requested Fee Award under the lodestar method. Plaintiffs are correct that because the attorneys' fees and the settlement funds derive from the "same source," in theory, the circumstances create a constructive common fund. Dewey v. Volkswagen Aktiengesellschaft, 558 F. App'x 191, 197 (3d Cir. 2014). But even under those circumstances, the percentage-of-recovery method still requires the court to be able to determine and assign a specific value to the fund itself. Here, "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method" to serve as the primary methodology. Gen. Motors, 55 F.3d at 821.

The Settlement Agreement consists of four components, each of which can be assigned an estimated monetary value. See Settlement Agmt. § 3.1. But the estimates are the subject of conflicting expert analyses. Compare Cecchi Decl. I, Ex. C, Rep. by Richard J. Eichmann ("Eichmann Rep."), at ¶ 44 (estimating that the value of certain components of the settlement is between $14.2 million and $22.7 million) with ECF No. 182.1, Decl. of Michael L. Kidney in Supp. of Defs.' Mem. in Opp. to Pls.' Mot. for Att'ys' Fees, Reimbursement of Expenses, and Pls.' Service Awards, Ex. A, Rep. of Nathan Soderberg ("Soderberg Rep.") at 30 (estimating that the value of certain components of the settlement is between $6 million and $6.8 million). And, those analyses only attempt to provide an estimated value for two of the four components. See Eichmann Rep. ¶¶ 29, 34 (explaining Defendants' warranty data was insufficient to estimate the value of the reimbursements for out-of-pocket costs incurred for engine repairs or of the extended warranty covering future engine repairs).

9

Without "a readily available method for calculating a definite monetary value of the settlement" as a whole, it is more appropriate to primarily use the lodestar method to evaluate the reasonableness of the Fee Award, and then cross-check the Fee Award under the percentage-of-recovery method. Schwartz v. Avis Rent a Car Sys., LLC, No. 11-4052, 2016 WL 3457160, at *12–13 (D.N.J. June 21, 2016) (applying lodestar method as primary approach to assess the reasonableness of a claims-made settlement arising from an automotive class action lawsuit and cross-checking the award under the percentage-of-recovery method); see also Granillo v. FCA US LLC, No. 16-153, 2019 WL 4052432, at *4–9 (D.N.J. Aug. 27, 2019) (same); McLennan v. LG Elec. USA, Inc., No. 10-3604, 2012 WL 686020, at *10 (D.N.J. Mar. 2, 2012) (applying lodestar method to a claims-made settlement with an "indefinite total value" that therefore could not "be characterized as [a] true 'common fund' for purposes of" the percentage-of-recovery analysis). The Court therefore first proceeds to analyze the Fee Award under the lodestar method.

**B.      Evaluating the Fee Award Under the Lodestar Method**

When used as the primary method to assess an attorneys' fees award, the reasonableness inquiry under the lodestar method follows a two-step process. First, the court determines the lodestar calculation by multiplying "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services." Rite Aid, 396 F.3d at 305. Then, the court divides the "the proposed fee award by the lodestar calculation" to determine whether the requested award involves a lodestar multiplier. AT&T, 455 F.3d at 164. If so, the court assesses whether a multiplier is warranted. See In re Prudential Ins. Co. of Am., 148 F.3d 283, 333 (3d Cir. 1998).

**1.      Objections to the Reasonableness of Class Counsel's Lodestar Calculation.**

The lodestar calculation is analyzed under a burden-shifting framework to determine whether the hours worked and the billing rate utilized are reasonable. First, the party moving for

the attorneys' fees award bears the burden of establishing the reasonableness of its request by submitting evidence of the hours and rates used to calculate the request. See Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).

The hours used to calculate the award must be "detailed with sufficient specificity . . . to allow the district court to determine if the hours claimed are unreasonable for the work performed." Gelis, 49 F.4th at 379–80. This requires providing "fairly definite information" about the number of hours worked by each attorney, the attorney's rate, the "general" tasks performed by each attorney, and the dates those tasks were performed. Id. at 380 & n.5. It does not require providing "the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." Id. at 380. Reporting hours through block billing is sufficient. See Gelis et al. v. BMW of N. Am., LLC, No. 17-7386, ECF No. 229, Op. at *9 (D.N.J. Aug. 16, 2024).

The billing rates of all attorneys and support staff are averaged together to determine a single "blended billing rate." AT&T, 455 F.3d at 164 n.3; see also In re Nat'l Football League Players' Concussion Inj. Litig., No. 12-2323, 2018 WL 1635648, at *9 (E.D. Pa. Apr. 5, 2018) (explaining that the blended billing rate, as endorsed by the Third Circuit, "simply average[s] the rates of all partners, associates, and paralegals" that worked on the matter). The court then assesses whether this rate is reasonable "based on the given geographical area, the nature of the services provided, and the experience of the attorneys." Rite Aid, 396 F.3d at 305.

Once the moving party meets its initial evidentiary threshold, the burden shifts to the party opposing the award to challenge the requested amount "with sufficient specificity." Rode, 892 F.2d at 1183. This does not require pointing to each individual time entry believed to be excessive; instead, the opposing party must "specify with particularity the reason for its challenge and the

category (or categories) of work being challenged." Bell v. United Princeton Props., Inc., 884 F.2d 713, 720–21 (3d Cir. 1989). In specifying the basis for its challenge, the party opposing the award must indicate the number of hours that "would be reasonable and why those hours would be reasonable" to complete the work within the challenged category. Rode, 892 F.2d at 1187. Where sufficient objections have been lodged, the burden then shifts back to the moving party "to justify the size of its award." Interfaith Comm. Org. v. Honeywell Intern., Inc., 426 F.3d 694, 713 (3d Cir. 2005). Analyzing the parties competing positions requires the court to engage in "a fair amount of 'judgment calling' based upon its experience with the case and its general experience as to how much time a case requires." Bell, 884 F.2d at 721.

Here, Defendants do not object to the reasonableness of Class Counsel's blended billing rate. See FAH Tr. at 17:8–18:7.[6] Defendants initially objected to Class Counsel's requested award based on a failure to provide sufficiently specific information to assess the reasonability of the hours Class Counsel expended throughout this litigation. Class Counsel ultimately provided records that include "fairly definite information" about the number of hours worked by each attorney, the attorney's rate, the "general" tasks performed, and the date each task was performed. Gelis, 49 F.4th at 380 & n.5; see also ECF No. 205, Decl. of Caroline F. Bartlett in Supp. of Pls.' Mot. for Award of Att'ys' Fees, Reimbursement of Expenses, and Pls.' Service Awards ("Bartlett Decl."), Ex. A ("Carella Byrne Records"); George Decl., Ex. A ("Seeger Weiss Records"). This is sufficient to satisfy Class Counsel's initial evidentiary burden.

---

[6] Class Counsel's blended billing rate is $811. For completeness, the Court has reviewed and determined that this is a reasonable rate based on the "geographical area, the nature of the services provided, and the experience of the attorneys." Rite Aid, 396 F.3d at 305; see also, e.g., Cohen v. Subaru of Am., Inc., No. 20-8442, ECF Nos. 244, 260 (D.N.J.) (approving request for attorneys' fees award in four-and-a-half year automotive class action litigation involving six firms, including Carella Byrne and Seeger Weiss, with blended billing rate of $765).

Defendants now assert seven categorical objections to the time Class Counsel expended on this litigation that, according to Defendants, reveals the unreasonableness of Class Counsel's lodestar. Class Counsel opposes each objection. The Court evaluates each in turn.

### a. Objections Related to Time Expended to Cure Errors.

Defendants first argue that Class Counsel's lodestar should be reduced by $51,965 for fees accumulated across ten billing entries related to a motion seeking leave to amend the then-operative TAC. From Defendants' perspective, it would be unreasonable to require them to compensate Class Counsel's efforts to address their own errors related to a motion Defendants did not oppose. Class Counsel counters that Defendants misrepresent the nature of the motion to amend and the at-issue billing entries. The Court agrees with Class Counsel.

First, Defendants obfuscate the nature of the at-issue motion. The TAC contained inconsistencies related to the descriptions of the named Plaintiffs' vehicles, and Defendants argued that certain of these Plaintiffs' claims should be dismissed on this basis. See ECF No. 94.1, Mem. of Law. in Supp. of Def. JLRNA's Mot. for Partial Dismissal of Pls.' TAC, at *16–17 & n.9. The Court had previously dismissed certain claims because of similar inconsistent descriptions in the SAC. See id. at *16. To blunt a likely meritorious argument, Plaintiffs therefore sought leave to amend and address what Class Counsel characterized as scrivener's errors. See ECF No. 104.1 at 4–5. In other words, the work was not precipitated by Class Counsel's independent desire to amend the complaint and address an unnecessary issue they created—it arose from Defendants explicit attempt to dismiss certain allegations based on this exact issue. The motion to amend was a necessary filing to ensure certain claims would not be dismissed.

Second, Defendants overstate the nature of the billing entries related to this issue. Seven of the ten challenged entries involve block billing. See Bartlett Decl. ¶¶ 3–8; Geroge Decl. II ¶ 5. This is a common practice among attorneys in this Circuit in which time spent across various

activities is holistically reported. Avaya Inc. v. Telecom Labs., Inc., No. 06-2490, 2016 WL 10590071, at *21 (D.N.J. Sept. 15, 2016). Hours attributed to block billing entries are "upheld as reasonable if the listed activities reasonably correspond to the number of hours billed." Id.

Here, none of the flagged entries raise any alarm bells. The seven entries with block billing generally all include references to work on the opposition brief to Defendants' motion to dismiss the TAC, and thus reasonably correspond with a more labor-intensive task. The three entries that refer solely to work on the motion to amend are also entirely reasonable. Two are de minimis. See Carella Byrne Records at 22 (entry for 0.20 hours); Seeger Weiss Records at 44 (entry for 1.00 hours). And the third refers to work completed on the separate memorandum of law Class Counsel was required to prepare to support its motion to amend the complaint. See Carella Byrne Records at 22 (entry for 3.90 hours); Civ. L.R. 7.1; 15.1. The Court finds the hours spent across these various entries to be entirely reasonable based on the tasks reported in each entry's narrative. For this independent reason, the Court rejects Defendants' request to reduce the lodestar for time spent on the motion to amend the TAC.

**b. Objections Related to Pleadings and Motion Practice.**

Defendants next argue that Class Counsel's lodestar should be reduced by $669,010.60— or forty percent of the total time each firm billed for pleadings and motion practice—for fees accumulated for what Defendants call Class Counsel's unsuccessful and excessive work opposing two of their motions to dismiss. Class Counsel counters that Defendants misrepresent the nature of these motions and fail to specifically explain how the time spent opposing these motions was excessive. The Court generally agrees with Class Counsel.

The court "should not reduce fees simply because some of a prevailing party's claims are unsuccessful." McKenna v. City of Philadelphia, 582 F.3d 447, 457 (3d Cir. 2009). This is particularly true where plaintiffs "claims involve a common core of facts or are based on related

legal theories" because "counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis."  Id.

This proposition applies fully here.  Plaintiffs' claims in this litigation were based on the same "common core of facts" across all complaints—that Plaintiffs' vehicles suffered turbocharger or engine damage based on a defective turbocharger design that Defendants' knew about but failed to disclose.  Id.  Although the FAC was dismissed in its entirety, it was dismissed with leave to amend and allow Class Counsel to supplement the complaint with the additional factual allegations necessary to withstand a Rule 12(b)(6) motion.  See ECF No. 36.  Class Counsel responded by filing amended complaints that did exactly that, and in each successive iteration, more substantive allegations were found to be sufficient to support a number of asserted claims.  See ECF Nos. 80, 128, 130.  Success in opposing these later motions permitted the initiation of discovery and ultimately jumpstarted settlement negotiations.  The product of those negotiations was an agreement that provides retroactive monetary relief and prospective warranty protections to remedy Plaintiffs' shared harm.  In other words, it is irrelevant that some claims that were asserted were ultimately dismissed because all claims shared a "common core of facts" and were based on the same legal theory of harm.  McKenna, 582 F.3d at 457.  The survival of certain claims— including those based on Defendants' alleged knowledge of the turbocharger defect—allowed Class Counsel to ultimately negotiate a settlement addressing the shared harm experienced by all Plaintiffs.  That represents successful, not unsuccessful, work on the part of Class Counsel.

Moreover, Defendants again obfuscate the nature of the motion practice at issue.  This was a complex, nationwide consumer class action.  Defendants claim that the hours Class Counsel spent opposing two of JLRNA's motions to dismiss were excessive.  But Defendants ignore that the first of those opposition briefs was the first opposition Class Counsel prepared to a motion to

dismiss in this case, and that Class Counsel was responding to a thirty-nine-page brief that raised twelve different legal arguments favoring dismissal of different claims. See ECF No. 25.1. They also ignore that the second of those opposition briefs responded to a motion of similar scope and had to additionally contend with the shortcomings identified in the Court's prior motion to dismiss decision. See ECF No. 49.1.

Most notably, Defendants not only ignore context; they also "fail to specify the number of hours that would be reasonable and why those hours would be reasonable" for work on either of these opposition briefs. Rode, 892 F.2d at 1187. Instead, they simply claim Class Counsel should have spent forty percent less time on this work. Such an assertion "appears . . . out of thin air" and unsupported by "competent evidence," such as evidence of the amount of time Defendants' counsel spent on their own motion to dismiss work. Bayer Cropscience AG v. Dow Agroscis. LLC, No. 12-256, 2015 WL 5772219, at *6 (D. Del. June 18, 2015). Defendants have thus failed to satisfy their burden to show that the time spent on these motions was unreasonable.[7] The Court, upon review of the relevant time entries and its understanding of the extensive motion to dismiss

---

[7] Defendants specifically argue that the excessive time spent on motion to dismiss motion practice was compounded by what they call Class Counsel's unnecessary inclusion of the UK Defendants in this case. This argument is unpersuasive. The Court denied the UK Defendants motion to dismiss for lack of personal jurisdiction because it determined that, as alleged, the UK Defendants may possess relevant information to support Plaintiffs' claims based on their relationship with JLRNA. See generally ECF No. 130. Moreover, the hours expended litigating issues related to the UK Defendants were driven up because of the Defendants' own actions. The UK Defendants opted to file separate motions to dismiss, despite recycling similar Rule 12(b)(6) arguments that were made by JLRNA. See ECF Nos. 49, 70 (motions to dismiss SAC); ECF Nos. 94, 95 (motions to dismiss TAC). That prompted Class Counsel to prepare separate opposition briefs. See ECF Nos. 55, 76 (oppositions to motions to dismiss SAC); ECF Nos. 103, 105 (oppositions to motions to dismiss TAC). The Defendants also filed a motion to reconsider (or alternatively receive certification for an interlocutory appeal) of the Court's denial of the UK Defendants' motion to dismiss. See ECF No. 134. That, again, prompted separate opposition briefing. See ECF No. 141. The UK Defendants also refused to accept or waive service, despite doing so in other litigation. See infra at 23; ECF No. 187.1, Reply Decl. of James E. Cecchi in Further Supp. of Mot. for Award of Att'ys' Fees, Reimbursement of Expenses, and Pls.' Service Awards ("Cecchi Decl. II"), at ¶¶ 16–18. And Defendants refused Class Counsel's offer to voluntarily dismiss the UK Defendants from the case if they agreed to provide certain documents in the UK Defendants' possession during discovery. See Cecchi Decl. II ¶¶ 13–15.

proceedings in this case, concludes that the hours Class Counsel spent preparing oppositions to Defendants' motions to dismiss were reasonable.[8]

### c. Objections Related to Discovery.

Defendants next argue that Class Counsel's lodestar should be reduced by $250,451.50—or seventy-five percent of the total time each firm billed for discovery—for fees accumulated for certain discovery activities. Specifically, given the stage of the case at the time of settlement, Defendants contend that the time Class Counsel spent negotiating an ESI protocol and preparing for depositions was unnecessary, and that the time spent conducting "document discovery" was excessive. Class Counsel counters that the time spent negotiating an ESI protocol and conducting document discovery was reasonable and conducted at an appropriate time, and that the entries related to depositions were miscoded. The Court again agrees with Class Counsel.

The time spent by Class Counsel preparing and negotiating an ESI protocol was reasonable for two reasons. First, pursuant to Federal Rule of Civil Procedure 26, "ESI obligations" arise "at the outset of the case." News Am. Mktg. In-Store Servs., LLC v. Floorgraphics, Inc., No. 09-6070, 2012 WL 1986493, at *2 (D.N.J. May 30, 2012); see also Fed. R. Civ. P. 26(f)(3)(C) (explaining that parties must confer "as soon as practicable" to, inter alia, develop a discovery plan that will account for the "disclosure, discovery, or preservation of electronically stored information"). Class Counsel cannot be faulted for taking steps early in this case to comply with their legal obligations under Rule 26. Second, Defendants own actions undermine their argument. If Defendants believed negotiation of an ESI protocol was premature,

---

[8] Defendants identify two entries totaling five and half hours that resulted in fees of $5,362.50 that was billed for work on Plaintiffs' opposition brief to Defendants' motion to dismiss the SAC that were dated the day after the opposition brief was filed with the Court. Class Counsel has failed to address this discrepancy. The Court finds it appropriate to deduct these fees from Class Counsel's lodestar.

Defendants could have entirely ignored Class Counsel's initial outreach.  Instead, Defendants ultimately responded with their own revised ESI protocol on two separate occasions.  See Cecchi Decl. II ¶¶ 5–10.  That engagement justifies Class Counsel's continued efforts to revise and negotiate an ESI Protocol early in the case.  Moreover, it strains credulity to believe that Defendants' own attorneys declined to bill this work.  That only further buttresses the reasonability of Class Counsel doing the same.

The Court also concludes that the time spent by Class Counsel conducting document discovery was reasonable.  Defendants' argument, simply put, is that because there were not "significant document production[s]" completed in this case, the approximately 260 hours billed to "document discovery" must be excessive.  But that position myopically presumes that the majority of time billed for "document discovery" must only relate to reviewing documents produced by an opposing party.  Reviewing the narratives associated with Class Counsel's time entries reveals that significant time billed as "document discovery" related to various additional discovery tasks, including:  (1) Class Counsel's development of Plaintiffs' written discovery requests (i.e., requests for production, requests for admission, and interrogatories); (2) Class Counsel's development of responses to Defendants' written discovery requests; (3) Class Counsel's efforts to collect and review documents from named Plaintiffs to complete productions pursuant to Defendants' written discovery requests and for mediation; and (4) legal research related to a motion to compel jurisdictional discovery.  See generally Seeger Weiss Records.  It also includes preparing for and attending twenty-two meet-and-confers with the Defendants and nine status conferences before Magistrate Judge Clark to discuss outstanding discovery issues.  See FAH Tr. at 24:6–9.  The Court, based on its own review and experience with this case, finds that the total time spent on these myriad discovery activities over the course of eight months was

18

entirely reasonable.  See Gelis, No. 17-7386, Op. at *16–17 (concluding in automotive class action that 280 hours billed for discovery activities unrelated to review of Defendants' document productions, including "production by Plaintiffs, meet and confers, communication between Class Counsel and their clients, and correspondence and conferences with the Court," was reasonable).

Once again, Defendants also "fail to specify the number of hours that would be reasonable and why those hours would be reasonable" for any of these various discovery activities.  Rode, 892 F.2d at 1187.  Instead, they seek an across the board reduction of seventy-five percent for time billed for "document discovery" that is pulled "out of thin air" and unsupported by "competent evidence," such as evidence of the amount of time Defendants' counsel spent on discovery related activities.  See Bayer, 2015 WL 5772219, at *6 .  This fails to satisfy their burden of justifying why the time spent on these activities was unreasonable.  See Rode, 892 F.2d at 1187.

Finally, the Court has reviewed each of the narratives for time entries coded "deposition discovery" and agrees with Class Counsel that these entries were miscoded and instead related to relevant litigation activities during this case, including drafting amended complaints, revising draft requests for production, and conducting research related to a motion to compel jurisdictional discovery.  See George Decl. ¶ 6(a).  The Court also finds the minimal hours billed for each of these activities was reasonable.[9]

### d.  Objections Related to Intake.

Defendants argue that Class Counsel's lodestar should also be reduced by $135,353—or seventy-five percent of the total time each firm billed for intake—for fees accumulated for intake activities.   They specifically argue that Class Counsel's intake entries lack the specificity to

---

[9] The Parties agree that three entries totaling eight hours that resulted in fees of $8,150 were mistakenly billed for deposition discovery is this case that actually involved work conducted for another case.  See George Decl. at 4 n.1.  The Court deducts these fees from Class Counsel's lodestar.

determine whether the hours billed for intake are unreasonable.  They also contend that Class Counsel cannot justify the amount of hours spent on intake by referencing the number of named Plaintiffs in this action because, even by that measuring stick, the time dedicated per Plaintiff remains excessive.  Class Counsel responds that it is unnecessary to provide the finite detail Defendants demand for these entries.  They also emphasize that intake work involves interviewing any potential class members and assessing candidates to serve as named plaintiffs, not only interviewing named plaintiffs.  Moreover, the billed intake work in this case also accounts for time used to obtain failed turbochargers from class members to develop their theory of the case with consulting experts.  See George Decl. ¶ 7.  Based on the justifications provided by Class Counsel, the Court concludes that the time spent for intake was reasonable.

Intake plays a vital role in complex class action litigation.  See, e.g., In re Home Depot Inc., 931 F.3d 1065, 1088 (11th Cir. 2019) ("Selecting proper class representatives is an important part of what class counsel does.").  It represents the time spent by Class Counsel strategically vetting and identifying class representatives that can support viable claims and contribute to eventual litigation success.  See Strauch v. Comp. Sci. Corp., No. 14-956, 2020 WL 4289955, at *10 n.9 (D. Conn. July 27, 2020) (citations omitted).  Often, "a sound (and not uncommon) strategy" during intake is to seek out representatives from different states to "ensure that if the proposed national class was not certified, there [are] state-specific classes as an alternative." Home Depot, 931 F.3d at 1088.  But that "is also a time-consuming process." Id.

Here, Defendants initial challenge to Class Counsel's hours billed to intake lacks legal merit.  To meet their evidentiary burden, Class Counsel were only required to identify the number of hours spent by each attorney on "general" litigation tasks. Gelis, 49 F.4th at 380 & n.5.  They were not, as Defendants demand, required to provide "the exact number of minutes spent nor the

precise activity to which each hour was devoted." Id. at 380.  Identifying time worked generally for "intake" is sufficient to meet the standard set by the Third Circuit.

Defendants also object to Class Counsel's time spent on intake as unreasonable. Specifically, they contend that spending 610 hours on intake in a class action involving at most twenty-one named Plaintiffs is unnecessarily excessive because the average time spent confirming basic information about each Plaintiffs' vehicle ownership and turbocharger issues far exceeds what would be necessary to prepare them for a deposition.  On the surface, this position has appeal. But it collapses under scrutiny.

For starters, Defendants fail to recognize that time spent on intake was not limited to time spent recruiting the named Plaintiffs in this action; it involved time spent interviewing prospective named plaintiffs, obtaining and testing their defective turbochargers, and working with consulting experts to develop the theory regarding the at-issue defect.  See Cecchi Decl. I ¶ 4; George Decl. ¶ 7.  Moreover, in a class with more than 127,000 members, Class Counsel's intake efforts likely involved interviewing hundreds of prospective plaintiffs.  See Cecchi Decl. I ¶ 26. Class Counsel's time entries strongly support this deduction.  There are nearly 650 time entries described as "intake."  See generally Seeger Weiss Records.  That means, on average, each intake entry involved 0.90 hours, or just shy of a single hour, of work (610 total hours divided by approximately 650 intake entries).  More than ninety percent of these entries proceeded the filing of the SAC, or the first iteration of the complaint that partially survived a motion to dismiss.  See generally id. And there are also no intake entries following the filing of the TAC.  See generally id.  In other

words, the duration and timing of the vast majority of Class Counsel's intake entries support the conclusion that many represent interviews with prospective named plaintiffs.[10]

In short, given the facts relevant to this class action lawsuit and the nature of Class Counsel's various intake time entries, the Court concludes that the hours spent by Class Counsel for intake were reasonable.

### e.  Objection Related to Senior Attorney Billing.

Defendants contend that Class Counsel's lodestar should also be reduced by $119,154.11 to account for the fact that Class Counsel staffed too many attorneys on the case compared to another similar class action lawsuit involving JLRNA, Schmidt v. Jaguar Automotive PLC, et al., No. 18-8528 (D.N.J), and because Class Counsel had senior attorneys conducting junior tasks, specifically legal research.  Class Counsel counters that Schmidt is inapposite from this case, and that Defendants rely on dated caselaw that fails to appreciate the importance of legal research and the structure of Class Counsel's law firms.  Again, the Court agrees with Class Counsel.

Initially, Defendants complaints about Class Counsel's "platoon" of timekeepers lacks merit.  Although it is true that Carella Byrne had fourteen different employees work on this case, nine of them billed de minimis hours.  See Cecchi Decl. I, Ex. A-1 (reporting that nine timekeepers collectively billed less than three percent of all hours spent on the case).  And although it is true that Seeger Weiss had twenty-one different employees bill time in this case, only six of these timekeepers were attorneys.  See Cecchi Decl. I, Ex. B-1.

---

[10] Notably, of the twenty-one named Plaintiffs identified in the FOAC, fifteen of them are from different states.  See FAC ¶¶ 25–162.  The FOAC (as well as the SAC and TAC) also raised specific claims on behalf of specific named Plaintiffs and state sub-classes.  See generally id.  This further suggests Class Counsel engaged in the "time-consuming" but "sound (and not uncommon) strategy" of interviewing and soliciting named plaintiffs from different states to support alternative state-wide classes in the event nationwide class certification was denied.  Home Depot, 931 F.3d at 1088.

Separately, Schmidt is hardly this case. There, the plaintiffs did not have to effectuate service via the Hague Convention (which was necessary here) because the only foreign defendant in that case, JLR plc, accepted service of the summons. See No. 18-8528, ECF No. 2; Cecchi Decl. II ¶¶ 16–18. A further review of Schmidt's docket also reveals it barely involved any litigation activity. A settlement conference was scheduled within eighteen months of the case being filed. See No. 18-8528, ECF Nos. 49, 51, 52. Prior to then, Schmidt involved no discovery, the filing of only two complaints (a second amended complaint was filed contemporaneously with the motion for preliminary approval of the settlement), myriad requests for an extension to answer the first amended complaint, and only one motion to dismiss, which was briefed (without a reply) but ultimately withdrawn. See id. at ECF Nos. 1, 12, 23, 28, 30, 31, 32, 36–39, 65, 66. It is thus unsurprising that Schmidt involved a lower lodestar. See id. at ECF No. 72.1 at 35–36 (identifying lodestar of $682,796.50). Class counsel there did far less work.

By contrast, the proceedings here were protracted. This case involved three fully briefed motions to dismiss (and one partially briefed motion to dismiss) and a motion to reconsider (or obtain an interlocutory appeal) of the Court's third decision on those motions; counsel investigated, drafted, and filed five complaints; and the Parties engaged in discovery.[11] See Cecchi Decl. I ¶¶ 5–22. Because of the significant disparities in the level of litigation activity between these cases, Schmidt is not a useful barometer. Accord Foe v. Cuomo, 892 F.2d 196, 198 (2d Cir.

---

[11] The Court notes the following differences to put a finer point on the distinction between Schmidt and this case: (1) Named plaintiffs at final approval, Flynn-Murphy 16, Schmidt 3; (2) Foreign defendants, Flynn-Murphy 2, Schmidt 1 (JLR plc did not contest service or challenge the exercise of personal jurisdiction); (3) Complaints filed, Flynn-Murphy 5, Schmidt 3; (4) Motions to dismiss under Rule 12(b)(6), Flynn-Murphy 4, Schmidt 1 (ultimately withdrawn); (5) Motions to dismiss under Rule 12(b)(2), Flynn-Murphy 2, Schmidt 0; (6) Motions for reconsideration, Flynn-Murphy 1, Schmidt 0; (7) Judicial decisions related to motions to dismiss, Flynn-Murphy 4, Schmidt 0; (8) Consent Orders extending or staying defendants' time to respond to pleadings, Flynn-Murphy 5, Schmidt 9; (9) Discovery-related events, Flynn-Murphy more than 30, Schmidt 0; and (10) Number of hours billed, Flynn-Murphy 3,651.95, Schmidt 922.70.

1989) (explaining that "[w]hile comparisons between similar actions may be helpful in addressing whether a settlement is fair, it is important to recognize distinctions between such actions" and, in any event, because "the ultimate question is whether <u>this</u> settlement was reasonable under the circumstances, a district judge is not required to make such a comparison") (emphasis in original).

Defendants' second objection—their complaints about "top-heavy" billing practices within Class Counsel's firms—also lacks merit.  Courts typically reduce fee awards when "[r]outine tasks" that are "easily delegable to non-professionals or less experienced associates" are instead "performed by senior partners in large firms."  <u>Ursic v. Bethlehem Mines</u>, 719 F.2d 670, 677 (3d Cir. 1983).  "However, where the suit presents 'multiple, complex legal questions,' is 'an issue of first impression,' or implicates issues of significant magnitude, the use of multiple attorneys, including partner-level attorneys[,] may be appropriate."  <u>Jefferson v. City of Camden</u>, No. 01-4218, 2006 WL 1843178, at *9 (D.N.J. 2006) (quoting <u>Planned Parenthood of Cent. N.J. v. Att'y Gen. of N.J.</u>, 297 F.3d 253, 272 (3d Cir. 2002)).

Defendants only specify one particular task that they believe should have been delegated to more junior attorneys—legal research.  But this "criticism [i]s misguided" and "undervalue[s] legal research and writing, which are often decisive, especially when dealing with complex and unusual issues."  <u>Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.</u>, No. 96-1718, 2002 WL 1801647, at *6 (S.D. Ind. July 5, 2002); <u>see also</u> <u>Simring v. Rutgers</u>, 634 F. App'x 853, 861 (3d Cir. 2015) ("Legal research is an essential part of a lawyer's job and should not always be deemed 'associate level' work.").  Legal research and writing were particularly decisive here, where the bulk of the research conducted by Class Counsel was related to efforts to oppose motions to dismiss that would have terminated the case.  Within those opposition briefs, Class Counsel also had to address novel and complex personal jurisdiction issues related to the UK Defendants, and had to oppose motions

24

to reconsider (or obtain an interlocutory appeal of) the Court's decision denying the motion to dismiss on that basis.  "[P]articularly in complex and unusual cases, it is not always inappropriate for a partner to do work that could have been performed by an associate."  United States ex rel. Scott v. Humana, Inc., No. 20-580, 2025 WL 2744602, at *29 (W.D. Ky. Apr. 30, 2025).  The Court finds this proposition particularly applicable here given the nature of the motion practice that occurred.

Defendants also fail to appreciate that the structure of Class Counsel's firms is far different from that of its own attorneys.  It is "well know that [smaller] law firms frequently follow a different model than large mega-firms in terms of the allocation of work between partners and associates, placing much more responsibility at higher levels."  In re Vitamin C Antitrust Litig., No. 05-453, 2013 WL 6858853, at *5 (E.D.N.Y. Dec. 30, 2013).  Compared to Defendants' counsel, both Carella Byrne and Seeger Weiss are considered small law firms with few associates.  The firms also experience personnel turnover that makes it more efficient for each firm's partners to develop institutional knowledge about cases themselves.  See George Decl. ¶ 11.  These considerations make the amount of work handled in this case by partners at each firm all the more reasonable.

In short, the Court declines Defendants' offer to instruct Class Counsel—two undisputed preeminent law firms with developed experience handling complex class action lawsuits—about how it should have staffed this case.  And it will not reduce the lodestar based on the time Class Counsel's senior attorneys spent conducting legal research in this action.

### f.  Objection Related to Work on Class Counsel's Withdrawn Interim Lead Counsel Appointment Request.

Defendants contend that Class Counsel's lodestar should also be reduced by $15,972.50 for time spent making a "premature letter request" under Federal Rule of Civil Procedure 23

("Rule 23"). Class Counsel counters that the request to appoint interim lead counsel was permitted by Rule 23, and that Defendants ignore important context related to this request. The Court again agrees with Class Counsel.

Rule 23 permits a court to appoint interim lead counsel. See Fed. R. Civ. P. 23(g)(3). It is not uncommon for counsel to file a Rule 23(g) request to address "the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action." See id., Advisory Comm. Note (2003). Courts in this district often grant these requests. See, e.g., Tijerina v. Volkswagen Group of Am., Inc., No. 21-18755, ECF No. 10 (D.N.J. Nov. 15, 2021); Sager v. Key Safety Systems, Inc., No. 21-15867, ECF No. 7 (D.N.J. Sept. 13, 2021). Because Rule 23(g) requests only seek to order the organization of plaintiffs' counsel, the motions are often considered noncontroversial and are unopposed.

Here, Defendants again obfuscate the nature of the at-issue motion. Class Counsel filed a letter requesting the interim appoint of class counsel pursuant to Rule 23(g). See ECF No. 52. They collectively spent seven hours preparing the eight-page letter request, which required legal research to present an argument in favor of the appointment. See Bartlett Decl. ¶ 13. This was entirely reasonable. Defendants then filed a four-page opposition to this request. See ECF No. 65. That precipitated Class Counsel to respond in support of the request. See ECF No. 66. They spent six hours preparing this response. See Bartlett Decl. ¶ 13. Based on the scope of Defendants' opposition, that was also entirely reasonable.[12] Given the nature of the motion, Class Counsel alternatively proposed that the Court administratively terminate the request and order the Parties

---

[12] The work on the Rule 23(g) request was primarily handled by Carella Byrne. See Seeger Weiss Records at 37–38 (including four time entries totaling 1.40 hours on work related to the appointment of interim class counsel). The Court finds the de minimis time spent by Seeger Weiss reviewing the materials Carella Byrne prepared (or limited research Seeger Weiss appears to have conducted itself) related to the Rule 23(g) request reasonable.

to meet and confer as to when the appropriate time to make this request would be.  <u>See</u> ECF No. 66.

Magistrate Judge Clark entered an order to this effect.  <u>See</u> ECF No. 67.

In other words, Class Counsel's time spent on the Rule 23(g) request was not unreasonable. It was pursuant to legal authority and in response to Defendants' own opposition to an otherwise noncontroversial motion.  As previously noted, it also strains credulity to believe that Defendants' own attorneys declined to bill their work preparing the opposition to Class Counsel's request. Fairness dictates that Class Counsel also be reasonably compensated for its efforts responding to that opposition.  The Court therefore declines to reduce the lodestar for work related to Class Counsel's withdrawn Rule 23(g) request to appoint interim lead counsel.

### g.  Objections Related to Trial, Class Certification, and Litigation Strategy Preparations.

Defendants last contend that Class Counsel's lodestar should be reduced by $79,334.50— or fifty percent of the total time each firm billed on certain trial preparation activities—for time unreasonably spent on trial preparation and class certification given that the case was only in the early stages of discovery at the time of settlement.  Defendants also seek this reduction for what they consider excessive time spent on intra-attorney communications and meetings related to litigation strategy.  Class Counsel counters that the time spent on trial preparation was miscoded, the limited time spent researching potential class certification issues was reasonable, and the time spent coordinating litigation strategy was reasonable given the nature and scope of this case.  Once again, the Court agrees with Class Counsel.

The one time entry from May 15, 2021 coded "trial preparation" was clearly miscoded. The narrative indicates that the work completed involved citation revisions to Plaintiffs' opposition brief during the first round of motion to dismiss briefing in this case.  <u>See</u> Seeger Weiss Records

at 27.  The brief was filed two days later.  See ECF No. 30.  The time spent revising the brief was clearly relevant to ongoing motion practice and reasonable.

The three time entries coded "class certification," which total just over two hours, were also reasonable.  The narrative entries indicate that the limited work done involved researching jurisprudential developments about the class certification standard.  The Court finds it entirely reasonable—in fact, it would expect—that competent counsel would want to keep abreast of what courts consider, or how parties seek to justify, class certification as they are developing their case. Such information may inform the type of evidence counsel seeks to gather to support the expert analyses often necessary to, inter alia, justify the class-wide nature of damages.  And it is of no moment that settlement occurred before this limited research could be utilized to draft and file a formal class certification motion.  See, e.g., Charlebois v. Angels Baseball LP, 993 F. Supp. 2d 1109, 1125 (C.D. Cal. 2012) (recognizing that "extensive authority supports awarding fees for time spent on unfiled motions"); Marjam Supply Co. of Fla., LLC v. Pliteq, Inc., No. 15-24363, 2021 WL 1200422, at *20 (S.D. Fla. Mar. 5, 2021) (recognizing that the "ebb and flow of complex litigation necessarily includes work on issues that ultimately may prove unsuccessful or that are left unpursued altogether").

Finally, the Court declines to find time spent communicating or holding meetings related to trial strategy unreasonable.  According to Class Counsel's records, Carella Byrne spent about seventy-five hours dedicated to litigation strategy communications or meetings.  See generally Carella Byrne Records.  Seeger Weiss spent approximately eighty hours on these same tasks.  See generally Seeger Weiss Records.   Defendants make no argument as to why each firm spending approximately two weeks' worth of time preparing, revising, or assessing litigation strategy related issues in a case that proceeded for more than four years before settlement was unreasonable.

Instead, they pull a fifty percent reduction "out of thin air," and fail to justify this requested reduction with any "competent evidence." Bayer, 2015 WL 5772219, at *6. That is insufficient to satisfy their burden. See Rode, 892 F.2d at 1187.

Class Counsel, by contrast, explains that activities billed under these headings related not only to intra- or inter-firm communications, but also to communications and meetings with consulting experts necessary to understand and develop their theory of defective turbochargers undergirding this case. See ECF No. 204, Pls.' Supp. Mem. of Law in Further Supp. of Mot. for an Award of Att'ys' Fees, at *28. Even if the Court had concerns about the time spent on these tasks, "it will not, without more, exclude hours from the lodestar calculation simply because they reflect attorney-to-attorney communications within the office." Fried v. Nat'l Action Fin. Servs., Inc., No. 10-2870, 2011 WL 6934845, at *8 (D.N.J. Dec. 29, 2011); see also Gelis, No. 17-7386, Op. at *20 (holding that the "prevalence" of attorney communications "throughout the billing records, without more, is insufficient to render the bills excessive"). But based on Class Counsel's representations and its review of Class Counsel's time entries, the Court finds the time spent on these tasks entirely reasonable given the multi-year duration and the national scope of this class action lawsuit.

**2. Class Counsel's Entitlement to Fees Incurred Litigating the Fee Award Application.**

In response to Defendants' lodestar objections, and in the event the Court determined it would apply the lodestar method, Class Counsel has separately moved the Court to permit it to file a supplemental fee petition that includes time spent defending the requested Fee Award and time that will be expended resolving disputes related to claim distribution. The Court will not permit Class Counsel to file a supplemental fee petition, but will include hours identified in the records submitted by Class Counsel to support the current Fee Award in the overall lodestar.

"A party entitled to an award of attorneys' fees is also entitled to reimbursement for the time spent litigating its fee application." Planned Parenthood v. AG, 297 F.3d 253, 268 (3d Cir. 2002). However, as with any requested attorneys' fees award evaluated under the lodestar method, counsel must meet their initial evidentiary burden to support the request with "fairly definite information" about the number of hours worked by each attorney, the attorney's rate, the "general" tasks performed by those attorneys, and the dates those tasks were performed. Gelis, 49 F.4th at 380 & n.5. A request for fees associated with litigating a fee application also must be balanced against the reality that "at some point, things must come to an end." Gelis, No. 17-7386, Op. at *7 (denying request for attorneys' fees award to include hours billed related to dispute over fee application or work related to settlement administration); accord Rode, 892 F.2d at 1190 (recognizing district court has discretion "to disallow any fees for time spent litigating the case after the last benefit is won from the defendant").

Here, the records provided by Carella Byrne include time entries specifying work completed on Class Counsel's fee application, the attorney that completed the work, the date the work was completed, and the number of hours spent completing the work through July 31, 2025. The records provided by Seeger Weiss contain entries with the same type of information through March 31, 2025. This is sufficient to satisfy Class Counsel's evidentiary burden. See Gelis, 49 F.4th at 380 & n.5. Neither firm has provided the Court with any records to verify time billed to the fee application after either of these two dates. Although the Court is mindful that Class Counsel has expended significant time defending the requested Fee Award, it is also mindful that it has received seven briefs over the course of seven months addressing this issue. It also held oral argument on issues related to this dispute. See FAH Tr. "[A]t some point, things must come to an end." Gelis, No. 17-7386, Op. at *7. Given the extensive attention the Court has already

provided to this fee application, the Court determines, in its sound discretion, that this is the appropriate time to resolve the Parties' dispute over the requested Fee Award.

The Court will exercise its discretion to include the time spent on the fee application by Carella Byrne through July 31, 2025 and by Seeger Weiss through March 31, 2025 in the lodestar calculation. The Court finds that this is particularly appropriate because, as previously noted, it strains credulity to believe that Defendants' own attorneys are not billing the time spent opposing the requested Fee Award. Fairness dictates Class Counsel also be compensated for this time. Based on its review of Class Counsel's records, the Court has discerned fifty-one narrative entries in Carella Byrne's records referring to work on the fee application totaling 147.50 hours, and it has discerned two narrative entries in Seeger Weiss' records referring to work on the fee application totaling one hour. See Carella Byrne Records at 25-27; Seeger Weiss Records at 54–55. It will multiply this collective 148.50 hours by the blended billing rate of $811 per hour and, in turn, increase Class Counsel's lodestar by $120,433.50 to account for the time spent preparing and defending the fee application.

### 3. Objections to the Reasonableness of Using a Multiplier to Enhance the Fee Award.

Based on the foregoing discussion, the Court has determined it is appropriate to reduce the lodestar calculation by $13,512.50 to account for unaddressed discrepancies or recognized errors in Class Counsel's records. See supra n.8 & n.9. The Court has also determined that it is appropriate to increase the lodestar calculation by $120,433.50 to account for time Class Counsel has spent preparing and defending its fee application. See supra at 29–31. Class Counsel's original lodestar calculation was $2,962,178.25. See Cecchi Decl. I, Exs. A-1 & B-1. With these additions and reductions accounted for, the new lodestar calculation is $3,069,099.25.

After a court determines a reasonable lodestar calculation, it proceeds to determine whether the requested award invokes a multiplier and, if so, whether the use of a multiplier is justified. The multiplier serves to balance competing interests. On the one hand, it "attempts to account for the contingent nature or risk involved in a particular case and" reward the "quality of the attorneys' work." Rite Aid, 396 F.3d at 305–06. On the other hand, it provides a way to assess whether the requested attorneys' fees award is too large. Id. at 306. A multiplier may be appropriate in a class action lawsuit if certain circumstances are present, including where the case: (1) was handled on a contingency basis; (2) involved quality representation; (3) obtained a beneficial outcome for the class; or (4) involved complex or novel issues. See Sullivan v. DB Invs., Inc., 667 F.3d 273, 330 n.61 (3d Cir. 2011). If the court determines that using a multiplier is warranted, it must "explain how the application of [the] multiplier is justified by the facts of [the] particular case." Prudential, 148 F.3d at 333.

Here, Class Counsel's requested attorneys' fees award is $6,600,000. This means Class Counsel is requesting a multiplier of 2.15. Defendants argue that the use of this multiplier is improper for multiple reasons, including: (1) that there is no statutory or contractual basis for the requested Fee Award; (2) that the case involved limited discovery; (3) that no significant multiplier was award in what Defendants view as the similar Schmidt case; and (4) that the class benefits here are less significant than Class Counsel represents. Class Counsel opposes each of these objections and argues that a multiplier is appropriate under the applicable standard. The Court concludes that Class Counsel's request to employ a multiplier to their lodestar calculation is warranted, and that the resultant multiplier, based on the revised lodestar calculation, is reasonable.

Each of the potential justifications Sullivan outlines supports the use of a multiplier here. First, Class Counsel took this case on a contingency basis. "This has required them to incur case-

32

related expenses and, more significantly, devote valuable attorney time to this matter—and as a result, away from other matters—notwithstanding the risk that no recovery would be obtained." Gelis, No. 17-7386, at *26.  This strongly favors using a multiplier.  See, e.g., Schwartz, 2016 WL 3457160, at *13 (finding that use of a multiplier was appropriate where "counsel has been litigating these matters for no less than five years on a wholly contingent basis, operating under the risk that they might never be compensated for their representation or reimbursed for their expenses").

Moreover, neither side disputes that this lawsuit involved quality representation from two well-experienced class action litigation firms.  See supra at 3 n.5.  That quality representation was displayed through Class Counsel's ability:  (1) to ensure the case survived multiple rounds of motion to dismiss briefing; (2) to navigate and ultimately prevail in their efforts to justify the exercise of personal jurisdiction over the UK Defendants; and (3) to negotiate a comprehensive settlement agreement that provides a class of more than 127,000 members with significant retrospective and prospective relief "without the need for, and attendant risk of, class certification briefing." Gelis, No. 17-7386, Op. at *26; see also Cecchi Decl. I ¶ 26.  Reaching that point also required Class Counsel to "navigate technical issues relating to numerous models of [JLRNA] vehicles" to understand and develop a theory regarding the defect present in the turbochargers. Gelis, No. 17-7386, Op. at *26.  And their efforts will continue beyond the resolution of this fee application as they "ensure the class members obtain the benefits of the settlement" and assist in the resolution of any forthcoming claims disputes.  Id.  These circumstances all support the use of a multiplier.

Based on these circumstances, the Court further finds that the resulting multiplier of 2.15 is reasonable.  This multiplier falls within the range of multipliers used by courts within this Circuit.  See Saint v. BMW of N. Am., LLC, No. 12-6105, 2015 WL 2448846, at *16 (D.N.J. May

21, 2015) (recognizing district courts within the Third Circuit "routinely find in complex class action cases that a lodestar multiplier between one and four is fair and reasonable"); accord In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 742 (3d Cir. 2001) (approving use of a 2.99 multiplier in a case that "was neither legally nor factually complex," that only lasted four months, and where "discovery was virtually nonexistent"). More specifically, it also falls within the range of multipliers that have been used in complex class action lawsuits obtaining claims-based settlement agreements. See, e.g., McLennan, 2012 WL 686020, at *10 (applying 2.93 multiplier); Gelis, No. 17-7386, Op. at *27–28 (applying 1.75 multiplier).

Defendants' arguments opposing the use of a multiplier are unavailing. They first argue that Plaintiffs have failed to identify a legal basis for their requested multiplier, particularly because the Settlement Agreement does not obligate them to pay any fees. The Court disagrees. First, the text of the settlement agreement states that Defendants "shall make payment of the incentive awards and attorneys' fees and expenses . . . to the extent approved by the Court in an order." Settlement Agmt. § 13.2. This plain language (specifically, the "shall" command and the "to the extent" caveat) indicates that the Parties intended that Defendants would pay some amount of incentive awards, attorneys' fees, and expenses and that the amount, not the question of payment generally, was subject to Defendants' opposition and the Court's approval. See, e.g., Schor v. FMS Fin. Corp., 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002) (explaining that where a contract's language is "clear and unambiguous," the court must "enforce those terms as written"); Settlement Agmt. § 17.4 (Settlement Agreement will be construed under New Jersey law). To the extent this language is determined to be ambiguous, extrinsic evidence further supports this conclusion. See Schor, 814 A.2d at 1112 (explaining where a contract's language is ambiguous, parties may "introduce proof of extrinsic circumstances bearing on the alleged proper

34

interpretation of the language used").  The Parties' settlement negotiations regarding attorneys' fees stalled because they could not agree on the <u>amount</u> Defendants would pay.  <u>See</u> Cecchi Decl. I ¶ 23.  The issue was not whether Defendants would pay at all.  <u>See id.</u>  And, on a final note, if Defendants were confident that the Settlement Agreement did not obligate the payment of attorneys' fees at all, they would not have waited until the eleventh of hour briefing on this issue to present that argument for the first time.[13]

Defendants' alternative positions fare no better.  As previously explained, this case and <u>Schmidt</u> are different in notable respects.  <u>See</u> <u>supra</u> at 23–24 & n.11.  The Court also finds that the benefits the settlement provides class counsel are significant.  <u>See</u> <u>supra</u> at 2, 15; <u>infra</u> at 39–40, 45 n.16.  And although true that this case had not proceeded deep into merits discovery at the time of settlement, it was the subject of vigorous motion practice for more than three years.  Much of this litigation activity was <u>driven by the Defendants</u>.  Defendants opted to oppose Plaintiffs' request to appoint interim counsel under Rule 23(g), necessitating a response from Plaintiffs.  <u>See</u> ECF Nos. 65, 66.  Defendants opted to file separate but overlapping motions to dismiss in the second and third round of motion to dismiss briefing, <u>see</u> ECF Nos. 49, 70 (motions to dismiss SAC); ECF Nos. 94, 95 (motions to dismiss TAC), necessitating two separate opposition responses from Plaintiffs, <u>see</u> ECF Nos. 55, 76 (oppositions to motions to dismiss SAC); ECF Nos. 103, 105 (oppositions to motions to dismiss TAC).  And Defendants opted to file a motion for reconsideration (or for interlocutory appeal) of the Court's decision denying the motion to dismiss the UK Defendants for lack of personal jurisdiction, <u>see</u> ECF Nos. 134, again necessitating a

---

[13] For this reason, Defendants "focus on the statutes under which named plaintiffs sued," and whether those statutes authorize attorneys' fees, "is misplaced," because the Court's award of attorneys' fees is "pursuant to a contract—the settlement agreement—not pursuant to a statute." <u>Gelis</u>, 49 F.4th at 381.  The Court therefore disregards Defendants reliance on inapposite caselaw regarding the application of multipliers in cases involving fee-shifting statutes.

response in opposition from Plaintiffs, see ECF Nos. 141. The Court does not reiterate this procedural history to criticize or comment on Defendants' litigation strategy. It does so to simply highlight that Defendants cannot reasonably argue that the lack of discovery in this case serves as an indication of the level of litigation activity that occurred prior to the settlement, much of which was driven by their own actions.

In sum, the Court determines that the use of a multiplier of 2.15 is reasonable and warranted in this case. It will apply this multiplier and, subject to the following cross-check analysis, grant the requested Fee Award of $6.6 million.

### C. Cross-Checking the Fee Award Under the Percentage-of-Recovery Method

The Court proceeds to cross-check the reasonability of the Fee Award under the percentage-of-recovery method.

Under this method, courts typically consider a variety of factors, including: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases." Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000) (the "Gunter factors"). Courts also may consider: "(1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any 'innovative' terms of settlement." AT&T, 455 F.3d at 165–66 (citing Prudential, 148 F.3d at 333) (the "Prudential factors").

36

The Gunter and Prudential factors "need not be applied in a formulaic way." Id. at 166. This is particularly the case where the percentage-of-recovery method is employed as the cross-check because a cross-check analysis is intended to be abbreviated. See id. at 169 n.6 (explaining that when used as a cross-check, the court need not engage in "a full-blown lodestar inquiry"); Rite Aid, 396 F.3d at 305 (explaining that an "abridged" cross-check analysis is sufficient). Indeed, "in certain cases, one factor may outweigh the rest." AT&T, 455 F.3d at 166. This appears to be true here considering the Parties' dispute—supported by competing expert analyses—focuses exclusively on the first Gunter factor, the "size of the fund." 223 F.3d at 195 n.1.

As explained below, the Court finds that the "size of the fund," as understood in light of the Parties' competing interpretations, does not undermine the reasonability of the requested attorneys' fees award. Other Gunter and Prudential factors also support the award's reasonability. The percentage-of-recovery cross-check therefore further supports the reasonability of the Fee Award.

### 1.    The Size of the Fund.

The Parties' dispute related to the size of the settlement fund has two components—one legal and one factual. Legally, the Parties dispute how the Court should measure the value of the fund for purposes of the cross-check. Class Counsel argues that the Court should assess the settlement's value based on the entire amount it makes available to the class, whereas Defendants argue that the settlement's value should be based on the anticipated number of claims that will be filed. Factually, the Parties separately dispute how much the settlement makes available to the class. Measuring only certain components of the settlement, Class Counsel's expert, Dr. Richard Eichmann, estimates that the value "made available" ranges from $14.2 million to $22.7 million. Defendants' expert, Dr. Nathan Soderberg, retorts that the value is more reasonably estimated between $6 million and $6.8 million.

For the reasons explained below, here, it is more appropriate to consider this settlement's value in terms of the amount it makes available to the entire class.  Considering certain of the critiques raised by Dr. Soderberg, a more accurate estimate of the value made available through the components of the settlement that have been evaluated by the competing expert analyses is $11.1 million.  However, when the entire settlement fund made available by the Defendants is considered, the requested amount of attorneys' fees vis-à-vis the total settlement fund is nonetheless reasonable.

> **a.  It is Appropriate to Consider the Total Amount Made Available to the Class to Assess the Reasonableness of the Fee Award.**

When assessing a claims-made settlement under the percentage-of-recovery method, the court must assign an overall value to the settlement to compare against the requested attorneys' fees award.  Generally, courts have assigned these types of settlements a value based on the overall benefit the settlement provides to the class.   See, e.g., Lake Forest Partners, L.P. v. Sprint Commc'ns Co., No. 12-999, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013) (citing Boeing Co. v. Van Gemert, 444 U.S. 472 (1980), for the proposition that in claims-made settlements it is appropriate to assess the percentage of fees requested against "the gross cash benefits available for class members to claim"); see also In re Baby Prods. Antitrust Litig., 708 F.3d 163, 177 (3d Cir. 2013) (explaining that Boeing "confirmed the permissibility of using the entire fund as the appropriate benchmark, at least where each class member needed only to prove his or her membership in the injured class to receive a distribution").

At the same time, however, the Third Circuit has instructed courts to ensure that their assessment of a claims-made settlement's value is "as much as possible, practical and not abstract." In re Wawa, Inc. Data Security Litig., 85 F.4th 712, 722 (3d Cir. 2023) (Wawa I) (quotation marks omitted).  Courts should therefore also "consider the level of direct benefit provided to the class."

Id. (quotation marks omitted).  Depending on the circumstances, this may mean placing more weight on the actual claims rate.  Id.  Such circumstances include settlements that require class members to "do more than raise their hands to get their payment" or involve non-monetary components.  Id.  But where non-monetary components have estimable values, considerations of the total funds "made available" to the class may remain warranted.  See In re Wawa, Inc. Data Security Litig., 141 F.4th 456, 474–75 (3d Cir. 2025) (Wawa II).

Here, it is more appropriate to consider the total value the settlement makes available to the class.  Initially, it is noteworthy that both estimates offered by the Parties' competing experts offer estimates of the amount certain components of the settlement make available to the class.  These estimates are also "practical and not abstract."  Wawa I, 85 F.4th at 722.  They are based on an estimate of the total number of vehicles that were likely damaged and that fall within the settlement's eligibility criteria (which requires excluding vehicle repairs already covered in full by Defendants' warranties), and they account for the different monetary percentage caps that the settlement imposes on reimbursements depending on vehicle age and mileage.  See Eichmann Rep. ¶¶ 26–27.

Moreover, the settlement's most significant components offer cash directly to class members to reimburse out-of-pocket expenses they incurred to repair damaged turbochargers or engines.  See Wawa I, 85 F.4th at 723 (explaining that courts should be more suspect of class action settlements primarily offering class members non-cash relief).  These provisions only require class members that fall within the settlement's eligibility criteria to "raise their hands to get their payment."  Id. at 722.  Additionally, certain of the settlement's non-monetary components—specifically, its extension of the turbocharger and engine repair warranties—have estimable monetary values based on the costs class members will save for potential turbocharger

or engine damage repairs in the future.  <u>Wawa II</u>, 141 F.4th at 474–75; <u>see</u> Eichmann Rep. at 34 (estimating value of turbocharger warranty).  Those extended warranties, although only likely to be invoked by a percentage of the class, also "meaningfully benefit class members" by providing intangible peace of mind that costs will be covered in the event of future damage that may not materialize.  <u>Wawa II</u>, 141 F.4th at 475 (explaining it was appropriate for district court to consider total amount "made available" to the class where the settlement provided, <u>inter alia</u>, an intangible benefit to class members through injunctive relief intended to protect class members' data from potential future breaches).

Finally, measuring the value of the settlement based on the total made available to the class recognizes that, "whether or not they exercise it," the class members are the beneficiary of these settlement funds because of "the efforts of the class representatives and their counsel."  <u>Boeing</u>, 444 U.S. at 478.  It would be inequitable to ignore that Class Counsel's efforts extracted concessions from the Defendants totaling a certain sum and instead only measure Class Counsel's efforts against the reality that not enough of the class members opted to raise their hands and claim the funds to which they are entitled.  Instead, it is more equitable to assess the success of Class Counsel's work on the maximum value that Defendants willingly agreed to potentially pay.

In sum, the Court concludes that it is more appropriate to assess whether the Fee Award is reasonable by analyzing the total amount the settlement makes available to the class.

### b.  Based on the Size of the Fund, the Fee Award is Reasonable.

To determine the size of the overall the settlement fund, the Court considers the estimated value of the settlement's different components.  Because all payments will be made by the Defendants, it is also "appropriate to base the percentage [of the attorneys' fees award] on . . . the additional benefits conferred on the class by the Settling Defendants' separate payment of attorney[s'] fees and expenses," as well as the class representative service awards.  <u>Lake Forest</u>,

2013 WL 3048919, at *2 (citing <u>Boeing</u>, 444 U.S. at 479); <u>see also</u> <u>Dewey</u>, 558 F. App'x at 197 ("[W]here the reality is that the fund and the fee[s] are paid from the same source . . . the arrangement is, for practical purposes, a constructive common fund"); <u>Jackson v. Wells Fargo Bank, N.A.</u>, 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) (assessing attorneys' fees award that was part of a constructive common fund under percentage-of-recovery method and including attorneys' fees, expenses, and costs of administration in the overall value of the fund).

The Court begins with the settlement's different components. Class Counsel's expert, Dr. Eichmann, utilized Defendants' warranty data to estimate the value of the reimbursements to class members for out-of-pocket costs incurred for turbocharger repairs and the extended turbocharger warranty. <u>See</u> Eichmann Rep. ¶ 43. Because of a lack of data, he did not estimate the value of the reimbursements to class members for out-of-pocket costs incurred for engine repairs or the extended engine warranty. <u>See</u> <u>id.</u> ¶¶ 41. He estimates the value of the reimbursements for out-of-pocket costs incurred for turbocharger repairs as $11.04 million, and the value of the turbocharger warranty as $0.3 million. <u>See</u> <u>id.</u> ¶ 43. His estimate accounts for the different eligibility criteria imposed by the settlement, as well as for repairs conducted within certain applicable warranties that meant costs were fully covered by Defendants, and concludes that approximately 3,514 vehicles will be eligible for reimbursements for out-of-pocket costs incurred for turbocharger repairs under the settlement. <u>See</u> <u>id.</u> ¶¶ 26–27 & n.35. He then estimates that retail mark-ups class members faced could have ranged from 25 percent to 100 percent, and therefore estimates the total value of the reimbursements for out-of-pocket costs incurred for turbocharger repairs to be between $13.8 million and $22.1 million. <u>See</u> <u>id.</u> ¶ 40. Accounting for the turbocharger warranty (and the same range of retail mark-ups), Dr. Eichmann estimates the total value of these two components to be between $14.2 million and $22.7 million. <u>See</u> <u>id.</u> ¶ 44.

Defendants' expert, Dr. Soderberg, does not contest Dr. Eichmann's $0.3 million estimate of the value of the turbocharger warranty.  See generally Soderberg Rep.  But he levies several critiques at Dr. Eichmann's estimate of the value of the reimbursements for out-of-pocket costs incurred for turbocharger repairs.  Specifically, he emphasizes that Dr. Eichmann concedes that his estimate would be an overestimate to the extent it fails to account for other warranties, outside of those considered by Dr. Eichmann, that indicate Defendants already fully covered the cost of repairs for turbocharger damage.  See id. at 19–20.  He then explains that there are approximately 2,353 vehicles in the warranty data that indicate Defendants covered some portion (he argues, likely all) of the cost of repairs outside the warranties considered by Dr. Eichmann that should have also been deducted from the value of the reimbursements for out-of-pocket costs incurred for turbocharger repairs, making a more appropriate estimate for this settlement component $5 million.  See id. at 24; ECF No. 195.2, Decl. of Michael L. Kidney in Supp. of Defs.' Sur-Reply in Opp. to Pls.' Mot. for Att'ys' Fees, Reimbursement of Expenses, and Pls.' Service Awards, Ex. A, Rebuttal Rep. of Nathan Soderberg ("Soderberg Rebuttal Rep.") at 10.  He specifically states that twenty-seven percent of these entries contain coding that indicates the applied warranties covered the cost in full.  See Soderberg Rebuttal Rpt. at 10.  Separately, although Dr. Soderberg recognizes the potential for retail mark-ups, he criticizes the lack of reliable data upon which Dr. Eichmann based his estimated range and Dr. Eichmann's failure to consider the monetary cap of $3,750 imposed by the Settlement Agreement on reimbursements for out-of-pocket costs incurred for turbocharger repairs.  See Soderberg Rep. at 29–30.  When this cap is considered, retail mark-ups could increase the value of this component of the settlement to a range of $6 million to $6.8 million.  See id.

There is <u>some</u> merit to each of Dr. Soderberg's critiques, but for the purposes of estimating the settlement's value, the deduction he seeks is overstated.  The Court begins with the total number of vehicles eligible for out-of-pocket reimbursements for turbocharger damages.  Dr. Soderberg's interpretation of the warranty data suggests that the Defendants <u>may have</u> covered all costs of repair for the 2,353 vehicles he identifies.  But he can only concretely determine, based on coding used in the warranty data, that twenty-seven percent of these vehicles were in fact repaired under warranties covering the full costs of repair.  This means the remaining vehicles <u>may be</u> eligible for reimbursement.  For purposes of ascertaining the value the settlement makes available to the class, the Court will only reduce the total number of eligible vehicles that the data clearly indicates are ineligible for relief because they were fully covered under a warranty identified by Dr. Soderberg and not considered by Dr. Eichmann (and not based on a series of inferences that <u>may</u>, but <u>may not</u>, indicate full coverage was provided).[14]  Therefore, the Court reduces the total number of eligible vehicles identified by Dr. Eichmann by 635 (twenty-seven percent of 2,353).  This means 2,879 vehicles may be eligible for relief.

According to Dr. Soderberg, the adjusted value paid by Defendants that should be deducted from Dr. Eichmann's estimate of this component to account for the 2,353 vehicles he identified was $6.01 million, or $2,554.19 per vehicle.  <u>See</u> Soderberg Rebuttal Rep. at 17.  That means the adjusted value paid by Defendants for the 635 vehicles that were covered in full by other warranties

---

[14] To the extent Dr. Soderberg's inferences are correct and certain other repairs reflected in the warranty data were in fact fully covered, Defendants can avoid having to fulfill those claims during claims administration by providing clear evidence that they already covered those repairs in full.  But for purposes of the instant Motion, the Court will not reduce the potential value "made available" by the settlement based on a series of inferences that do not clearly indicate vehicle ineligibility.

was $1.62 million.[15]   That reduces the overall value of this component from $11.04 million to $9.42 million.

The Court now turns to the retail mark-up.  Dr. Soderberg presents a valid critique about Dr. Eichmann's range of estimated retail mark-ups—it fails to account for the monetary cap of $3,750 imposed by the Settlement Agreement for this component.  See Soderberg Rep. at 29–30. He also reasonably argues that the total value by which these retail mark-ups could increase the settlement should be based on the number of vehicles determined to be eligible for relief.  See id. Assuming the 2,879 vehicles eligible for relief were repaired at retail mark-up prices that meet or exceed the $3,750 cap, the total reimbursement cost—and the total value made available to the class—is $10.80 million.  Combined with the turbocharger warranty, this results in an estimated value for these two components of $11.1 million.

Because Defendants will be paying all elements associated with this settlement, the "economic reality" of this settlement presents a constructive common fund.  Gen. Motors, 55 F.3d at 821.  Therefore, the total value of the fund to measure the requested Fee Award against must account for the settlement's estimated value, as well as the payments for attorneys' fees, expenses, and representative awards.  Lake Forest, 2013 WL 3048919, at *2.  Here, the requested attorneys' fees award is $6.6 million; the requested expenses total $0.17 million; and the total value of the requested class representative service awards is $0.04 million (see infra at 50–51).  Combining this with the estimated settlement value of $11.1 million results in a total fund of $17.91 million. This means the requested attorney's fees award represents 36.85 percent of the total fund value,

---

[15] The Court lacks the information necessary to assess how many of these 635 vehicles fall within each of the settlement's different reimbursement eligibility categories.  But Dr. Soderberg's overall estimate accounts for these different categories.  See Soderberg Rebuttal Rep. at 14.  For purposes of an abbreviated percentage-of-recovery cross-check, the Court deems it appropriate to estimate the reduction in value based on the average cost Defendants incurred repairing each of the 2,353 vehicles Dr. Soderberg identifies.

which is within the range regularly approved by courts in this Circuit.  See Gen. Motors, 55 F.3d at 822 (explaining that courts in this Circuit approve attorneys' fees awards in a range representing nineteen to forty-five percent of a settlement fund's value); Demmick v. Cellco P'ship, No. 06-2163, 2015 WL 13646311, at *3 (D.N.J. May 1, 2015) ("Many district courts in this Circuit have chosen to award attorneys' fees at the 33.33% level—which is the approximate median of the range recognized as acceptable by the Third Circuit.").[16]

Thus, the Court concludes that the requested Fee Award is reasonable based on the size of the fund made available in this litigation.

### 2.    Other Gunter and Prudential Factors Support the Reasonableness of Fee Award.

The Court finds that other Gunter and Prudential factors further support the reasonableness of the requested Fee Award.

---

[16] Defendants contend that it is unreasonable to justify Class Counsel's requested fee award on the basis that they seek this award.  But their argument is meritless for two reasons.  First, it ignores that when conducting a percentage-of-recovery analysis, courts in this Circuit generally consider attorneys' fees as part of the overall settlement fund if presented with the dynamics of a constructive common fund.  See Dewey, 558 F. App'x at 197; Jackson, 136 F. Supp. 3d at 713; Lake Forest, 2013 WL 3048919, at *2.  Defendants cite no countervailing caselaw and they do not argue that the "economic reality" of here does not present a constructive common fund.  Gen. Motors, 55 F.3d at 821.

Second, Defendants ignore that the estimated value of this settlement is conservative.  Excluding the requested Fee Award, the overall fund's value in this case is $11.31 million.  The attorneys' fees award would therefore represent fifty-eight percent of the fund's value, which is larger than the range of awards approved in this Circuit.  However, this estimate does not account for either the reimbursements for out-of-pocket costs incurred for engine repairs component or the engine warranty component of the settlement.  Although Defendants contend that the data suggests engine damage occurs less frequently than turbocharger damage, see Soderberg Rep. at 30–32, the monetary caps agreed upon in the Settlement Agreement reflect the Parties' understanding that engine damage is far more costly to class members, see Settlement Agmt. § 3.2 (imposing monetary cap of $3,750 for reimbursements for costs incurred for turbocharger repairs compared to $12,000 for reimbursements for costs incurred for engine repairs, suggesting engine damage can be at least three times more expensive than turbocharger damage).  The current estimate also does not account for the intangible benefit provided to all class members through the peace of mind provided by the extended warranty coverage.  See supra at 40.  Although there are no monetary values assigned to these different components and benefits, the Court believes that when accounted for, they are likely to increase the settlement fund's total value significantly enough (when still excluding the requested Fee Award) to make the Fee Award reasonable from a percentage basis.

Under <u>Gunter</u>, courts also consider "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." 223 F.3d at 195 n.1. In a class totaling 127,386 persons, Class Counsel only received three minor objections related to the finalized scope of the settlement; no objections were submitted related to the request for attorneys' fees. <u>See</u> FAH Tr. 6:11-19; Cecchi Decl. I ¶ 26. The "dearth of objections strongly supports approval of the requested fee." <u>Granillo</u>, 2019 WL 4052432, at *9 (quotation marks omitted); <u>see also</u> <u>id.</u> (holding objection rate of 0.02% of the total class members supported finding that the requested attorneys' fees award was reasonable). This factor therefore supports approving the requested Fee Award.

Courts also consider "the skill and efficiency of the attorneys involved." <u>Gunter</u>, 223 F.3d at 195 n.1. This is measured "by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience, and expertise of [] counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." <u>Hall v. AT&T Mobility LLC</u>, No. 07-5325, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010). As previously noted, it is undisputed that Class Counsel are high-quality attorneys with substantial experience litigating complex class action lawsuits like this case. <u>See</u> <u>supra</u> at 3 n.5. The quality of their representation was displayed through their ability to navigate consistent opposition to various motions prepared by quality litigators representing the Defendants. <u>See</u> <u>supra</u> at 4–6, 15–16; <u>see also</u> <u>Granillo</u>, 2019 WL 4052432, at *10 (holding Class Counsel's ability to achieve the settlement "in the face of formidable legal opposition further evidences the quality of their work, which weights in favor of approval of the attorneys' fee award"). And they ultimately obtained a settlement agreement providing retrospective and prospective relief to the class. <u>See</u> <u>supra</u> at 2, 15, 39–40, 45 n.16; <u>see also</u> <u>In re AremisSoft Corp. Sec. Litig.</u>, 210 F.R.D.

46

109, 132 (D.N.J. 2002) (explaining that "the single clearest factor reflecting the quality of class counsel's services to the class are the results obtained").  This too weighs in favor of approving the Fee Award.

Courts additionally consider "the complexity and duration of the litigation."  <u>Gunter</u>, 223 F.3d at 195 n.1.  This is intended to capture "the probable costs, in both time and money, of continued litigation."  <u>Gen. Motors</u>, 55 F.3d at 812.  This complex class action litigation has lasted five years.  It involved "extensive work by Class Counsel (including motion practice, discovery, and multiple mediation sessions) to result in a successful conclusion."  <u>Granillo</u>, 2019 WL 4052432, at *10.  That work was challenged at nearly every turn—requiring opposition to repeated motions to dismiss, and then a subsequent motion for reconsideration, as well as nearly two dozen meet-and-confers to negotiate and resolve issues related to discovery.  <u>See</u> <u>supra</u> at 4–6.  It involved complex questions of personal jurisdiction.  <u>See</u> <u>supra</u> at 5–6, 16 n.7.  And, based on its procedural history—and the fervor with which all motions, including the instant Motion, have been litigated by the Parties—it likely would have entailed significant engagement from the Parties over the course of the next several years in further discovery (both fact and expert), subsequent dispositive motion practice, and trial if Class Counsel was unable to negotiate the current settlement with Defendants.  This factor therefore also weighs in favor of approving the Fee Award as reasonable.

Courts also consider whether counsel took the case at a "risk of nonpayment" and the amount of time counsel "devoted to the case."  <u>Gunter</u>, 223 F.3d at 195 n.1.  As previously recognized, Class Counsel undertook this case at the risk of non-payment and advanced all costs and expenses for the litigation.  <u>See</u> <u>supra</u> at 32–33.  Class Counsel also devoted significant time to this case—more than 3,600 hours across their two firms—at that risk of nonpayment.  <u>See</u> Cecchi Decl. ¶ 31.  Both of these considerations further weigh in favor of approving the requested

47

Fee Award.  See Granillo, 2019 WL 4052432, at *10–11 (finding both factors weighed in favor of approving attorneys' fees award where counsel billed more than 2,000 hours on litigation at risk of non-payment).

Courts further consider "awards in similar cases."  Gunter, 223 F.3d at 195 n.1.  Under this factor, courts:  "(1) compare the actual award requested to other awards in comparable settlements; and (2) ensure that the award is consistent with what an attorney would have received if the fee were negotiated on the open market."  Saint, 2015 WL 2448846, at *18.  To determine comparability, the court assesses the nature and scope of the litigation and the results of the settlement.  Attorneys on the open market regularly contract for attorneys' fees on a contingency basis ranging from thirty percent to forty percent of the overall recovery.  See In re Remeron Direct Purchaser Antitrust Litig., No. 03-85, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005).

Here, the Court finds that the requested Fee Award falls within a range of comparable settlements in other automotive class action cases.  See, e.g., Cohen, No. 20-8442, ECF Nos. 244, 260 (approving attorneys' fees award of $15.5 million in case involving four years of litigation resulting in settlement providing reimbursement and warranty relief estimated at $380 million in class involving approximately 1.4 million vehicles); In re Volkswagen Timing Chain Prod. Liab. Litig., No. 16-2765, 2018 WL 11413299 (D.N.J. Dec. 14, 2018) (approving attorneys' fees award of $8.5 million); id., ECF No. 106.1 (explaining case involved two years of litigation and settlement only provided warranty relief of inestimable value).[17]  It also finds the requested attorneys' fees—totaling 36.85 percent of the overall recovery (as conservatively estimated)

---

[17] As previously noted, Schmidt is incomparable to this litigation.  See supra at 23–24 & n.11.  The Court also notes that Cohen is particularly comparable.  Based on the estimated value of the settlement and the number of vehicles in the at-issue class, the value the settlement provided per vehicle was approximately $271 ($380 million divided by 1.4 million vehicles).  Similarly, the estimated value the settlement here provides per vehicle is approximately $267 ($11.1 million divided by 41,543 vehicles).  And, notably, the settlement's value here only accounts for half of the different components providing benefits to the class.

extracted from the Defendants—is consistent with a contingency fee rate that would be negotiated on the market.  See Demmick, 2015 WL 13646311, at *3.  This factor also weighs in favor of the reasonableness of the requested Fee Award.

Finally, courts may also consider certain additional factors, such as whether the result is attributable to the efforts of any government agencies or investigations.  Prudential, 148 F.3d at 338.  Here, Class Counsel did not benefit from any investigations resourced by government agencies into the defective turbochargers.  Instead, as noted, Class Counsel devoted significant time investigating the turbocharger defect with consulting experts, identifying potential named Plaintiffs, and developing a case intended to root out the evidence necessary to support their claimed bases for liability.  See supra at 19–22.  This factor, too, thus supports approving the requested Fee Award.

In sum, the factors considered under a percentage-of-recovery cross-check analysis support the reasonableness of Class Counsel's requested Fee Award.  The Court therefore grants Class Counsel's motion for the requested $6.6 million Fee Award.

### D.     Requested Expenses and Class Representative Service Awards

In addition to the requested Fee Award, Class Counsel also seek $171,502.81 for reimbursement of their expenses and $45,000 for class representative service awards ($2,500 per Settlement Class Representative).  Defendants raise no objection to either request.  The Court concludes both requests are reasonable and will grant each, as modified below.

### 1.     Requested Expenses.

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." Careccio v. BMW of N. Am. LLC, No. 08-2619, 2010 WL 1752347, at *8 (D.N.J. Apr. 29, 2010).

49

Here, Class Counsel advanced $171,502.81 in expenses "without assurance that they would ever be repaid." Granillo, 2019 WL 4052432, at *11.

The Court is satisfied that Class Counsel has provided adequate documentation of their expenses that shows their expenses were reasonably incurred in the prosecution of this case. See Cecchi Decl. I, Exs. A-2 & B-2.[18]  The Court therefore grants Class Counsel's motion for $171,502.81 for expenses advanced throughout this litigation.

### 2.    Class Representative Service Awards.

Awards for class representatives "are not uncommon in class action litigation." Sullivan v. DB Investments, Inc., 667 F.3d 273, 333 n.65 (3d Cir. 2011).  They are intended "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." Id. (quotation marks omitted).

Here, Class Counsel seeks class representative service awards of $2,500 for each of the Settlement Class Representatives (each of whom was also a named Plaintiff in this action).  At the time Class Counsel filed the instant Motion, there were eighteen Class Representatives.  However, as recognized by the Final Approval Order, two of these Class Representatives were determined to fall outside of the Settlement Agreement's defined class. See Final Approval Order at 1 n.1.

Each of the remaining Class Representatives contributed time to assist in the drafting of the various complaints, participated in discovery, made their vehicles available for inspection, and otherwise consulted with Class Counsel to help with decisions throughout the litigation, including

---

[18] Class Counsel has provided sufficient records of expenses through May 29, 2025.  Although Seeger Weiss certified that they have expended $3,915 in expenses as of August 6, 2025, they failed to provide adequate documentation to support this request. See Cecchi Decl. II, Ex. A.  Therefore, the Court has not included these expenses in the total expenses awarded.

related to settlement negotiations.  <u>See</u> Cecchi Decl. I ¶ 35.  The Court concludes it is reasonable for each of the Class Representatives that remain class members to be compensated $2,500 for their efforts.  <u>See, e.g.</u>, <u>Granillo</u>, 2019 WL 4052432, at *12 (awarding class representative awards of $5,000 to named plaintiffs); <u>In re Ins. Brokerage Antitrust Litig.</u>, 282 F.R.D. 92, 125 (D.N.J. 2012) (awarding class representative awards of $5,000 to each of forty-one named plaintiffs). Accordingly, the Court grants Class Counsel's motion for class representative service awards totaling $40,000 ($2,500 for each of the sixteen Settlement Class Representatives).

## IV.    CONCLUSION

For the foregoing reasons, Class Counsel's Motion, ECF No. 176, is **GRANTED** as modified.  Defendants are **ORDERED**, in accordance with the Parties' Settlement Agreement, to pay Class Counsel $6.6 million in attorneys' fees, $171,502.81 for reimbursement of expenses, and $40,000 for class representative service awards.

An appropriate Order will follow the entry of this Opinion.

Date: 12.31.2025                     *s/ Madeline Cox Arleo*
                                     **MADELINE COX ARLEO**
                                     **UNITED STATES DISTRICT JUDGE**